**LATHROP & GAGE L.C.**
**William R. Hansen (WH-9446)**
**Gianfranco G. Mitrione (GM-8168)**
**Bernadette McGlynn Reilly (BM-4117)**
230 Park Avenue, Suite 1847
New York, New York 10169
(212) 850-6220 (tel)
(212) 850-6221 (fax)

**Attorneys for Defendant**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
| | |
|---|---|
| CHAMILIA, LLC, | Civil Action No.: |
| | 04 CV 06017 (KMK) |
| Plaintiff, | |
| -against- | ECF CASE |
| PANDORA JEWELRY, LLC, | |
| Defendant. | |

------------------------------------------------------------X

## NOTICE OF MOTION

PLEASE TAKE NOTICE that, upon the accompanying declarations of Gianfranco G. Mitrione (executed on January 14, 2005), Michael Lund Petersen (executed on January 12, 2005), Jody Henderson (executed on January 12, 2005), Steve Glueck (executed on January 12, 2005) and Knud Hostrup (executed on January 13, 2005) and the exhibits annexed thereto, the attached Statement of Material Facts submitted pursuant to Rule 56.1 of the local rules, and the memorandum of law submitted therewith, the undersigned will move this Court, before the Honorable Kenneth M. Karas, United States District Court Judge, at the United States Courthouse, 500 Pearl Street, Courtroom 21D, New York, New York, on January 28, 2005, or as

1

soon thereafter as counsel can be heard, for an Order pursuant to Rule 56 of the Federal Rules of Civil Procedure, granting defendants summary judgment against all of the claims averred by plaintiff, Chamilia, LLC, in its complaint dated August 2, 2004, and for such other and further relief as the Court may deem just and proper.

PLEASE TAKE FURTHER NOTICE that, by Order of the Court dated December 20, 2004, answering papers, if any, shall be served on the undersigned by no later than January 21, 2005, and any reply papers shall be served by no later than January 28, 2005. Oral argument will be on a date and at a time designated by the Court.

Dated: New York, New York
       January 14, 2005

                                        Respectfully submitted,


                                        s/William R. Hansen
                                        William R. Hansen (WH-9446)
                                        Gianfranco G. Mitrione (GM-8168)
                                        Bernadette McGlynn Reilly (BM-4117)
                                        LATHROP & GAGE L.C.
                                        230 Park Avenue, Suite 1847
                                        New York, New York 10169
                                        Tel:   (212) 850-6220
                                        Fax:   (212) 850-6221


                                        Attorneys for Defendant
                                        Pandora Jewelry, LLC

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
CHAMILIA, LLC,                             :     Civil Action No.:
                                           :     04 CV 06017 (KMK)
              Plaintiff,         :
                                           :
    -against-                              :     ECF CASE
                                           :
PANDORA JEWELRY, LLC,                      :
                                           :
                                           :
              Defendant.         :
---------------------------------------------------------------X

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pandora Jewelry, LLC ("Pandora" or "defendant") submits the following Statement of Undisputed Material Facts for which there are no genuine issues pursuant to Rule 56.1 of the Rules of the United States District Court for the Southern District of New York.

1. Pandora is engaged in the business of creating, manufacturing, marketing, distributing and selling custom designed bracelets and necklaces featuring silver and 14-karat gold jewelry beads. See Declaration of Michael Lund Petersen dated January 12, 2005, ¶¶ 5 and 12 ("Petersen Decl. ¶ __").

2. With regard to specialty bracelets, necklaces and beads, Pandora is a recognized leader in the jewelry industry, particularly for elegant jewelry that is inspired by a distinctive Scandinavian style and design. See Petersen Decl. ¶ 5.

NYDOCS 7796v1

3.        Pandora's jewelry designs were created in 2000, and are protected by the Danish Copyright laws. Pandora obtained U.S. Copyright Certificate Registrations VA-1-208-549, VA-1-210-216, VA-1-210-240 and VA-1-218-723, for its jewelry designs that first became effective on September 4, 2003. See Petersen Decl. ¶ 6.

4.        In October, 2002, Pandora entered the United States market and began distributing Pandora's copyrighted catalogs and other sales information including samples of the Pandora jewelry designs to retailers and potential customers. See Petersen Decl. ¶ 7.

5.        In April, 2003, Pandora began selling the copyrighted Pandora jewelry designs crafted in silver and 14 karat gold into the United States. See Petersen Decl. ¶ 7.

6.        Building upon the original character of copyrighted Pandora jewelry designs, Per. A. Enevoldsen, a principal of Pandora, invented a unique method of stringing jewelry beads, spacer, and clips which, in turn, form individually distinctive bracelets and necklaces. See Petersen Decl. ¶ 8.

7.        On July 21, 2003, Pandora filed a patent application with the U.S. Patent and Trademark Office to protect Mr. Enevoldsen's invention. The patent application currently pending is entitled "NECKLACES AND BRACELETS WITH KEEPERS" and was assigned Application No. 10/623,641. See Petersen Decl. ¶ 8.

NYDOCS 7796v1

8. Pandora began using the legend "patent pending" on all of its promotional and advertising materials used in connection with the distribution and sale of the Pandora jewelry once it filed the patent application. See Petersen Decl. ¶ 9.

9. When Pandora's patent application was published by the U.S. Patent and Trademark Office on July 29, 2004, as Publication No. US 2004/0144131-A1, Pandora provided notice to Chamilia, and to other manufacturers and retailers of the application's publication. See Petersen Decl. ¶ 11.

10. In June 2003, Dov Schwartz, a principal of Chamilia, became a customer of Pandora. See Petersen Decl. ¶ 14.

11. During the summer of 2003, Chamilia arranged to have the Pandora jewelry designs reverse engineered in Asia by taking a casting from existing jewelry items and creating a mold. See Petersen Decl. ¶ 14.

12. In mid-August 2003, Mr. Petersen learned that Chamilia had copied Pandora's collection of jewelry designs and were offering them for sale to Pandora's customers. To confirm that Chamilia had in fact copied Pandora's copyrighted jewelry designs, Mr. Petersen attended the San Francisco International Gift Fair in San Francisco, California on August 26, and 27, 2003. See Petersen Decl. ¶ 14.

3

13. On August 26, 2003, Mr. Petersen visited Chamilia's booth and discovered that Chamilia was displaying jewelry products which, in fact, were illegal copies of Pandora's jewelry designs. See Petersen Decl. ¶ 15.

14. On August 27, Mr. Petersen visited the Chamilia booth again, and encountered Lisa Whirlow. Mr. Petersen was aware that she was a Chamilia sales representative for the southern California area. See Petersen Decl. ¶ 15.

15. After examining Chamilia's line of jewelry, Mr. Petersen realized that Chamilia's jewelry was unquestionably inferior in quality and that it copied the system used by Pandora to string jewelry beads, spacers and clips to necklaces and bracelets. See Petersen Decl. ¶ 17.

16. Chamilia's inferior, copy-cat jewelry products are known to Mr. Petersen, the jewelry industry and to the public as "knockoffs." See Petersen Decl. ¶ 17.

17. Merriam-Webster's Collegiate Dictionary, Tenth Edition, defines the term "knockoff" as "a copy that sells for less than the original; a copy or imitation of someone or something popular." The verb "knock off" is defined as "to make a knock off of: copy, imitate; [e.g.] knocks off popular dress designs." See Declaration of Gianfranco G. Mitrione dated January 14, 2005, ¶ 5 ("Mitrione Decl. ¶ __").

18. During Mr. Petersen's encounter with Ms. Whirlow, he informed her that the jewelry imported, marketed and sold by Chamilia were copies of Pandora's copyrighted designs. See Petersen Decl. ¶ 16.

4

NYDOCS 7796v1

19. Mr. Petersen also informed Ms. Whirlow that Pandora's jewelry designs were protected by the Berne Convention and that Pandora owned a copyright in the United States for all of its jewelry designs. See Petersen Decl. ¶ 16.

20. Mr. Petersen told Ms. Whirlow that Pandora owned a "worldwide copyright" for its jewelry designs. See Petersen Decl. ¶ 16.

21. Ms. Whirlow told Mr. Petersen that there were a number of companies in the jewelry industry that had copied or planned to copy Pandora's jewelry designs. See Petersen Decl. ¶ 16.

22. Mr. Petersen notified Ms. Whirlow that Pandora had a patent application pending for the method by which the jewelry beads, clips and spacers are fastened to the bracelets and necklaces. See Petersen Decl. ¶ 18.

23. Ms. Whirlow asked Mr. Petersen for the patent application number and Mr. Petersen told her he did not know it off-hand. See Petersen Decl. ¶ 18.

24. At no time did Mr. Petersen advise Ms. Whirlow that Pandora would use its patent to "shut down" Chamilia or any of Pandora's competitors. See Petersen Decl. ¶ 18.

NYDOCS 7796v1

25. On August 26, 2003, Mr. Petersen instructed, Pandora's then intellectual property counsel, William S. Ramsey, to send a letter to Chamilia demanding that it cease infringing Pandora's jewelry designs. See Petersen Decl. ¶ 19, Ex. G.

26. In Mr. Ramsey's letter, he informed Chamilia of Pandora's copyright rights in the jewelry designs and further informed Chamilia that Pandora had filed a "nonprovisional U.S. Patent Application to obtain claims directed to the functional and structural aspects of Pandora's necklaces and bracelets." See Petersen Decl. ¶ 19, Ex. G.

27. Despite being put on notice of the strength of Pandora's rights and goodwill in their original and novel jewelry designs, Chamilia continued to distribute jewelry products copying Pandora's jewelry designs in the United States. See Petersen Decl. ¶ 20.

28. On September 25, 2003, Pandora filed suit against Chamilia in the United States District court for the Southern District of New York, Civil Action No. 03 CV 7587 ("New York Action") and another suit was filed in the District Court of New Jersey ("New Jersey Action") alleging, among other things, that Chamilia had been illegally copying Pandora's jewelry bead designs thereby infringing Pandora's valid, worldwide copyrights in those designs. See Petersen Decl. ¶¶ 21 and 24.

29. In the New York Action, it was plead that Chamilia illegally copied the design of Pandora's silver and 14-karat gold jewelry beads in an effort to make Chamilia's infringing products confusingly similar to Pandora's. See Petersen Decl. ¶ 23, Ex. I.

NYDOCS 7796v1

30. In the New York Action, Pandora sought a temporary restraining order ("TRO") against Chamilia. On October 2, 2003, after holding a hearing, District Court Judge Sprizzo issued a TRO which enjoined Chamilia, and any other person acting in concert or participation with Chamilia, from, among other things, the copying, marketing or selling of copies of Pandora's copyrighted jewelry designs. See Peterson Decl. ¶ 22, Ex. H.

31. After a period of settlement discussions, during which the TRO remained in effect by the stipulation of the parties, Chamilia consented to the entry of a judgment against it. On November 24, 2003, a Final Judgment on Consent ("Final Judgment") was entered by the Southern District of New York and executed by the parties involved whereby a final judgment of copyright infringement was entered against Chamilia in favor of Pandora. See Peterson Decl. ¶ 23, Ex. I.

32. In early November, 2003, in order to restrain various retailers in New Jersey from settling the infringing Chamilia jewelry, Pandora filed an action against Jason Adams, individually, and Jason Adams conducting business as Chamilia Beaded Charms in the District Court for New Jersey alleging copyright and trademark infringement resulting from the New Jersey retailer's sale of the Chamilia jewelry. See Peterson Decl. ¶ 24.

33. On November 7, 2003, the District Court Judge in New Jersey also issued a TRO enjoining the New Jersey retailers from promoting, selling or distributing the Chamilia jewelry. See Peterson Decl. ¶ 24.

NYDOCS 7796v1

34. On January 26, 2004, the District Court in New Jersey entered a Stipulation and Order of Settlement whereby Jason Adams consented to an injunction permanently restraining Mr. Adams from copying Pandora's jewelry designs and selling the Chamilia jewelry. See Peterson Decl. ¶25, Ex. J.

35. On March 14, 2003, Ms. Henderson visited the LAD Group display booth at the Chicago Gift Show. She was wearing a Pandora bracelet with various silver and 14-karat gold jewelry beads. See Declaration of Jody Henderson dated January 12, 2005, ¶ 4 ("Henderson Decl. ¶ __").

36. While at the LAD Group booth, Ms. Riley approached Ms. Henderson and inquired about her Pandora bracelet. They spoke concerning the Pandora jewelry line before Ms. Riley asked Ms. Henderson about a lawsuit involving Pandora and Chamilia. See Henderson Decl. ¶ 5.

37. The only individuals present at the LAD Group booth during the conversation between Ms. Henderson and Ms. Riley Ms. Henderson's daughter and Robbi Potter, owner of LAD Group. See Henderson Decl. ¶ 5.

38. Ms. Henderson informed Ms. Riley that the only lawsuit she was aware of concerned the copying of Pandora's jewelry bead designs by Chamilia. See Henderson Decl. ¶ 6.

39.     On March 14, 2003, Ms. Henderson was aware of Pandora's pending patent application but she and Ms. Riley never discussed it. See Henderson Decl. ¶ 6.

40.     Ms. Henderson never indicated to Ms. Riley that Pandora was suing or intended to sue Chamilia based upon its pending patent rights. The only lawsuit that Ms. Riley and Ms. Henderson discussed involved the copyright infringement suit against Chamilia, which ended in November, 2003. See Henderson Decl. ¶ 6.

41.     When asked by a customer or potential customer of the Pandora jewelry line about any lawsuit involving the two companies, Ms. Henderson would present a copy of a Gift Beat press release to them so that they can familiarize themselves with the facts of that case. See Henderson Decl. ¶ 8, Ex. K.

42.     The Gift Beat article indicates that Pandora has a "patent-pending on its bracelet design." See Henderson Decl. ¶ 8, Ex. K.

43.     Ms. Henderson has never advised a customer or potential customer that Pandora would close down Chamilia with the Pandora patent. See Henderson Decl. ¶ 8.

44.     On or about February, 2004, Pandora was an exhibitor at the Winter International Gift Show in San Francisco, California. Mr. Glueck was the only Pandora representative who oversaw and managed the exhibition booth during the days of that Gift Show. See Declaration of Steve Glueck dated January 12, 2005, ¶ 5 ("Glueck Decl. ¶ __").

9

45. Mr. Glueck did not purposefully visit Petitioner's booth at this show, but on his way to the restroom, he encountered Ms. Whirlow at Chamilia's exhibition booth and introduced himself. Ms. Whirlow and Mr. Glueck discussed the pending copyright infringement suit that Pandora instituted against Chamilia. See Glueck Decl. ¶ 6.

46. Ms. Whirlow indicated to Mr. Glueck that she regretted that Chamilia had ever copied Pandora's jewelry beads. See Glueck Decl. ¶ 7.

47. Ms. Whirlow also stated to Mr. Glueck that she was unaware that Chamilia would copy a competitor's protected jewelry designs. See Glueck Decl. ¶ 7.

48. Mr. Glueck stated to Ms. Whirlow that Pandora did not own a patent, but that Pandora filed a patent application for its jewelry line, and if such patent application were to issue, Pandora would take the necessary steps to protect those rights. See Glueck Decl. ¶ 9.

49. Mr. Glueck never stated to Ms. Whirlow that Pandora owned a patent or that Chamilia had violated Pandora's "patent rights." See Glueck Decl. ¶ 9.

50. At the conclusion of the Gift Show in San Francisco, Mr. Glueck received a telephone call from a gentleman who introduced himself as the vice president of Chamilia. He accused Mr. Glueck of informing a Chamilia customer that Pandora would "close down" Chamilia based on its patent rights. He further advised Mr. Glueck that Pandora and Chamilia should make their jewelry products compatible since there "is enough business for all of us." Mr. Glueck informed the gentleman that Pandora was likely not interested in conducting

10

business with Chamilia. Further, Mr. Glueck advised the gentleman that his customer obviously misunderstood any statement he had made. Mr. Glueck reiterated to the caller the same statement he had made to Ms. Whirlow, and advised him that if Pandora's pending patent application issued, Pandora was prepared to take the necessary steps to protect those rights. See Glueck Decl. ¶ 10.

51.     Mr. Glueck has told several customers or potential customers which inquired about Pandora's "patent rights" that if Pandora's pending patent application issued, Pandora was prepared to take the necessary steps to protect those rights. See Glueck Decl. ¶ 10.

52.     Mr. Glueck never advised a customer or potential customer that Pandora would "close down Chamilia with the Pandora patent" or that Chamilia was having "financial problems." See Glueck Decl. ¶ 11.

53.     Knud Hostrup managed Pandora's exhibition booth at the Atlanta Tradeshow on July 9 - 13, 2004. See Declaration of Knud Hostrup dated January ___, 2005, ¶ 4 ("Hostrup Decl. ¶ __").

54.     During the days of the Atlanta Tradeshow Mr. Hostrup does not recall telling a Chamilia representative that the Chamilia line of jewelry was a "knockoff" or that Pandora was the "original." See Hostrup Decl. ¶ 5.

11

55.     Mr. Hostrup has told numerous customers and potential customers that Pandora is the "original" inventor, designer and manufacturer of the type of jewelry sold by Pandora. <u>See</u> Hostrup Decl. ¶ 6.

56.     Mr. Hostrup has told Pandora customers and potential customers that Pandora has a "patent pending" for its jewelry product and has shown individuals a copy of Pandora's jewelry products brochure which bears the legend "patent pending" clearly marked. <u>See</u> Hostrup Decl. ¶ 7.

57.     Mr. Hostrup never told a Chamilia representative at the Tradeshow that "any merchant who bought and stocked Plaintiff's product should expect to have their inventories confiscated whenever Defendant deemed appropriate." <u>See</u> Hostrup Decl. ¶ 9.

58.     Mr. Hostrup never suggested that Chamilia or any of its salespeople were in violation of "existing patent laws." <u>See</u> Hostrup Decl. ¶ 9.

59.     Mr. Hostrup has informed Pandora customers and potential customers, that if, and only if the patent in question issues, Pandora would take the necessary steps to protect its rights. <u>See</u> Hostrup Decl. ¶¶ 8 and 9.

60.     During Mr. Hostrup's encounter with the Chamilia representative at the Tradeshow he discussed the quality of Chamilia's jewelry products. He told the representative that Chamilia's jewelry products are inferior to those manufactured and sold by Pandora. He explained that Chamilia's jewelry beads, in their manufacturing, are not finished as well as

Pandora's jewelry and, as a result, they often times get stuck and become immovable when trying to thread them onto a Pandora or Chamilia bracelet or necklace. See Hostrup Decl. ¶ 10.

61. Since Pandora's remarkable sales during the 2003-2004 holiday season, there have emerged at least five (5) jewelry manufacturers which have begun selling necklaces and bracelets in the United States which appear to utilize substantially the same construction and perform the same function as Pandora's patent pending for its necklaces and bracelets. See Petersen Decl. ¶ 26.

62. Pandora's counsel has notified each one of them that Pandora's patent application had been published. The United States Patent and Trademark Office has not issued a U.S. patent for Pandora's patent application. See Petersen Decl. ¶ 26, Ex. F.

Dated: New York, New York
      January 14, 2005

        Respectfully submitted,

        LATHROP & GAGE L.C.

By:     s/William R. Hansen
      William R. Hansen (WH-9446)
      Gianfranco G. Mitrione (GM-8168)
      Bernadette McGlynn Reilly (BM-4117)
      230 Park Avenue, Suite 1847
      New York, New York 10169
      (212) 850-6220 (tel)
      (212) 850-6221 (fax)

      Attorneys for Defendant
      Pandora Jewelry, LLC

NYDOCS 7796v1

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of January, I electronically filed the declarations of Gianfranco G. Mitrione (executed on January 14, 2005), Michael Lund Petersen (executed on January 12, 2005), Jody Henderson (executed on January 12, 2005), Steve Glueck (executed on January 12, 2005) and Knud Hostrup (executed on January 13, 2005) and the exhibits annexed thereto, the Statement of Material Facts submitted pursuant to Rule 56.1 of the local rules, and a memorandum of law with the Clerk of the Court by using the CM/ECF system.

I further certify that on the 14th day of January, 2004, I mailed the foregoing documents and the notice of electronic filing by FedEx to the following:

>James G. Goggin
>VERRILL DANA, LLP
>One Portland Square
>Portland, Maine 04112

>s/Gianfranco G. Mitrione
>*An Attorney for Defendant*
>*Pandora Jewelry, LLC*

NYDOCS 7759v2