**UNPUBLISHED DECISIONS**

LEXSEE 1982 US DIST LEXIS 17044

**PATRICK McSHERRY, Plaintiff, against NATIONAL BLUE PRINT DIVISION OF NATIONAL REPROGRAPHICS INC. and CHRISTOPHER CHARLES, Defendant.**

**No. 81 Civ. 5182 (RWS)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*1982 U.S. Dist. LEXIS 17044*

**December 27, 1982**

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1]

TERENCE F. GAFFNEY, ESQ., 394 Old Country Road, Garden City, New York 11530, for Plaintiff

LESTER, SCHWAB, KATZ & DWYER, ESQS., 120 Broadway, New York, New York 10271, By: PATRICK H. LYONS, ESQ., for Defendants

**OPINIONBY:**

SWEET

**OPINION:**

OPINION

SWEET, D.J.

In this diversity action plaintiff Patrick McSherry seeks damages for alleged defamatory statements. Defendants Christopher Charles ("Charles") and National Blue Print, a Division of National Reprographics, Inc. ("National Blue Print") have asserted an affirmative defense of qualified privilege. They claim that the business lunch at which the alleged statements were made was a privileged occasion. I agree.

Qualified privilege is meant to protect statements made in furtherance of a legitimate interest. See W. Prosser, The Law of Torts § 115 (4th ed. 1971); *Restatement (Second) Torts § § 594-98* (1977). Here we are concerned with the interests of the speaker (Charles/National Blue Print) and the recipient (Montgomery). The interest of Montgomery was in protecting his business against dishonest employees. The interest of Charles was in protecting his business against unethical competition, which is a legitimate interest. See [*2] id. at 787. While it has been said that protection of a business interest alone is insufficient to support a claim of qualified privilege, see *Rupert v. Sellers, 65 A.D.2d 473, , 411 N.Y.S.2d 75, 82* (4th Dep't 1978), aff'd, *50 N.Y. 2d 881*, cert. denied, *449 U.S. 901 (1980)*, the cases reveal that the circumstances of this case merit qualified protection.

For example, in *British American & Eastern Co. v. Wirth Ltd., 592 F.2d 75 (2d Cir. 1979)*, the court sustained a claim of privilege where the alleged defamer had a long-standing business association with the recipient of the alleged defamation. *Id. at 81*.

Similarly, in *Sindorf v. Jacron Sales Co., 27 Md. App. 53, 341 A.2d 856 (1975)*, aff'd, *276 Md. 580, 350 A.2d 688 (1976)*, the close personal and business relationship between the communicator and the recipient justified a finding of privilege.

See also Rupert v. Sellers, supra, 65 A.D.2d at   ,
411 N.Y.S.2d at 83 (insurance agency administering plan
for medical society had common business interest with
society that would support privilege for alleged
defamation of competitor insurance agency); *Skenkman
v. O'Malley, 2 A.D.2d 567, 157 N.Y.S.2d 290* (1st Dep't
1956) (in [*3]  proper circumstances business interest
may support qualified privilege); *Converters Equip.
Corp. v. Condes Corp., 80 Wis.2d 257, 258 N.W.2d 712
(1977)* (suggesting that protection from use of stolen
trade secret or from infringement of patent rights will
support privilege).

It has also been suggested that protection of a
present business interest will support the privilege as
long as the statements are made defensively and not
offensively. R. Sack, Libel, Slander, and Related
Problems 302 (1980).

Applying these principles to the evidence adduced at
this trial, I conclude that the privilege applies. Gibbs &

Hill had a long-standing business relationship with
National Blue Print.  National Blue Print's interest in
protecting that relationship from erosion due to dishonest
business practices is legitimate.  The circumstances
surrounding the making of Charles' statements also
persuade me that the privilege should apply.  It was a
business lunch arranged to discuss the relationship
between the two companies.  Charles and Montgomery
had a common interest in exploring the particulars of that
relationship. Cf. Rupert v. Sellers, supra.

The privilege, of course, is lost if it is abused.  [*4]
See *Shapiro v. Health Ins. Plan of Greater N.Y., 7 N.Y.2d
56, 61, 194 N.Y.S.2d 509, 513 (1959); Restatement
(Second) Torts § §  599-605A* (1977).  Whether the
privilege was abused is a question for the jury, which
will be submitted to them with appropriate instructions.

IT IS SO ORDERED.

LEXSEE 2004 US DIST LEXIS 25913

**PROFESSIONAL SOUND SERVICES, INC., Plaintiff, - against - ROLAND J. GUZZI et al., Defendants.**

**02 Civ. 8428 (DC)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 25913*

**December 27, 2004, Decided**
**December 28, 2004, Filed**

**PRIOR HISTORY:** *Prof'l Sound Servs. v. Guzzi, 2003 U.S. Dist. LEXIS 15820 (S.D.N.Y., Sept. 10, 2003)*

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted and second amended complaint dismissed.

**LexisNexis(R) Headnotes**

**COUNSEL:** STEPHEN E. FELDMAN, P.C., Attorneys for Plaintiff, By: Robert H. Morse, Esq, New York, New York.

MEISTER SEELIG & FEIN LLP, Attorneys for Defendants, By: Christopher J. Lutzo, Esq., Howard S. Koh, Esq., New York, New York.

**JUDGES:** DENNY CHIN, United States District Judge.

**OPINIONBY:** DENNY CHIN

**OPINION: CHIN, D.J.**

In this case, plaintiff Professional Sound Services, Inc. ("PSS") alleges product disparagement and false designation of origin under § 43(a) of the Lanham Act, *15 U.S.C. § 1125(a)*, and makes various state law claims as well. Defendants move for summary judgment dismissing all claims. For the reasons that follow, the motion is granted as to the two *Lanham Act* claims, and the Court declines to exercise subject matter jurisdiction over the remaining state law claims. The second amended complaint is dismissed.

## BACKGROUND

### A. The Facts

Construed in the light most favorable to plaintiff, the non-moving party, the facts are as follows:

#### 1. The Parties

PSS is a New York corporation in the business of sales, rental, and repair of professional [*2] on-location sound recording equipment. (Second Am. Comp. P13; Topham Dep. at 11). Richard Topham is the president of PSS. (Topham Dep. at 10). Defendant Gotham Sound and Communications, Inc. ("Gotham") is a New York corporation also involved in the sales and rental of professional on-location sound recording equipment, in the same market as PSS. (Second Am. Comp. P15; Schneider Dep. at 3). Defendants Roland J. Guzzi and Peter Schneider are shareholders of Gotham. (Defs.' 56.1 Statement P8). n1 Guzzi is a former employee of PSS and is Topham's cousin. (Defs.' 56.1 Statement PP11, 12).

n1 Where Defs.' 56.1 Statement is cited, plaintiff is deemed to have agreed to or conceded the facts alleged, unless otherwise indicated.

#### 2. The Disparaging Comment

Guzzi left PSS on January 11, 2002. (Guzzi Dep. at 9-10). Sometime thereafter, Guzzi initiated contact with at least one of its customers, making the following statement: "Rich lies to his customers about the prices he

gets when he resells their equipment on [*3] consignment, for which by agreement he is only supposed to take a 20% commission. He actually resells their equipment at a much higher price than he tells these customers, and then pockets the difference." (hereinafter "disparaging statement"). (Mohan Decl. P5). PSS alleges that Guzzi made the disparaging statement to "virtually all" of its customers. (Second Am. Compl. P50). n2 PSS makes this allegation with no evidentiary support; as discussed below, the only evidence is the affidavit of one customer. Guzzi has denied ever making the statement, but for purposes of this motion, I assume he did make the statement to at least one customer.

          n2 Plaintiff's complaint also alleges Guzzi made three additional disparaging comments. (See Second Am. Compl. PP41, 48). Per this Court's Memorandum Decision dated September 10, 2003, plaintiff's Lanham Act claims based on these three comments were dismissed, as I found them to be statements of opinion, not fact. *Professional Sound Servs., Inc. v. Guzzi, 2003 U.S. Dist. LEXIS 15820, 02 Civ. 8428 (DC), 2003 WL 22097500 (S.D.N.Y. Sept. 10, 2003).*

[*4]

### 3. Plaintiff's "Mark"

PSS alleges that it uses as its trademark the capital letter "S" to identify itself as the source of its products. (Second Am. Compl. P104). PSS states that it "always" places an "S" on invoices, documents accompanying shipments, and the outsides of packages it sells. (Topham Decl. P6). PSS would "place[] it in a leading position in front of a few letters that were closely related to the manufacturer's name," followed by a catalog number. (Id. P5). As an example, PSS states that a product manufactured by Lectrosonics, with catalog number 0211, is resold by PSS with the code "SLEC0211." (Id.). PSS does not allege, nor does the record reflect, that it employed any unique design or stylized appearance of the letter "S." Rather, the letter "S" was either typed in the same basic font as the rest of the invoice, or was handwritten by whichever employee wrote up an order form. (See Defs.' Ex. P). PSS has not registered this trademark. (Defs.' 56.1 Statement P47; Topham Dep. at 153).

### 4. Defendants' Use of the Letter "S"

Since its inception in June, 2002, Gotham has used the letter "S" in inventory codes in a similar manner as PSS. [*5] (Guzzi Decl. P16; Defs.' Ex. I; www.gothamsound.com (last visited Dec. 14, 2004)). Gotham's website lists individual items by the name of

the manufacturer, with the inventory code below, in smaller, bold font. (Id.).

### B. Procedural History

PSS filed its complaint on October 22, 2002, and a first amended complaint on March 3, 2003. Defendants moved to dismiss the first amended complaint, on the basis that the sole federal claim alleged at the time, product disparagement under the Lanham Act, failed to state a claim upon which relief can be granted. The Court granted defendants' motion in part and denied it in part. *Prof. Sound Services, Inc. v. Guzzi, 2003 U.S. Dist. LEXIS 15820, No. 02 Civ. 8428 (DC), 2003 WL 22097500 (S.D.N.Y. Sept. 10, 2003).* Plaintiff's motion to file a second amended complaint, adding the claim of false designation of origin under the Lanham Act, was granted on December 10, 2003.

The parties engaged in discovery and the instant motion for summary judgment followed.

### DISCUSSION

First, I set out the legal standard for summary judgment. Next, I discuss separately PSS's two claims under the Lanham Act, for product disparagement and false designation [*6] of origin. Finally, I briefly address PSS's state law claims.

### A. Summary Judgment Standard

Summary judgment will be granted when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*; see *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-87, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).* Accordingly, the Court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).* Summary judgment is inappropriate if, resolving all ambiguities and drawing all inferences against the moving party, there exists a dispute about a material fact "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248-49 (citing *Adickes v. S.H. Kress & Co., 398 U.S. 144, 159, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970))*; accord *Bay v. Times Mirror Magazines, Inc., 936 F.2d 112, 116 (2d Cir. 1991).*

To defeat a motion for summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical [*7] doubt as to the material facts." *Matsushita Elec. Indus., 475 U.S. at 586.* There is no issue for trial unless there exists sufficient evidence in the record favoring the party opposing summary judgment to support a jury verdict in that

party's favor. *Anderson, 477 U.S. at 249-50*. To that end, any "affidavits submitted in support of or in opposition to a summary judgment motion must 'be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" *Patterson v. County of Oneida, 375 F.3d 206, 219 (2d Cir. 2004)* (quoting *Fed. R. Civ. P. 56(e)*). The requirement set forth in *Rule 56* that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit "also means that an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Id. at 219*; see also *H. Sand & Co. v. Airtemp Corp., 934 F.2d 450, 454-55 (2d Cir. 1991)* (hearsay assertion that would [*8] not be admissible if testified to at trial is not competent material for a *Rule 56* affidavit).

## B. Defamation and Disparagement under the Lanham Act

### 1. Applicable Law

Plaintiff's first cause of action alleges defamation and disparagement in violation of section 43(a)(1)(B) of the Lanham Act. See *15 U.S.C. § 1125(a)(1)(B)*. The Lanham Act provides in pertinent part that:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --
>
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, service, or commercial activities,
>
> shall be liable in a civil action . . . .

*15 U.S.C. § 1125(a)*.

Hence, in a product disparagement case under the Lanham Act, a plaintiff must show (1) the use of a false or misleading statement of fact (2) in commerce (3) for commercial advertising [*9] or promotion (4) resulting in damages. *Randa Corp. v. Mulberry Thai Silk, Inc., 2000 U.S. Dist. LEXIS 17014, No. 00 Civ. 4061 (LAP), 2000 WL 1741680, at *2 (S.D.N.Y. Nov. 27, 2000)*. Subjective claims or opinions are not actionable because they are not statements of fact that can be proven true or false. See *Groden v. Random House, Inc., 61 F.3d 1045,*

*1051 (2d Cir. 1995)* ("statements of opinion are generally not the basis for Lanham Act liability"); *Randa Corp., 2000 U.S. Dist. LEXIS 17014, 2000 WL 1741680, at *2*; *CYTYC Corp. v. Neuromedical Sys., Inc., 12 F. Supp. 2d 296, 300-01 (S.D.N.Y. 1998)*; *Licata & Co. v. Goldberg, 812 F. Supp. 403, 408 (S.D.N.Y. 1993)*.

To constitute commercial advertising or promotion, a statement must be (1) commercial speech (2) made by a defendant who is a competitor of the plaintiff (3) to influence consumers to buy defendant's goods or services and (4) is disseminated sufficiently to the relevant purchasing public to constitute advertising or promotion. *Gordon & Breach Sci. Publishers S.A., STBS v. Am. Inst. of Physics, 859 F. Supp. 1521, 1536 (S.D.N.Y. 1994)*. The level of dissemination required varies depending [*10] on the industry involved. *Fashion Boutique of Short Hills v. Fendi USA, 942 F. Supp. 209 (S.D.N.Y. 1996)*.

### 2. Application

PSS claims Guzzi intentionally made the disparaging statement "for the sole purpose of defamation and disparaging plaintiff so as to misappropriate plaintiff's business." (Pl.'s Mem. at 4). Defendants argue that summary judgment should be granted in their favor because plaintiff cannot show that the statement was used in advertising and promotion, an element of the Lanham Act claim. (Defs.' Mem. at 7). Because PSS as a matter of law has failed to show that the comment was used in advertising and promotion, the motion for summary judgment is granted as to the Lanham Act claim for product disparagement.

Guzzi denies making the disparaging statement. (Guzzi Decl. P15). Even assuming arguendo Guzzi did make the statement, PSS has failed as a matter of law to prove that facts exist that could support a finding that the statement was made in advertising and promotion. In its Memorandum of Law, PSS claims that "plaintiff, at this time, can prove that the defamatory statement was disseminated to at least four out of plaintiff's 36 customers. [*11]  " (Pl.'s Mem. at 9). In support of this assertion, PSS merely cites its second amended complaint. (Id.). PSS insists that it "is still investigating the exact number of customers who heard the [disparaging] statement. Since this investigation is still pending, a question of material fact is raised." (Id.).

Plaintiff misses the point. As the non-moving party, PSS is required under *Rule 56* to show there is a genuine issue for trial, by putting forth admissible evidence that could support a jury verdict in its favor. *Fed. R. Civ. P. 56*; *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. Merely asserting that PSS will prove at trial more customers heard the statement is insufficient to create a genuine

issue for trial. PSS has had nearly two years to obtain this evidence; its failure to do so is telling.

Although not cited in its Memorandum of Law on this point, PSS has submitted one affidavit of a customer who testifies to having heard the disparaging comment. (See Mohan Decl. P5). Nevertheless, the statement of one customer is insufficient as a matter of law to establish that the comment was made in advertising or promotion. n3

> n3 Both parties misinterpret this Court's Memorandum Decision on defendants' motion to dismiss as requiring plaintiff on summary judgment to prove that "virtually all" of its customers heard the disparaging statement. (See Defs.' Mem. at 7; Pl.'s Mem. at 8). In the context of the motion to dismiss, I found that if plaintiff proved the allegations in its complaint that "virtually all" its customers heard the disparaging comment, then it might be able to prove the statement constituted advertising or promotion, i.e., these allegations were sufficient to defeat a motion to dismiss. *Professional Sound Servs., Inc. v. Guzzi, 2003 U.S. Dist. LEXIS 15820, 02 Civ. 8428 (DC), 2003 WL 22097500, at *3 (S.D.N.Y. Sept. 10, 2003).* In the summary judgment context, I apply the law regarding Lanham Act disparagement to the evidence plaintiff now has produced in support of its claim.

[*12]

A statement made in advertising or promotion is one made with the purpose of disseminating information to the public. Thus,

> the touchstone of whether a defendant's actions may be considered "commercial advertising or promotion" under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market. Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting this requirement. Thus, businesses harmed by isolated disparaging statements do not have redress under the Lanham Act; they must seek redress under state-law causes of action.

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 314 F.3d 48, 57 (2d Cir. 2002).* Dissemination of a statement to one customer out of 36 n4 simply does not meet this standard. See *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc., 942 F. Supp. 209, 216 (S.D.N.Y. 1996)* ("most of the courts that have addressed this issue have held that dissemination to a single consumer is not sufficient"), citing *Goldsmith v. Polygram Diversified Ventures, Inc., 1995 U.S. Dist. LEXIS 15351, No. 94 Civ. 8888 (DLC), 1995 WL 614560,* [*13] *at *7-8 (S.D.N.Y. Oct. 9, 1995); Garland Co. v. Ecology Roof Sys. Corp., 895 F. Supp. 274, 279 (D. Kan. 1995); American Needle & Novelty, Inc. v. Drew Pearson Mktg., 820 F. Supp. 1072, 1078 (N.D. Ill. 1993).*

> n4 Topham testified in his deposition that PSS has approximately more than one hundred customers. (Topham Dep. at 120-21). In its Memorandum, plaintiff alleges it has a total of 36 customers. (Pl.'s Mem. at 9.).

Plaintiff points to cases in which courts have found sufficient statements made to a small number of customers; these cases are easily distinguished as they involved a significantly larger percentage of affected customers. See, e.g., *National Artists Mgmt. v. Weaving, 769 F. Supp. 1224 (S.D.N.Y. 1991)* (ten out of thirty customers); *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co., 173 F.3d 725 (9th Cir. 1999)* (one out of three customers). In this case, the potential customer base ranges from 36 to more than one hundred people. [*14] Evidence of one customer having heard the disparaging statement certainly does not suggest "an organized campaign to penetrate the relevant market." *Fashion Boutique, 314 F.3d at 57.* Therefore, plaintiff fails to support an essential element of its Lanham Act claim for product disparagement, and defendants' motion for summary judgment on this claim is granted.

## C. False Designation of Origin

### a. Applicable Law

PSS's eighth cause of action alleges a violation of section 43(a)(1)(A) of the Lanham Act, which prohibits false designation of the origin of goods in interstate commerce. *15 U.S.C. § 1125(a)(1)(B).* Under the Lanham Act:

> (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which --

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, [*15] sponsorship, or approval of his or her goods, services, or commercial activities by another person . . . shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

*15 U.S.C. § 1125(a)(1)(A).* "The gist of the action under this section is a use of the mark or tradename in interstate commerce which is likely to cause confusion or to deceive purchasers as to the source of origin of the goods." *Mortellito v. Nina of California, Inc., 335 F. Supp. 1288, 1294 (S.D.N.Y. 1972).*

It is not required that a mark be registered to state a claim under the Lanham Act. *Id. at 1294.* "A claim for relief arises if the . . . [party] affixes to the goods a false designation of origin or any false description or representation." Id. To succeed on a false designation claim under § 1125(a), plaintiff must demonstrate (1) it holds a valid trademark entitled to protection and (2) there is a "likelihood of confusion." *Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996).* Likelihood of confusion requires that "an appreciable number of [*16] ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Kraft General Foods, Inc. v. Allied Old English, Inc., 831 F. Supp. 123, 127-28 (S.D.N.Y. 1993)* (quotation omitted).

**b. Application**

PSS alleges that defendants have violated the Lanham Act, falsely designating the origin of their products by using PSS's purported trademark -- the letter "S" -- on defendants' products. Defendants allege that the letter "S," without more, cannot be a trademark, or in the alternative, that no likelihood of consumer confusion exists. Defendants' motion for summary judgment as to the Lanham Act claim for false designation of origin is granted, for no reasonable trier of fact could find, on the record before the Court, that a valid trademark entitled to protection exists. Alternatively, no reasonable trier of fact could find that there exists a likelihood of consumer confusion.

**i. Is the Trademark Valid and Entitled to Protection?**

As a threshold matter, plaintiff must show that it has a valid trademark entitled to trademark protection. *Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960 (2d Cir. 1996).* [*17] The statutory definition of a trademark is broad, including "any word, name, symbol, or device or any combination thereof used by a person . . . to identify and distinguish his or her goods . . . from those manufactured or sold by others and to indicate the source of those goods, even if that source is unknown." *15 U.S.C. § 1127.* For a mark to be considered a valid trademark, entitled to protection, the trademark must be either validly registered or a qualifying unregistered trademark. *Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768, 120 L. Ed. 2d 615, 112 S. Ct. 2753 (1992).* "The general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Id. at 767.* A mark may qualify for registration if it is "capable of distinguishing the applicant's goods from those of others." Id., citing *15 U.S.C. § 1052.*

A single letter can be a valid trademark entitled to protection. 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition 7:11 (4th ed. 2004), citing *Singer Mfg. Co. v. Singer Upholstering & Sewing Co., 130 F. Supp. 205 (D. Pa. 1955)* [*18] (single letter "S"); *Michelin Tire Corp. v. General Tire & Rubber Co., 202 USPQ (BNA) 294 (T.T.A.B. 1979)* (single letter "X"); *Quality Semiconductors, Inc. v. QLogic Corp., 31 U.S.P.Q.2d 1627 (N.D. Cal. 1994)* (single letter "Q"). Here, plaintiff has not registered its single letter trademark. Therefore, plaintiff is required to show that its use of a single letter is capable of distinguishing its goods from those of others, i.e., its use of the letter "S" is distinctive. Plaintiff fails to do so.

On the issue of whether the mark is valid and entitled to protection, PSS argues only that its mark is distinctive because it in fact distinguishes its products. I address this argument first. Courts determine if a mark is distinctive by deciding if it is either inherently distinctive or has developed secondary meaning. I address this analysis second.

The entirety of plaintiff's distinctiveness argument is that the letter "S" is a "truly distinctive mark because consumers in the . . . professional sound industry recognize this mark as that of the plaintiff." (Pl.'s Mem. at 20-21). In other words, plaintiff argues that the letter "S" as it uses it is [*19] capable of distinguishing its products because it in fact does so. Plaintiff offers no evidence in support of this proposition, save inadmissible hearsay testimony of two of its employees. (See Perez Decl. P7; Fill Decl. P5). The testimony that "over the years customers have commented on our use of the letter S, and have come to say that they recognize products using this system as coming from us" (Fill Decl. P5; see also Perez Decl. P7 (similar)) relies on out-of-court statements to prove the truth of the matter asserted: customers identify plaintiff's products by the "S." See

*Fed. R. Evid. 801.* Such hearsay statements are inadmissible at trial and, accordingly, are insufficient to withstand a *Rule 56* motion. *Fed. R. Civ. P. 56(e); Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 2004); H. Sand & Co. v. Airtemp Co., 934 F.2d 450, 454-55 (2d Cir. 1991).*

PSS has failed to show that the letter "S" is capable of distinguishing plaintiff's goods because it in fact does identify plaintiff as the source of the goods; therefore, I turn to an analysis of the mark's distinctiveness. A mark can be distinctive if it is either [*20] inherently distinctive or has developed secondary meaning. *Wal-Mart Stores, Inc. v. Samara Bros, Inc., 529 U.S. 205, 210-11, 146 L. Ed. 2d 182, 120 S. Ct. 1339 (2000).*

A mark is inherently distinctive if "its intrinsic nature serves to identify a particular source." *Id. at 210.* In the context of word marks, courts have analyzed whether a mark's intrinsic nature serves to identify a source using a test originally formulated by Judge Friendly, "in which word marks that are 'arbitrary' ('Camel' cigarettes), 'fanciful' ('Kodak' film), or 'suggestive' ('Tide' laundry detergent) are held to be inherently distinctive." *Id. at 210-11,* citing *Abercrombie & Fitch Co. v. Hunting World, Inc., 537 F.2d 4, 10-11 (2d Cir. 1976).* Marks that are merely descriptive of a product or are a generic term for a product are not inherently distinctive. *Abercrombie & Fitch Co., 537 F.2d at 9-10.* These categories, however, bear less relevance where the mark at issue is a naked, unadorned letter.

Here, plaintiff suggests that its trademark may be categorized as "arbitrary." (See Pl.'s Mem. at 21). An arbitrary mark is a mark that has a dictionary meaning that [*21] does not describe the product. *Gruner + Jahr USA Publ'g v. Meredith Corp., 991 F.2d 1072, 1075 (2d Cir. 1993).* An arbitrary mark uses a common word in an unfamiliar way. *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344 (2d Cir. 1999).* It is commonly accepted that arbitrary marks are considered inherently distinctive, *Abercrombie & Fitch Co., 537 F.2d at 11; Two Pesos v. Taco Cabana, 505 U.S. 763, 768, 120 L. Ed. 2d 615, 112 S. Ct. 2753 (1992),* but this idea cannot be applied blindly to hold that any mark that arguably is arbitrarily employed is a valid trademark entitled to protection. Reliance on these categories is misplaced in the context of single letters. A single letter can never be other than "arbitrary," i.e., it could not be considered a generic term for a product or merely descriptive of the product to which it is associated.

The purpose of the arbitrary classification is a method for determining whether a mark is distinctive and can serve to identify a source of a product. The ultimate question is always whether a mark "is capable of distinguishing [one's] goods from those of others." *Two Pesos, 505 U.S. at 767.* [*22] Here, plaintiff has not shown that its use of a plain, unadorned letter of the alphabet is capable of distinguishing its goods from goods of others. Plaintiff has not created a design for the letter "S," nor does it create any specific, consistent appearance for the letter; rather, the "S" is written in plaintiff's standard font for invoices or in the handwriting of whichever employee happened to write the catalog number. The letter is not featured prominently on the documents; one has to search for the letter to even find it. PSS makes no effort to make the letter "S" distinctive in any way such that a customer would notice it and eventually associate the letter with PSS. Finally, PSS does not use the letter "S" in any advertising or promotional materials targeted to an outside audience, nor anywhere on its website; rather, the "S" is used on internal documents and packaging -- items customers likely only see once they have already purchased PSS's goods. PSS has failed to present any evidence to support its argument that the naked letter "S" as PSS uses it is inherently distinctive and capable of distinguishing its goods from goods of others.

Where a party fails to establish a mark [*23] is inherently distinctive, it may be entitled to protection if the mark has acquired secondary meaning, i.e., "in the minds of the public, the primary significance of a mark is to identify the source of the product rather than the product itself." *Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 211, 146 L. Ed. 2d 182, 120 S. Ct. 1339 (2000).* Plaintiff has submitted no evidence supporting its allegation that the relevant consumers have accepted the letter "S" as a source identifier, instead relying on inadmissible hearsay. (See Pl.'s Mem. at 21; Perez Decl. P7; Fill Decl. P5).

Protecting the letter "S" as a trademark in this case would not serve the purpose of the Lanham Act, which is to "secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation." *Park 'N Fly v. Dollar Park & Fly, 469 U.S. 189, 198, 83 L. Ed. 2d 582, 105 S. Ct. 658 (1985)* (citing S. Rep. No. 1333, 79th Cong., 2d Sess., 3-5 (1946)). Where the owner of the alleged [*24] trademark has made no effort to associate its reputation with the mark, and the mark has no inherent capacity to distinguish itself to consumers, a mark will not be protected under the Lanham Act.

**ii. Is There a Likelihood of Consumer Confusion?**

Even if the letter "S" as used by PSS were a valid trademark entitled to protection, no reasonable trier of fact could find a likelihood of consumer confusion, the second element of a false designation of origin claim.

Courts apply the well-established Polaroid factors to determine whether a likelihood of confusion exists: (1) strength of plaintiff's mark, (2) similarity of plaintiff and defendants' marks, (3) competitive proximity of the products, (4) likelihood that plaintiff will "bridge the gap" and offer a product like defendants', (5) actual confusion, (6) defendants' good faith, (7) quality of defendants' product, and (8) sophistication of the buyers. *Polaroid Corp. v. Polorad Elecs. Corp., 287 F.2d 492, 495 (2d Cir. 1961).* The application of these factors is not mechanical, and no single factor is determinative. *Plus Prods. v. Plus Discount Foods, Inc., 722 F.2d 999, 1004 (2d Cir. 1983);* [*25] *Clinique Labs., Inc. v. Dep Corp., 945 F. Supp. 547 (S.D.N.Y. 1996).* In applying these factors, a court "should focus on the ultimate question of whether consumers are likely to be confused." *Paddington Corp. v. Attiki Imps. & Distribs. Inc., 996 F.2d 577, 584 (2d Cir. 1993).*

### a. Strength of the Mark

Plaintiff's mark is weak. The strength of a mark is "its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *Sports Authority, Inc. v. Prime Hospitality Corp., 89 F.3d 955, 960-61 (2d Cir. 1996).* The strength of a mark depends on its inherent distinctiveness and its distinctiveness in the marketplace. *Brockemeyer v. Hearst Corp., 248 F. Supp. 2d 281, 294 (S.D.N.Y. 2003).* The inherent distinctiveness of a mark is a similar inquiry to whether a mark is distinctive and thus protected under the Lanham Act. *Sports Authority, 89 F.3d at 961 n.1.* A mark's distinctiveness in the marketplace examines the extent to which the mark in fact is known in the marketplace. *Brockmeyer, 248 F. Supp. 2d at 295.*

As discussed above, [*26] the letter "S" as used by PSS -- naked, unadorned -- is not inherently distinctive. Furthermore, PSS fails to present any concrete evidence to show that its mark is distinctive in the marketplace; its failure to submit evidence showing consumers associate its mark with its product suggests that the mark is not in fact known in the marketplace. *Brockmeyer, 248 F. Supp. 2d at 295.* For these reasons, PSS's mark is a weak mark, and defendants' use of it is not likely to confuse consumers.

### b. Similarity

Second, although the marks are similar in appearance, that similarity is not likely to confuse consumers in this case. In examining similarity of marks,

a court considers "two key questions: 1) whether the similarity between the two marks is likely to cause confusion and 2) what effect the similarity has upon prospective purchasers. In deciding whether the marks are similar as used, we do not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace." *Sports Authority, 89 F.3d at 962.* Plaintiff relies entirely on a facial comparison of the marks, asserting they are identical, and therefore similar [*27] and likely to cause confusion, without mention of how the marks are used in the marketplace.

In this case, the marks are similar in appearance, but their similarity does not show a likelihood of consumer confusion. The marks are similar only in the sense that both employ an unadorned, naked capital letter "S." They are not identical, as plaintiff alleges, because defendant makes some attempt at adorning the "S," using bold-faced font, in contrast to plaintiff's use of a standard font or handwritten lettering.

Furthermore, when viewed in context of their use, the similarity ceases. PSS uses the letter "S" on packages, invoices, and documents accompanying shipments, whereas defendants use the "S" on their website. Defendants' website clearly says "Gotham Sound" in large print, and a consumer must type in Gotham's specific URL to access defendants' website. In other words, the context in which a consumer would see defendants' use of the letter "S" is one in which the consumer is aware that she is viewing Gotham's products. The use of the letter "S" by defendants in a different presentation than plaintiff (website rather than documents), where the context alerts consumers to defendants [*28] as origin of the products, weighs against a finding that the marks are similar and likely to cause consumer confusion. See *C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc., 753 F.2d 14, 18 (2d Cir. 1985)* (size, layout, design, and logotype of two titles reduced potential for confusion under the similarity of mark analysis); *Brockmeyer v. Hearst Corp., 248 F. Supp. 2d 281, 296 (S.D.N.Y. 2003)* (context of use of letter "O", including title of defendant's magazine accompanying mark, tends to differentiate marks and reduce similarity).

### iii. Proximity of the Products

The proximity of the products does not create a likelihood of confusion. This factor examines "whether, due to the commercial proximity of the competitive products, consumers may be confused as to their source." *Hasbro, Inc. v. Lanard Toys, Ltd., 858 F.2d 70, 77 (2d Cir. 1988); Clinique Labs. Inc. v. Dep Corp., 945 F. Supp. 547, 553 (S.D.N.Y. 1996).* In assessing commercial proximity, courts should compare all relevant aspects of the products, including price, style, intended uses, target

clientele, and channels of distribution. *Brockmeyer, 248 F. Supp. 2d at 296.* [*29] Here, the products are in the same general market and targeted to the same consumers, but the channels of distribution in which the marks are used differ. PSS uses the mark on internal documents emanating from its physical store, while defendants use it on their website. Thus, this is not a case where proximity weighs strongly in plaintiff's favor, e.g., where the products are sold in the same physical location and consumers are presented with the products simultaneously. See e.g., *Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474 (2d Cir. 1996).* Plaintiff does not show that the sale locations are geographically close, see *Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209 (2d Cir. 2003),* or argue that plaintiff's consumers might accidentally enter defendants' website. Because the consumer will only be presented with defendants' products if she intentionally enters defendants' store or defendants' website, the likelihood of confusion over the origin of defendants' goods, based on defendants' use of the letter "S" in cataloguing those goods, is slim. Therefore, while there is a proximity of the products, this factor weighs only slightly in [*30] plaintiff's favor, if at all.

### iv. Likelihood that Plaintiff Will Bridge the Gap

The fourth factor considers whether the plaintiff will "bridge the gap" and enter defendants' business. *Sports Authority, 89 F.3d at 963.* This factor recognizes "the senior user's interest in preserving avenues of expansion and entering into related fields." *Hormel Foods Corp. v. Jim Henson Prods., Inc., 73 F.3d 497, 504 (2d Cir. 1996)* (citation omitted). Here, the parties already compete in the same market. Therefore, the question of whether plaintiff will "bridge the gap" is irrelevant. *Paddington Corp. v. Atiki Imps. & Distribs., 996 F.2d 577, 586 (2d Cir. 2003)* (likelihood of bridging the gap irrelevant where parties already compete in the same market); accord *Robot Wars LLC v. Roski, 51 F. Supp. 2d 491, 494 n.3 (S.D.N.Y. 1999).*

### v. Actual Confusion

The fifth factor is actual confusion, meaning "consumer confusion that enables a seller to pass off his goods as the goods of another." *Sports Authority, 89 F.2d at 963* (citation omitted). Plaintiff makes no effort to present evidence of actual confusion, [*31] merely stating that "this factor is neutral but is still under investigation." (Pl.'s Mem. at 22). Plaintiff has raised no triable issue of fact concerning actual confusion. This factor weighs in defendants' favor and against a finding of likelihood of confusion.

### vi. Good Faith

The sixth factor examines defendants' good faith in adopting the mark, asking "whether [a] defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Retirement Living Pub. Co., 949 F.2d 576, 583 (2d Cir. 1991)* (citation omitted). Plaintiff makes no attempt to show defendants' bad faith, but rather makes sweeping allegations without citing any evidence on the record. (See Pl.'s Mem. at 22 ("Bad faith is shown by the defendants' taking of customer lists, Guzzi's breach of his secrecy agreement, failure to pay bills in a timely manner, and defamatory statements made while still in the plaintiff's employ.")). This factor weighs in defendants' favor.

### vii. Quality of Products

The seventh factor, quality of defendants' products, asks "whether the senior user's [*32] reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Arrow Fastener Co. v. Stanley Works, 59 F.3d 384, 398 (2d Cir. 1995).* Here, the parties sell the same products. Plaintiff concedes that "this factor is neutral." (Pl.'s Mem. at 22).

### viii. Sophistication of the Buyers

In evaluating the sophistication of the buyers, "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods, is the touchstone." *McGregor-Doniger, Inc. v. Drizzle, Inc., 599 F.2d 1126, 1137* (quoting 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 81.2, at 577 (3d ed. 1969)). Plaintiff's entire argument on this point is that "this factor is neutral." (Pl.'s Mem. at 22).

To the contrary, PSS has made clear that its buyers are a "small, very close knit community of persons" engaged in a specialized profession of on-location sound recording. (Pl.'s Mem. at 2). The equipment they are buying from the parties is "very expensive, and the conditions for their use [*33] highly specialized." (Topham Decl. P3). These are not ordinary consumers casually purchasing inexpensive products, more likely confused by similar trademarks, see *Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 219 (2d Cir. 2003),* but rather are sophisticated professionals likely to take great care in purchasing the expensive equipment the parties sell. Therefore, the sophistication of the buyers weighs against the likelihood of their confusion.

### ix. Aggregate Assessment

Overall, the *Polaroid* factors in favor of defendants strongly outweigh those in favor of plaintiff. Weighed as a whole, in light of the overall assessment of the

Case 7:04-cv-06017-KMK    Document 15-11    Filed 01/14/2005    Page 12 of 29

2004 U.S. Dist. LEXIS 25913, *                                    Page 9

likelihood of consumer confusion, the factors show that no reasonable trier of fact could conclude that there is a likelihood of consumer confusion because of defendants' use of the letter "S." Therefore, plaintiff's Lanham Act claim for false designation of origin fails as a matter of law.

### D. State Law Claims

The Court need not consider PSS's state law claims. In dismissing the Lanham Act claims, the Court has the discretion whether to exercise jurisdiction over the remaining state law claims. *28 U.S.C. § 1367* [*34] *(c)(3)*; see also *United Mine Workers v. Gibbs, 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)*; *Reese Publ'g Co. v. Hampton Int'l Communications, Inc., 620 F.2d 7, 13 (2d Cir. 1980)* (holding that when a Lanham Act claim is dismissible upon motion, state law claims should be dismissed without prejudice). The Court declines to exercise jurisdiction over such claims.

Accordingly, PSS's state law claims are hereby dismissed without prejudice to re-filing in state court.

### CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment is granted as to plaintiff's Lanham Act claims, and the Court declines to exercise supplemental jurisdiction over the remaining state law claims. The Clerk of the Court shall enter judgment in favor of defendants dismissing the complaint, with prejudice as to the Lanham Act claims and without prejudice as to the state claims.

SO ORDERED.

Dated: New York, New York

December 27, 2004

DENNY CHIN

United States District Judge

LEXSEE 2004 US DIST LEXIS 25257

**KASADA, INC., JOHN MICHAELS, INC., GABBEY DESIGN GROUP, INC. GARMENT MAKERS, INC., THEORDORE SADAKA, KAREN SADAKA AND GLADYS SADAKA, Plaintiffs, -against- ACCESS CAPITAL, INC., WESTGATE FINANCIAL CORP., FINOVA CAPITAL, INC., UCC ASSET MANAGEMENT CORP., STAR FUNDING, INC., OMNI COMMERCIAL, L.L.C., COMMERCIAL SERVICES, INC., d/b/a C.I.T. GROUP, ROSENTHAL & ROSENTHAL, MILES M. STUCHIN and RICHARD I. SIMON, Defendants.**

01 Civ. 8893 (GBD)

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2004 U.S. Dist. LEXIS 25257*

**December 10, 2004, Decided
December 14, 2004, Filed**

**DISPOSITION:** [*1] Defendants' motions to dismiss granted in part and denied in part.

**LexisNexis(R) Headnotes**

**COUNSEL:** For Kasada, Inc., John Michaels, Inc., Gabbey Design Group, Inc., Garment Makers, Inc., Theodore Sadaka, Karen Sadaka, Gladys Sadaka, Plaintiffs: Laura M. Dilimetin, Dilimatin & Dilimetin, New York, NY.

For Access Capital, Inc., Miles M. Stuchin, Defendants: Clifford M. Solomon, Solomom & Tanenbaum, P.C., White Plains, NY.

For UCC Asset Management Corp., Star Funding, Inc., Defendants: Joseph J. Macchiarola, Ruskin, Moscou, Evans & Faltischek, P.C., Uniondale, NY.

For Omni Commercial, L.L.C., Defendant: Liviu Vogel, Salon, Marrow, Dyckman & Newman, L.L.P., New York, NY.

For Omni Commercial, L.L.C., Counter Claimant: Liviu Vogel, Salon Marrow Dyckman & Newman LLP, New York, NY.

For Omni Commercial, L.L.C., Cross Claimant: Liviu Vogel, Salon, Marrow, Dyckman & Newman, L.L.P., New York, NY.

For Access Capital, Inc., Miles M. Stuchin, Counter Claimants: Clifford M. Solomon, Solomom & Tanenbaum, P.C., White Plains, NY.

For UCC Asset Management Corp., Star Funding, Inc., Counter Claimants: Joseph J. Macchiarola, Ruskin, Moscou, Evans & Faltischek, P.C., Uniondale, NY.

For Kasada, [*2] Inc., John Michaels, Inc., Gabbey Design Group, Inc., Garment Makers, Inc., Theodore Sadaka, Karen Sadaka, Gladys Sadaka, Counter Defendants: Laura M. Dilimetin, Dilimatin & Dilimetin, New York, NY.

**JUDGES:** GEORGE B. DANIELS, United States District Judge.

**OPINIONBY:** GEORGE B. DANIELS

**OPINION:**

MEMORANDUM DECISION AND ORDER

GEORGE B. DANIELS, DISTRICT JUDGE:

Case 7:04-cv-06017-KMK    Document 15-11    Filed 01/14/2005    Page 14 of 29

Page 2
2004 U.S. Dist. LEXIS 25257, *

Plaintiffs bring suit alleging price fixing and monopoly claims in violation of the *Sherman Act § § 1, 2*, the *Clayton Act § 4*, the *New York State Donnelly Act*, and pendant common law claims. Defendants filed motions to dismiss pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons below, defendants' motions to dismiss are granted in part and denied in part.

I. Background

Plaintiffs are garment manufacturers, their principals and related entities who bring suit against various credit institutions alleging price fixing and monopoly in violation of federal and state antitrust statutes and state common law. Plaintiffs Kasada, Inc., John Michaels, Inc., Gabbey Design Group, Inc. and Garment Makers, Inc. are corporations engaged in the business of domestic garment manufacturing. Complaint at 2-3, PP4-7. Plaintiff Theodore [*3] Sadaka is the principal officer of plaintiffs Garment Makers, Inc. and John Michaels, Inc.. Plaintiff Karen Sadaka is a principal officer of plaintiff Kasada, Inc. Plaintiff Gladys Sadaka is a principal officer of plaintiff Gabbey Design Group, Inc. Id. at 3, P8.

Plaintiffs' allegations revolve around the business of factoring, a form of commercial finance by which credit institutions provide financing to clients in exchange for the right to collect the client's accounts receivable. These credit institutions, commonly referred to as factors, advance up to 80% of the worth of a garment manufacturers' invoices in exchange for fees and interest. Complaint at 8, P20. The factor also assumes the risk of collecting the client garment manufacturers' accounts receivable. Id. A factor assumes that credit risk, however, only after it has checked whether its client garment manufacturer is selling to a creditworthy purchaser. The garment manufacturer, in turn, uses that credit to purchase raw materials to produce their product. Id.

Plaintiffs allege that the defendants mutually agreed to stop credit-checking plaintiff garment manufacturers, denied them credit and/or withdrew their [*4] funding. The refusal by a factor to credit check a garment manufacturer results in "the garment manufacturer [being] unable to obtain virtually any fabric or other raw materials on credit." Id. at 10, P24. Specifically, plaintiffs allege that Westgate Financial Corp. and Finova Capital, Inc. allegedly discontinued their funding of plaintiff John Michaels, Inc. Id. at 4, P11. Finova Capital, Inc. also allegedly denied credit to John Michaels, Inc. Id. at 5, P12. Defendants Rosenthal & Rosenthal ("Rosenthal") and Star Funding, Inc. are alleged to have withdrawn funding from plaintiff Gabbey Design, Group, Inc. Id. at 3, 5, 6 PP6, 13, 16. Defendant Omni Commercial denied credit and refused to release

monies to plaintiff Garment Makers, Inc. and caused defendant C.I.T. to deny credit to Garment Makers, Inc. as well. Id. at 3, 5, PP7, 14. The plaintiffs also allege that defendant Access Capital "published false accusations against plaintiffs, which caused plaintiffs to be group boycotted by defendants." Id. at 3, P7. Plaintiffs further claim that "Access Capital designed and orchestrated the group boycott of plaintiffs and caused defendants to deny credit . [*5] . . and caused plaintiffs to cease operations." Id. at 4, P10. Individual defendants Miles M. Stuchin and Richard I. Simon are alleged to be the presidents of Access Capital, Inc. and Westgate Financial Corp., respectively. Id. at 6, P17. Each are alleged to have "conspired with other defendants to conduct a group boycott against plaintiffs." Id. at 6-7 PP17-18.

Plaintiffs assert that defendants' actions precluded them from receiving the credit they needed to purchase fabric or other raw materials. This, in turn, caused some of them to lose money and "to cease operations." Complaint at 2-4, PP4-10. n1 Without specifically identifying which defendants were involved and which plaintiffs were affected, the plaintiffs allege that the "factoring defendants, engaged in boycotting certain plaintiffs, denied credit to certain plaintiffs, fixed costs and interest rates, published letters to plaintiffs' customers, and agreed with other factors to fund certain manufacturers and to deny funding to other manufacturers, and to drive them out of business." Id. at 11, P25. Plaintiffs claim that the defendants communicated with each other, shared credit information, and agreed to make [*6] credit decisions together. Complaint at 12, P30. These communications allegedly occurred during meetings of the Uptown Credit Group and the Thursday Group. n2 Plaintiffs maintain that these groups "allowed defendants to conduct their secret meetings and made many of their collective credit decisions at these meetings and during telephone calls and other contacts." Id. at 12, P28. Plaintiffs argue that the defendants' denial of credit constitutes a group boycott in violation of *Section 1 of the Sherman Act*. In addition, plaintiffs allege that the defendants "controlled the price and interest rates for factoring" constituting illegal price-fixing in violation of *Section 1* of the Sherman Act. Id. at 18, P57. Plaintiffs also claim that defendants' actions constitute illegal price-fixing in the "piece goods" market, arguing that the "piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors." n3 Id. at 8, P20.

n1 Without specifically identifying which manufacturers, plaintiffs allege that "numerous garment manufacturers have been driven out of business." Plaintiffs' complaint, however, is

devoid of any allegation that any of the plaintiffs have gone out of business. To the contrary, plaintiffs complaint alleges that each corporate plaintiff "was and still is a domestic Corporation duly organized and licensed to do business within the State of New York." Complaint at 2-3, PP4-7. [*7]

n2 Uptown Credit Group and the Thursday Group are not parties to this litigation.

n3 The piece goods market is the market for raw materials such as fabric, buttons, trim and other accessories.

Plaintiffs also claim that the defendants violated *Section 2 of the Sherman Act* by engaging "in an unlawful combination and conspiracy to unreasonably restrain and monopolize interstate commerce." Complaint at 12, P30. Plaintiffs allege that the defendants acted as "one," in that defendants "black listed certain customers and weeded out those that they targeted to drive out of business." Id. at 11, P27 (internal quotations omitted). Plaintiffs assert that through these actions, the defendants "have engaged in predatory and anti-competitive conduct, with a specific intent to monopolize, and have achieved monopoly power." Id. at 17, P53. This conspiracy to monopolize allegedly occurred in two markets: the factoring market for domestic garment manufacturers and the piece goods market. Plaintiffs claim that the defendants "factor 90% of the factored piece goods vendors in the United States." [*8] Id. at 10, P24. Plaintiffs also allege that all the defendants are members of the Uptown Credit Group and the Thursday Group, which plaintiffs maintain are designed "to maintain a monopoly over the industry, and they collectively agreed unlawfully to deny plaintiffs credit." Id. at 9, P22. Plaintiffs allege that "collectively, defendants involved in these two groups control over 85% of [the] factoring market for garment manufacturing and virtually all of the piece goods manufacturing segment of that market." Id. n4

n4 Plaintiffs also assert claims under the *Clayton Act § 4*, the *Donnelly Act of the State of New York*, as well as the following common law claims: trade libel, defamation, injurious falsehood, interference with commercial relations, and breach of contract.

Defendants submitted motions to dismiss plaintiffs' claims, arguing that the plaintiffs failed to allege a violation of *Section 1 of the Sherman Act*. Specifically, defendants argue that plaintiffs failed to make sufficient allegations [*9] to establish that: the defendants entered into an agreement to boycott; the defendants engaged in price-fixing; and the defendants caused plaintiffs to suffer an antitrust injury rather than an injury specific to plaintiffs. Defendants also maintain that plaintiffs have failed to sufficiently allege a violation of *Section 2 of the Sherman Act*, arguing that plaintiffs' complaint fails to allege: a conspiracy by defendants to monopolize the market; an abuse of power by defendants; an antitrust injury; and a relevant market. n5 Defendants further argue that plaintiffs have failed to state a claim under the *Section 4 of the Clayton Act*, the Donnelly Act, or other state laws.

n5 Defendants C.I.T. Group and Rosenthal & Rosenthal submitted a brief in support of their motion to dismiss. Their arguments to dismiss plaintiff's federal claims were adopted by Westgate Financial Corp., Richard I. Simon, and Omni Commercial. In lieu of filing a motion, defendants Star Funding, Inc. and UCC Asset Management submitted a letter dated March 12, 2002 stating that "counsel for plaintiff and [these defendants] have agreed that to the extent that portion of the decision of the Court regarding the federal claims (and the *Donnelly Act* claim) applies to all Moving Defendants, it shall also be deemed to apply to Star and UCC." Similarly, defendants Access Capital, Inc. and Miles M. Stuchin, in a letter dated February 7, 2002, informed the Court that "in lieu of filing a formal motion to dismiss the plaintiffs' complaint, [defendants] submit this letter to join and adopt the legal arguments made by counsel for [Finova], [C.I.T.], [Rosenthal & Rosenthal], [Omni], [Westgate], and [Simon] in connection with their respective motions to dismiss."

[*10]

II. Discussion

*Federal Rule of Civil Procedure 12(b)(6)* allows a party to move to dismiss a complaint where the complaint "fail[s] . . . to state a claim upon which relief can be granted[.]" *FED. R. CIV. P. 12(b)(6)*. In reviewing a motion to dismiss, this Court accepts the allegations in the complaint as true and draws all reasonable inferences in favor of the non-moving party. See *Patel v. Searles, 305 F.3d 130, 134-35 (2d Cir. 2002)*. A motion to dismiss will only be granted if the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. See *Citibank, N.A. v. K-H*

*Corp., 968 F.2d 1489, 1494 (2d Cir. 1992)*. In considering a motion to dismiss under *Fed. R. Civ. P. 12(b)(6)*, a district court must limit itself to facts stated in the complaint or in documents attached to the complaint as exhibits or incorporated in the complaint by reference. *Kramer v. Time Warner, Inc., 937 F.2d 767, 773 (2d Cir. 1991)*; see also *Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 71 (2d Cir. 1998)*(in evaluating motions to dismiss, a court must limit its review to the allegations contained within [*11]     the four corner's of the complaint).

Although no heightened pleading requirements apply in antitrust cases, *Todd v. Exxon Corporation, 275 F.3d 191, 198 (2d Cir. 2001)*, a plaintiff must do more than cite relevant antitrust language to state a claim for relief. See *TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1024 (10th Cir. 1992)*. "A plaintiff must allege sufficient facts to support a cause of action under the antitrust laws. Conclusory allegations that the defendant violated those laws are insufficient." Id. (citing *Klebanow v. New York Produce Exch., 344 F.2d 294, 299 (2d Cir. 1965))*. Furthermore, "it is not . . . proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been" set forth in the complaint. *George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139 (2d Cir. 1998)*. The complaint must set forth enough information to suggest that relief would be based on some recognized legal theory. *Fort Wayne Telsat v. Entertainment and Sports Programming Network, 753 F.Supp 109, 111 (S.D.N.Y. 1990)*. [*12]     "In practice, a complaint must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Id. (quoting *District of Columbia v. Air Florida, Inc., 243 U.S. App. D.C. 1, 750 F.2d 1077, 1081-82 (D.C. Cir. 1984))*.

A. Section 1 of the Sherman Act

*Section 1 of the Sherman Act* prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." *15 U.S.C. § 1*. This blanket prohibition against any restraint of trade has been delineated into two separate doctrines. The first doctrine finds certain conduct illegal *per se*.

> In construing and applying the *Sherman Act*'s ban against contracts, conspiracies, and combinations in restraint of trade, the Court has held that certain agreements or practices are so plainly anticompetitive, and so often lack any redeeming virtue,

> that they are conclusively presumed illegal without further examination under the rule of reason generally applied in *Sherman Act* cases.

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 7-8, 99 S. Ct. 1551, 1556, 60 L. Ed. 2d 1 (1979)* [*13]     (internal quotations and citations omitted). Examples of *per se* illegal conduct include horizontal restraints, i.e. agreements between competitors at the same level of market structure, like agreements to fix prices and group boycotts. See, *Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212, 79 S. Ct. 705, 3 L. Ed. 2d 741 (1959)*(finding group boycotts unreasonable *per se*); *United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S. Ct. 811, 84 L. Ed. 1129 (1940)*(finding price fixing unreasonable *per se*); *Michelman v. Clark-Schwebel Fiber Glass Corporation, 534 F.2d 1036, 1043 (2d Cir. 1976)*(finding that a group boycott, because of its inherently anti-competitive nature, is unreasonable *per se* and thus always illegal).

Conduct that does not fall within the *per se* rule is subject to the rule of reason analysis. Under the rule of reason, the anticompetitive consequences of a challenged practice are weighed against the business justifications upon which it is predicated and its putative procompetitive impact, and a judgment with respect to its reasonableness is made. See KAYE SCHOLER, KAYE SCHOLER'S ANTITRUST [*14]     DESKBOOK, 6 (3d ed. 2002). For example, allegations of agreements between entities at different market levels that restrain trade i.e., vertical agreements, are analyzed under the rule of reason. *Electronics Communications Corp. v. Toshiba America Consumer Prods. Inc., 129 F.3d 240, 243 (2d Cir. 1997)*("Absent price-fixing between a supplier and distributor, vertical restraints are generally subject to 'rule of reason' analysis.") Id.

a. *Per se* Illegal Conduct: Group Boycott and Price Fixing

Plaintiffs allege that the defendants violated *Section 1 of the Sherman Act* "by engaging in an unlawful group boycott and a concomitant price-fixing conspiracy" in which the defendants collectively refused to credit check certain garment manufacturers. Complaint at 18, P56. Plaintiffs further claim that defendants colluded to fix the price and interest rates for factoring as well as the price of the piece goods purchased by the garment manufacturers.

Defendants argue that plaintiffs' complaint alleges no facts to support a finding that an agreement or conspiracy to boycott existed and that plaintiffs' complaint "alleges only the naked conclusion that the

Case 7:04-cv-06017-KMK    Document 15-11    Filed 01/14/2005    Page 17 of 29

Page 5
2004 U.S. Dist. LEXIS 25257, *

defendants [*15] conspired and agreed. No specific agreement is alleged with any factual particularity -- no dates, no details, no places, no participants, no purpose, no decisions, no terms, no actions." Defendant C.I.T.'s Memorandum of Law in Support of Its Motions to Dismiss the Complaint ("C.I.T. Brief") at 7. Defendants also argue that the plaintiffs have failed to state a claim to establish price fixing in either the factoring market or the piece goods market.

i. Group Boycott

Courts have found that group boycotts, because of their anti-competitive nature, are unreasonable *per se* and therefore always illegal. See *Klor's, Inc., 359 U.S. at 212; Michelman v. Clark-Schwebel Fiber Glass Corporation, 534 F.2d at 1043*. Plaintiffs allege that the defendants conspired to conduct a group boycott against plaintiffs by denying them credit.

> Defendants routinely communicated with each other, had access to each others' databases and credit information, consulted with each other regarding credit decision, shared confidential information, and agreed together when making credit decisions concerning garment manufacturers.

Complaint at 12, P30. Plaintiffs, [*16] however, fail to provide sufficient factual allegations to support this claim. There is no allegation that a particular plaintiff, once refused to be credit checked by one factor, was subsequently refused by each of the other factors. Compare *Dresses for Less, Inc. v. CIT Group/Commercial Services, Inc., 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482, *9 (S.D.N.Y. 2002)*(in finding that plaintiff stated a claim for group boycott, the Court found that "the gravamen of plaintiff's amended complaint is that C.I.T. and the other factors agreed that once C.I.T. refused to credit check a manufacturer, the other factors would refuse to check that manufacturer's credit as well"). Id. There is no allegation that a particular garment manufacturer applied for and was refused to be credit checked by all of the defendants.

Conversely, there is no allegation that a particular factor refused to credit check all of the plaintiffs. Plaintiffs' complaint specifically alleges that specific defendants denied credit to specific plaintiffs, withheld from a specific plaintiff credit or refused to release to a specific plaintiff monies allegedly owed. Complaint at 3-7, PP6-18. Plaintiffs [*17] allege that "after a group meeting of defendants," defendants Westgate Financial Corp. and Finova Capital, Inc. refused to continue funding plaintiff John Michaels and that Finova Capital, Inc. denied credit to John Michaels, Inc. Id. at 4, 5 PP11-

12. "After a group meeting of defendants," defendants Rosenthal & Rosenthal and Star Funding, Inc. are alleged to have withdrawn funding to plaintiff Gabbey Design. Id. at 3, 5, 6 PP6, 13, 16. "After a group meeting of defendants," defendant Omni Corp. is alleged to have refused to release monies to plaintiff Garment Makers, Inc. Id. at 3, P7. "After a group meeting of defendants," defendant Omni Commercial is alleged to have denied credit to plaintiff Garment Makers, Inc. and caused defendant C.I.T. to deny credit to Garment Makers, Inc. There is, furthermore, no allegation that the plaintiffs are one organization, belong to the same association, or that they possess any contractual relationship. Lastly, plaintiffs allegation that defendants "used subjective criteria and denied credit based upon malice, ill will, a personal dislike of management, rumors with no bearing on the customer's creditworthiness, or simply due to negligence" [*18] belies their argument that a collective decision not to credit check certain plaintiffs was because of a conspiracy to boycott. Complaint at 10, P24. Rather, this allegation supports a finding that credit-checking decision were made independently by each factor based on subjective criteria.

Plaintiffs' also argue that the defendants "engaged in group meetings" to share "credit information" and "had access to each other's databases and credit information." Complaint at 11-12, PP27, 28, 30. Although "information exchange" has been found to be an example of a facilitating practice that a court could use to help support an inference of a price-fixing agreement, n6 the exchange of information between business firms concerning the credit-worthiness of customers has long been held not to violate the *Sherman Act*." *Michelman v. Clark-Schwebel Fiber Glass Corp., 534 F.2d 1036, 1048 (2d Cir. 1976); see also Cement Mfrs. Protective Asso. v. United States, 268 U.S. 588, 604, 69 L. Ed. 1104, 45 S. Ct. 586, 591 (1925)*. n7 Furthermore, "the dissemination to competitors of information concerning the credit-worthiness of customers aids sellers in gaining information necessary to protect [*19] themselves against fraudulent or insolvent customers." *Michelman, 534 F.2d at 1048*. Lastly, the Second Circuit has held that "it is not a violation of *Section 1* to exchange such information, provided that any action taken in reliance upon it is the result of each firm's independent judgment, and not of agreement." Id.

n6 See *Todd v. Exxon Corporation, 275 F.3d 191, 198 (2d Cir. 2001)*.

n7 Although the Supreme Court has found that the exchange of information itself, as opposed to merely using the information exchanged as evidence upon which to infer a

price-fixing agreement, violates *Section 1 of the Sherman Act* under a Rule of Reason analysis, plaintiffs in the present case have made no such argument and therefore, this type of violation will not be entertained by the Court.

In the absence of factual allegations to support their claim, plaintiffs claim of group boycott is dismissed. See *Fort Wayne Telsat v. Entertainment and Sports Programming Network, 753 F. Supp. at 115* [*20] (finding that local subscription company had to do more than merely allege existence of a conspiracy; company was required to prove factual basis for the allegation); see also *Garshman v. Universal Resources Holding Inc., 824 F.2d 223, 230 (3d Cir. 1987)*("The allegation of unspecified contracts with unnamed other entities to achieve unidentified anticompetitive effects does not meet the minimum standards for pleading a conspiracy in violation of the *Sherman Act*." Id.); *Heart Disease Research Foundation v. General Motors Corp., 463 F.2d 98, 100 (2d Cir. 1972)*("a bare bones statement of conspiracy or of injury under the antitrust laws without any supporting facts permits dismissal"). Id.

ii. Price Fixing

Plaintiffs' claim of price fixing is equally conclusory. Plaintiffs allege that the defendants "have dominated the factoring market for domestic garment manufacturers for many years [and] used their control over [the] market to fix conditions," specifically by controlling "the price and interest rates for factoring." Id. at 18, PP56-57. Plaintiffs allege that by colluding and agreeing to drive their own clients out of business, [*21] the defendant factors have "enhanced their overall competitive position and [reduced] [their] collective credit risk exposure." Id. at 18, P57. Defendants argue that "plaintiffs do not allege, even in conclusory fashion, that defendants fixed the price of the product they provide: factoring and financial serves. There is no allegation that the price, terms, conditions, interest rates or any other aspect of defendants' factoring services were fixed." C.I.T. Brief at 11.

Similar to plaintiffs' arguments in *Dresses for Less, Inc. 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482*, plaintiffs' in the present case argue that the factor's denial of credit is analogous to the facts of *Catalano v. Target Sales, Inc. 446 U.S. 643, 100 S. Ct. 1925, 64 L. Ed. 2d 580 (1980)*. In Catalano, competing beer wholesalers agreed to fix the credit terms on which they would sell beer to retailers. Specifically, the wholesalers agreed to require that the retailers pay in advance or upon delivery, and to discontinue the practice of accepting late payments without interest. *Id. at 644-45*. The Court held that "credit terms must be characterized as an inseparable

part of price. [*22] An agreement to terminate the practice of giving credit is thus tantamount to an agreement to eliminate discounts, and thus falls squarely within the traditional *per se* rule against price fixing." *Id. at 648*. Unlike *Catalano*, however, the present complaint alleges that the defendants specifically denied credit to the plaintiffs alone and to all of their customers. Most importantly, there is no allegation that the defendants conspired or agreed to fix the price or terms of credit. Plaintiffs' price fixing argument hinges on the allegation that by not extending credit to the plaintiffs, the defendants "minimized their risks and costs of doing business" thereby controlling the price and interest rates for factoring. Complaint at 18, P57. Plaintiffs, however, do not state how the denial of credit to specific garment manufacturers affected market prices. *Dresses for Less, Inc. 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482 at *10*. Plaintiffs claims of price fixing in the factoring industry are completely conclusory, unsupported by factual allegations and are, therefore, dismissed.

Furthermore, plaintiffs appear to allege that defendants have also fixed the prices in the [*23] piece goods market. Plaintiffs argue that "when defendants conspire to withdraw funding, they are actually fixing the prices of the goods." Plaintiffs' Brief at 18. Plaintiffs apparent argument is that piece goods cost more to the plaintiffs as a result of defendants denial of credit. This allegation is insufficient to find that the defendants conspired or agreed to fix prices in the piece goods market. Plaintiffs claim that defendants fixed prices in the piece goods market, therefore, is also dismissed.

b. The Rule of Reason

In alleging a violation of *Section 1 of the Sherman Act* under the rule of reason, a plaintiff bears the burden of showing that the challenged action has an actual adverse effect on competition as a whole in the relevant market. *Capital Imaging Assocs., P.C. v. Mohawk Valley Medical Assocs., Inc., 996 F.2d 537, 543 (2d Cir. 1993)*. It is not sufficient for plaintiffs merely to show that they have suffered injury due to the alleged agreement; they must also demonstrate "an actual adverse effect on competition market-wide." *Electronics Communications Corp., v. Toshiba, 129 F.3d at 244*. "The injury to a relevant market requirement [*24] assures that the *Sherman Act* protected competition as a whole in the relevant market, and not the individual competitors within that market." *Dresses for Less, Inc. 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482 *7 (S.D.N.Y. 2002)*(internal quotations omitted).

In support of their rule of reason claim, plaintiffs allege that

each of the agreements entered into among the defendants was an agreement in restraint of trade in violation of *15 U.S.C. § 1*, intending to achieve anti competitive effects. Each agreement violates the *Sherman Act* under the Rule of Reason because its pro-competitive effects are outweighed by its anti-competitive effects.

Complaint at 19, P65. Plaintiffs also claim that "as a result of defendants' conduct, plaintiffs have been damaged in an amount to be determined at trial in excess of $ 40,000,000.00 for which defendants are jointly liable." Id. at 19, P66. Plaintiffs also allege that the

piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors. The domestic garment manufacturing market is adversely affected by the antitrust violations through [*25] the resulting increase in piece goods prices and the elimination of garment manufacturers from the marketplace.

Id. at 8, P20.

These allegations are insufficient to establish a violation under the rule of reason. Plaintiffs make no allegations from which the Court could infer that defendants' alleged actions had "any anticompetitive effect beyond the injury to plaintiffs." See *Granite Partners, L.P v. Bear, Stearns & Co., Inc. 17 F. Supp.2d 275, 297-98 (S.D.N.Y. 1998)*. As discussed *supra,* plaintiffs have not articulated with any particularity the effect of the defendants' alleged actions on the piece goods market. Alleging that the price they paid for piece goods increased as a result of their concomitant inability to receive credit to purchase those goods falls short of alleging an anticompetitive effect beyond personal injury to the plaintiffs. Furthermore, the allegation that client competition among the factors was reduced is conclusory and unsubstantiated. Lastly, plaintiffs' allegation of an anticompetitive effect on the domestic garment manufacturing marker is also conclusory. Plaintiffs claim that garment manufacturers were eliminated from [*26] the marketplace. However, they do not allege what garment manufacturers, other than themselves, were affected by defendants' alleged actions. Indeed, plaintiffs' claims center on their injury alone and not on a broader injury to competition generally. Plaintiffs, therefore, have also failed to allege the requisite antitrust injury to competition resulting from defendants' actions.

A plaintiff that fails to plead an actual injury to competition may nonetheless show antitrust injury by showing that the defendant possesses "market power" sufficient to inhibit competition on a market-wide basis. *Dresses for Less, 2002 U.S. Dist. LEXIS 18338, 2002 WL 31164482 at *7 (S.D.N.Y. 2002)*. Market power is defined as the power to raise prices significantly above the competitive level without losing all of one's business. See id.; see also *CDC Techs., Inc. v. IDEXX Lab., Inc., 186 F.3d 74, 81 (2d Cir. 1999)*(internal citations and quotations omitted). Plaintiffs do not allege with any specificity that defendants possess market power in the factoring market. Plaintiffs, furthermore, do not allege that the defendants sought to raise the price for credit market-wide in a manner that affected competition. Plaintiffs' [*27] Second Cause of Action alleging a violation under the Rule of Reason is therefore dismissed.

B. Section 2 of the Sherman Act

Plaintiffs claim that the defendants have conspired to monopolize both the factoring market for domestic piece goods vendors and the factoring market for domestic garment manufacturers. n8 They allege that the defendants "engaged in an unlawful combination and conspiracy to unreasonably restrain and monopolize interstate commerce." Complaint at 12, P30. Plaintiffs assert that the "defendants acted as "one" and that they "black listed certain customers and weeded out those that they targeted to drive out of business." Id. at 11, P27. Defendant C.I.T. argues that plaintiffs' complaint fails to allege a conspiracy to monopolize, an abuse of monopoly power, an antitrust injury or a relevant market. n9 Defendant Rosenthal similarly argues that plaintiffs have failed to allege an antitrust injury, an abuse of monopoly power or a relevant market. n10

n8 Although plaintiffs did not specify in their complaint that their third cause of action constituted a conspiracy to monopolize claim as opposed to a monopolization claim, in their Memorandum of Law in Opposition to Defendants' Motions to Dismiss the Complaint ("Plaintiffs' Brief"), plaintiffs argue that their complaint alleges a conspiracy to monopolize. See Plaintiffs' Brief at 20. [*28]

n9 C.I.T. also asserts that they should not even be a defendant in this matter as they are not alleged to have had a factoring contract with the plaintiffs and were not a party to any of the alleged tortious conduct that C.I.T. claims is the

gravamen of plaintiffs' complaint. C.I.T. argues that they are "named as a defendant solely because of [their] alleged market share and because [they] attended, along with other factors, weekly meetings of two industry credit groups. That is not enough to state a claim under any law, including the antitrust laws." C.I.T. Brief at 1.

n10 Rosenthal likewise argues that "CIT was added to the Complaint simply to permit a *Section 2* claim to be asserted." Rosenthal Brief at 13.

*Section 2 of the Sherman Act* provides that "every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize, any part of the trade or commerce among the several States" shall have committed an illegal act. *15 U.S.C. § 2*. In order to state a claim of conspiracy to monopolize under *Section 2*, [*29] a plaintiff must allege (1) a concerted action, (2) overt acts in furtherance of the conspiracy, and (3) specific intent to monopolize. *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc., 129 F.3d 240, 246 (2d Cir. 1997).* "Intent alone is not sufficient, however; the defendant's power in the relevant market must be established, to establish whether the defendant is a monopolist or is threatening to become one." Id. Furthermore, "a short plain statement of a claim for relief which gives notice to the opposing party is all that is necessary in antitrust cases, as in other cases under the Federal Rules." *George C. Frey Ready-Mixed Concrete, inc. v. Pine Hill Concrete Mix Corp., 554 F.2d 551, 554 (2d Cir. 1977).* Lastly, "in antitrust cases in particular, the Supreme Court has stated that dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *George Haug Co. v. Rolls Royce Motor Cars Inc., 148 F.3d 136, 139 (2d Cir. 1998)*(internal quotations and citations omitted).

Plaintiffs' complaint presents colorable claims of a conspiracy to monopolize under *Section* [*30] *2*. The gravamen of plaintiffs' *Section 2* claims, and indeed of all of plaintiffs' federal claims, is that the defendants conspired to selectively choose which garment manufacturers would receive credit and which would not. This choice, in effect, ultimately decided which manufacturers went out of business and which ones did not. Complaint at 20, P68. Whether through the defendants' alleged membership in both the Uptown Credit Group and the Thursday Group, or through other unspecified meetings, plaintiffs maintain that the defendants "shared all credit information and in effect merged the companies." Id. at 11, P27. It is at these meetings and "during telephone calls and other contacts"

that the alleged concerted action took place. Id. at 12, P28.

Similar to their arguments to dismiss plaintiffs' *Section 1* claims, defendants contend that the plaintiffs have failed to specify the conspiracy claims with any particularity, citing several cases where antitrust conspiracy actions were dismissed for failing to allege any supporting facts. See *Telectronics Proprietary, Ltd., v. Medtronic, Inc., 687 F.Supp 832, 839 (S.D.N.Y. 1988)*(quoting *Heart Disease Research Foundation v. General Motors Corp., 463 F.2d 98, 100 (2d Cir. 1972)).* [*31] n11 Unlike their *Section 1* claim, however, plaintiffs have alleged facts sufficient to support a preliminary finding of concerted action among the defendants. n12

n11 Unlike the plaintiff in *Telectronics,* who did not name the others who allegedly conspired with the defendants, plaintiffs in the instant case have alleged that all the defendants conspired with each other to monopolize the factoring markets for garment manufacturers and for piece goods vendors.

n12 *Sections 1* and *2* of the *Sherman Act* require proof of conspiracies which are reciprocally distinguishable from and independent of each other, although the objects of the conspiracies may partially overlap. See *American Tobacco Co. v. United States, 328 U.S. 781, 788, 66 S. Ct. 1125, 1129, 90 L. Ed. 1575 (1946).*

Plaintiffs, furthermore, allege several overt acts in furtherance of the alleged conspiracy. Plaintiffs claim that the defendants

deliberately created a monopoly by merging their interests, eliminating competition, [*32] and working to together control the business, by agreeing and deciding to give Plaintiffs credit or not, setting the prices, controlling every credit decision relative to factored sales, issuing substantially the same unconscionable contract, and having the ability to drive manufacturers out of business, including plaintiffs.

Complaint at 13, P33. Plaintiffs further allege that the defendants

have the power to drive manufacturers out of business by their agreements together

to control the market and in turn control the garment manufacturers by choosing which manufacturers they would withhold payments to and deny credit to, fixing costs of goods at artificially high prices, and charging exorbitant fees.

Complaint at 9, P21. These allegations are sufficient to allege overt acts in furtherance of the conspiracy.

Plaintiffs have also specifically alleged the defendants' intent to monopolize. Plaintiffs claim that the defendants "engaged in the acts and practice alleged herein with the specific intent to achieve or maintain monopoly power in the two affected markets." Complaint at 20, P69. Plaintiffs further allege that the defendants' merging of interests gave [*33] the defendants "a dominant share in the factored domestic manufacturing market" and in the piece goods market, as well as "the power to drive manufacturers out of business by their agreements together to control the market and in turn control the garment manufacturers." Id. at 9, P21. This alleged monopoly power came from the defendants' ability to "control 85% of factoring market for garment manufacturing" and "90% of the factored piece goods vendors in the United States." Id. at 9, 10 PP22, 24. Although the allegation of market share is not the same as one alleging monopoly power, the existence of monopoly power may be inferred from a predominant share of the market. See *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71, 86 S. Ct. 1698, 1703-04, 16 L. Ed. 2d 778 (1966). The higher the market share, the stronger the inference of monopoly power. See *Broadway Delivery Corp. v. United Parcel Serv. of America, Inc.*, 651 F.2d 122, 129 (2d Cir. 1981).

Defendants further argue that plaintiffs' fail to allege an anticompetitive effect harmful to competition or antitrust injury. "Market share is not enough to allege a violation of *Section 2* because [*34] monopoly power is not unlawful *per se.*" Defendant C.I.T. Brief at 14 (internal quotations and citations omitted). An "antitrust injury" is an

injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violations or of anticompetitive acts made possible by the violation. It should, in short, be the type of loss that the claimed violations ... would likely cause.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S. Ct. 690, 50 L. Ed. 2d 701 (1977); see also *Mr. Furniture Warehouse, Inc. v. Barclays American/Commercial, Inc.*, 919 F.2d 1517, 1522 (11th Cir. 1990)(finding that a "monopolist's refusal to deal becomes actionable under the antitrust laws only where the refusal is designed to have an anticompetitive effect, whether to gain greater market share, to drive up prices, or to obtain some other illegal goal"). To state an antitrust injury, a plaintiff must demonstrate that defendants' conduct "has had an actual adverse effect on competition as a whole in the relevant market; to [*35] prove it has been harmed as an individual competitor will not suffice." *Capital Imaging*, 996 F.2d at 543; see also *Brunswick Corp.*, 429 U.S. at 488 ("The antitrust laws ... were enacted for 'the protection of competition, not competitors.'")(quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S. Ct. 1502, 8 L. Ed. 2d 510 (1962)). Plaintiffs, however, have proffered sufficient allegations displaying harm to competition and antitrust injury. Plaintiffs allege that

defendants have violated Section 2 of the Sherman Act, 15 U.S.C. § 2, because they have acted with specific intent to archive (sic) or maintain monopoly power in the factoring market for domestic piece goods and garment manufacturers by merging with competitors and unlawfully utilizing its resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers that potentially enhance defendants' overall credit risk exposure.

Complaint at 20, P70. Plaintiffs also maintain that the defendants'

actions have harmed consumers in that the manufacturer has to charge higher prices and the manufacturers [*36] that were forced out of business prevented consumers from having the freedom to choose from quality merchandise suppliers since there is a limited product.

Complaint at 16, P49. These allegations are sufficient to allege both the anticompetitive effect of, as well as the antitrust injury resulting from, defendants' actions.

Lastly, defendants argue that the plaintiffs have failed to adequately allege a relevant market. "A complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed." *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.*, 2001 U.S. Dist. LEXIS

*18831, 2001 WL 1468168 (S.D.N.Y. 2001)*. However, because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market." *Todd v. Exxon Corporation, 275 F.3d 191, 199 (2d Cir. 2001)*. "To survive a *Rule 12(b)(6)* motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes-- analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible. [*37] " *Id. at 199* (internal citations omitted). "Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way." Id.

Plaintiffs allege that the "relevant market is the factoring market for domestic garment manufacturers." Complaint at 8, P20. Plaintiffs further claim that factors are distinguishable from banks and other credit institutions in that factors are willing to grant credit without the borrower having to put up collateral outside of the borrower's invoices and incoming accounts receivable. Id. Plaintiffs also claim that the "piece goods market is impacted adversely by antitrust violations through the resulting reduction of price and client competition among the factors. The domestic garment manufacturing market is adversely affected by the antitrust violations through the resulting increase in piece goods prices and the elimination of garment manufacturers from the marketplace. [*38] " Id. Defendants' motions to dismiss plaintiffs' *Section 2* claims are denied.

C. Clayton Act

Plaintiffs also assert claims under *Sections 4* and *7* of the Clayton Act. Complaint at 1, P1. n13 Plaintiffs make the same allegation they did under their *Section 1* and *Section 2* claims alleging that the

> defendants violated the *Clayton Act* because it has acted with specific intent to achieve or maintain its monopoly power in the factoring market for domestic piece goods and garment manufacturers by merging with competitors and unlawfully utilizing its resulting economic leverage to fix piece goods prices and to drive out of business garment manufacturers to enhance defendants' overall credit risk exposure.

Complaint at 21, P76.

n13 The Fourth Cause of Action of plaintiffs' complaint does not specify which section of the *Clayton Act* was violated. In paragraph 1 of their complaint, plaintiffs allege a violation of *Section 4. Section 4*, however, does not provide a substantive claim for relief but rather enables plaintiffs who have been injured under the antitrust laws to sue for damages. See *Floors-N-More, Inc. v. Freight Liquidators, 142 F. Supp.2d 496, 499-500 (S.D.N.Y. 2001)*; see also *Associated General Contractors of California, Inc. v. California State Council of Carpenters, 459 U.S. 519, 526, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983)*. In contrast, plaintiffs argue in their Memorandum of Law in Opposition to Defendants' Motion to Dismiss that they have adequately alleged a claim under *Section 7 of the Clayton Act*. Plaintiffs do not reference any other section of the *Clayton Act*. The Court, therefore, will construe plaintiffs' *Clayton Act* claim as one being under *Section 4* and *Section 7* of that act.

[*39]

The Supreme Court summarized the purpose of *Section 7* of the Clayton Act in *United States v. Falstaff Brewing Corp., 410 U.S. 526, 531-32, 35 L. Ed. 2d 475, 93 S. Ct. 1096, 1099- 1100, (1973)*: Section 7 of the *Clayton Act* forbids mergers in any line of commerce where the effect may be substantially to lessen competition or tend to create a monopoly. n14 The section proscribes many mergers between competitors in a market, *United States v. Continental Can Co., 378 U.S. 441 (84 S. Ct. 1738, 12 L. Ed. 2d 953) (1964)*; *Brown Shoe Co. v. United States, 370 U.S. 294 (82 S. Ct. 1502, 8 L. Ed. 2d 510) (1962)*; it also bars certain acquisitions of a market competitor by a noncompetitor, such as a merger by an entrant who threatens to dominate the market or otherwise upset market conditions to the detriment of competition, *FTC v. Procter & Gamble Co., 386 U.S. 568, 578- 580 , 18 L. Ed. 2d 303, 87 S. Ct. 1224 (1967)*. Suspect also is the acquisition by a company not competing in the market but so situated as to be a potential competitor and likely to exercise substantial influence on market behavior. Entry through merger [*40] by such a company, although its competitive conduct in the market may be the mirror image of that of the acquired company, may nevertheless violate § 7 because the entry eliminates a potential competitor exercising present influence on the market. *Id., at 580-581 (87 S. Ct. at 1231-1232)*; *United States v. Penn-Olin Chemical Co., 378 U.S. 158, 173-174 (84 S. Ct. 1710-1718, 12 L. Ed. 2d 775) (1964)*.

n14 *Section 7 of the Clayton Act* provides that

> No person engaged in commerce or in any activity affecting commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person engaged also in commerce or in any activity affecting commerce, where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

*15 U.S.C. § 18.*

[*41]

None of the preceding situations exist in the present case. Plaintiffs allegations of a 'merger' are conclusory and unsupported by any factual allegations. Plaintiffs do not allege the existence of either a merger agreement or an acquisition agreement to support its *Section 7* claim. Plaintiffs' *Section 7* claim, therefore, is dismissed.

### D. Donnelly Act

Plaintiffs also assert claims under the *Donnelly Act of the State of New York*. Specifically, plaintiffs allege that the defendants

> entered into agreements with other factoring companies to engage in group boycotts where they refused to approve credits for New York based garment manufacturers, unlawfully fixed piece goods prices for those manufacturers, drove them out of business, and enabled the factors to maintain supra-competitive pricing structures and stable market shares, among other anti-competitive effects.

Complaint at 22, P79. Plaintiffs further assert that

> the unlawful reduction of the number of garment manufacturers competing in the market has resulted in artificially maintained and non-competitive levels of prices for factoring services throughout

New York and has enabled the factors to stabilize [*42] their respective market shares in a way that could not have been achieved or maintained had the factors operated in a genuinely competitive environment.

Complaint at 22, P80. Defendants move to dismiss plaintiffs' *Donnelly Act* claims on the same grounds that it moved to dismiss the *Sherman Act* claims.

The Donnelly Act, *N.Y. Gen. Bus. Law § 340*, states that "every contract, agreement, arrangement or combination whereby a monopoly ... is or may be established or maintained, or whereby competition ... may be restrained" is illegal. *N.Y. Gen. Bus. Law § 340(1)*. The Donnelly Act was patterned after the *Sherman Act* and has been narrowly construed to encompass only those causes of action falling within the *Sherman Act*. See also *State v. Mobil Oil Corp., 38 N.Y.2d 460, 381 N.Y.S.2d 426, 427, 344 N.E.2d 357 (1976)*; accord *Great Atlantic & Pacific Tea Co., Inc. v. Town of East Hampton, 997 F. Supp. 340 (E.D.N.Y.1998)* (finding *Donnelly Act* is modeled after the *Sherman Antitrust Act* and is generally interpreted in accordance with federal precedent); see also *Anheuser-Busch, Inc. v. Abrams, 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820, 520 N.E.2d 535 (1988)* [*43] (*Donnelly Act* was modeled on the *Sherman Act* and is to be construed in accord with it). Accordingly, defendants' motion to dismiss plaintiffs' *Donnelly Act* claims is granted in part and denied in part. Plaintiffs' *Donnelly Act* claims of price-fixing and group boycott are therefore dismissed.

### E. State Law Claims

In addition to plaintiffs' federal and state antitrust claims, plaintiffs also allege the following pendant state law claims: trade libel; defamation, libel and slander; injurious falsehood; interference with commercial relations; and breach of contract. Each of these claims, with the exception of plaintiffs' breach of contract claim, have been alleged as conspiracies to commit the alleged tortious acts. In presenting their claims in this manner, plaintiffs allege that all of the defendants are liable for the tortious conduct. Specifically, plaintiffs' Sixth, Seventh, Eighth and Ninth Causes of Action claim that all of the defendants "engaged in an unlawful combination and conspiracy" to commit trade libel; defamation, libel and slander; injurious falsehood; and interference with commercial relations.

Under New York law, however, "a mere conspiracy to commit a [tort] [*44] is never of itself a cause of action." *Alexander & Alexander v. Fritzen, 68 N.Y.2d 968, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986)* (citations omitted). An independent tort must form the basis of a

claim of civil conspiracy. See *Demalco v. Feltner, 588 F. Supp. 1277, 1278 (S.D.N.Y.1984); Smukler v. 12 Lofts Realty, 156 A.D.2d 161, 548 N.Y.S.2d 437, 439 (1st Dep't 1989),* app. den., *76 N.Y.2d 701, 557 N.Y.S.2d 878, 557 N.E.2d 114 (1990).* "[A] defendant may be held liable in tort for conspiracy to do an unlawful thing, or to do a lawful thing in an unlawful manner." *Arlinghaus v. Ritenour, 622 F.2d 629, 639 (2d Cir.1980)*(internal citations omitted); see *Banque Nationale de Paris v. Prudential Sec., Inc., 1997 U.S. Dist. LEXIS 15998, 1997 WL 639257, at *3 (S.D.N.Y. Oct. 16, 1997).* The purpose of civil conspiracy is to "establish[] joint liability by co-participants in a particular tortious conduct." *Sackman v. Liggett Group, Inc., 965 F. Supp. 391, 395 (E.D.N.Y.1997).* A successful claim for civil conspiracy requires a plaintiff to show the primary tort plus the following four elements: "'([1]) a corrupt [*45] agreement between two or more persons[;] ([2]) an overt act in furtherance of the agreement[;] ([3]) the parties' intentional participation in the furtherance of a plan or purpose[;] and ([4]) the resulting damage or injury.'" *Andre Emmerich Gallery, Inc. v. Segre, 1997 U.S. Dist. LEXIS 16899, 1997 WL 672009, at *10 (S.D.N.Y. Oct. 29, 1997)* (quoting *Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1267 (S.D.N.Y.1991)).*

Plaintiffs provide no factual support for their conclusory allegations of a conspiracy to commit any of these torts. Plaintiffs claims of a conspiracy to commit these torts, therefore, is dismissed as to all plaintiffs. Furthermore, as will be seen, plaintiffs have also failed to allege facts sufficient to support their claims of the underlying torts.

a. Trade Libel and Injurious Falsehood

Plaintiffs Sixth and Eighth Causes of Action allege independent trade libel and injurious falsehood claims against all the defendants. In support of their trade libel claim, plaintiffs allege that the

> defendants have engaged in an unlawful combination and conspiracy to cause the publication of untruths disparaging plaintiffs, such as [*46] plaintiffs' actions are fraudulent, their products and services are of inferior quality, they misappropriated inventories and are poor risks. Such publications being accompanied by an intent to cause competitive injury, personal hostility, and bad faith. These untruths were published maliciously and without reasonable or probable cause to believe in the truth thereof. These publications of injurious falsehoods constituted, and continue to

constitute, the tort of trade libel for which defendants are jointly and severally liable.

Complaint at 23, P87.

Similarly, in support of their injurious falsehood claim, plaintiffs restate many of the same conclusory allegations in their trade libel claim. Plaintiffs maintain that the

> defendants have engaged in an unlawful combination and conspiracy to cause the publication of untruths disparaging plaintiffs, such publication being accompanied by an intent to cause competitive injury, personal hostility, and bad faith. These untruths were published maliciously and without reasonable or probable cause to believe in the truth thereof. These publications of injurious falsehoods such as plaintiffs committed fraud, stole money, fraudulently [*47] conveyed assets, misrepresented themselves, and lied to their customers, and switched receivables constitute the tort of injurious falsehood. Defendants made these statements and published these statements knowing they were false and knowing and intending to cause harm to plaintiffs. These statements in fact caused harm to plaintiffs' in that plaintiffs' customers stopped doing business with plaintiffs and other factors withdrew funding from plaintiffs and factors refuse to factor plaintiffs.

Complaint at 25, P92.

These conclusory allegations are insufficient to support plaintiffs' claim of trade libel or injurious falsehood. The allegations fail to identify which specific defendants committed these torts. Furthermore, the allegations fail to identify the false statements made by any defendant. However, in their Seventh Cause of Action for defamation, slander and libel, plaintiffs make allegations from which the Court may infer false statements in support of their trade libel and injurious falsehood claims. Plaintiffs allege that Miles M. Stuchin "defamed and slandered Plaintiffs by writing and publishing false and libelous letters, including a letter dated November 3, 2000, and [*48] telephone calls, mainly during October 2000 and through and including December 2000, and oral communications to Plaintiffs' clients and to the industry." Complaint at 6, P17. Stuchin and defendant Access Capital, of which he is president, are alleged to have

defamed[,] libeled and slandered plaintiffs in that on many dates during the time between October 2000 and February 2001, defendant and his employees including Vincent Grillo called and wrote plaintiffs' customers and others in the industry stating that plaintiffs "committed fraud," "stole money," "fraudulently conveyed assets," "misrepresented themselves" and "lied" to their customers, and "switched receivables.

Complaint at 6, P17. Lastly, plaintiffs maintain that in a letter dated January 16, 2001, defendants Richard I. Simon and Westgate Financial, of which he is allegedly president, "accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey." Complaint at 7, 15, PP18, 43. These statements were published to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others. Id. at 15, P43. [*49] n15

n15 Plaintiffs have not pled their trade libel or injurious falsehood claim against all defendants with any specificity. The only defendants identified as having made false statements are Miles M. Stuchin, Access Capital, Richard I. Simon and Westgate Financial. The Court will therefore treat plaintiffs' claims of trade libel and injurious falsehood as against those defendants only. If indeed plaintiffs intended to allege these claims against all of the defendants, those claims are dismissed as conclusory and unsupported by specific allegations of published false statements.

Although pled separately, the torts of trade libel and injurious falsehood require the same allegations to be pled. The distinction between the two is slight; courts having articulated that statements disparaging another's product were called "trade libel," another's business "injurious falsehood," and another's title "slander of title." *Payrolls & Tabulating, Inc. v. Sperry Rand Corp.,* 22 A.D.2d 595, 257 N.Y.S.2d 884, 887 [*50] *(1st Dep't 1965).* "The tort of trade libel or injurious falsehood consists of the knowing publication of false matter derogatory to the plaintiff's business of a kind calculated to prevent others from dealing with the business or otherwise interfering with its relations with others, to its detriment." *Waste Distillation,* 136 A.D.2d 633, 634, 523 N.Y.S.2d 875 (2nd Dep't 1988); see also *Global Merch., Inc. v. Lombard & Co.,* 234 A.D.2d 98, 99, 650 N.Y.S.2d

724 (1st Dep't 1996) ("trade libel ... requires 'knowing publication of false matter derogatory to the plaintiff's business.'") (quoting *Waste Distillation,* 136 A.D.2d at 634, 523 N.Y.S.2d 875). "The utterance or furnishing of false and misleading information may be actionable if done maliciously or with the intention to harm another, or so recklessly and without regard to its consequences, that a reasonably prudent person should anticipate that damage to another will naturally follow." *Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co.,* 7 A.D.2d 441, 444, 184 N.Y.S.2d 58, 61 (App. Div. 1st Dep't 1959).

The elements of a claim of injurious falsehood or trade libel are:    [*51]    (i) falsity of the alleged statements; (ii) publication to a third person; (iii) malice; and (iv) special damages. See *Drug Research Corp. v. Curtis Publishing Co.,* 7 N.Y.2d 435, 440, 199 N.Y.S.2d 33, 37, 166 N.E.2d 319 (1960); see also *Computech Int'l, Inc. v. Compaq Computer Corp.,* 2002 U.S. Dist. LEXIS 20307, No. 02 Civ. 2628, 2002 WL 31398933, at *5 (S.D.N.Y. Oct. 24, 2002). The requirement of pleading and proving special damages is applied strictly. See *id.WL at *6.* Thus, a motion to dismiss a claim of injurious falsehood may be granted for failure to allege special damages with the requisite specificity. See *id.*; see also *Drug Research Corp.,* 7 N.Y.2d at 440-41, 199 N.Y.S.2d at 37-38, 166 N.E.2d 319.

Plaintiffs' claims of trade libel and injurious falsehood, like their defamation, slander and libel claims, are premised on two letters dated November 3, 2000 and January 16, 2001 as well as telephone calls made during October 2000 and through and including December 2000. Plaintiffs complaint, however, does not allege with particularity to whom the November 3, 2000 letter was written. n16 Plaintiffs' claim regarding the November 3, 2000 letter, therefore,    [*52] is dismissed. Furthermore, all of plaintiffs' trade libel and injurious falsehood claims against all defendants must be dismissed because plaintiffs failed to allege special damages with sufficient particularity. Under New York law, plaintiffs' special damages claim, premised on their loss of business, must be "fully and accurately stated." *Drug Research Corp. v. Curtis Pub. Co.,* 7 N.Y.2d 435, 440-41, 199 N.Y.S.2d 33, 37-38, 166 N.E.2d 319 (N.Y. 1960)(finding that special damages were not adequately alleged where the damage claim was a round figure [$ 5,000,000] with no attempt at itemization); see also *Rall v. Hellman,* 284 A.D.2d 113, 114, 726 N.Y.S.2d 629, 632 (App. Div. 1st Dep't 2001)(finding that complaint was deficient because it failed to identify special damages with sufficient particularity). Plaintiffs allege damages "in an amount to be determined at trial but not less than $ 40,000,000.00." Complaint at 23, 26, PP87, 93. This allegation is insufficient under New York law and cannot survive defendants' motion to dismiss.

n16 Plaintiffs do, however, allege that "on December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance" Complaint at 15, P42. Plaintiffs also allege the third person to whom Westgate published false statements: "on or about January 16, 2001 Defendants, including Westgate Financial Corp., accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey. Defendants published these statements to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access Capital, Star Funding, John Michaels, and Gabbey, among others." Complaint at 15, P43.

[*53]

b. Defamation, Libel, Slander

In their Seventh Cause of Action, plaintiffs assert claims of defamation, libel and slander. Premised on the same set of allegations as their trade libel and injurious falsehood claims, plaintiffs' defamation, libel and slander claim is based on false statements allegedly made by defendants Stuchin, Access Capital, Simon and Westgate Financial in two letters dated November 3, 2000 and January 16, 2001, as well as oral statements made on the telephone from October 2000 through and including February 2001. Complaint at 6, 13, 14, 24, PP17, 36, 37, 89. As with plaintiffs trade libel and injurious falsehood claims, plaintiffs' claim regarding the November 3, 2000 letter fails to specify to whom the letter was published and is, therefore, dismissed.

Although defendants Westgate, Simon, Access and Stuchin argue that plaintiffs claim must be dismissed for failing to specify to whom all of the alleged defamatory statements were made, plaintiffs' complaint does allege that "on December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance. [*54] " Complaint at 15, P42. Plaintiffs further assert

that on or about January 16, 2001 Defendants, including Westgate Financial Corp., accused Gabbey Design of theft and fraud and created allegations of false, untrue, and malicious charges against Gabbey. Defendants published these statements to Rosenthal & Rosenthal, Bruce Cohen, Dana Flaxman, Access

Capital, Star Funding, John Michaels, and Gabbey, among others.

Complaint at 15, P43. n17

n17 Additionally, plaintiffs maintain that Omni Corp. "slandered plaintiffs to many in the industry." Complaint at 3, P7. Although plaintiffs allege that Omni Corp. and not named defendant Omni Commercial, LLP slandered the plaintiffs, assuming *arguendo* that the plaintiffs allegation is directed towards defendant Omni Commercial, plaintiffs' claim would still be dismissed for failure to state a claim. Plaintiffs do not allege a specific defamatory statement; to whom these statements were made; nor any special damages to support their claim.

Under New York law, [*55] the elements of a defamation cause of action are: (i) a defamatory statement of fact concerning the plaintiff, (ii) publication to a third party by the defendant, (iii) falsity of the defamatory statement, (iv) some degree of fault, and (v) special damages or per se actionability (defamatory on its face). See *Dillon v. City of New York*, 261 A.D.2d 34, 37, 704 N.Y.S.2d 1- 38, (App. Div. 1st Dep't 1999); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 176 (2d Cir.2000). As a general rule, a statement is defamatory per se if it "tends to disparage a person in the way of his office, profession or trade." *Celle*, 209 F.3d at 179 (emphasis in original); see also *Aronson v.. Wiersma*, 65 N.Y.2d 592, 594, 493 N.Y.S.2d 1006, 1008, 483 N.E.2d 1138 (1985). If a statement is defamatory *per se*, injury is assumed and the statement is actionable without proof of special damages. Special damages are those which flow directly from the injury to a plaintiff's reputation caused by the defamation and which involve the loss of something having economic or pecuniary value. See *Celle*, 209 F.3d at 179 (citing [*56] *Matherson v. Marchello*, 100 A.D.2d 233, 235, 473 N.Y.S.2d 1006, 1000 (App. Div.2d Dep't 1984)). Lastly, "a plaintiff in a libel action must identify a plausible defamatory meaning of the challenged statement or publication." *Celle* 209 F.3d at 178. If the statement is susceptible of only one meaning, it becomes the court's responsibility to determine, as a matter of law, whether that one meaning is defamatory. On the other hand, if the words are reasonably susceptible of multiple meanings, some of which are not defamatory, it becomes the trier of fact's responsibility to determine in what sense the words were used and understood. See id.

Although plaintiffs allege that all of the defendants committed defamation, plaintiffs' complaint only supports claims against defendants Stuchin, Access

Capital, Simon and Westgate Financial. Stuchin and Access Capital are alleged to be responsible for the November 3, 2000 letter as well as the oral communications between October 2000 and February 2001. Defendants Simon and Westgate are alleged to be responsible for the January 16, 2001 letter. As plaintiffs' complaint does not refer to any other communications, [*57] plaintiffs claims against all other defendants are dismissed.

Plaintiffs' claims against defendants Stuchin and Access Capital regarding the November 3, 2000 letter are dismissed for failing to allege with specificity the exact words contained in the November 3, 2000 letter that plaintiffs' claim are libelous. Plaintiffs' insufficient pleading of the allegedly defamatory statement goes hand in hand with their failure to identify a plausible defamatory meaning for that statement. Plaintiffs further fail to allege to whom that letter was published. Lastly, plaintiffs fail to allege special damages or that the defamatory words contained in the letter should be considered by the Court as defamatory *per se*. See *Church of Scientology Int'l v. Eli Lilly & Co., 778 F.Supp 661, 668 (S.D.N.Y. 1991)*(dismissing claim that failed "to provide both the context and the precise language of" the alleged statements).

Plaintiffs allegations concerning the January 16, 2001 letter allegedly written by defendants Simon and Westgate Financial suffer from the same deficiencies as their claims regarding the November 3, 2000 letter. Plaintiffs fail to articulate the libelous statement [*58] made in that letter and also fail to allege either special damages or that the libelous statement reaches *per se* liability. Although plaintiffs allege to whom that letter was sent, that allegation alone is insufficient to support plaintiffs' claims. Plaintiffs' libel claim regarding the January 16, 2001 letter is therefore dismissed.

Plaintiffs claims regarding telephone calls and other oral communications that occurred between October 2000 and February 2001 against Stuchin and Access Capital are dismissed except for one slander allegation: "on December 5, 2000, Defendant Stuchin telephoned Rosenthal & Rosenthal and falsely accused plaintiffs of committing fraud, stealing money, and switching invoices in a fraudulent conveyance." Complaint at 15, P42. Under New York law, there are four elements necessary to establish a *prima facie* case of slander: (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff. The fourth element is presumed when the defamatory statement takes the form of slander *per se. Weldy v. Piedmont Airlines, 985 F.2d 57, 61-62 (2d Cir. 1993)* [*59] (citations omitted). Defamation *per se* "consist[s] of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure

another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman v. Gelstein, 80 N.Y.2d 429, 435, 590 N.Y.S.2d 857, 605 N.E.2d 344 (1992)*. The second type of defamation *per se* is "limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities". *Id.* Thus, "charges against a clergyman of drunkenness and other moral misconduct affect his fitness for the performance of the duties of his profession, although the same charges against a business man or tradesman do not so affect him". *Id. at 436, 590 N.Y.S.2d 857, 605 N.E.2d 344* (citations omitted). For the purposes of this motion, therefore, plaintiff has adequately pled a *prima facie* case of slander. Defendants' motion to dismiss plaintiffs' [*60] claim of slander based on this telephone call is denied.

c. Interference with Commercial Relations

In their Ninth Cause of Action, plaintiffs also allege a claim of interference with commercial relations. Plaintiffs maintain that the

> defendants have induced Plaintiffs' clients to refrain from purchasing from Plaintiffs by publishing disparaging and false statements about the products and services of Plaintiff, such publications being accompanied by an intent to cause competitive injury, personal hostility, bad faith, knowing the matter was false, by creating the impression and belief that to work with plaintiffs would jeopardize such customers' continued status, and by Defendants having purposely induced or otherwise caused third persons not to enter into or continue business relations with Plaintiffs.

Complaint at 13, P34. These allegations are insufficient to state a claim of tortious interference with business relations against all of the defendants. The only allegations which specify direct conduct by particular defendants are actions by defendants Access Capital and Stuchin against plaintiff John Michaels. Plaintiffs allege that Access Capital and Stuchin "interfered [*61] with an unrelated lawsuit plaintiffs were involved in, illegally diverted and opened plaintiffs' personal and business mail." Complaint at 6, P17. Plaintiffs assert that

> on or about and after October 27, 2000, Defendant Access intentionally and illegally diverted, opened and withheld

Plaintiffs' mail, made illegal financial threats and demands upon Plaintiff John Michaels' accounts causing many of John Michael's accounts to withhold payments and caused John Michaels to be unable to operate its business.

Complaint at 14, P40. Plaintiffs maintain that

defendants' actions constitute interference of John Michaels' and other plaintiffs' contractual relationships with its customer accounts, and disrupted the normal operation of John Michaels' and plaintiffs' business, causing a great loss of booked orders plus future sales. Defendants acted intentionally with the knowledge that their actions would cause John Michaels' accounts to stop payments for shipments received and that the factors would refuse to do business with plaintiffs, and that plaintiffs' customers would refuse to do business with plaintiffs.

Complaint at 15, P41.

In order to state a claim for tortious [*62] interference with contractual relations under New York law, a plaintiff must allege "(1) the existence of a valid contract between itself and a third party for a specific term; (2) defendant's knowledge of that contract; (3) defendant's intentional procuring of its breach; and (4) damages." *150 East 58th St. Partners, L.P. v. Wilkhahn Wilkening & Hahn GmbH & Co., 1998 U.S. Dist. LEXIS 1701, No. 97 CIV. 4262(SHS), 1998 WL 65992, at *1 (S.D.N.Y. Feb. 17, 1998)* (quoting *Riddell Sports Inc. v. Brooks, 872 F. Supp. 73, 77 (S.D.N.Y.1995))*; see *Jews for Jesus, Inc. v. Jewish Community Relations Council of N.Y., Inc., 968 F.2d 286, 292 (2d Cir.1992)*; *Union Carbide Corp. v. Montell N.V., 944 F. Supp. 1119, 1136 (S.D.N.Y.1996)*; *Foster v. Churchill, 87 N.Y.2d 744, 749-50, 665 N.E.2d 153, 156, 642 N.Y.S.2d 583, 586 (1996)*.

The standard for demonstrating tortious interference with business relations "is somewhat more stringent." *Campo v. 1st Nationwide Bank, 857 F. Supp. 264, 273 (E.D.N.Y.1994)*; see *International Minerals and Resources, Inc. v. Pappas, 761 F. Supp. 1068, 1075 (S.D.N.Y.1991)*. A plaintiff [*63] must allege that defendants interfered with business or economic relations between the plaintiff and a third party, either with the sole purpose of harming the plaintiff or by dishonest, unfair, or improper means. See *PPX Enters., Inc. v. Audiofidelity Enters., Inc., 818 F.2d 266, 269 (2d Cir.1987)*; *Fonar Corp. v. Magnetic Resonance Plus, Inc., 957 F. Supp. 477, 482 (S.D.N.Y.)*, cert. denied, *522 U.S. 908, 118 S. Ct. 265, 139 L. Ed. 2d 191 (1997)*; *Houbigant, Inc. v. ACB Mercantile, 914 F. Supp. 964,*

*995 (S.D.N.Y.1995)*; *Campo, 857 F. Supp. at 273*. Indeed, the defendant "must interfere with the business relationship directly; that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." *Fonar Corp., 957 F. Supp. at 482*.

Defendants Access and Stuchin argue that plaintiffs fail under both standards. First, defendants argue that plaintiffs fail to allege that they were "actually and wrongfully prevented from entering into or continuing in a specific business relationship." *Solar Travel Corp. v. Nachtomi, 2001 U.S. Dist. LEXIS 7549, 2001 WL 641151 (S.D.N.Y. 2001)*; [*64] *Korn v. Princz, 226 A.D.2d 278, 641 N.Y.S.2d 283 (1st Dep't 1996)*. Defendants further contend that plaintiffs have not alleged that a contract would have been entered into but for the alleged actions of Access and Stuchin. See, e.g., *Bankers Trust Co. v. Bernstein, 169 A.D.2d 400, 563 N.Y.S. 2d 821 (1st Dep't 1991)*.

Plaintiffs' claims against defendants Stuchin and Access Capital must be dismissed. Plaintiffs do not allege with any specificity the contracts it claims were breached or the business relations it claims were prevented from going forward as a result of either Stuchin's or Access Capital's actions. Plaintiffs also fail to identify the third parties that plaintiffs had either a contractual or prospective business relationships with. Plaintiffs' claim of tortious interference with commercial relations is, therefore, dismissed.

### d. Breach of Contract

As is the case with all of their claims, in their breach of contract claim, plaintiffs do not specify which plaintiffs had contractual relationships with which defendants, generally alleging that the

defendants conduct and the unlawful acts in restraint of trade have caused the breach [*65] of their respective contracts with plaintiffs, and, Defendants have breached their contractual duties to each plaintiff separately and apart from their anti-competitive conduct. Defendants also engaged in the following additional actions that further breached its covenants of good faith and fair dealing. Defendants' bad faith actions contributed substantially to the demise of the plaintiffs, and caused each of the plaintiffs' substantial financial loss. The contracts themselves are unconscionable, against public policy, and predatory.

Complaint at 26-27, P98. Indeed the only allegations that support a breach of contract claim which specifically

identify a breach by a particular defendant of a contract with a specific plaintiff are against defendants Westgate and Star Funding. Plaintiffs allege that

> Westgate Financial confiscated Plaintiff John Michael's client inventory and sold it to a salvage company, never gave plaintiffs credit for payments made, refused to give advance funding, breached their contract, and caused a loss in excess of Two Million Dollars. Defendants misappropriated Plaintiffs' inventory and charged unlawfully high interest rates causing serious financial [*66] loss to John Michael's.

Complaint at 13, P35.

> Plaintiffs further allege that they were coerced and forced under duress to use the factor Star Funding, and then Star Funding immediately breached their contract based upon Rosenthal & Rosenthal's request not to go forward with its funding to Gabbey, all of this occurred after Star Funding and Rosenthal & Rosenthal met with defendants and agreed to force plaintiffs out of business.

Complaint at 14, P38.

In order to state a claim for breach of contract, plaintiffs must allege: (1) the existence of a contract; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract provisions by the defendants; and (4) damages resulting from the breach. See *Terwilliger v. Terwilliger, 206 F.3d 240, 246 (2d Cir. 2000)*. As plaintiffs have only alleged contracts with defendants

Westgate and Star Funding, plaintiffs breach of contract claim against all other defendants are dismissed. Plaintiffs claims against these remaining defendants are also dismissed for failing to allege adequate performance of the contract by the plaintiffs as well as damages resulting from the breach.

III. Conclusion [*67]

Defendants' motions to dismiss plaintiffs' claims under *Section 1 of the Sherman Act* are granted. Defendants' motions to dismiss plaintiffs' claims under *Section 2 of the Sherman Act* are denied. Defendants' motions to dismiss plaintiffs' claims under the *Clayton Act* are granted. Defendants' motions to dismiss plaintiffs' price-fixing and group boycott claims under the *Donnelly Act* are granted. Defendant's motion to dismiss plaintiffs' monopolization claims under the *Donnelly Act* are denied. Defendants' motions to dismiss all of plaintiffs' claims of trade libel, injurious falsehood, tortious interference with commercial relations and breach of contract are granted. Defendants' motion to dismiss plaintiffs' defamation, libel and slander claims is granted in part and denied in part. All of plaintiffs' defamation, libel and slander claims are dismissed except for plaintiffs' slander claim regarding the alleged December 5, 2000 telephone call.

Dated: New York, New York

December 10, 2004

SO ORDERED:

GEORGE B. DANIELS

United States District Judge [*68]