**LATHROP & GAGE L.C.**
**William R. Hansen (WH-9446)**
**Gianfranco G. Mitrione (GM-8168)**
**Bridget A. Short (BS-4191)**
**230 Park Avenue, Suite 1847**
**New York, New York 10169**
**(212) 850-6220 (tel)**
**(212) 850-6221 (fax)**

**Attorneys for Defendant**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
-----------------------------------------------------------X
CHAMILIA, LLC,                          :      Civil Action No.:
                                        :      04 CV 06017 (KMK)
                  Plaintiff,            :
                                        :
       -against-                        :      ECF CASE
                                        :
PANDORA JEWELRY, LLC,                   :
                                        :
                                        :
                  Defendant.            :
-----------------------------------------------------------X
```

### SUPPLEMENTAL DECLARATION OF GIANFRANCO G. MITRIONE
### IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

GIANFRANCO G. MITRIONE, does hereby declare:

1.     I am an associate with the firm of Lathrop & Gage L.C., attorneys for Defendant, Pandora Jewelry, LLC.  I am admitted to practice law in the State of New York.  I am familiar with all the facts and circumstances in this proceeding.

2.     I submit this supplemental declaration pursuant to Rule 56 of the Federal Rules of Civil Procedure in support of defendant's motion for summary judgment.  My original declaration dated January 14, 2005 is also submitted to the Court.

3.     Attached hereto as Exhibit O are excerpts from the transcript of the deposition of Michael Lund Petersen held on May 11, 2005.

4.     Attached hereto as Exhibit P are excerpts from the transcript of the deposition of Knud Hostrup held on April 26, 2005.

5.     Attached hereto as Exhibit Q are excerpts from the transcript of the deposition of Kathy L. Shaw-Riley held on May 6, 2005.

6.     Attached hereto as Exhibit R are excerpts from the transcript of the deposition of Jeff Julkowski held on May 12, 2005.

7.     Attached hereto as Exhibit S are excerpts from the transcript of the deposition of Lisa Whirlow held on May 13, 2005.

8.     Attached hereto as Exhibit T is a copy of a letter dated June 9, 2005 from James G. Goggin to Honorable Kenneth M. Karas.


I DECLARE under penalty of perjury that the foregoing is true and correct.


Dated: New York, New York
       July 15, 2005

                                        _____
                                        Gianfranco G. Mitrione


NYDOCS 9404v1

                                2

# EXHIBIT O to Supplemental Declaration of Gianfranco G. Mitrione dated July 15, 2005

Page 1

COPY

1
2

IN THE UNITED STATES DISTRICT COURT

3        FOR THE SOUTHERN DISTRICT OF NEW YORK

4    CHAMILIA, LLC,                          )
                                            )
5                        Plaintiff,         ) CONFIDENTIAL
                                            )
6            vs.                            ) 04 CV 06017
                                            )
7    PANDORA JEWELRY, LLC,                   )
                                            )
8                        Defendant.         )
     ------------------------------)

9
10
11
12            CONFIDENTIAL DEPOSITION OF
13            MICHAEL LUND PETERSEN
14                New York, New York
15            Wednesday, May 11, 2005
16
17
18
19
20
21
22
23    Reported by:
      Jeremy Frank, MPM
24    JOB NO. 172664
25

CONFIDENTIAL

Page 19

```
 1                      Petersen
 2    invented this concept of Pandora Jewelry.
 3         Q.     Can you describe the jewelry?
 4         A.     That I can.  It is a bracelet that
 5    is divided in three sections where it is
 6    divided into three sections where the middle
 7    one has two movable things, threads, and there
 8    is also a thread on the last section.  And
 9    then there is thread inside the attachment,
10    no, the beads.
11         Q.     Okay.
12         A.     Threads in the beads.
13         Q.     Did you invent the Pandora
14    Jewelry?
15         A.     No.
16         Q.     Who did?
17         A.     Per Enevoldsen.
18         Q.     Let's, when did you first come to
19    the United States?
20         A.     Around '86, I was here from '86 to
21    '89.
22         Q.     What were you doing here?
23         A.     I worked by selling Scandinavian
24    and Scandinavian and Italian furnitures.
25         Q.     Was that with Mr. Hostrup?
```

CONFIDENTIAL

Page 27

1                          Petersen

2                    Did you look for any letters that

3    related to Chamilia?

4         A.    We have never gotten any letters

5    as far as I can remember.

6         Q.    I show had you what's been

7    previously marked as Chamilia number 8, I ask

8    you to take a look at that.

9         A.    Do you want him to read it all

10   (sic)?

11        Q.    Do you recognize that letter?

12        A.    It is Pandora's terms and

13   conditions.

14        Q.    Could you look at the second page

15   of the letter.

16                   Did you send that letter?

17        A.    Yes, I have sent that letter.

18        Q.    You can turn back to the first

19   page, sir.  I would like you to look at the

20   fifth paragraph, could you read the fifth

21   paragraph to yourself.

22        A.    Yes.

23        Q.    Can you tell me the names of the

24   manufacturers who are referred to in that

25   paragraph?

CONFIDENTIAL

1                          Petersen

2       A.      Pasha, Biagi, you asked who are

3  mentioned so I just mentioned Biagi.

4       Q.      The names of the manufacturers

5  that are referred to.

6               MS. SHORT:  Can you please

7          translate what the witness said in

8          response to Mr. Goggin's question?  We

9          need to keep the record as clear and

10         precise as possible.  Any time the

11         witness provides an answer, you must

12         translate and interpret it to the best

13         of your ability.

14              THE INTERPRETER:  He said, "You

15         just have to say that."

16      A.      I told you why I mentioned these

17  names here because I tried to look for names

18  but they are not in that paragraph.

19      Q.      Correct.

20              What other manufacturers are

21  referring to in that paragraph?

22      A.      Pasha, Biagi, Chamilia, Zo Beads.

23  Then a lot of other firms which has appeared

24  but I don't remember the names of those.

25      Q.      Okay.

Page 52

1                      Petersen

2

3

4

5                      REDACTED

6

7

8

9

10

11          Q.    Can one of your customers sell

12   Pandora beads as well as Troll Beads?

13               MS. SHORT:  Objection to form, it

14        is ambiguous.  You haven't established

15        who Mr. Lund's customers are.

16          Q.    You can answer the question.

17          A.    Our customers can sell whatever

18   they want, we don't interfere with whatever

19   they want to sell except those firms that has

20   copied our concept.

21          Q.    Those firms were the firms we

22   talked about earlier?

23          A.    Biagi, Zo Beads, Chamilia, Pasha,

24   et cetera, et cetera.

25          Q.    Other than those companies that

CONFIDENTIAL

Page 53

1              Petersen

2    you just named, who are your competitors in

3    the marketplace?

4              MS. SHORT:  Objection as to form.

5              The witness never said those

6         manufacturers are competitors of

7         Pandora.

8         Q.    You can answer.

9         A.    I don't think we have any

10   competitors besides those who has copied our

11   concepts who all sell their merchandise under

12   Pandora beads, Pandora style beads.

13        Q.    Do you mean their marketing refers

14   to Pandora style beads?

15        A.    Not to firms themselves but their

16   customers.  If you go on line and you look at

17   all the firms we just mentioned, they all

18   write Pandora style beads.  And the local

19   advertizements I have seen in the shops states

20   that they have this different lines or marks.

21   The firms we just mentioned that they state

22   that they have those brands and they are all

23   Pandora style beads.

24        Q.    Okay.

25             MR. GOGGIN:  We can take a break.

CONFIDENTIAL

1                    Petersen

2        will agree to the words as they appear

3        on the page.

4             MR. GOGGIN:  Did you go over the

5        recording with him with that

6        transcript?

7             MS. SHORT:  He --

8             MR. GOGGIN:  You're stipulating

9        that's an accurate transcription of the

10       recording?

11            MS. SHORT:  We have compared the

12       voicemail message to the Exhibit 11 and

13       it is an accurate transcription.

14            MR. GOGGIN:  Thank you.

15            Then I'm going to play it and ask

16       you whether this is your voice.

17            (Tape played.)

18       A.    Yes, it is my voice.

19       Q.    Okay.

20            Who were you speaking to?

21       A.    To an answering machine.

22       Q.    Who did you call, who was the

23   person that you called?

24       A.    To Donna whose one of the owners

25   of the shop.  She had been selling our

CONFIDENTIAL

Page 60

1                     Petersen

2    merchandise at one point.  And since we

3    couldn't reach agreement on the, under which

4    conditions she should sell our merchandise,

5    then she decided to go back and sell

6    Chamilia's merchandise because of since she

7    had been told that you hadn't applied for a

8    patent.

9              So the reason for my call was to

10   inform her that now our pending patent

11   application was, had been publicized and what

12   the consequences of this could be as we have

13   had customers relationship.

14        Q.    What do you believe the

15   consequences of publishing a patent

16   application are?

17        A.    I think that it is that if we end

18   up getting the patent and we win the case

19   against Chamilia, then she's responsible for

20   some royalties and legal expenses out of the

21   outermost consequence.  And I just wanted to

22   inform her that this is how the things are and

23   which is exactly the contrary of what she had

24   been informed about earlier which was the

25   opposite of what she had been told by the

CONFIDENTIAL

1              Petersen

2    competitive firm.

3        Q.    What was the name of the shop?

4        A.    Carlos Italian Charm Shop.

5        Q.    Did you ever actually speak with

6    Donna as opposed to the machine?

7        A.    No, she asked me only I think she

8    faxed to me if I would be kind enough to send

9    the application, patent application to her,

10   and that my lawyers did the day after.

11       Q.    Did you have any other

12   conversations with Donna about this?

13       A.    No, not after because she chose

14   not to talk to me, but earlier I had talked

15   several times with her.

16       Q.    Can you tell me what those

17   conversations were about?

18       A.    It was about she would rather sell

19   our lines than in instead of those she had

20   been selling before, that she got permission

21   to and bought our merchandise.  But when we

22   told her that she couldn't advertize in a

23   local paper in Sacramento, then she decided

24   she would rather sell the other merchandise,

25   and then we decided to cut off our business

CONFIDENTIAL

Page 62

1                     Petersen

2    relationship.  And since our policy in the

3    firm is that we don't sell our merchandise

4    together with people who has copied our

5    concept.

6         Q.    Why couldn't she advertize in the

7    local paper in Sacramento?

8         A.    Because I had made a poor business

9    agreement with another customer whose Franco

10   Ferini who was one of the first customers we

11   were trading with, and we had promised her she

12   could have exclusive rights for Sacramento  if

13   she also obtained a certain number of sales,

14   but she didn't do that completely, therefore,

15   we opened up for the other customer.

16               But when Franco Ferini was a real

17   good customer of ours, used this specific

18   local magazine for an advertizement of our

19   merchandise, we felt it was too much to step

20   on her toes, which I regret today.

21        Q.    The name that we have been talking

22   about, Donna, is that a male or female?

23        A.    I have only spoken to a lady.  The

24   reason I say Donna is it is standing here and

25   I can't remember her name.

CONFIDENTIAL

Page 70

1                       Petersen

2    used on a Troll bead bracelet?

3          A.      I have heard about that, yes.

4          Q.      Can they be?

5          A.      Only as far as I know.

6          Q.      Yes?

7          A.      I have never tried it.

8          Q.      Have you heard -- strike.

9                  Will Troll Beads fit on a Pandora

10   bracelet?

11         A.      No, they do not.

12         Q.      Just give me a second.

13                 Have you ever heard of a company

14   called Nappi Wholesale?

15         A.      I have never heard of it.

16         Q.      Has Pandora taken any action to

17   stop those companies that are, that you say

18   are manufacturing beads similar to Pandora

19   beads?

20         A.      We sent them a notice when our

21   patent application was publicized, and that we

22   have sent to all of those we know who is

23   producing it, and it is many more than I know

24   the names of.

25         Q.      Does Pandora Smykker have a web

CONFIDENTIAL

1                      Petersen

2

3

4

5

6

7                          REDACTED

8

9

10

11

12

13

14          Do you know what the word knockoff

15   means?

16       A.    Yes.

17       Q.    What does it mean?

18       A.    A copy.

19       Q.    Does it mean anything else than

20   just copy?

21       A.    Not so far as I know.

22       Q.    Do you believe that Chamilia

23   products are inferior products to Pandora?

24       A.    Yes.

25       Q.    How are they inferior?

CONFIDENTIAL

Page 73

1                            Petersen

2          A.    Our quality is far better than

3     theirs in all the stages of production, it is

4     handmade jewelry.  And most of theirs are

5     casted.  So it is a combination of handmade

6     and casted.  Ours are also but we have much

7     more handwork done in our jewelry, therefore

8     our jewelry are much more detailed.  If one

9     weighs the bracelets next to them, ours are

10    far heavier, and that is well known in the

11    brands.  And that is a well known fact in the

12    field that our jewelries (sic) are superior to

13    the others.  And that's not only what we say,

14    but it is well known.

15               That is there is a magazine called

16    Gift Beads which also has a web site where

17    people can discuss, can discuss the

18    experiences there they said our quality is far

19    superior of the other beads and the other

20    trademarks, brands.

21         Q.    Your beads, are your beads casted

22    as well?

23         A.    Yes, they are casted.  But most of

24    our work is handwork.  So for an ordinary

25    person if you put beads next to each other,

CONFIDENTIAL

Page 74

1                          Petersen

2     they can see that ours are much more detailed

3     than --

4

5

6

7

8

9

10

11

12

13                         REDACTED

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page 76

1                        Petersen

2                You can answer the question if

3      you can.

4      A.      I have no copies of what is

5      happening, then they print out some pages

6      which I can read in the airplane.  You don't

7      have to keep it because you can always go back

8      and see what remarks people have made.

9      Q.      You're saying you have seen

10     remarks about Pandora's products, correct?

11     A.      Yes.  And now since you are asking

12     me the question of whether our merchandise are

13     superior to Chamilia's, then there are direct

14     comparisons between their merchandise and our

15     merchandise.  Where for most people write in

16     there is no doubt that our merchandise are far

17     superior to the others, of better quality.

18     Q.      Is there any other site on the

19     internet where you have seen comparisons

20     between Pandora and Chamilia products?

21     A.      This is the only place I, we can

22     go in on, but I'm not aware if there are any

23     other sites that compare with other jewelry.

24     Q.      Do customers ever return Pandora

25     beads because they have broken?

CONFIDENTIAL

1                    Petersen

2        A.    Of course they do since these are

3    handmade, but it is something that happens

4    very, very seldom.

5        Q.    What's a typical defect that you

6    see?

7             MS. SHORT:  Objection to the form

8        of the question.

9        Q.    You can answer it.

10       A.    Our most common complaint is that

11    the thread in on the bracelet has become loose

12    because they are handmade soldered.  That is

13    the most common complaint, but it is very

14    seldom that any complaint on the Pandora

15    beads.

16             But our second biggest complaint

17    is that is when the other firms who was copied

18    our concept that their beads are sitting tight

19    now they are getting stuck on our bracelets so

20    you can't unscrew them, that is the second

21    biggest complaint.  And those we don't

22    exchange because we have to send them back

23    because our guarantee doesn't cover that.

24

25

CONFIDENTIAL

Page 92

1                          Petersen

2          A.     Less than one handful.   And when

3    some people who have sold merchandise without

4    telling so, they have sold our merchandise

5    together with the other merchandise, and then

6    we immediately have stopped the sale to them.

7    And then most of those have chosen to stop

8    selling the others and continued Pandora.   But

9    that is something they have chosen all by

10   themselves.

11         Q.     Do you keep track of your market

12   share compared to the other companies' market

13   share?

14         A.     No.

15         Q.     How do you enforce the requirement

16   that your retailers can't carry these

17   competing products?

18         A.     Our salespeople visits the shops

19   at least three to four times a year.   The

20   shops are keeping an eye on each other and

21   controlling -- the shops, the shops are

22   checking on each other to make sure that

23   nobody can be permitted something which the

24   others cannot be permitted to do.   That is our

25   way of policing it, to enforce it.

1                       Petersen

2          Q.     One retailer will check on another

3    retailer if they see that the other retailer

4    is selling both, they'll tell Pandora?

5          A.     Yes, they do.  And also the

6    salespeople for the other lines, they the

7    representative for the other lines are so dumb

8    that they tell the customers that they have

9    opened another customer with their

10   merchandise.  They tell one of Pandora's

11   customers that they have already opened

12   another of their customers by selling their

13   lines in the hope that they then will buy it.

14

15

16

17

18

19
                         REDACTED
20

21

22

23

24

25

CONFIDENTIAL

1                          Petersen

2     required.

3          Q.    Is that because, have you closed a

4     factory recently?

5          A.    No, but we are in the process of

6     opening a new so we can deliver after the

7     supply and demand.

8          Q.    Do you personally attend trade

9     shows?

10         A.    Only a very few.

11         Q.    What's the first trade show that

12    you can recall attending for Pandora?

13         A.    That was when I found out that

14    Chamilia had copied our beads 100 percent.

15    That was the reason we won the case, it was

16    when we had made these beads, it was when

17    Chamilia had made the beads that we won a

18    copyright infringement.

19         Q.    So that was before September 2003?

20         A.    I know it was a San Francisco show

21    and I think it was in September or August

22    2003.

23         Q.    Have you been to any trade shows

24    since that lawsuit was over, resolved?

25         A.    I have been to three trade shows

**EXHIBIT P to Supplemental Declaration
of Gianfranco G. Mitrione
dated July 15, 2005**

Confidential

1

1                UNITED STATES DISTRICT COURT

2         FOR THE SOUTHERN DISTRICT OF NEW YORK

3           CASE NO. 04-CV-06017 (KMK)

4

5  CHAMILIA, LLC,                )

                        )

6           Plaintiff,   )

                        )

7     vs.                 )

                        )

8  PANDORA JEWELRY, LLC,      )

                        )

9           Defendant.   )

                        )

- - - - - - - - - - - - - - - - x

10

11      CONFIDENTIAL - ATTORNEYS' EYES ONLY

12          VIDEOTAPED DEPOSITION

13              OF

            KNUD HOSTRUP

14

15      Taken before Brian Gary Berkowitz,

16  Shorthand Reporter and Notary Public in and for

17  the State of Florida at Large, pursuant to Notice

18  of Taking Deposition filed in the above cause.

19

20                - - - - - - - - -

21

22  44 West Flagler Street

    Suite 1400

23  Miami, Florida 33130

    Tuesday, April 26, 2005

24  9:03 a.m. - 12:55 p.m.

25

Confidential

24

1    reviewed, that you didn't bring with you today?

2        A.    No.

3        Q.    Are you aware that there was a lawsuit

4    between Pandora and Chamilia before this lawsuit?

5        A.    Yes.

6        Q.    What do you know about that case?

7        A.    I was told that the case has been

8    litigated and -- and that Chamilia was ordered to

9    stop producing the type of beads which infringed

10   on Pandora's copyrighted beads, and that they

11   had -- Pandora was rewarded a sum of money.

12       Q.    When were you told that?

13       A.    I don't recall.

14       Q.    You don't mean recently?

15       A.    Not recently, no.

16       Q.    Were you involved with that lawsuit at

17   all?

18       A.    Not at all.

19       Q.    Did you know it was going on at the

20   time?

21       A.    No.

22       Q.    Have you ever been deposed before?

23       A.    Yes.

24       Q.    In what connection?

25       A.    In a car accident.

Confidential

31

1    did he ask you to help him?

2        A.    There are many different situations.

3    How to sell, how to approach the market, how to

4    hire reps.

5        Q.    This is what you knew from your

6    experience in your furniture business?

7        A.    Yes.

8        Q.    What was the product that he wanted you

9    to help him with?

10       A.    The product is -- is known today,

11   Pandora Jewelry.

12       Q.    Can you just generally tell us what that

13   jewelry is?

14       A.    It is necklace, and bracelet, in various

15   sizes, where the necklace and bracelet has

16   soldered on a thread.  The bracelet divided into

17   three parts with those threads.

18           The bracelet and necklace comes with

19   various locks.  They have something called a

20   Pandora lock, and the -- also comes with a lobster

21   claw lock, plus there are several hundred beads,

22   spaces, as well as clips, who clips on top of the

23   threads to divide the bracelet into different

24   parts, plus that every single bead is threaded.

25   Means that the beads is being screwed on to the

Confidential

32

1    bracelet or necklace, in the combination what

2    people can decide their own personalized jewelry,

3    and it comes in sterling silver.  It is made in

4    two tone, gold and silver, and it is made in 14

5    karat gold.

6        Q.    Is it only a bracelet?

7        A.    I mentioned bracelet and necklace.

8        Q.    And a necklace?

9        A.    Yes.

10       Q.    Is that the only product that Pandora

11   sells?

12       A.    At that time I met Michael --

13       Q.    Right.

14       A.    -- it was.  Today it's not.

15       Q.    What else does Pandora sell today?

16       A.    They sell a line called Pandora Match,

17   which is rings, earrings, different necklaces.

18       Q.    Anything else?

19       A.    No.

20       Q.    And in the marketing literature that

21   I've seen, the claim is that the system is unique.

22            MS. SHORT:  Objection as to form.

23   BY MR. GOGGIN:

24       Q.    Have you heard that?

25            MS. SHORT:  I'm not even sure what

Confidential

42

1    A.    You are fighting for the same customer,

2    consumer.

3    Q.    Would you consider a Troll Bead product

4    to be a similar product to the --

5    A.    No.

6    Q.    -- Pandora?

7    A.    No.

8    Q.    What's the difference?

9    A.    The difference is that, in my opinion,

10   that Pandora has developed a product, which in my

11   opinion is unique, in the sense that it is a

12   bracelet who is divided into three sections.

13        The way it's divided, is divided with a

14   little thread, which is soldered on to the

15   bracelet, and each bead has an inside thread

16   fitted into the bead.

17        So, the only way to get the beads off

18   and on a bracelet is to twist it on to the

19   bracelet, which has the effect that when a person

20   who wears the product takes it off, that the beads

21   will not fall out of the bracelet.  And besides

22   that, there are small clips who clip on top after

23   you position your beads where you like them to be

24   on the bracelet.

25        You put your small clips on top of the

Confidential

43

```
 1   thread, which make this bracelet division into the

 2   three different parts, and to the best of my

 3   knowledge, Troll Beads does not have any kind of

 4   threaded beads, does not use -- utilize the same

 5   kind of design of the bracelet, the chain, and the

 6   necklace chain, and does not screw on-off.  Does

 7   not screw off and on, no.

 8       Q.    Do you know whether you can use Troll --

 9   a Troll bead on a Pandora bracelet?

10           MS. SHORT:  Objection as to form.

11           You can answer the question.

12   BY MR. GOGGIN:

13       Q.    You can answer.

14       A.    Yes, I know.  And you cannot.

15       Q.    You cannot use it?

16       A.    You cannot use it.

17       Q.    Have you ever tried it?

18       A.    No.

19       Q.    How do you know you can't do it?

20       A.    Because I'm told it cannot be done.

21       Q.    Are there other -- strike that.

22           Are there beads manufactured by

23   companies other than Pandora and Troll Beads, that

24   are compatible with the Pandora bracelet?

25           MS. SHORT:  Objection as to form.
```

Confidential

44

```
 1   BY MR. GOGGIN:

 2        Q.    You can answer.

 3             MS. SHORT:  The witness testified

 4        that -- gave testimony that Troll beads are

 5        not to be used with or cannot be used with

 6        Pandora, and your question assumes that they

 7        can.

 8             MR. GOGGIN:  Well, I didn't intend it

 9        that way.  I'll try it again.

10   BY MR. GOGGIN:

11        Q.    Are you aware of any other -- strike

12   that.  Any companies other than -- well, strike

13   that.

14             Are you aware of any companies whose

15   beads can be used with Pandora bracelets?

16        A.    Yes.

17        Q.    Which?

18        A.    I'm aware of two companies, which is Zo

19   Beads and Chamilia.

20        Q.    How do you spell the first one?

21        A.    I think it's Z-O Beads.  Zo Beads.

22        Q.    Tell me about Zo Beads.

23        A.    Zo Beads.

24        Q.    Zo Beads.  What kind of company is that?

25        A.    It's a company who used to sell, and I
```

Confidential

45

1    believe still sells, Italian charm bracelets,

2    which is an old product, and due to Pandora's

3    success that they have formed, formed, they are

4    selling under the name Zo Beads a similar product

5    to Pandora, where they have copied the idea of

6    having threaded beads which screw off and on the

7    bracelets.

8        Q.    Are there -- where is the Zo Beads

9    Company located?

10        A.    I believe they are in Florida.

11        Q.    Has Pandora taken any action to stop Zo

12    Beads from doing that?

13        A.    I believe Pandora's lawyer have sent a

14    letter to the two companies just mentioned, Zo

15    Beads and Chamilia.

16        Q.    Have you seen the letter that was sent?

17        A.    No.

18        Q.    What do you know about the letter that

19    was sent to both companies?

20        A.    I only know what I just told you.

21            THE WITNESS:  Would you mind if we take

22        a break?

23            MR. GOGGIN:  No.  Okay?

24            MS. SHORT:  That's fine.

25                (Thereupon, a short recess was

Confidential

46

1                   taken.)

2    BY MR. GOGGIN:

3        Q.    Mr. Hostrup, I think you identified two

4    other companies that you are aware that

5    manufactured beads that might be used with the

6    Pandora bracelet.  Correct?

7        A.    Correct.

8        Q.    And that was Chamilia and --

9        A.    Zo Beads.

10       Q.    Zo Beads.  Have you ever heard of a

11   company called Nappiwholesale.com?

12       A.    Can you repeat it?

13       Q.    N-A-P-P-I Wholesale.

14       A.    No.

15       Q.    Have you heard of a company called

16   Biaggi?

17       A.    Biaggi?

18       Q.    Biaggi.

19       A.    Yes.

20       Q.    That's B-I-A-G-I.

21       A.    I think it's B-I-A-G-G-I.

22       Q.    What do they do?

23       A.    From my understanding, is that they are

24   selling Italian charm bracelet, plus they are also

25   selling a copy of Pandora.

Confidential

47

1    Q.    A copy of Pandora?

2    A.    Yes.

3    Q.    Is this an authorized copy of Pandora?

4    A.    No.  Not that I know of.

5    Q.    So, it's not a different bead that might

6    be used.  It's a copy?

7    A.    It's the same system.

8    Q.    Do you know whether Pandora has taken

9    any efforts to make Biaggi stop doing that?

10    A.    I don't.

11    Q.    Have you heard of a company called

12    Italycharms.com?

13    A.    No.

14         MR. GOGGIN:  Let's mark this one as 4.

15              (Whereupon, Pandora Exhibit 4 was

16              marked for identification.)

17         MS. SHORT:  Okay.  Thank you.

18         MR. GOGGIN:  Thank you.

19    BY MR. GOGGIN:

20    Q.    Mr. Hostrup, I show you what we have

21    marked as Exhibit No. 4, and ask you if you could

22    read through that, please.

23    A.    Read through the document here?

24    Q.    I'm going to ask you questions about it,

25    and your attorney has been asking that you read

Confidential

51

1   from the Italian charm bracelets on the Pandora

2   bracelet?

3       A.    No.    No.    In my opinion, that cannot be

4   done.

5       Q.    And why not?

6       A.    Because the small, independent links in

7   an Italian charm bracelet, is a link by itself

8   which you hook on to one another and make it any

9   length you like.    It's not starting with what

10  Pandora -- what we have, which is a bracelet in

11  various lengths already pre-made, and the link

12  itself, where our beads needs to have a chain to

13  be put on, to screw on to, or a necklace to screw

14  on to, the Italian charm bracelets make itself by

15  hooking on each link to one another, and makes the

16  design as well as it makes the chain itself.    Two

17  totally different concepts.

18      Q.    Have you ever heard of a company called

19  Uno Domani?

20      A.    Yes.

21      Q.    U-N-O, D-O-M-A-N-I?

22      A.    Yes.

23      Q.    What do they do?

24      A.    They have also been selling, I don't

25  know if they still do, Italian charm bracelets.

Confidential

52

1  Q. Italian charm bracelets?

2  A. Yes.

3  Q. What this says is -- well, this appears

4 to describe, when they talk -- strike that.

5   It says, "Uno Domani is selling Pandora

6 Italian bead bracelets."

7   Is that true?

8  A. I am familiar with the Uno Domani have

9 also copied Pandora's system and concept.

10  Q. How did they copy it?

11  A. With screw on beads.  With inside

12 threads on each bead, yes.

13  Q. Were they also using the name, Pandora?

14  A. No.

15  Q. Do you know whether Pandora took any

16 efforts to stop Uno Domani from doing that?

17  A. That I don't know.

18  Q. On the second page of this, there is

19 a -- halfway down it says, "Our concept," and it

20 says, "Pandora Jewelry, the company, Pandora has

21 deep roots in the City of Firenze, Italy."

22   Is that true?

23  A. I don't know.  I don't believe so.

24  Q. As far as you know, where are the roots

25 of Pandora Jewelry Company?

Confidential

65

1              THE WITNESS:  Yes.

2    BY MR. GOGGIN:

3        Q.    Have you seen that letter before?

4        A.    Yes.

5        Q.    The letter is dated September 14, 2004.

6    Correct?

7        A.    Yes.

8        Q.    It refers to a document called "Terms

9    and Conditions."  Is that correct?

10       A.    Yes.

11       Q.    What are the terms and conditions that

12   were sent on to Pandora's customers?

13       A.    That is a two page document, which

14   outlines the terms and conditions to become a

15   Pandora authorized dealer.

16       Q.    What are the terms -- what are the terms

17   and conditions, as you remember them?

18       A.    The first condition is that you cannot

19   become a Pandora authorized dealer if the customer

20   decides to carry any other manufacturer's product

21   who has the same idea as Pandora.  Means that if

22   any other company has copied Pandora's bracelet

23   type with the -- with the threads and as well as

24   the threaded beads, that Pandora will not consider

25   them a potential customer.

Confidential

66

1    Q.    Okay.

2    A.    And the second condition is that Pandora

3    will not accept customers who wants to sell our

4    product on Ebay, with or without a store.  With or

5    without a retail store.

6    Q.    Do you know why that is?

7    A.    No.

8    Q.    How long has that policy been in effect?

9    Excuse me.  The two conditions you just described,

10   how long has Pandora required those conditions for

11   retailers?

12   A.    I don't recall when we first applied

13   that to our dealers, but I believe that around

14   this period when this letter is sent out, in

15   September 2004, was the time when we want to put

16   that in writing and have it signed by the

17   customer.

18   Q.    So, you think you had it sometime before

19   this, but this was to put it in writing?

20   A.    Yes.

21   Q.    Was it a policy that Pandora had from

22   the very beginning?

23   A.    I don't know.

24        MS. SHORT:  Objection as to form, as to

25        "beginning."

Confidential

70

```
 1       A.    Selling the same concept as Pandora,

 2   which is a bracelet divided into parts with screw

 3   on beads.

 4       Q.    Sometimes you use the word "concept" and

 5   sometimes you say it's a copy.  Is there a

 6   difference in your mind between the two?

 7       A.    I don't know what you are referring to.

 8   For me, the concept is the whole concept of

 9   building your own bracelet and necklace, the way

10   it is described by me previously, which is a

11   divided bracelet into three parts, with specific

12   small threads soldered on to the bracelet, where

13   all the beads has an inside thread which screws on

14   into the bracelets, which has clips who goes on

15   top of the little thread after you put your beads

16   on, where you position them where you want them to

17   be, or the necklace, for that matter.  It's the

18   same.

19       Q.    Okay.

20       A.    And that is what I refer to as the

21   concept of Pandora.

22             When I'm talking about copying, that

23   means, in my estimation, is that -- what I mean by

24   that is that people or companies who have copied

25   that concept, they're copying the concept.  The
```

Confidential

78

1    A.    Nothing happens.

2    Q.    They continue on?

3    A.    They will continue on, but it might, at

4    the end, end up where that we will not keep our

5    exclusivity with that customer, that we will open

6    another store so we can get the full amount of

7    sales based upon that territory.

8    Q.    What is the -- what is the exclusivity,

9    territorial exclusivity arrangement that you have?

10    MS. SHORT:   Objection as to form.   With

11    whom?

12    BY MR. GOGGIN:

13    Q.    With your retailers.

14    A.    Again, you are basing it on my

15    territory, of course?

16    Q.    Your territory, right.

17    A.    We have a general rule, which is that

18    customers will get an exclusivity based upon

19    inhabitants in the area, with the distance    **REDACTED**

20    between stores in case there are more than

21    people, that we will try to have a competitor

22    within walking distance.

23    Q.    I didn't understand that.   I'm sorry.

24    A.    That's okay.

25    Q.    We can take it a bit at a time.

Confidential

79

1          You want to have one store for every

2          inhabitants, generally?          REDACTED

3      A.      If there's more than          people,

4   there will be one other store.   There will be two

5   stores.

6      Q.      And the two stores will have some --

7      A.      And we have -- we will not have that in

8   a walking distance between the stores, those two

9   locations.

10      Q.      I see.   Okay.

11          If one of your stores is not performing

12   as is expected, you might withdraw that

13   exclusivity agreement and put another store in?

14          MS. SHORT:   Objection as to form.

15   BY MR. GOGGIN:

16      Q.      You could answer.

17      A.      Yes.   We will then -- first we will

18   consult the store to find out why he's not

19   performing the way we expect, and if he doesn't

20   have the money to invest more in the line, if he

21   doesn't have the space to show the line better, if

22   the customer doesn't want to advertise the line,

23   if the customer don't want to have trunk shows,

24   then we will inform the customer that we will

25   consider another store in his area.

Confidential

90

1           indicate the source of the recording, the date

2           of the recording and the participants of the

3           conversation.

4                Do you agree to that?

5                MR. GOGGIN:  I do.

6                MS. SHORT:  Thank you.

7      BY MR. GOGGIN:

8           Q.   What is your understanding of the

9      meaning of the term, "knock off"?

10          A.   My personal opinion, right, you are

11     asking for?

12          Q.   Yes.

13          A.   My opinion of somebody trying to knock

14     off somebody else's product is to make a copy, to

15     make the consumer believe that they can buy the

16     same product through another company, another

17     source.  Trying to copy somebody else's product,

18     is a knock off.

19          Q.   Have you ever used that term with

20     respect to Chamilia's products?

21          A.   Yes.

22          Q.   When have you said that about Chamilia's

23     products?

24          A.   Not just about Chamilia's, but I've said

25     it about many other of the companies on the market

Confidential

91

1    which I believe is a knock off.  Many occasions.

2       Q.    Do you believe that there is a quality

3    difference between the Chamilia products and the

4    Pandora products?

5       A.    My personal opinion, after I have seen

6    Chamilia's and Pandora's jewelry, I believe that

7    Pandora has a much more refined and detailed

8    product, which is -- functions better than the

9    Chamilia product due to the way it is being

10    polished and refined, finished.  Yes.

11       Q.    Tell me in more detail how the Chamilia

12    product is inferior to the Pandora product.

13       A.    Besides being a more detailed and

14    refined piece of jewelry, in my opinion, Pandora

15    is -- one of the -- I believe one of the

16    products -- one of the problems with Pandora --

17    with Chamilia product is that due to their lack of

18    refined jewelry, a lot of times their system which

19    they have copied from Pandora, the threaded beads,

20    gets stuck on either Pandora's or their own

21    bracelets, cannot be twisted on and off no more.

22    Part of the -- part of what I am explaining to

23    you.

24       Q.    Okay.  Anything else?

25       A.    No.  Except not from what I just

Confidential

92

1    explained.   No.

2              MR. GOGGIN:   Let's mark this as number

3       9.

4                   (Whereupon, Pandora Exhibit 9 was

5                   marked for identification.)

6              MS. SHORT:   Thank you.

7              MR. GOGGIN:   Thank you.

8    BY MR. GOGGIN:

9       Q.    Mr. Hostrup, I show you what we have

10   marked as Pandora No. 9, and ask you to read that

11   to yourself, please.

12      A.    Uh-huh.

13                   (Pause.)

14             THE WITNESS:   Yes.

15   BY MR. GOGGIN:

16      Q.    Have you seen that letter before today?

17      A.    No.

18      Q.    Have you written -- do you know who

19   Steve Glueck is?

20      A.    Yes.

21      Q.    Who is he?

22      A.    He's a sales rep for Pandora on the West

23   Coast.

24      Q.    Do you know him?

25      A.    What do you mean by "know him"?

Confidential

93

1      Q.    Have you ever met him?

2      A.    Yes.

3      Q.    Have you talked to him about this --

4   about this issue with Chamilia?

5      A.    No.

6      Q.    Never?

7      A.    Never.

8      Q.    Did you know that a letter like this had

9   been sent to customers?

10     A.    No.

11     Q.    Do you know what he means when he says

12  that the Chamilia sales force has been trying to

13  strong arm customers?

14     A.    No.

15           MS. SHORT:  By "he," you mean

16      Mr. Glueck?

17           MR. GOGGIN:  Mr. Glueck, correct.

18           THE WITNESS:  I have no idea what he

19      means.

20  BY MR. GOGGIN:

21     Q.    Have you observed any, quote, strong

22  arm, close quote, tactics by Chamilia, in your

23  territory?

24     A.    Yes.  I have experienced Chamilia rep

25  telling our customers, some of them, that they

Confidential

94

1    could easily carry Chamilia as well.  Yes, I have

2    experienced that.

3        Q.    And you call that a strong arm tactic?

4        A.    It's not truth, because they don't, but

5    I don't want to call it strong arm.  It's not my

6    terms.

7        Q.    What's not true?

8        A.    That our stores is carrying Chamilia,

9    and they could easily carry Chamilia, because that

10   is not truth.  That's a lie.  They cannot.

11       Q.    Why is it a lie?

12       A.    Because they cannot.  We would not -- we

13   would not allow our dealers to carry Chamilia.  We

14   will -- either they have the decision to make not

15   to bring in Chamilia, or they will have -- we will

16   have to pull our merchandise from the store.

17       Q.    Mr. Glueck says that some of his stores

18   felt bullied by the Chamilia representatives.  Is

19   that what --

20       A.    Yes, he said that.

21           MS. SHORT:  You can look at the exhibit.

22           THE WITNESS:  Yes, he said that.

23   BY MR. GOGGIN:

24       Q.    Have you experienced any similar

25   feelings from the stores within your region?

Confidential

95

1          MS. SHORT:  Object to the form of the

2      question.

3          The witness can't speak to what

4      Mr. Glueck was feeling at the time he wrote

5      the letter.

6   BY MR. GOGGIN:

7      Q.    Have any of your stores expressed any

8   concerns to you whatsoever, over anything that's

9   being said to them by Chamilia?

10     A.    Not that I can recall.

11     Q.    Mr. Glueck apparently refers to knock

12  off companies as companies with significant

13  quality and image differences.  Is that correct?

14     A.    Yes, he does.

15         MS. SHORT:  Again, the document speaks

16     for itself.

17         MR. GOGGIN:  The witness has answered

18     the question.

19  BY MR. GOGGIN:

20     Q.    Do you agree with that?

21     A.    I have to -- I don't remember the --

22  what was your question?

23     Q.    Do you agree with Mr. -- the assessment

24  stated in this letter by Mr. Glueck, that the

25  knock offs have a significant quality and image

96

1    difference?

2        A.    Quality difference, I agree with him.

3    There is a significant quality difference.

4        Q.    That's as we discussed earlier?

5        A.    Yes.

6        Q.    What about image difference?

7        A.    I don't know what he means by that.

8        Q.    He says that, to his customers, that, "I

9    believe that you all understand where Pandora is

10   heading in the future."

11           Do you know what he's referring to

12   there?

13       A.    I have no idea.

14       Q.    Have you -- well this letter is dated

15   April 12, this spring.

16           Have you recently received any calls

17   from stores expressing concerns about Chamilia?

18       A.    Not that I recall.

19       Q.    Let's go back.  I'd like to talk about

20   communications that you have had at these trade

21   shows regarding Chamilia, and start with the

22   August 2003 San Francisco trade show.

23           Do you remember being there?

24       A.    No.

25       Q.    I'm sorry.  The February 2000 -- the

Confidential

100

```
 1        Q.    Okay.  Anything else in here that you

 2   would like to correct?

 3        A.    No.  No.  You want my copy?

 4        Q.    Yes.

 5        A.    Okay.

 6        Q.    So, now, tell me without reading from

 7   your affidavit, or your declaration, what it is

 8   you recall about discussions you had then with the

 9   Chamilia person.

10        A.    I recall --

11              MS. SHORT:  Object to the form of the

12        question.  He's already corrected his

13        affidavit, or declaration, that he's not -- he

14        doesn't recall if the individual to whom he

15        spoke was a Chamilia person, as you have

16        identified in your question.

17              MR. GOGGIN:  He said but he now believes

18        that it was.

19              MS. SHORT:  Now, he does, but you said

20        "the Chamilia person."  So, I just make that

21        clear for the record.

22   BY MR. GOGGIN:

23        Q.    You can answer the question.

24        A.    I remember a situation from the trade

25   show where somebody came to the booth and wanted
```

Confidential

101

1    to hear about our product.

2            During that conversation, I remember

3    that the person told me that the person did not

4    believe that we had a patent application, to which

5    I stated to the person that I could not believe

6    that Pandora would write on all public material

7    like brochures, like, I pointed out to the person,

8    on the big banners, we had banners, big posters we

9    have in the booth, that it was clearly marked

10   "Patent Pending," that I did not believe that

11   Pandora would do that and be so bold and let

12   people believe they had something which in fact

13   they did not.

14           I remember the person got very upset

15   about my statement and walked away from the booth,

16   looking kind of angry, and the reason that I

17   recall that is that was the only person who did

18   that.  So -- during the whole show.  So, I assume

19   that was the situation being referred to by

20   Chamilia in their complaints.

21       Q.    You said the only person doing that?

22       A.    Walked away and feeling upset.

23       Q.    Being angry?

24       A.    Yes.

25       Q.    Okay.  Have you had any other

Confidential

105

1     A.    Yes.

2     Q.    Do you recall any discussions about

3  Chamilia?

4     A.    The discussion doesn't go too much about

5  Chamilia.  It goes about any company.  It's just

6  not Chamilia.  We don't care about Chamilia.  We

7  don't care about Zo Beads.  We care about them

8  all, who will try to knock off our idea and our

9  concept.

10    Q.    Do you talk to your sales reps about

11 what they discuss with their customers?

12    A.    Not generally, no.

13    Q.    How do you keep track of what they're

14 doing?

15    A.    Look at how many orders they open and

16 how many new accounts they open, and we get a

17 written report in about who they see and who they

18 talk with, but not about what they talk.  They're

19 independent contractors as well as we all are, so

20 we can't demand too much paperwork from them.

21    Q.    Have you ever told anybody that Pandora

22 was going to shut down Chamilia?

23    A.    No.  That wouldn't be true.  To the

24 contrary.

25    Q.    What do you mean, "To the contrary"?

Confidential

107

1    might sue retailers who sold Chamilia products?

2        A.    Never.

3        Q.    Did you ever tell anybody that Pandora

4    would confiscate Chamilia inventory from the

5    customers?

6        A.    Never.  How could they?  No.

7        Q.    Did you ever tell anybody that Pandora

8    would take sales representatives' commissions?

9        A.    No.

10       Q.    Do you know an Amy Paliotti?

11       A.    I didn't hear your question.

12       Q.    Do you know a person named Amy Paliotti,

13   P-A-L-I-O-T-T-I?

14       A.    No.

15       Q.    Do you know a company called Charm

16   Del'Italia?  That's D-E-L, apostrophe,

17   I-T-A-L-I-A.

18       A.    You have to tell me from what state

19   and -- because they all call the same, so --

20       Q.    They're all called Italian Charms or

21   something?

22       A.    They have so many names, that, yes.  We

23   have a big problem with that.

24       Q.    Braintree, Massachusetts?

25       A.    Yes.  We have a customer called that.

**EXHIBIT Q to Supplemental Declaration
of Gianfranco G. Mitrione
dated July 15, 2005**

Page 1

1

2                    UNITED STATES DISTRICT COURT

3                    SOUTHERN DISTRICT OF NEW YORK

4              Civil Action No. 04-CV-06017 (KMK)

5

6                                                    COPY

7   CHAMILIA, LLC,

8                    Plaintiff,

9           vs.

10  PANDORA JEWELRY, LLC,

11                   Defendant.

12

13

14              DEPOSITION of KATHY L. SHAW-RILEY, taken

15  pursuant to notice, at the offices of Verrill & Dana,

16  One Portland Square, Portland, Maine, on May 6, 2005,

17  commencing at 9:05 A.M., before Susan R. Berube, Registered

18  Merit Reporter, a Notary Public in and for the State of

19  Maine.

20

21

22

23

24

25     JOB NO.: 173120

1   A.   Jewelry customers or --

2   Q.   Jewelry customers.

3   A.   Approximately -- I need to clarify that.  Jewelry

4   stores or jewelry -- just anybody who buys jewelry?

5   Q.   How many customers do you call on to sell the jewelry

6   products, the customers whether they be retailers or --

7   A.   Approximately 200.

8   Q.   And do you maintain a list of those customers?

9   A.   Yes, I do.

10   Q.   How is that list maintained?

11   A.   How do you mean how is it maintained?

12   Q.   Do you have a hard copy that you --

13   A.   I keep hard copies.

14   Q.   Do you have a list on your computer?

15   A.   I wish I did, no.

16   Q.   How often do you call on individual retail customers?

17   A.   It all depends if you class a retail customer -- we

18   class them as A, B and C customers.  I could call on an A

19   customer probably every two weeks, a B customer once a

20   month and a C customer 6 to 12 weeks.

21   Q.   What do you consider an A customer?

22   A.   An A customer is a finer boutique or jewelry store,

23   more high end or one that does the most volume.  I have

24   some A customers that could be a grocery store, so I wanted

25   to clarify that.

Page 31

1    Italian charms in the last two years.

2    Q.    Italian charms?

3    A.    The Italian charms.

4    Q.    Which ones are those?

5    A.    The add-a-link.

6    Q.    And what are the brand names of add-a-link charms?

7    A.    C.G. Creations and Lavello.

8    Q.    Could you spell that?

9    A.    L-A-V-E-L-L-O.   And Sunrise and that's not a name I

10   gave you before.

11   Q.    So the bulk of your business has been selling Italian

12   charms?

13   A.    Yes.

14   Q.    And what --

15   A.    In the last two years only.

16   Q.    And has there been a change in that business?

17   A.    Yes, there has.

18   Q.    And what has been the change?

19   A.    The change is the add-a-link charms are slowing down

20   and the bulk of the business is starting to come from

21   Chamilia and a card company I represent, that's my

22   business.

23   Q.    What do you attribute the slowing down of the sale of

24   add-a-link jewelry to be?

25   A.    It's the nature of the business.   The consumer is

Page 32

1   spiffle, they move from one product to the next.

2   Q.   So approximately when did the customer start moving

3   away from the add-a-link charms to the Chamilia product?

4   A.   Approximately in the last six to nine months.

5   Q.   So back in late 2003 when you say you began selling

6   the Chamilia jewelry products, was your sale less than the

7   Italian charms, add-a-link bracelets?

8   A.   Repeat the time frame, please.

9   Q.   You began selling Chamilia jewelry products in late

10  2003; isn't that what you said?

11  A.   Correct.

12  Q.   Back in late 2003 you also were selling Italian

13  charms, add-a-link bracelets?

14  A.   Yes.

15  Q.   At that time were you selling more Italian add-a-link

16  bracelets than Chamilia jewelry products?

17  A.   Well, probably I need to clarify it for you.

18  Q.   Okay.

19  A.   We're talking two different entities.  The Italian

20  charms are $1.25.

21  Q.   1.25?

22  A.   Wholesale, I'm speaking wholesale.

23  Q.   Each piece?

24  A.   Each piece.  Chamilia at that time was $5.50 starting

25  prices.  So at that point in time the bulk of my business

1  **when the product was first introduced.  I have not had that**

2  **problem in a long, long time.**

3  Q.   If a retailer of yours wishes to discontinue the sale

4  of Chamilia jewelry product, how do they go about doing

5  that?

6  **A.   I haven't really had any wish to discontinue selling**

7  **it.**

8  Q.   Has a customer communicated to you any confusion that

9  they have between Chamilia and Pandora Jewelry products?

10  **A.   What type of confusion?**

11  Q.   That they thought they were buying Pandora when they

12  were buying Chamilia?

13  **A.   No, they know the difference.**

14  Q.   Do they have any -- have you ever received returns of

15  Pandora's beads --

16  **A.   No, I have not.**

17  Q.   -- from customers?  No?

18  **A.   No.**

19  Q.   Has any Chamilia sales representative communicated to

20  you any confusion they have experienced in the marketplace

21  between Chamilia and Pandora Jewelry products?

22  **A.   No.**

23  Q.   What makes Zo beads a competitor of Chamilia?

24  **A.   They are a competitor of Pandora and Chamilia.  They**

25  **all look alike basically, they are all screw on beads, they**

1    A.    I believe they are the same entity.

2    Q.    Was anyone else present during your conversation with

3    Jody Henderson?

4    A.    I had a customer come by.  I do not know if she heard

5    the conversation or not, but there were other manufacturers

6    to our right and to our left and the owner was there and

7    like I said another Illinois rep group and there were

8    booths right across from us or people in booths right

9    across the aisle from us.

10    Q.    And how many people were in the booth, if you recall,

11    at the time having a conversation?

12    A.    Four of us and Jody's little girl.

13    Q.    So there were five total, including you and Jody

14    Henderson?

15    A.    Correct -- no -- yes, correct.

16    Q.    Is Chamilia jewelry products displayed in the Message

17    Connection booth?

18    A.    No, it's not.

19    Q.    What is the layout of the booth?

20    A.    It had a table along the back and I believe two tables

21    on each side.

22    Q.    And where were the other people that you referred to

23    standing in relation to where you and Jody were having your

24    conversation?

25    A.    I was standing to the right, Jody was standing mostly

1    application is made and that is much after the fact then

2    when several companies were out there with the same

3    product.

4    Q.    Do you know whether Pandora holds a patent for its

5    Jewelry designs?

6    A.    It does not to my knowledge.

7    Q.    How do you know it doesn't?

8    A.    Well, I believe that I was told, but I'm sure if they

9    were, they would -- it says patent pending, I haven't seen

10   a document that says it's gotten the patent.

11   Q.    Has anyone communicated to you otherwise?

12   A.    Yes, I have been told that through Chamilia that there

13   is no patent on it.

14   Q.    And do you remember who communicated that to you?

15   A.    No, I do not.

16   Q.    Do you know when that was communicated to you?

17   A.    It's been recently, also, probably within the last

18   month.

19   Q.    And what would be the reason for this person to tell

20   you that there hasn't been a patent issued for Pandora

21   jewelry designs?

22   A.    I'm sure to insure their rights to still sell the

23   product.

24   Q.    Through you?

25   A.    Through everyone.

1  Q.   Has Chamilia ever shared with you a business plan of

2  projected sales?

3  **A.   No, they would not do that.**

4  Q.   Have they ever indicated to you that they would expect

5  a certain amount of sales of Chamilia jewelry products to

6  retailers?

7  **A.   In my territory or in the U.S.?**

8  Q.   In your territory.

9  **A.   They don't have to, but I'm one of the best reps in**

10  **the U.S.**

11  Q.   How do you know that?

12  **A.   I open more accounts and do more business; I'm always**

13  **in the top three or four.**

14  Q.   You're always in the top three or four of what?

15  **A.   The salespeople.**

16  Q.   How do you know that?

17  **A.   Lisa Whirlow and Jeff and Killian have told me.**

18  Q.   Verbally?

19  **A.   Yes.**

20  Q.   Is there a document which reflects that you're one of

21  the top four salespeople for Chamilia?

22  **A.   No.**

23  Q.   Are their sales reports provided by Chamilia of sales

24  generated by individual sales reps?

25  **A.   No, because we're independent reps, we would not be**

Page 142

1    A.    A customer would have been a customer that already was

2    buying Message Connection bracelets and/or other jewelry

3    product and/or potential customers who have not placed the

4    line, but you're hoping to be able to sell that line.

5    Q.    So they weren't Message Connection customers or

6    potential customers of Chamilia?

7    A.    All -- most all of my customers are potential

8    customers to all the manufacturers I represent.

9    Q.    But these specific customers that you're referencing

10   that were in and out of the booth when you were having the

11   conversation with Jody Henderson were they customers?

12   A.    Yes, one of them was a customer.

13   Q.    Who was that?

14   A.    That was the Gingerbread Cottage.

15   Q.    Who from Gingerbread Cottage was present?

16   A.    Pam Mitchell.

17   Q.    Pam Mitchell?

18   A.    Yes.  And a potential customer was a customer that was

19   with her from Elkhart, Indiana and boy, I don't recall her

20   name or the store's name, but I can get that for you.

21   Q.    And how do you know they heard the conversation

22   between you and Jody Henderson?

23   A.    I believe I stated they were standing there, I'm not

24   sure that they heard the exact conversation, but they were

25   present and around the booth at the time.

**EXHIBIT R to Supplemental Declaration
of Gianfranco G. Mitrione
dated July 15, 2005**

1                                                                 1

2     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
3     ----------------------------x

4      CHAMILIA, LLC,

5                      Plaintiff,

6           v.                              04-CV-6017
                                              (KMK)
7

8      PANDORA JEWELRY, LLC,

9                      Defendant.

10    ----------------------------x

11

12          CONFIDENTIAL - ATTORNEYS EYES ONLY

13

14                              May 12, 2005

15                              9:15 a.m.

16

17          Videotaped deposition of JEFFREY

18    JULKOWSKI, taken by Defendant, pursuant to

19    notice, at the offices of Lathrop & Gage, 230

20    Park Avenue, New York, NY 10169, before Lisa

21    Mango, a Shorthand Reporter and Notary Public of

22    the State of New York.

23

24

25

```
 1              Julkowski - Confidential          147
 2       Q.    If you've never seen -- read it, sure.
 3             I would ask you to only look at the
 4     exhibit I put in front of you, if you could.
 5     Thank you.
 6             MR. GOGGIN:  He can look at whatever he
 7          wants to.
 8             MS. SHORT:  I'm asking him questions
 9          about that document I presented.
10             MR. GOGGIN:  He's trying to understand
11          this case that you're talking about.  And if
12          you've given him an exhibit, he's entitled
13          to read it.
14       Q.    Have you finished?
15       A.    As much as I understand, yes.
16       Q.    Do you recognize this document?
17       A.    Correct.
18       Q.    I'm sorry.
19       A.    Correct.
20       Q.    You do?
21       A.    It's a settlement document between the
22     lawsuit.
23       Q.    What is the title of the document?  I
24     direct your attention to the right-hand column?
25       A.    Final Judgment on Consent.
```

Julkowski - Confidential                148

1

2     Q.    What do you understand that to be?

3     A.    A settlement between the two companies

4  on the disagreement.

5     Q.    Who are the two parties?

6     A.    Pandora Jewelry, LLC and Chamilia, LLC.

7     Q.    What do you understand the terms of

8  this judgment to be?

9     A.    That the company is going to melt down

10 the product that they were selling at that time.

11    Q.    Which company?

12    A.    Chamilia was going to melt down the

13 product that they were selling at that time.

14    Q.    Do you understand that this is a final

15 judgment that was entered against Chamilia for

16 copyright infringement?

17    A.    Correct.

18    Q.    Do you understand that this judgment

19 indicates that Chamilia consented to a permanent

20 injunction to cease the sale of the beads as

21 attached as Exhibit 1?

22    A.    Correct.

23    Q.    And did Chamilia cease the sale of the

24 beads?

25    A.    They were all sent back to the factory

```
 1              Julkowski - Confidential          149
 2    and melted and credit was applied to the account.
 3         Q.    As part of this judgment, was Chamilia
 4    required to pay any money to Pandora?
 5         A.    That's point number 7, yes.
 6         Q.    What amount is that?
 7         A.    $110,000.
 8         Q.    I refer your attention to page 5.  Is
 9    that your signature?
10         A.    No.
11         Q.    On page 5?
12         A.    Correct.
13         Q.    The second page 5.
14         A.    Yes.
15              MS. SHORT:  Let the record reflect that
16         Mr. Goggin is laughing.
17         Q.    Is that your signature?
18         A.    On page 5-B, yes.
19         Q.    By signing this document, what did you
20    understand you were doing?
21         A.    The settlement -- the disagreement
22    between Pandora and Chamilia was completed, both
23    sides came to an agreement.
24         Q.    What, if anything, did Pandora agree as
25    a result of this judgment?
```

1          Julkowski - Confidential          150

2          A.    That Chamilia would not sell the beads

3     that are on this page.

4          Q.    What did Pandora do?  What were they

5     required to do as part of this judgment?

6          A.    You have to ask Pandora.

7          Q.    You signed the agreement.  Does the

8     agreement require Pandora to do anything?

9          MR. GOGGIN:  The agreement speaks for

10          itself.  You can answer.

11         Q.    What is your answer?

12         A.    That the lawsuit was completed.  Two

13    companies had a disagreement and this is the

14    document that they agreed on that the

15    disagreement's over.

16         Q.    By signing this judgment, did you admit

17    that Chamilia committed copyright infringement of

18    Pandora's copyrighted jewelry designs?

19         MR. GOGGIN:  Objection to the extent

20          that calls for a legal conclusion as to the

21          effect of signing a judgment.

22         Q.    You can answer the question.

23         A.    This document shows that Pandora didn't

24    have any more complaints about Chamilia.  We

25    agreed that there was no disagreement at that

1                Julkowski - Confidential              151

2     point.

3         Q.    By signing this judgement, did you

4     admit that Chamilia committed copyright

5     infringement of Pandora's jewelry products?

6              MR. GOGGIN:  Same objection.

7         A.    The agreement says that Pandora was

8     going to stop with their complaints and all

9     parties agreed that there was no complaints, that

10    there was no issues after we came to this

11    agreement.

12        Q.    I refer the witness's attention to

13    paragraph 4, page 2.  What do you understand that

14    paragraph to say?

15             MR. GOGGIN:  Objection to the extent it

16             calls for a legal conclusion.  He is not an

17             attorney.

18             MS. SHORT:  I'm asking the witness's

19             understanding of the paragraph 4 of the

20             document that he signed.

21        A.    I don't understand.  I mean, looking

22    through this it says we went to court and the

23    judge is the one who made the agreement.  The

24    agreement was made between our counsel and

25    Pandora's counsel.  So I don't understand all of

```
 1              Julkowski - Confidential              152
 2    these points within here.
 3         Q.    So number 4, what is your understanding
 4    of that, paragraph 4?
 5         A.    It says final judgment has been
 6    granted.
 7         Q.    In favor of who?
 8         A.    In favor of Pandora.
 9         Q.    For what claim?
10         A.    On a complaint of copyright
11    infringement, and all counts are thereby
12    dismissed.
13              MS. SHORT:  I ask that the court
14         reporter mark as Pandora 9, document
15         entitled Undertaking in Connection with
16         Final Judgment on Consent.
17              (Undertaking in Connection with Final
18         Judgment on Consent marked Pandora Exhibit 9
19         for identification)
20         Q.    Mr. Julkowski, can you review that
21    document and let me know when you completed
22    reviewing it.  Thank you.
23         A.    Yes.
24         Q.    Do you recognize this document?
25         A.    Correct.
```

1          Julkowski - Confidential          189

2          Q.    I'm asking you.

3          A.    Yes.  I spoke with several of those

4     customers, yes.  And several of them were told

5     that Donna Renee, who is still a customer but was

6     told my Michael Lund several times -- Carlos

7     Italian Charm Shop -- several times that she

8     would be sued -- Newt Hofstra, I believe is his

9     name, called her also and I think may have

10    actually visited her.  Michael has sent her

11    e-mails and voicemails saying that he would be

12    closing us down with his patent.

13         Q.    Were you present during any

14    conversations Donna Renee may have had with

15    Michael Lund regarding a patent?

16         A.    No.  Unfortunately not.  I did hear

17    voicemails and e-mails, strictly from him.

18         Q.    Were you present during a conversation

19    between Donna Renee and Newt Hofstra regarding a

20    patent Pandora may have?

21         A.    No.

22         Q.    Other than what Donna Renee has

23    communicated to, what is your personal knowledge

24    that Newt Hofstra has discussed a patent Pandora

25    may have?

Julkowski - Confidential                    192

1
2         A.    I don't know.  I don't know when she
3    was selling them online.
4         Q.    Now how do you know that, in fact, she
5    was selling --
6         A.    I saw them online.  I don't recall the
7    time frame.
8         Q.    You don't recall when you saw them
9    online?
10        A.    No.
11        Q.    Does Carlos Italian Charm Shop
12   currently sale Chamilia beads?
13        A.    Yes.
14        Q.    And when did they start carrying
15   Chamilia jewelry products?
16        A.    I don't recall.
17        Q.    Was it 2004?
18        A.    I don't recall.
19        Q.    Was it 2005?
20        A.    I don't recall.
21             MR. GOGGIN:  Asked and answered.
22        Q.    Was it 1988?
23        A.    Wasn't in business in 1988.
24        Q.    So then the answer is no?
25        A.    I didn't say no.  I said I don't know.

```
 1                  Julkowski - Confidential        234
 2          Q.    What rights does a patent afford its
 3     holder?
 4          A.    I have to ask counsel.  I don't know
 5     exactly what that --
 6          Q.    What is your understanding?
 7                MR. GOGGIN:  I will object to the
 8          extent it calls for a legal conclusion.
 9                But you can give her your
10          understanding.
11          A.    A patent provides you -- my loose
12     understanding is if you have something that the
13     US government believes is something unique and
14     different, they will provide you a patent to
15     protect that.
16          Q.    Have you applied for a patent for any
17     of your jewelry designs?
18          A.    I have not filed for a patent.
19          Q.    Has Chamilia?
20          A.    No.
21          Q.    What is your understanding of the term
22     patent pending?
23          A.    That they -- patent pending means there
24     is a possibility that somebody could or could not
25     get a patent.
```

Julkowski - Confidential                    300

A.    Sales organizations have their own internal numbers what they want to sell.  I don't know what their internal goals are to how much to sell.

Q.    So does Chamilia have a plan which shows anticipated growth of business?

A.    No.

Q.    Does Chamilia have a plan which shows it's perspective business opportunities?

A.    No, not that I recall.

Q.    Does Chamilia have a list of customers that it intends to target?

A.    We have a list -- no -- we have a list of customers that reps send us and we send them postcards as we discussed earlier.  As a target list, I don't know, I don't know what the count is.

Q.    Has Chamilia ever held a sales meeting?

A.    Yes.

Q.    And when was that?

A.    The reps did, national sales reps did.

Q.    And when was that?

A.    January '04.

Q.    Where was it held?

```
 1              Julkowski - Confidential              304
 2     that Michael spoke with, Rob Knott in Jersey,
 3     said it was a shit product inferior to his
 4     product.
 5          Q.    And when was that communication made?
 6          A.    I have to go back and look in my notes
 7     to see when he spoke with Rob.  It was multiple
 8     times he spoke with that customer.
 9          Q.    When was the last time you know that
10     Michael spoke with that customer?
11          A.    I have no idea.
12          Q.    Have you ever heard a Pandora
13     representative say, in your presence, that
14     Chamilia jewelry products are shoddy quality
15     merchandise?
16          A.    No.
17          Q.    Have you ever met Steve Glueck?
18          A.    Seen him, never met him.
19          Q.    Where did you see him?
20          A.    San Francisco gift show, fall of '04 --
21     or summer of '04 -- fall of '04.
22          Q.    Have you ever spoken to him?
23          A.    No.
24          Q.    You've indicated that customers have
25     canceled their order to purchase Chamilia jewelry
```

```
1                    Julkowski - Confidential              325
2      that you've personally heard?
3           A.    I personally have -- yes, the
4      voicemails and personally read the e-mails.
5           Q.    When have you overheard Pandora or
6      Pandora's representatives threaten your customers
7      with suits for willful patent infringement?
8           A.    Donna Renee Carlos was threatened with
9      that.
10          Q.    You personally heard the threat?
11          A.    I'm sorry.  No -- yes, well, going back
12     to the voicemail, I'm not sure if there was a
13     threat or what the voicemail entailed, but it was
14     to that customer.
15          Q.    But do you recall Pandora
16     representative or Pandora making threats
17     specifically referencing suits for willful patent
18     infringement?
19          A.    Yes.
20          Q.    Personally?
21          A.    From the customers.
22          Q.    But you've never personally heard a
23     Pandora representative say that?
24          A.    Well, Michael Lund, yes.
25          Q.    Other than at the Atlanta trade show?
```

Julkowski - Confidential                326

1

2    A.    Just voicemails and e-mails.

3    Q.    Have you ever heard a Pandora

4    representative threaten your customers with a

5    suit for millions of dollars in damages and

6    attorney's fees awards?

7    A.    I have not.  Our sales reps have.

8    Q.    And who are those sales reps?

9    A.    We can go back to some of the

10   documents -- I don't know off the top of my head.

11   Q.    As you sit here today, you cannot

12   recall any names of the sales representatives --

13   A.    Lisa Whirlow.

14   Q.    -- who were threatened with the stamen

15   that they will be sued for millions of dollars in

16   damages by Pandora?

17   A.    Let me see the exact wording what you

18   are referring to.  I'm sorry what --

19   Q.    Line 3, paragraph 15.

20   A.    Yes.  I've heard that language from

21   several reps.  I'd have to go back and look at my

22   notes of which ones they were and which e-mails.

23   Reps have provided us with, you know, similar

24   comments.

25   Q.    Has that specific language been used to

1              Julkowski - Confidential              335

2        Q.    Have you ever heard Steve Glueck make

3    any statements regarding any alleged patent

4    rights Pandora has?

5        A.    I haven't spoken with him, no.

6        Q.    Have you seen anything written from

7    Steve Glueck which alleges that Pandora has any

8    patent rights?

9        A.    I don't recall what his note was

10   referring to.

11       Q.    Have you ever heard Newt Hofstra make

12   statements about alleged patent rights of

13   Pandora?

14       A.    Customers have told me that he has.

15   These customers told me he visited their stores

16   on numerous occasions and made comments that he

17   was going to -- has a patent and was going to

18   shut down their store and confiscate their

19   inventory.

20       Q.    Have you personally heard Newt make

21   these statements?

22       A.    Through the customers.

23       Q.    You've overheard that?

24       A.    I've not heard Newt say that out of his

25   mouth, but customers have told me that.

Julkowski - Confidential                    340

2  that Chamilia was having financial problems?

3        A.    I've heard from -- I'm sorry, who --

4        Q.    Personally.

5        A.    -- said it?

6        Q.    Personally have you heard that?

7        A.    Personally I heard from sales reps,

8  yes.

9        Q.    No, have you personally overheard a

10  Pandora representative state that Chamilia was

11  having financial problems?

12        A.    Through customers.  Not personally from

13  the sales rep.  But from customers who sales reps

14  told that to.

15        Q.    I refer your attention to paragraph 23,

16  "As a result of defendant's unlawful activities,

17  plaintiff has suffered special damages."

18              Do you see that?

19        A.    23, yes.

20        Q.    Do you know what special damages is

21  referring to?

22              MR. GOGGIN:  Objection to the extent

23        that's a legal term of art drafted by

24        counsel, not by this witness.

25        Q.    You can answer the question if you have

```
1                Julkowski - Confidential              341
2      an answer.
3           A.    I'm reading the sentence.  The next
4      words would be including injuries to goodwill and
5      reputation, reduction in sales, loss of profits
6      and inability to distribute the sales.
7           Q.    Okay.
8           A.    That's the end of the paragraph.
9      Should I read the next one?
10          Q.    No, there's no question pending.
11                What do the understand the term special
12     damages to be?
13          A.    The verbiage that's on the paper,
14     including injury to goodwill, reputation,
15     reduction of sales, loss of profits and inability
16     to distribute its customers.  Included in that
17     would be having to field calls that we're still
18     in business.  And our inventory is still on our
19     shelves and hasn't been confiscated by the local
20     sheriff.
21          Q.    Has Chamilia at any time had an
22     inability to distribute or sell its products?
23          A.    At this lawsuit, no.
24          Q.    I'm sorry.
25          A.    Reading this -- referring to this
```

1                Julkowski - Confidential              353

2          A.    I don't recall.

3          Q.    Have you ever personally heard Mr.

4     Hofstra indicate to a Chamilia customer that

5     their inventories will be confiscated by Pandora?

6          A.    The customer has indicated that to me,

7     yes.

8          Q.    And you've personally heard Mr. Hofstra

9     communicate that to a customer?

10         A.    No.

11         Q.    Have you personally heard Mr. Hofstra

12    communicate to a customer that if they sell

13    Chamilia jewelry products, they will be in

14    violation of an existing patent?

15         A.    I heard customers who told me that,

16    yes.

17         Q.    Have you personally heard that?

18         A.    I personally have not heard Mr.

19    Hofstra, no.

20         Q.    Have you personally heard Mr. Hofstra

21    communicate to a Chamilia customer that Pandora

22    would have any commissions earned confiscated at

23    Pandora's request for selling Chamilia jewelry

24    products?

25         A.    Yes, I've heard that.  Was that to me

```
 1              Julkowski - Confidential          354
 2      or was that to somebody else?  I've heard the
 3      comment.  Not from him personally.
 4          Q.    And who have you heard that from?
 5          A.    Sales reps, customers.
 6          Q.    Have you personally heard that
 7      statement being made by a Pandora representative?
 8          A.    No.  I don't recall.
 9          Q.    Have you personally seen any
10      advertising or marketing materials by Pandora
11      which referenced Chamilia?
12          A.    Yes.
13          Q.    And what are those?
14          A.    Document number 8 -- 9.
15          Q.    You consider document 9 to be a
16      marketing material or advertising?
17          A.    Depends on the way it's used.
18          Q.    Well, I asked you if you had seen any
19      marketing or advertising materials by Pandora
20      which referenced Chamilia.  Then you answered
21      Plaintiff's Exhibit 9.
22              So I'm asking you, is it a marketing
23      material or advertising material in your opinion?
24          A.    It depends how it's used.  If it's
25      going external from the company, I consider it a
```

1           Julkowski - Confidential           355
2    marketing or advertising.
3           Q.    Have you personally seen any documents
4    which reference -- have you personally seen any
5    marketing or advertising literature of Pandora's
6    which particularly reference the term patent
7    pending?
8           A.    I'm sorry.
9                 MS. SHORT:  Can you read the question
10          back, Ms. Court reporter.
11                (Record read)
12          A.    Yes.
13          Q.    And what documents were those?
14          A.    Advertisements, magazines, sales
15    brochures, websites.  Only more recently.
16          Q.    In that context, what do you understand
17    the term patent pending to mean?
18          A.    Back to -- I don't know.  Back to the
19    prior conversation, they applied for something
20    and asked for something to see if they can
21    receive that.
22          Q.    What do you understand is covered by
23    the patent pending?
24          A.    I have no idea.
25          Q.    What jewelry is being advertised in

# EXHIBIT S to Supplemental Declaration of Gianfranco G. Mitrione dated July 15, 2005

1                                                          1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ----------------------------x

4     CHAMILIA, LLC,

5                    Plaintiff,

6         v.                          04-CV-6017
                                        (KMK)
7

8     PANDORA JEWELRY, LLC,

9                    Defendant.

10   ----------------------------x

11

12          CONFIDENTIAL - ATTORNEYS EYES ONLY

13

14                            May 13, 2005

15                            9:15 a.m.

16

17          Videotaped deposition of LISA WHIRLOW,

18   taken by Defendant, pursuant to notice, at the

19   offices of Lathrop & Gage, 230 Park Avenue, New

20   York, NY 10169, before Lisa Mango, a Shorthand

21   Reporter and Notary Public of the State of New

22   York.

23

24

25

```
 1                    Whirlow - Confidential              23

 2      usually call me and I try to help them resolve

 3      the problems.

 4            Q.    Okay.  You said there are 125 reps.  So

 5      would that be, as you explained, someone in Cathy

 6      Reilly's position?

 7            A.    Yes.

 8            Q.    So that could also be called a sub-rep?

 9            A.    It would be a sub-rep for the group.

10      Cathy Reilly's a sub-rep for Reggie Bowles.

11      Their not sub-reps for me.  Whirlow & Associates

12      is a rep group.

13            Q.    And how many rep groups are there?

14            A.    I think I told you nine.

15            Q.    And who are they?

16            A.    Wolf Group, BrassSmith, David Philip,

17      Dave Mazzio, Reggie Bowles, Whirlow & Associates

18      Ron Bauman & Associates, Cathy & Company,

19      MarkWest & Associates, North Bay.  There's ten

20      actually.

21            Q.    What territory does Cathy & Company

22      cover?

23            A.    Oh, boy.  The middle of the state.

24            Q.    The middle of the United States?

25            A.    Yes.
```

Whirlow - Confidential                    57

Q.    To your knowledge, was Chamilia
required to change it's round clasp?

A.    Yes.

Q.    Who required that?

A.    Well, I don't -- actually, when Michael
Lund showed up in San Francisco, I had not seen
the product of Pandora or Chamilia before the
August show.  And when Michael Lund showed up and
showed me that the products were alike, I made a
phone call and said, you know, this is
unacceptable.  We need to change this line so
that it has its own identity.

Q.    So it was your decision to change the
clasp of the Chamilia chain?

A.    I mean, we had discussed changing the
line, and then there was the legal action.

Q.    So was it your decision to change the
lock on the Chamilia chain?

A.    I wouldn't say it was my decision.

Q.    Whose decision was it?

A.    I would say that that was Jeff's
decision.

Q.    And when was that decision made?

A.    Well, I think the decision to change

Whirlow - Confidential                    70

harassed to no end.

Q.    Words Lovely Words, what have they communicated to you that Pandora representatives have made statements about Chamilia?

A.    They're a small business, they were afraid, they didn't want to be involved in any of this.  They said that the rep had called and said that they had already had the sheriff go into another store and confiscate the product, just walked in and took it off the shelf.  And they were afraid.

Q.    And who did you speak with at Words Lovely Words?

A.    I don't remember the name.

Q.    Who's the owner of Words Lovely Words?

A.    I don't remember the name.

Q.    And when did you have this conversation?

A.    I don't really remember the date.

Q.    Was it this year?

A.    Yes.  No, it was the end of last year.

Q.    Did you hear personally the statements made by Pandora representatives to Words Lovely Words?

Whirlow - Confidential                    71

A.    No.

Q.    Has Words Lovely Words shown you any written communications from Pandora representatives regarding Chamilia?

A.    No.

Q.    Petals & Stems, are they a customer of Chamilia?

A.    Yes, and they're not of Pandora.

Q.    Does Words Lovely Words sell Pandora?

A.    I don't think so.

Q.    But you don't know?

A.    But I don't know.

Q.    Do they carry Chamilia?

A.    Yes.

Q.    What did Petals & Stems communicate to you of the statements made by Pandora representatives about Chamilia?

A.    That the rep came in -- well, I handed you the paper if you wanted it.  The rep just wrote me an e-mail yesterday.  So we always have to call and try to make the customer feel comfortable after this.

Q.    And what does the Petals & Stems store claim the statements were that the Pandora

Whirlow - Confidential                    72

representative made to them?

    A.    The statement that they often say,
they're closing us down.

    Q.    Any others?

    A.    Any other statements or stores?

    Q.    Any other statements.

    A.    That Pandora says?

    Q.    That Petals & Stems says that Pandora
representatives have made to them about Chamilia.

    A.    That's pretty much it, that they're
closing us down.

    Q.    And were you present when these
statements were made by the Pandora
representatives to Petals & Stems?

    A.    No.

    Q.    Are you aware of any written
communications that Pandora representatives have
had with Petals & Stems about Chamilia?

    A.    No.

    Q.    No?

    A.    I got the e-mail last night.

    Q.    So then, no, you're not aware of any
written?

    A.    No.

Whirlow - Confidential                              73

Q.      And Carrots, what statements do
representatives of Carrots claim that Pandora
representative made about Chamilia?

A.      They were closing us down.

Q.      As in us, you refer to Chamilia?

A.      Chamilia.

Q.      And when were those statements made?

A.      Oh, starting -- the statements have
continued from when -- from August on non-stop.

Q.      When were those statements made to
Carrots to the best of your knowledge?

A.      Probably in August and September.

Q.      August of which year?

A.      2003.

Q.      August, September of 2003.  And what
are the statements that Carrots claimed were made
by Pandora representatives?

A.      That they were closing us down, that
they had a patent.

Q.      Did Carrots reference any copyright
infringement that Chamilia was alleged to have
been committing against Pandora?

A.      No.

Q.      Have you personally heard statements

```
              Whirlow - Confidential              74
```

made by Pandora representatives to

representatives of Carrots about Chamilia?

    A.    No.

    Q.    Have you ever seen any written

statements made by Pandora representatives to

representatives of Carrots about Chamilia?

    A.    No.

    Q.    Claremont Pharmacy, what have they

communicated to --

    A.    They stopped --

    Q.    -- about statements made by Pandora

representatives?

    A.    We were getting closed down because

they had a patent.

    Q.    And by we, who do you mean?

    A.    Chamilia.

    Q.    And did you hear that directly from the

representatives of Claremont Pharmacy?

    A.    Yes.

    Q.    And when did you have that

communication?

    A.    Probably September.

    Q.    Of what year?

    A.    '03.  They're no longer a customer.

Whirlow - Confidential                    87

representatives as you've just described was in early 2004?

A.    From her.

Q.    You spoke directly with Tina's Hallmark and received that information?

A.    Um-hum.

Q.    Did you personally hear the statements made by a Pandora representative to Tina's Hallmark about Chamilia?

A.    No.

Q.    Have you personally heard any statements made by Pandora representatives to Tina's Hallmark that they have a patent?

A.    No.

Q.    Have you seen any written statements made by Pandora representatives to Tina's Hallmark that they have a patent?

A.    No.  I --

Q.    Have you -- I'm sorry.  Go ahead.

A.    I have not heard anyone at Pandora say anything to any of these customers.  I have not overheard it.  I personally heard it from Michael Lund, he told me.  And Steve Glueck in the following show in January, Steve Glueck

Whirlow - Confidential                    88

personally, he kept walking by our booth.  And
finally I stopped him and said hi, you know, are
you the Pandora rep and he said yes.

Q.   Did you personally see any written
communications by Pandora representatives to
Tina's Hallmark that they were going to shut
Chamilia down?

A.   No.

Q.   In addition to Tina's Hallmark, what
other retailers have communicated to you that
they have heard statements made by Pandora
representatives about Chamilia?

A.   So every person I name off you're going
to ask me, even though I've told you that they
haven't -- I didn't witness it, so we're going to
go through the ten questions with each customer?

Q.   I'm sorry.  I understand you're asking
me a question, but you're not really in the
position to ask any questions.  I'm the one
asking questions.

        If you could answer the question, I
would appreciate it.  If you don't understand a
question I'm asking you --

A.   Well, I mean -- I thought it was just

Whirlow - Confidential                    89

easier if I, you know -- let's just save us all a lot of time.  I haven't overheard any of these customers.  So it's like let's just get to the punch.

You know, these are claims -- these people have called me.  But I have not heard, seen any of it.  The only two represent -- is Steve Glueck, I've talked to him.  And I talked to some girls in the Atlanta gift show at a restaurant who were very nice that were working for Pandora.

Q.    And who were they?

A.    I don't remember their names.

Q.    And how do you know they were working for Pandora?

A.    Because they had Pandora T-shirts on and we were in a restaurant and we were all having a nice time, and they were very friendly and very nice.

Q.    And what position did they hold with Pandora?

A.    They were sales rep.

Q.    How do you know that?

A.    They had a T-shirt that said Pandora

Whirlow - Confidential                    115

Q.    Just so the record's clear, my understanding is Pandora representatives made statements to David M. Brian who communicated those statements to Tony Brading, and then Tony Brading communicated those statements to you?

A.    Right.

Q.    At any time did you communicate those statements to Jeff Julkowski?

A.    Probably.

Q.    And when was that?

A.    Probably when it happened.

Q.    Did you communicate to anyone else about these statements?

A.    I don't think so.

Q.    Other than David M. Brian --

A.    I didn't talk to David M. Brian.

Q.    Other than David M. Brian, what other retailers?

A.    Oh, okay.  Linda's Gifts.

Q.    And where are they located?

A.    California.

Q.    And what statements did they claim were made by Pandora representatives about Chamilia?

A.    All these people I'm going to give you

Whirlow - Confidential                    116

the name, they all had the same statement.  You

know, they had a patent, they were closing us

down.  So if that helps any.

     And all these people, you know, I did

not oversee or hear Pandora.

Whirlow - Confidential                    124

Q.    Of the names that appear on that piece of paper that you're going to read into the record, do you have knowledge of any written statements that they received by Pandora representatives about Chamilia?

A.    I didn't see any of them.

Q.    You did not?

A.    I mean, it's all -- you know, these are people that come to mind that have either returned their product and no longer customers or have been harassed in some way.

Q.    Of the list that you have in front of you, how many communications that were made by Pandora representatives to those individuals did you personally hear?

A.    I haven't heard any of them.  So I should probably just stop saying the names, huh?

Q.    Can you identify a situation where you heard a Pandora representative communicate with one of Chamilia's customers that Chamilia is violating Pandora's patent?

A.    I have not heard -- I have -- I have not overheard Pandora reps or Michael Lund talk to anybody.  I haven't overheard those

Whirlow - Confidential                          125

conversations.

Q.    Why don't you, if you could, read the names into the record.

A.    Well, I mean --

MR. GOGGIN:  Just read them in.

Q.    I think you left off at Country Clutter.

A.    Yes, I know where I left off. Classic Duck.

Q.    Okay.  You can continue.

A.    Oh, I can?

Q.    Just give the list.

A.    Oh, great.  Okay.  Perfect.

Interiors & More, Fine Things, A Thousand Charms, Forever Charmed, Shad's, Bishop Hallmark, Pamela's, Identity Jewelers, Picket Fence.  And I just thought of another one, Richard's Gifts.  And --

MR. GOGGIN:  Are you still reading from the list.

THE WITNESS:  No, I'm not.  I've read all the list that I wrote down this morning.

Q.    Okay.  Before you leave I'd like a copy of the list.

Whirlow - Confidential                    132

Q.   And was it in connection with the
twists that used to appear on the chain that you
indicated now don't?

A.   I thought it was the top copyright with
the beads.

I think the same thing's on everybody's
website.  You know, Pasha, everybody.

Q.   What other function does that twisting
device at the end of your bracelet perform other
than allowing the beads to attach to the
bracelet?

A.   Not a lot.  I mean, it holds it closed.

Q.   Which beads don't have the threading or
the twisting mechanism in them?

A.   The glass beads.

Q.   Any others?

A.   No.

Q.   Are there any other beads sold by
Chamilia which do not have the threading or the
twisting design in them?

A.   Oh, spacers.

Q.   Any others?

A.   I don't -- I don't know.

Q.   So other than the spacers and the glass

Whirlow – Confidential                                    133

beads, all other beads screw onto the bracelet in

order to --

    A.    Yes.

    Q.    In order to be attached.

        On your bracelet, can you point to the

decorative locks that keep your beads from

sliding across the chain as described in

paragraph C on page 1 of Pandora 6?

    A.    This one.

    Q.    And what is that decorative lock

affixed to?

    A.    That hump I showed you before, the

hump.

    Q.    Without the hump can the decorative

lock affix to the bracelet?

    A.    Well, it will stay on.

    Q.    So what is the function of the hump

underneath the decorative lock?

    A.    Well, so you can keep them in sections,

I guess.

    Q.    But the decorative locks can be affixed

to the bracelet at any point on the chain,

correct?

    A.    They can be put anywhere on the chain.

want to guess or whether you want to

estimate.

       THE WITNESS:  Oh, I see.

       MS. SHORT:  Approximate is the word.

       MR. GOGGIN:  Approximate.  And they are

two different things.  So be clear --

       THE WITNESS:  I see.

   A.   A lot of people were customers that

aren't customers anymore.  So I'm not -- maybe

700, 800.

       I really sound like a lousy sales

manager.  All the stuff I don't know.

   Q.   If a retail location used to carry

Chamilia jewelry products, would their name still

appear on your customer list?

   A.   Quite possibly.

   Q.   Do you know whether they would or would

not?

   A.   I have heard that people are on there

that have gone on there that aren't still

carrying Chamilia.

   Q.   And how have you heard that?

   A.   I've heard that from -- I'm not quite

sure.  Either reps -- I have heard that, but I

Whirlow - Confidential                      154

MR. GOGGIN:   She just said she --

A.    I gave you a couple.  I mean, I gave you, you know, a couple of them.  A stone falls out.

Q.    No, that's when you explained that a product was damaged.  I'm asking what your experience is with a defective jewelry product.

A.    I mean, it's just the buzz word.  You write damaged and defective merchandise.  Love Letters, Jewelry John, all the companies, you know, guarantee -- it's just the way you write it.

Q.    But then there's nothing defective that you've received as a return from customers?

A.    I'm sure there is.

Q.    Then what are those situations?

A.    You know, it's maybe something's not right with it.  I don't -- you know.

Q.    And what about it wouldn't be right that would make it defective?

A.    That it might not go on the bracelet.

Q.    Why wouldn't it go on the bracelet?

A.    Because it would be defective.

Q.    What about the bead would be defective

Whirlow - Confidential                          155

that wouldn't allow it to attach to the bracelet?

      MR. GOGGIN:  This is all speculation.

I object to this questioning.

      MS. SHORT:  I asked for examples and

she's providing me examples of situations --

      MR. GOGGIN:  Of what might be?

      MS. SHORT:  Court reporter, could you

read back the entire exchange, please.

      (Record read)

    A.    I mean, the hole could be too small.

    Q.    Have you seen that with Chamilia beads?

    A.    That the hole's too small?

    Q.    Um-hum.

    A.    I don't really -- I mean, I've seen a

pile of stuff that came back.  I don't go look at

it.  I don't care.

    Q.    But have you?

    A.    No.

    Q.    So what product have you received as a

return from a customer that has been defective?

    A.    I personally don't do returns.  I'm not

involved in that.  So I don't think I personally

have taken anything back.

    Q.    What have your sales reps communicated

to you that customers have returned based on a
product sold by Chamilia being defective?

        A.      Well, if it's defective, I tell them,
you know, to take care of it.

        Q.      And what about the jewelry product was
defective?

                MR. GOGGIN:  Asked and answered.

        A.      I mean, it's like I don't get involved
in that.  I mean, it's like I do other things.  I
mean, it's like -- I want them to take care of
the customers and make the customer happy.

        Q.      Have you ever had situations where a
customer returned a bead because it was unable to
thread onto the bracelet?

        A.      To me, no.  I --

                MR. GOGGIN:  If you don't know, say you
don't know.

        Q.      Do you have knowledge of a situation
where a customer returned a bead and it was --

        A.      I'm sure these things have happened.
But do I have exact knowledge of these certain
situations, no.

        Q.      Are you aware of any situation where a
customer returned a Chamilia jewelry product

Whirlow - Confidential                    157

because a bead was unable to be removed from the bracelet because it was stuck?

A.    Yes, I do know that.

Q.    Would you call it a defect?

A.    I mean, we would characterize it as a defect.  But whether or not the customer hit the bead and damaged it, we cover it.  But how it actually happened -- it went on there at one point and it was fine.  So I think that there was some damage done to it, but we still cover it.

Q.    But that would be a defect if a bead was stuck on --

A.    That would come under damage and defect.  So, I mean, your interpretation of damage and defect, I don't analyze it all that much.

Q.    I'm just asking for your understanding.

A.    I know.

Q.    Who do you consider to be competitors of Chamilia?

A.    Pandora.

Q.    What makes Pandora a competitor of Chamilia?

A.    Well, what I say to people is, at a

Whirlow - Confidential                    180

A.    They may have one, but I haven't seen it.

Q.    Have you ever prepared a chart or other document which would show an anticipated projection of sales?

A.    No.

Q.    Has Chamilia ever held a sales meeting?

A.    Yes.

Q.    When have they held a sales meeting?

A.    I had a sales meeting in January in Atlanta.

Q.    January of which year?

A.    '04.

Q.    Who was present at the sales meeting?

A.    Oh, gosh.  Just mostly rep principals and a few reps.  It wasn't a very big one.

Q.    How many people total were present at the meeting?

A.    Maybe 15.

Q.    Who organized the meeting?

A.    I did.

Q.    How did you go about organizing it?

A.    I had the showroom group get me a room to have a small meeting and asked everyone to

Whirlow - Confidential                    202

Chamilia customers by Pandora representatives at
that Texas 2004 gift show?

A.    No, they weren't there, so they
wouldn't -- I don't think they were there.

Actually, Avery's is the store out of
Texas that's a chain and there are, you know,
various locations.

Q.    Have you received any e-mails from
Chamilia customers indicating a discontinuance of
sale of Chamilia jewelry products as a result of
statements made by Pandora or it's
representatives?

A.    Have customers -- customers haven't
e-mailed me, no.    Customers --

Q.    Have you received any written
communications from your customers indicating a
discontinuance of sale of Chamilia jewelry
products as a result of statements made by
Pandora?

A.    No.    Retailers really aren't up on
e-mails.    A lot of them don't use e-mail.    I know
it's hard for you guys in your profession because
everybody's e-mail freaks.    But in the retail
industry they're really not -- you know, it's --

Whirlow - Confidential                    203

they're really not into the e-mail.  They're
starting to get.  So they use the telephone to
communicate.

Q.    As the national sales manager for
Chamilia, have any of the hundred or so sales
representatives of Chamilia forwarded on to you
any written correspondence they've received from
their customers which indicate a discontinuance
of sale of Chamilia jewelry products as a result
of any statements made by Pandora?

A.    If I get an e-mail, it'd be like the
one I showed you today.  That's from the rep
stating a conversation.  But nobody has given me
copies of something that a retailer has written,
that I can think of.

Q.    That would be whether it's a letter or
a fax?

A.    Right.

Q.    Or an e-mail?

A.    Correct.

Q.    I need to ask you some more questions
about your attendance at that January 2005 gift
show.

A.    Okay.

Whirlow - Confidential                    215

meaning of the term knock-off without using the
word in providing me with your understanding of
it's meaning?

A.    Well, they see a product or an item and
then they make something similar or like.

Q.    Have you ever heard a Chamilia product
being described as a knock-off?

A.    Um-hum.

Q.    And when have you heard that?

A.    I have heard that through customers
saying that, you know, Pandora said that.

Q.    Have you ever personally heard a
Pandora representative describe a Chamilia
product as a knock-off?

A.    No.

Q.    Would you describe the Chamilia jewelry
products being sold in the fall of 2003 as
knock-offs of Pandora jewelry products sold at
that time?

A.    Yes.

Q.    Do you know what a patent is?

A.    Yes.

Q.    What is it?  What is your
understanding?

Whirlow - Confidential                    234

Pandora representatives concerning Chamilia?

    A.    Cathy Reilly, she had a conversation I think at the Chicago show with a Pandora rep. They also repped the same line, another mutual line.  And Cathy Reilly introduced herself and said, oh, you know, I rep Chamilia.  And the woman turned on her instantly and was very rude.

    I don't -- the woman told Cathy that they were shutting us down.  I don't remember the woman's name.  And Cathy tried to be friendly. But the woman was very rude.

    Q.    When did Cathy Reilly tell you this?

    A.    When it happened.

    Q.    Do you remember when that was?

    A.    At one of the shows.  I think it was the summer show last season, '04.

    Q.    Have you ever heard a Pandora representative describe Chamilia jewelry products as inferior or shoddy quality merchandise?

    A.    To me, no.  Not to me.

    Q.    You've never witnessed a Pandora representative communicate that to anyone else, have you?

    A.    No.

Whirlow - Confidential                    235

Q.    Have you ever seen any advertising or
marketing materials by Pandora which reference
Chamilia?

A.    No.

Q.    Have you ever personally heard a
Pandora representative communicate to Chamilia
customers that Pandora will sue Chamilia for
millions of dollars in damages?

A.    Have I ever heard Pandora say that?
No.

Q.    To a customer in your presence?

A.    Oh, no, no.  I never heard Pandora talk
to any customers.

Q.    Have you ever personally witnessed a
Pandora representative threatening a Chamilia
customer?

A.    No.

Q.    Have you ever heard of the e-mail
address Jvinba@ValorNet.com?  Does that e-mail
address sound familiar?

A.    May I see it?

Q.    Sure.  I now hand the witness what has
been marked as Plaintiff Exhibit 6.

A.    It doesn't ring a bell.

# EXHIBIT T to Supplemental Declaration
## of Gianfranco G. Mitrione
## dated July 15, 2005

# Verrill Dana LLP

Attorneys at Law

JAMES G. GOGGIN
PARTNER
jgoggin@verrilldana.com
Direct Dial: 207-253-4602
Direct Fax: 207-253-4603

ONE PORTLAND SQUARE
PORTLAND, MAINE 04112-0586
207-774-4000 • FAX 207-774-7499

June 9, 2005

**VIA FACSIMILE & FEDERAL EXPRESS**

Honorable Kenneth M. Karas
United States District Court
Southern District of New York
500 Pearl Street, Room 920
New York, NY 10007

   Re: Chamilia, LLC v. Pandora Jewelry, LLC
     Civil Action No. 04-CIV-06017 (KMK) (ECF Case)

Dear Judge Karas:

  This is to briefly respond to Pandora's letter of June 6, 2005 regarding the production of the "Pandora, LLC's terms and condition letters". We seek any of these letters that were signed by customers or that indicate with an address to whom they were sent. Without repeating the arguments I made in our telephone conference, our discovery request was for any documents which refer to Chamilia. I have attached as Exhibit A an excerpt from the deposition of Michael Lund Petersen in which he states that the manufacturers referred to in the September 16, 2004 letter include Chamilia. (Page 28, lines 19-25).

  As for relevance, we are not contending that this agreement by itself violates the antitrust law, but rather that this relates to Pandora's misrepresentations about intellectual property rights. The letter itself refers to pending published patent applications, and further states that Pandora is "aggressively pursuing those who infringe on our intellectual property rights". The letters are relevant to the allegation in Paragraph 21 that says that "Defendant has made statements to Plaintiff's customers and potential customers advising them not to purchase products from Plaintiff because the Defendant has asserted patent rights." When combined with oral statements made by Pandora and its sales representatives to customers that Pandora has a patent, that Pandora will "shut down Chamilia", that Pandora would impound Chamilia inventory and sue for any profits realized by the retailers from the sale of Chamilia's products, the letters can be seen as part of the scheme that constitutes tortuous interference with advantageous relationships alleged in Count VI and unfair competition alleged in Count VII of the Plaintiff's Complaint. Plaintiff is entitled to know who has signed these letters, and when, and as evidence that customers have declined to make additional purchases of Plaintiff's products as alleged in Paragraph 53 of the Complaint, or who have breached their contracts by canceling purchase

Honorable Kenneth M. Karas
June 9, 2005
Page 2

orders or have communicated their intention not to purchase products in the future as alleged in
Paragraph 56 of the Plaintiff's Complaint.

In addition, these agreements are referred to in the Steve Glueck letter, provided to you as
Exhibit 5 to Mr. Hansen's letter, where Mr. Glueck says "as you all know, we have an agreement
with you not to carry the knock-off companies, as we had outlined in our terms and conditions
policy". These letters are also evidence that people have chosen not to do business with
Chamilia because of allegations made by Pandora about knock-off jewelry, which are relevant to
our Lanham Act Claim in Count I, Defamation Claim in Count VI, Business-Product
Disparagement in Count V, as well as the previously mentioned tortuous interference and unfair
competition claims.

Finally, these letters are also relevant to prove the dollar amount of damages suffered by
the Plaintiff, and might lead to additional discoverable information in the form of witness
interview of the people who signed them.

Sincerely,

James G. Goggin

JGG/sms
Enclosures
cc:    William R. Hansen, Esq.
       Dylan Smith, Esq.
       Troy Sargent
P:\jgoggin\chamilia\karas.4ltr.doc