**LATHROP & GAGE L.C.**
William R. Hansen (WH-9446)
Gianfranco G. Mitrione (GM-8168)
Bridget A. Short (BS-4191)
230 Park Avenue, Suite 1847
New York, New York 10169
(212) 850-6220 (tel)
(212) 850-6221 (fax)

**Attorneys for Defendant**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
CHAMILIA, LLC,                                    :     Civil Action No.:
                                                  :     04 CV 06017 (KMK)
                 Plaintiff,       :
                                                  :
     -against-                                 :     ECF CASE
                                                  :
PANDORA JEWELRY, LLC,                             :
                                                  :
                                                  :
              Defendant.       :
-------------------------------------------------------------X

## STATEMENT OF UNDISPUTED MATERIAL FACTS

    Pandora Jewelry, LLC ("Pandora" or "defendant") submits the following Statement of

Undisputed Material Facts for which there are no genuine issues pursuant to Rule 56.1 of the

Rules of the United States District Court for the Southern District of New York.

    1.        Pandora is engaged in the business of creating, manufacturing, marketing,

distributing and selling custom designed bracelets and necklaces featuring silver and 14-karat

gold jewelry beads.  See Declaration of Michael Lund Petersen dated January 12, 2005, ¶¶ 5 and

12 ("Petersen Decl. ¶ __").

2.       With regard to specialty bracelets, necklaces and beads, Pandora is a recognized leader in the jewelry industry, particularly for elegant jewelry that is inspired by a distinctive Scandinavian style and design.  See Petersen Decl. ¶ 5.

3.       Pandora's jewelry designs were created in 2000, and are protected by the Danish Copyright laws.  Pandora obtained U.S. Copyright Certificate Registrations VA-1-208-549, VA-1-210-216, VA-1-210-240 and VA-1-218-723, for its jewelry designs that first became effective on September 4, 2003.  See Petersen Decl. ¶ 6.

4.       In October, 2002, Pandora entered the United States market and began distributing Pandora's copyrighted catalogs and other sales information including samples of the Pandora jewelry designs to retailers and potential customers.  See Petersen Decl. ¶ 7.

5.       In April, 2003, Pandora began selling the copyrighted Pandora jewelry designs crafted in silver and 14 karat gold into the United States.  See Petersen Decl. ¶ 7.

6.       Building upon the original character of copyrighted Pandora jewelry designs, Per. A. Enevoldsen,  a principal of Pandora, invented a unique method of stringing jewelry beads, spacer, and clips which, in turn, form individually distinctive bracelets and necklaces.  See Petersen Decl. ¶ 8;  see also Dep. Tr. of Michael Lund Petersen ("Petersen"), p. 19, lines 3-12; Dep. Tr. of Knud Hostrup ("Hostrup"), p. 31, lines 14-25, p. 32, lines 1-9, p. 42, lines 9-25, p. 43, lines 1-7, p. 70, lines 4-18.

2

7.      On July 21, 2003, Pandora filed a patent application with the U.S. Patent and Trademark Office to protect Mr. Enevoldsen's invention. The patent application currently pending is entitled "NECKLACES AND BRACELETS WITH KEEPERS" and was assigned Application No. 10/623,641. See Petersen Decl. ¶ 8.

8.      Pandora began using the legend "patent pending" on all of its promotional and advertising materials used in connection with the distribution and sale of the Pandora jewelry once it filed the patent application. See Petersen Decl. ¶ 9; see also Petersen Suppl. Decl. ¶¶ 4-6, 8-12 and Ex. L.

9.      Mr. Julkowski, President of Chamilia, has seen Pandora marketing and advertising literature, namely advertisements, magazines, sales brochures, web sites, which reference the term "patent pending." See Dep. Tr. of Jeffrey Julkowski ("Julkowski"), p. 355, lines 3-15.

10.      Pandora has received unsolicited media attention from Gift Beat magazine in which Pandora's "patent pending" was clearly mentioned. The Gift Beat article clearly stated that Pandora "has a patent-pending on its bracelet design." See Petersen Suppl. Decl. ¶ 7; see also Ex. K attached to the Declaration of Jody Henderson dated January 12, 2005 for a copy of the Gift Beat article.

11.      When Pandora's patent application was published by the U.S. Patent and Trademark Office on July 29, 2004, as Publication No. US 2004/0144131-A1, Pandora provided

3

notice to Chamilia, and to other manufacturers and retailers of the application's publication. <u>See</u> Petersen Decl. ¶ 11.

12.      In June 2003, Dov Schwartz, a principal of Chamilia, became a customer of Pandora. <u>See</u> Petersen Decl. ¶ 14.

13.      During the summer of 2003, Chamilia arranged to have the Pandora jewelry designs reverse engineered in Asia by taking a casting from existing jewelry items and creating a mold. <u>See</u> Petersen Decl. ¶ 14.

14.      In mid-August 2003, Mr. Petersen learned that Chamilia had copied Pandora's collection of jewelry designs and were offering them for sale to Pandora's customers. To confirm that Chamilia had in fact copied Pandora's copyrighted jewelry designs, Mr. Petersen attended the San Francisco International Gift Fair in San Francisco, California on August 26, and 27, 2003. <u>See</u> Petersen Decl. ¶ 14.

15.      On August 26, 2003, Mr. Petersen visited Chamilia's booth and discovered that Chamilia was displaying jewelry products which, in fact, were illegal copies of Pandora's jewelry designs. <u>See</u> Petersen Decl. ¶ 15.

16.      On August 27, Mr. Petersen visited the Chamilia booth again, and encountered Lisa Whirlow. Mr. Petersen was aware that she was a Chamilia sales representative for the southern California area. <u>See</u> Petersen Decl. ¶ 15.

4

17.    After examining Chamilia's line of jewelry, Mr. Petersen realized that Chamilia's jewelry was unquestionably inferior in quality and that it copied the system used by Pandora to string jewelry beads, spacers and clips to necklaces and bracelets. See Petersen Decl. ¶ 17; see also Dep. Tr. of Petersen, p. 72, lines 22-25, p. 73, lines 1-25, p. 74, lines 1-4, p. 76, lines 9-17, p.95, lines 11-18; Dep. Tr. of Hostrup, p. 91, lines 2-23, p. 95, lines 11-25, p. 96, lines 1-5.

18.    Chamilia's inferior, copy-cat jewelry products are known to Mr. Petersen, the jewelry industry and to the public as "knockoffs." See Petersen Decl. ¶ 17; see also Dep. Tr. of Hostrup, p. 90, lines 8-18.

19.    Merriam-Webster's Collegiate Dictionary, Tenth Edition, defines the term "knockoff" as "a copy that sells for less than the original; a copy or imitation of someone or something popular." The verb "knock off" is defined as "to make a knock off of: copy, imitate; [e.g.] knocks off popular dress designs." See Declaration of Gianfranco G. Mitrione dated January 14, 2005, ¶ 5 ("Mitrione Decl. ¶ __"); see also Dep. Tr. of Hostrup, p. 90, lines 8-18.

20.    During Mr. Petersen's encounter with Lisa Whirlow, he informed her that the jewelry imported, marketed and sold by Chamilia were copies of Pandora's copyrighted designs. See Petersen Decl. ¶ 16.

21.    Mr. Petersen also informed Ms. Whirlow that Pandora's jewelry designs were protected by the Berne Convention and that Pandora owned a copyright in the United States for all of its jewelry designs. See Petersen Decl. ¶ 16.

5

22.    Mr. Petersen told Ms. Whirlow that Pandora owned a "worldwide copyright" for its jewelry designs. See Petersen Decl. ¶ 16.

23.    The first time Ms. Whirlow saw the Chamilia jewelry line was in August, 2003 at a trade show in San Francisco, California and when she found out the line was just like Pandora's, in that the entire line was pretty much identical, she notified Jeff Julkowski. See Dep. Tr. of Lisa Whirlow ("Whirlow"), p. 57 lines 5-25, p. 58, lines 1-13.

24.    Ms. Whirlow told Mr. Petersen that there were a number of companies in the jewelry industry that had copied or planned to copy Pandora's jewelry designs. See Petersen Decl. ¶ 16.

25.    Mr. Petersen notified Ms. Whirlow that Pandora had a patent application pending for the method by which the jewelry beads, clips and spacers are fastened to the bracelets and necklaces. See Petersen Decl. ¶ 18.

26.    Ms. Whirlow asked Mr. Petersen for the patent application number and Mr. Petersen told her he did not know it off-hand. See Petersen Decl. ¶ 18.

27.    At no time did Mr. Petersen advise Ms. Whirlow that Pandora would use its patent to "shut down" Chamilia or any of Pandora's competitors. See Petersen Decl. ¶ 18.

28.    On August 26, 2003, Mr. Petersen instructed, Pandora's then intellectual property counsel, William S. Ramsey, to send a letter to Chamilia demanding that it cease infringing Pandora's jewelry designs. See Petersen Decl. ¶ 19, Ex. G; see also Petersen Suppl. Decl. ¶ 5.

29.    In Mr. Ramsey's letter, he informed Chamilia of Pandora's copyright rights in the jewelry designs and further informed Chamilia that Pandora had filed a "nonprovisional U.S. Patent Application to obtain claims directed to the functional and structural aspects of Pandora's necklaces and bracelets." See Petersen Decl. ¶ 19, Ex. G.

30.    Despite being put on notice of the strength of Pandora's rights and goodwill in their original and novel jewelry designs, Chamilia continued to distribute jewelry products copying Pandora's jewelry designs in the United States. See Petersen Decl. ¶ 20.

31.    On September 25, 2003, Pandora filed suit against Chamilia in the United States District court for the Southern District of New York, Civil Action No. 03 CV 7587 ("New York Action") and another suit was filed in the District Court of New Jersey ("New Jersey Action") alleging, among other things, that Chamilia had been illegally copying Pandora's jewelry bead designs thereby infringing Pandora's valid, worldwide copyrights in those designs. See Petersen Decl. ¶¶ 21 and 24.

32.    In the New York Action, it was plead that Chamilia illegally copied the design of Pandora's silver and 14-karat gold jewelry beads in an effort to make Chamilia's infringing products confusingly similar to Pandora's. See Petersen Decl. ¶ 23, Ex. I.

7

33.     In the New York Action, Pandora sought a temporary restraining order ("TRO")

against Chamilia. On October 2, 2003, after holding a hearing, District Court Judge Sprizzo

issued a TRO which enjoined Chamilia, and any other person acting in concert or participation

with Chamilia, from, among other things, the copying, marketing or selling of copies of

Pandora's copyrighted jewelry designs.   See Peterson Decl. ¶ 22, Ex. H.

34.     After a period of settlement discussions, during which the TRO remained in effect

by the stipulation of the parties, Chamilia consented to the entry of a judgment against it.  See

Dep. Tr. of Julkowski, p. 147, lines 23-25, pgs. 148-151, p. 152, lines 1-12.

35.     On November 24, 2003, a Final Judgment on Consent ("Final Judgment") was

entered by the Southern District of New York and executed by the parties involved whereby a

final judgment of copyright infringement was entered against Chamilia in favor of Pandora.  See

Peterson Decl. ¶ 23, Ex. I; see also Dep. Tr. of Petersen p. 95, lines 11-18; Dep. Tr. of Hostrup,

p. 24, lines 7-11.

36.     In early November, 2003, in order to restrain various retailers in New Jersey from

settling the infringing Chamilia jewelry,  Pandora filed an action against Jason Adams,

individually, and Jason Adams conducting business as Chamilia Beaded Charms in the District

Court for New Jersey alleging copyright and trademark infringement resulting from the New

Jersey retailer's sale of the Chamilia jewelry. See Peterson Decl. ¶ 24.

8

37.    On November 7, 2003, the District Court Judge in New Jersey also issued a TRO enjoining the New Jersey retailers from promoting, selling or distributing the Chamilia jewelry. See Peterson Decl. ¶ 24.

38.    On January 26, 2004, the District Court in New Jersey entered a Stipulation and Order of Settlement whereby Jason Adams consented to an injunction permanently restraining Mr. Adams from copying Pandora's jewelry designs and selling the Chamilia jewelry. See Peterson Decl. ¶ 25, Ex. J.

39.    On March 14, 2003, Ms. Henderson visited the LAD Group display booth at the Chicago Gift Show. She was wearing a Pandora bracelet with various silver and 14-karat gold jewelry beads. See Declaration of Jody Henderson dated January 12, 2005, ¶ 4 ("Henderson Decl. ¶ __").

40.    While at the LAD Group booth, Kathy Shaw-Riley approached Ms. Henderson and inquired about her Pandora bracelet. Ms. Riley is one of Chamilia's best sales representatives, is the top 3 or 4 out of approximately 125 Chamilia sales representatives and calls on approximately 200 jewelry customers on behalf of Chamilia. Dep. Tr. of Kathy Shaw-Riley ("Riley"), p. 26, line 5-7; p. 132, lines 1-19; Dep. Tr. of Whirlow, p. 23, lines 4-7.

41.    During their conversation, Ms. Riley and Ms. Henderson spoke concerning the Pandora jewelry line before Ms. Riley asked Ms. Henderson about a lawsuit involving Pandora and Chamilia. See Henderson Decl. ¶ 5.

42.      The only individuals present at the LAD Group booth during the conversation between Ms. Henderson and Ms. Riley were Ms. Henderson's daughter and Robbi Potter, owner of LAD Group. See Henderson Decl. ¶ 5. Ms. Riley does not know whether anyone overheard her exact conversation with Ms. Henderson. Dep. Tr. of Riley, p. 113, lines 2-9; p. 142, lines 21-25.

43.      Ms. Henderson informed Ms. Riley that the only lawsuit she was aware of concerned the copying of Pandora's jewelry bead designs by Chamilia. See Henderson Decl. ¶ 6.

44.      On March 14, 2003, Ms. Henderson was aware of Pandora's pending patent application but she and Ms. Riley never discussed it. See Henderson Decl. ¶ 6.

45.      Ms. Riley has seen documents which say Pandora has a "patent pending," but has not seen a document which says that Pandora has "gotten" a patent. See Dep. Tr. of Riley, p. 131, lines 4-13. Ms. Riley has not had any retailers who discontinued the sale of Chamilia jewelry products. See Dep. Tr. of Riley, p. 103, lines 3-7.

46.      Ms. Henderson never indicated to Ms. Riley that Pandora was suing or intended to sue Chamilia based upon its pending patent rights. The only lawsuit that Ms. Riley and Ms. Henderson discussed involved the copyright infringement suit against Chamilia, which ended in November, 2003. See Henderson Decl. ¶ 6.

10

NYDOCS 7796v2

47.    When asked by a customer or potential customer of the Pandora jewelry line about any lawsuit involving the two companies, Ms. Henderson would present a copy of a <u>Gift Beat</u> press release to them so that they can familiarize themselves with the facts of that case. <u>See</u> Henderson Decl. ¶ 8, Ex. K.

48.    The <u>Gift Beat</u> article indicates that Pandora has a "patent-pending on its bracelet design." <u>See</u> Henderson Decl. ¶ 8, Ex. K; see also Petersen Suppl. Decl. ¶ 7.

49.    Ms. Henderson has never advised a customer or potential customer that Pandora would close down Chamilia with the Pandora patent. <u>See</u> Henderson Decl. ¶ 8.

50.    Chamilia's income is down because due to the economy "taking a nose dive" in the spring and summer of 2004, people are very particular about how they spend their money and what they spend it on. Dep. Tr. of Riley, p. 33, lines 17-25, p. 34, lines 1-3. Chamilia's sales have slowed because consumers are "fickle"[sic], they move from one product to the next. Dep. Tr. of Riley, p. 31, lines 23-25, p. 32, line 1.

51.    On or about February, 2004, Pandora was an exhibitor at the Winter International Gift Show in San Francisco, California. Mr. Glueck was the only Pandora representative who oversaw and managed the exhibition booth during the days of that Gift Show. <u>See</u> Declaration of Steve Glueck dated January 12, 2005, ¶ 5 ("Glueck Decl. ¶ __").

52.    Mr. Glueck did not purposefully visit Petitioner's booth at this show, but on his way to the restroom, he encountered Ms. Whirlow at Chamilia's exhibition booth and introduced

11

himself. At the time, Ms. Whirlow and Mr. Glueck discussed the pending copyright infringement suit that Pandora instituted against Chamilia. See Glueck Decl. ¶ 6.

53.     Ms. Whirlow indicated to Mr. Glueck that she regretted that Chamilia had ever copied Pandora's jewelry beads. See Glueck Decl. ¶ 7.

54.     Ms. Whirlow also stated to Mr. Glueck that she was unaware that Chamilia would copy a competitor's protected jewelry designs. See Glueck Decl. ¶ 7.

55.     Mr. Glueck stated to Ms. Whirlow that Pandora did not own a patent, but that Pandora filed a patent application for its jewelry line, and if such patent application were to issue, Pandora would take the necessary steps to protect those rights. See Glueck Decl. ¶ 9.

56.     Mr. Glueck never stated to Ms. Whirlow that Pandora owned a patent or that Chamilia had violated Pandora's "patent rights." See Glueck Decl. ¶ 9.

57.     At the conclusion of the Gift Show in San Francisco, Mr. Glueck received a telephone call from a gentleman who introduced himself as the vice president of Chamilia. He accused Mr. Glueck of informing a Chamilia customer that Pandora would "close down" Chamilia based on its patent rights. He further advised Mr. Glueck that Pandora and Chamilia should make their jewelry products compatible since there "is enough business for all of us." Mr. Glueck informed the gentleman that Pandora was likely not interested in conducting business with Chamilia. Further, Mr. Glueck advised the gentleman that his customer obviously misunderstood any statement he had made. Mr. Glueck reiterated to the caller the same

12

statement he had made to Ms. Whirlow, and advised him that if Pandora's pending patent application issued, Pandora was prepared to take the necessary steps to protect those rights. See Glueck Decl. ¶ 10.

58.     Mr. Glueck has told several customers or potential customers which inquired about Pandora's "patent rights" that if Pandora's pending patent application issued, Pandora was prepared to take the necessary steps to protect those rights. See Glueck Decl. ¶ 10.

59.     Mr. Glueck never advised a customer or potential customer that Pandora would "close down Chamilia with the Pandora patent" or that Chamilia was having "financial problems." See Glueck Decl. ¶ 11.

60.     Knud Hostrup managed Pandora's exhibition booth at the Atlanta Tradeshow on July 9 - 13, 2004. See Declaration of Knud Hostrup dated January 13, 2005, ¶ 4 ("Hostrup Decl. ¶ __");

61.     During the days of the Atlanta Tradeshow Mr. Hostrup does not recall telling a Chamilia representative that the Chamilia line of jewelry was a "knockoff" or that Pandora was the "original." See Hostrup Decl. ¶ 5.

62.     Mr. Hostrup has told numerous customers and potential customers that Pandora is the "original" inventor, designer and manufacturer of the type of jewelry sold by Pandora. See Hostrup Decl. ¶ 6.

63.     Mr. Hostrup has told Pandora customers and potential customers that Pandora has a "patent pending" for its jewelry product and has shown individuals a copy of Pandora's jewelry products brochure which bears the legend "patent pending" clearly marked. See Hostrup Decl. ¶ 7; see also Dep. Tr. of Hostrup, p. 100, lines 6-25, p. 101, lines 1-13

64.     Mr. Hostrup never told a Chamilia representative at the Tradeshow that "any merchant who bought and stocked Plaintiff's product should expect to have their inventories confiscated whenever Defendant deemed appropriate." See Hostrup Decl. ¶ 9; see also Dep. Tr. of Hostrup, p. 107, lines 3-6.

65.     Mr. Hostrup never told anyone that Pandora was going to shut down Chamilia. See Dep. Tr. of Hostrup, p. 105, lines 21-24.

66.     Mr. Hostrup never suggested that Chamilia or any of its salespeople were in violation of "existing patent laws." See Hostrup Decl. ¶ 9.

67.     Mr. Hostrup never told anyone that Pandora would take Chamilia sales representatives' commissions. See Dep. Tr. of Hostrup, p. 107, lines 7-9.

68.     Mr. Hostrup has informed Pandora customers and potential customers, that if, and only if the patent in question issues, Pandora would take the necessary steps to protect its rights. See Hostrup Decl. ¶¶ 8 and 9.

14

69.    During Mr. Hostrup's encounter with the Chamilia representative at the

Tradeshow he discussed the quality of Chamilia's jewelry products. He told the representative

that Chamilia's jewelry products are inferior to those manufactured and sold by Pandora. He

explained that Chamilia's jewelry beads, in their manufacturing, are not finished as well as

Pandora's jewelry and, as a result, they often times get stuck and become immovable when trying

to thread them onto a Pandora or Chamilia bracelet or necklace. See Hostrup Decl. ¶ 10; see

also Dep. Tr. of Petersen, p. 76, lines 24-25, p. 77, lines 1-23; Petersen Suppl. Decl. ¶ 17.


70.    Chamilia customers have returned Chamilia jewelry products because Chamilia's

beads have been stuck on Chamilia's bracelets. See Dep. Tr. of Whirlow, p. 156, lines 24-25, p.

157, lines 1-4. Chamilia's beads have, at times, been unable to fit onto Chamilia bracelets

because the bead's whole has been too small. See Dep. Tr. of Whirlow, p. 154, lines 14-24, p.

155, lines 11-14.


71.    Since Pandora's remarkable sales during the 2003-2004 holiday season, there have

emerged at least five (5) jewelry manufacturers which have begun selling necklaces and

bracelets in the United States which appear to utilize substantially the same construction and

perform the same function as Pandora's patent pending for its necklaces and bracelets. See

Petersen Decl. ¶ 26; see also Dep. Tr. of Petersen, p. 27, lines 9-25, p. 28, lines 1-24, p. 52, lines

11-25, p. 53, lines 1-23; Dep. Tr. of Hostrup, p. 44, lines 14-19, p. 44, lines 24-25, p. 45, lines 1-

7, p. 46, lines 15-25, p. 47, lines 1-7, p. 51, lines 18-25, p. 52, 1-12.


72.    The manufacturers who received notice by letter that Pandora's patent application

had been published included Chamilia, as well as, AMORINI INC. of Novato, California; BIAGI

15

JEWELRY of Oldsmar, Florida; PASHA JEWELRY of Manhattan Beach, California; PUKA

CREATIONS of San Francisco, California; ZO BRANDS, LLC of Fort Lauderdale, Florida; and

ZOPPINI, LLC of Fort Lauderdale, Florida. See Petersen Suppl. Decl. ¶ 9.


73.    Pandora's counsel has notified each one of them that Pandora's patent application

had been published. The United States Patent and Trademark Office has not issued a U.S. patent

for Pandora's patent application. See Petersen Decl. ¶ 26, Ex. F; see also Petersen Suppl. Decl. ¶

8-11; Dep. Tr. of Petersen, p. 70, lines 16-24.


74.    Pandora adopted the "Terms and Conditions" agreements in order to control the

integrity and quality of its products in which it has invested so much time, money and resources.

See Dep. Tr. of Hostrup, p. 65, lines 16-25, p. 66, lines 1-20; see also Petersen Suppl. Decl. ¶ 15.


75.    Since most of the competitors' jewelry products at issue here are not branded,

Pandora's exclusivity agreements prevents retailers from advertising the Pandora name and its

unique jewelry products in order to sell a highly similar and incompatible competing jewelry

product manufactured by companies identified in paragraph 72. See Petersen Suppl. Decl. ¶ 16.


76.    To protect the integrity of our Pandora's product warranty, which does not cover

defects or malfunctions resulting from a customer threading or using a competing company's

jewelry product on a Pandora jewelry chain, Pandora requires its retail customer to only carry

Pandora jewelry products. See Petersen Suppl. Decl. ¶ 17.

77.     The exclusivity requested of Pandora's retail customers was, in part, established to balance the territorial exclusivity provided to Pandora's retail customers. By agreeing to carry Pandora jewelry products exclusively, retail customers receive Pandora's commitment to not open another retail store in that territory. <u>See</u> Dep. Tr. of Hostrup, p. 78, lines 8-22, p. 79, lines 1-9; <u>see also</u> Petersen Suppl. Decl. ¶ 18.

78.     Mr. Petersen authorized Mr. Glueck to send a letter dated April 12, 2005 to all of his Pandora retail accounts on the West Coast in an effort to address Pandora's retail customers' concerns and to remind the retail customers to adhere to Pandora's "Terms and Conditions" agreement. <u>See</u> Dep. Tr. of Hostrup, p. 93, lines 21-25, p. 94, lines 1-16; <u>see also</u> Dep. Tr. of Petersen, p. 92, lines 15-25, p. 93, lines 2-13; Petersen Suppl. Decl. ¶ 20.

79.     On August 16, 2004, Mr. Petersen telephoned Donna Renee Carlos of Carlos Italian Charm Shop and left her a voice mail message to inform her that Pandora's patent application had been published and that the jewelry products she was selling could expose her to monetary damages. <u>See</u> Petersen Suppl. Decl. ¶ 12; <u>see also</u> Dep. Tr. of Petersen, p. 59, lines 22-25, pgs. 60-62.

80.     On August 18, 2005, Pandora's counsel sent a letter to Carlos Italian Charm Shop of Rancho Cordova, California providing notice that Pandora's patent application had been published. <u>See</u> Petersen Suppl. Decl. ¶ 13 and Ex. M attached thereto.

81.     Carlos Italian Charm Shop of Rancho Cordova, California is currently a retail customer of Chamilia. <u>See</u> Dep. Tr. of Julkowski, p. 189, lines 1-17, p. 192, lines 11-13.

17

82.     Ms. Whirlow has not personally heard any statements made by Pandora representatives to Chamilia's customers.  See Dep. Tr. of Whirlow, p. 87, lines 8-23; p. 88, lines 10-18; p. 88 line 25, p. 89, lines 1-8; p. 115, lines 23-25, p. 116, lines 1-6; p. 124, line 13-25, p. 125, lines 1-2.

83.     Ms. Whirlow has never personally heard a Pandora representative describe a Chamilia product as a knock-off, as inferior or shoddy merchandise to anyone.  See Dep. Tr. of Whirlow, p. 215, lines 13-16; p. 234, lines 18-25.

84.     Ms. Whirlow has never personally witnessed a Pandora representative threaten a Chamilia customer.  See Dep. Tr. of Whirlow, p. 235, lines 15-18.

85.     Ms. Whirlow has never personally heard a Pandora representative communicate to Chamilia customers that Pandora will sue Chamilia for millions of dollars in damages.  See Dep. Tr. of Whirlow, p. 235, lines 6-14.

86.     Other than spacers and glass beads, all other beads sold by Chamilia have the threading or twisting design in them, and in order to be attached to Chamilia's bracelet they must be screwed on.  See Dep. Tr. of Whirlow, p. 132, lines 14-25,p. 133, lines 1-5.

87.     Chamilia has approximately  700 to 800 customers.  See Dep. Tr. of Whirlow, p. 146, lines 9-11.

18

88.     Chamilia does not have any e-mails from its customers who have indicated a discontinuance of sale of Chamilia jewelry products as a result of statements made by Pandora or its representatives. See Dep. Tr. of Whirlow, p. 202, lines 9-15.

89.     Chamilia has not received any written communications from its customers who have indicated a discontinuance of sale of Chamilia jewelry products as a result of statements made by Pandora. See Dep. Tr. of Whirlow, p. 202, lines 16-22.

90.     Chamilia's customers are not "really into email" so they use the phone to communicate. See Dep. Tr. of Whirlow, p. 202, lines 21-25, p. 203, lines 1-4.

91.     None of Chamilia's sales representatives has received any written communications from their customers, be it email, fax or letter, indicating a discontinuance of the sale of Chamilia jewelry products as a result of statements made by Pandora. See Dep. Tr. of Whirlow, p. 203, lines 5-20.

92.     Mr. Julkowski has never drafted a business plan on behalf of Chamilia or ever seen a business plan of Chamilia's. See Dep. Tr. of Julkowski, p. 299, lines 10-15.

93.     Chamilia does not have a plan which shows anticipated growth of business. See Dep. Tr. of Julkowski, p. 300, lines 6-8.

94.     Chamilia does not have a plan which shows its perspective business opportunities. See Dep. Tr. of Julkowski, p. 300, lines 9-11.

19

95.     Mr. Julkowski has never heard a Pandora representative, in his presence, say that Chamilia jewelry products are shoddy quality merchandise. See Dep. Tr. of Julkowski, p. 304, lines 12-16.

96.     Mr. Julkowski has only heard that Pandora representatives have made threats specifically referencing suits for willful patent infringement from customers. See Dep. Tr. of Julkowski, p. 325, lines 15-21.

97.     Mr. Julkowski has never heard a Pandora representative threaten Chamilia's customers with a suit for millions of dollars in damages and attorney's fees awards. See Dep. Tr. of Julkowski, p. 326, lines 3-7.

98.     Mr. Julkowski has never personally heard Steve Glueck or Knud Hostrup make any statements regarding any alleged patent rights of Pandora. See Dep. Tr. of Julkowski, p. 335, lines 2-5, 20-25.

99.     Mr. Julkowski has never personally heard a Pandora representative state that Chamilia was having financial problems. See Dep. Tr. of Julkowski, p. 340, lines 9-14.

100.     Other than the Fall of 2003 when counsel for Chamilia advised Chamilia not to sell its product during the period the temporary restraining order was in effect, Chamilia has not had an inability to sell its products. See Dep. Tr. of Julkowski, p. 341, lined 21-25, p. 343, lines 1-8; Ex. H.

101.    Mr. Julkowski has never personally heard Knud Hostrup indicate to a Chamilia customer that their inventories will be confiscated by Pandora or that if they sell Chamilia jewerly products they will be in violation of an existing patent. See Dep. Tr. of Julkowski, p. 353, lines 3-25, p. 354, lines 1-3.

102.    Mr. Julkowski has never personally heard a Pandora representative state to a Chamilia customer that Pandora would have any commissions earned, confiscated at Pandora's request for selling Chamilia jewelry products. See Dep. Tr. of Julkowski, p. 353, lines 20-25, p. 354, lines 1- 8.

103.    As of May 12, 2005, the date of Mr. Julkowski's deposition, neither Mr. Julkowski nor Chamilia has applied for a patent. See Dep. Tr. of Julkowski, p. 234, lines 16-20.

Dated:  New York, New York
        July 15, 2005

Respectfully submitted,

LATHROP & GAGE L.C.

By: _____s/William R. Hansen_____
        William R. Hansen (WH-9446)
        Gianfranco G. Mitrione (GM-8168)
        Bridget A. Short (BS-4191)
        230 Park Avenue, Suite 1847
        New York, New York 10169
        (212) 850-6220 (tel)
        (212) 850-6221 (fax)

        Attorneys for Defendant
        Pandora Jewelry, LLC

NYDOCS 7796v2