# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CHAMILIA, LLC, | ) | |
| | ) | Civil Action No.:  04-CV-06017 (KMK) |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PANDORA JEWELRY, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

James G. Goggin (*pro hac vice*)
Dylan Smith (DS 6740)
VERRILL DANA, LLP
One Portland Square
Portland, ME  04112
(207) 774-4000
(207) 774-7499 (fax)

*Attorneys for Plaintiff Chamilia, LLC*

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

FACTS .........................................................................................................2

ARGUMENT ................................................................................................6

I.      There Are Trial-Worthy Issues Precluding Summary Judgment On
        Chamilia's Federal Claims Under The Lanham Act and 35 U.S.C. § 292
        and Chamilia's State Unfair Competition Claim ....................................7

II.     Chamilia's Other State Law Claims Raise Genuine Issues for Trial ....................11

        A.      Chamilia's Claim for Slander of Title Raises Genuine Issues
                for Trial ...................................................................................11

        B.      Chamilia's Defamation Claim Raises Genuine Issues for Trial ................12

                1.      Pandora's false and disparaging statements are not privileged......12

                2.      Chamilia need not prove special damages resulting from
                        Pandora's statements which impugned the basic integrity of
                        Chamilia's business; and, in any event, Chamilia has
                        provided evidence of special damages ...........................................14

        C.      Chamilia's Product Disparagement Claim Raises Genuine Issues
                for Trial ...................................................................................16

        D.      Chamilia's Tortious Interference Claim Raises Genuine Issues for
                Trial    ...................................................................................18

III.    Chamilia Is Entitled to Declaratory Relief...........................................................18

CONCLUSION.............................................................................................19

CERTIFICATE OF SERVICE .......................................................................20

TABLE OF AUTHORITIES

Page

Cases

*Accent Designs v. Jan Jewelry Designs,*
   827 F. Supp. 957 (S.D.N.Y. 1993) ................................................................ 6, 9-10
*Blank v. Pollack,*
   916 F. Supp. 165 (N.D.N.Y. 1996) ........................................................................ 11
*Boulé v. Hutton,*
   320 F. Supp. 2d 132 (S.D.N.Y. 2004) ............................................................. 14, 15
*Consarc Corp. v. Marine Midland Bank, N.A.,*
   996 F.2d 568 (2d. Cir. 1993) ................................................................................... 6
*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,*
   314 F.3d 48 (2d Cir. 2002) ............................................................................... 10, 14
*Fashion Boutique of Short Hills, Inc. v. Fendi, USA, Inc.,*
   No. 91 Civ. 4544, 1998 WL 259942, *2 (S.D.N.Y. May 21, 1998)
   (Cedarbaum, Jr.) ..................................................................................................... 17
*Gordon & Breach Sci. Publrs. S.A. v. Am. Inst. of Physics,*
   859 F. Supp. 1521 (S.D.N.Y. 1994) .................................................................... 7, 8
*Grant Airmass Corp. v. Gaymar Indus., Inc.,*
   645 F. Supp. 1507 (S.D.N.Y. 1986) ...................................................................... 16
*Lase Co. v. Wein Prods., Inc.,*
   357 F. Supp. 210 (N.D. Ill. 1973) .......................................................................... 10
*Liberman v. Gelstein,*
   80 N.Y.2d 429, 605 N.E.2d 344 (1992) .......................................................... 13, 17
*Mann v. Quality Old Time Serv., Inc.,*
   120 Cal. App. 4th 90 (Cal. App. 4th Dist. 2004) ................................................... 13
*Prof'l Sound Servs., Inc. v. Guzzi,*
   349 F. Supp. 2d 722 (S.D.N.Y. 2004) ................................................................... 10
*Ruder & Finn, Inc. v. Seaboard Sur. Co.,*
   52 N.Y.2d 663, 422 N.E.2d 518 (1981) ....................................................... 11-12, 14
*Sadler-Cisar, Inc. v. Commercial Sales Network, Inc.,*
   786 F. Supp. 1287 (N.D. Ohio 1991) ...................................................................... 8
*Seven-Up Co. v. Coca-Cola Co.,*
   86 F.3d 1379 (5th Cir. 1996) .................................................................................... 9
*Stukuls v. State,*
   42 N.Y.2d 272 (1977) ............................................................................................. 17
*Tuff-N-Rumble Mgmt., Inc. v. Sugarhill Music Publ'g Inc.,*
   8 F. Supp. 2d 357 (S.D.N.Y. 1998) ....................................................................... 12
*Van-Go Transp. Co., Inc. v. New York City Bd. of Educ.,*
   971 F. Supp. 90 (E.D.N.Y. 1997) ........................................................................... 16
*Verizon Directories Corp. v. Yellow Book USA, Inc.,*
   309 F. Supp. 2d 401 (E.D.N.Y. 2004) .................................................................... 17
*Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council,*
   857 F.2d 55 (2d Cir. 1988) ..................................................................................... 18

Statutes

35 U.S.C. § 102.................................................................................................... 2
35 U.S.C. § 292.................................................................................................... 7

Other

*Restatement (Second) of Torts* § 596, cmt. c-e (2d ed. 1977)................................................ 13

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Chamilia, LLC ("Chamilia") hereby responds as follows to the Motion for

Summary Judgment dated July 15, 2005 (Docket No. 25) of defendant Pandora Jewelry, LLC

("Pandora").  For the reasons set forth below and in the accompanying Opposing Statement of

Material Facts and the Declarations of James G. Goggin ("Goggin Decl."), Donna-Renee Carlos

("Carlos Decl.") Michele C. Vogel ("Vogel Decl."), Dawn Moore ("Moore Decl.") and Jeffrey

Julkowski ("Julkowski Decl."), Pandora's motion for summary judgment should be denied.

## INTRODUCTION

Although Pandora's memorandum in support of its motion discusses the summary

judgment standard at some length, it goes on to ignore that standard.  The record is replete with

evidence that Pandora falsely claimed to possess a patent, falsely accused Chamilia of infringing

that patent, and disseminated these false statements (along with other disparagements) to

numerous retailers, thereby damaging Chamilia's business reputation and depriving Chamilia of

customers and sales.  The evidence would allow a reasonable jury to conclude that Pandora's

false and disparaging comments were part of a coordinated campaign to mislead and intimidate

customers and potential customers of Chamilia.  The evidence also supports the conclusion that

Pandora knew all along that it held no patent and that its patent application was improperly filed

to begin with.  Pandora's arguments to the contrary amount to little more than a plea that this

Court weigh evidence and draw conclusions turning, not on undisputed facts, but on a

tendentious and highly implausible view of the facts.  Since that is not the role of the Court under

Rule 56, Pandora's motion must be denied.

1

## FACTS

The following overview of the facts more fully set forth in Chamilia's Opposing Statement of Material Facts ("Chamilia Stmt.") demonstrates that there is, at the very least, a genuine issue for trial on the central allegation running through all of Chamilia's claims in this action:  that Pandora engaged in an orchestrated campaign to disparage Chamilia and destroy its customer base.  Pandora's chief tactic in this campaign was to lead retailers to believe it possessed patent rights—patent rights that did not, in fact, exist—and to accuse Chamilia of infringing these non-existent patent rights.

In June 2002, Pandora began offering its jewelry for sale in the United States.  *See* Chamilia Stmt. ¶¶ 4-5.  More than one year later, in July 2003, it applied for a patent.  *See* Defendant's Statement of Undisputed Material Facts ("Pandora Stmt.") ¶ 7.  As an applicant must file for a patent within one year of placing a claimed invention into the marketplace, it is reasonable to infer that Pandora, advised by able counsel, knew its patent application was improper.  *See* 35 U.S.C. § 102(b) ("A person shall be entitled to a patent unless the invention . . . was in public use or sale in this country, more than a year prior to the date of the application for patent in the United States.").

One month after Pandora filed its patent application, Pandora's president, Michael Lund Petersen, made a statement that he and other Pandora representatives would echo over the following year-and-a-half.  At the San Francisco Gift Fair in August 2003, he told Chamilia's national sales representative, Lisa Whirlow, that Pandora had a "worldwide patent" and intended to use this "patent" to shut down Chamilia and any other future competitor.  Chamilia Stmt. ¶ 20.  Pandora's claim to possess then-enforceable patent rights was repeated at the February 2004 Winter International Gift Show in San Francisco by Pandora sales representative Steve Glueck,

Chamilia Stmt. ¶¶ 51, 55-56, and at the March 2004 Chicago Gift Show by Pandora sales

representative Jody Henderson, who reiterated the threat to put Chamilia out of business, *id.*

¶¶ 39-44.  Ms. Henderson made these statements in a trade show booth in the presence of at least

one customer and with other potential customers coming in and out of the booth.  *Id.* ¶ 42.

       In direct communications with retailers, Pandora has combined oral misstatements and

ominous written communications to create the impression that any store carrying Chamilia was

putting itself at financial and legal risk.  For example, between March and May 2004, Mr. Lund

Petersen placed several calls to Carlos Italian Charm Shop of Rancho, Cordova, California to

express his displeasure that it sold both Chamilia and Pandora jewelry.  Chamilia Stmt. ¶ 108.

During these calls, Lund Petersen told the store's proprietor, Donna-Renee Carlos, that Pandora

had a patent, and that the Chamilia people were "counterfeiters" who had stolen his patent.  *Id.*

¶ 110.  Although her store had never agreed to carry Pandora exclusively, Lund Petersen told

Ms. Carlos that her store could not continue to sell Pandora if it sold Chamilia.  *Id.* ¶¶ 111, 116.

       On July 29, 2004, Pandora's patent application was published.  Pandora Stmt. ¶ 11

Shortly thereafter, on August 16, 2004, Lund Petersen again telephoned Ms. Carlos and left a

message on her answering machine that could only have been designed to mislead and intimidate

her:  "Could you please give me a call before my lawyer sends you a letter?  I just want to talk to

you myself in regards to the Chamilia you're selling.  Cause now our patent application that has

been publicized *and you are selling something that violates my patent and therefore I can sue

you for your profits and legal expenses*."  Chamilia Stmt. ¶ 112 (emphasis added).  Three days

later, Carlos Italian Charm Shop received a letter from Pandora's lawyer.  With Lund Petersen

having already told Ms. Carlos that the "public[ation]" of his patent gave him the right to sue her

for "violat[ing] my patent," the lawyer's letter not only notified her that Pandora's patent

application had been published, but also stated: "Pandora is now aware that Carlos Italian Charm Shop is offering to sell or selling necklaces and bracelets in the United States which appear to utilize substantially the same construction and perform the same function as Pandora's patent pending for its necklaces and bracelets." Chamilia Stmt. ¶ 113. Of course, given her prior contacts with Lund Petersen, Carlos understood this letter to refer to Chamilia. Chamilia Stmt. ¶ 114. Pandora followed up with Carlos Italian Charm Shop on September 16, 2004 by sending it a copy of its "Terms and Condition[s]," which purported to forbid the sale of any jewelry "which may appear to utilize substantially the same construction and perform the same function as described in Pandora's patent application." Chamilia Stmt. ¶ 115.

Carlos Italian Charm Shop's experience is only part of a larger pattern. Pandora admits that it sent its lawyers' notice of its patent publication "to other manufacturers and retailers." Pandora Stmt. ¶ 11. Pandora sent its Terms and Conditions letter to hundreds of retailers. Chamilia Stmt. ¶ 150. Moreover, Pandora continued to disparage Chamilia and press misleading claims of existing or imminent patent rights.

At the January 2005 Atlanta trade show, for example, Lund Petersen told the owner of Highlands West Gift Company that Chamilia's jewelry was a "cheap imitation" of Pandora's jewelry; that Chamilia's jewelry did not work properly; that Chamilia had stolen the design of Pandora's charm bracelets; that Pandora was the original; and that it had a patent pending. Chamilia Stmt. ¶¶ 117-18. At that same trade show, several customers reported to Chamilia's president, Jeff Julkowski, that Lund Petersen had repeated his threat to shut Chamilia down with a patent. Accordingly, Mr. Julkowski went to hear for himself. He stood and listened while Lund Petersen told retail store owners from North Carolina that Pandora was shutting down

4

Chamilia with a patent, and that Chamilia's customers would be required to disgorge profits and would have their Chamilia inventory confiscated. Chamilia Stmt. ¶ 120.

In April 2005, Pandora sales representative Knud Hostrup telephoned the proprietor of the West End Gallery in East Aurora, New York, which sold both Pandora and Chamilia, to warn her that Pandora had a "patent lawsuit" against Chamilia, that Pandora would shut Chamilia down once it received its patent, and that the West End Gallery itself was at risk of being shut down. Chamilia Stmt. ¶¶ 121-24. Lund Petersen followed up with calls to the West End Gallery insisting that it could not continue carrying Pandora if it also sold Chamilia. *Id.* ¶ 125.

Lund Petersen also has led Pandora's sales representatives to believe that Pandora has a patent—presumably so that they will spread this false information as well. Chamilia Stmt. ¶ 126.

As noted, Pandora's disparagement of Chamilia has not been limited to allegations of patent infringement. Indeed, Pandora's Knud Hostrup has admitted it is likely he has used the term "knockoff" to describe Chamilia at trade shows. Chamilia Stmt. ¶ 61. In April 2005, Pandora's Steve Glueck distributed a letter to Pandora customers that described Chamilia as one of the "knock-off companies" referenced in Pandora's Terms and Conditions Letter. Chamilia Stmt. ¶ 128. Pandora has admitted that Lund Petersen authorized Glueck to send the letter to all his West Coast accounts "to remind the retail customers to adhere to Pandora's 'Terms and Conditions' agreement." Pandora Stmt. ¶ 78.

Pandora's campaign against Chamilia has taken a toll. Pandora's allegations of patent infringement, combined with its insistence that retailers not stock both lines, have caused numerous customers and potential customers to refuse to carry Chamilia's jewelry. Chamilia Stmt. ¶¶ 129-130. Moreover, at least eighteen former customers have declined to continue

carrying Chamilia products as a result of Pandora's threats relating to its alleged patent rights. *Id.* ¶¶ 132-49. Collectively, these customers accounted for more than $50,000 in sales over the first ten months of 2004 alone. *Id.*[1] In many cases, these customers returned Chamilia merchandise they had purchased only a short time earlier. *Id.* ¶¶ 132-149. Notably, these returns correspond to the period when Pandora's campaign against Chamilia peaked: between July 2004 and November 2004, the customers in question returned at least $16,186 of merchandise to Chamilia, with nearly half those returns occurring in September 2004, the month Pandora sent out its Terms and Conditions letter. *Id.* ¶¶ 133, 135-39, 143, 147. At least four of the customers who abruptly stopped purchasing Chamilia merchandise are known to have signed Pandora's Terms and Conditions letters. *Id.* ¶¶ 132, 136, 140, 146 151. Between January and July 2004, these four customers accounted for $17,661 in Chamilia sales.

## ARGUMENT

"[W]hen examining the record before it to see if there are any genuine issues of material fact, the court's focus is on issue-finding, not on issue-resolution. In making its assessment, the trial court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Accent Designs v. Jan Jewelry Designs*, 827 F. Supp. 957, 963 (S.D.N.Y. 1993) (quoting *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir. 1993)). Here, because all of Pandora's arguments in support of its motion for summary judgment turn on disputed issues of material fact, or the proper inferences to be drawn from those facts, its motion must be denied.

---

[1] The bulk of these sales actually occurred between January and July 2004. *See* Chamilia Stmt. ¶¶ 132-49.

**I.    There Are Trial-Worthy Issues Precluding Summary Judgment On Chamilia's Federal Claims Under The Lanham Act And 35 U.S.C. § 292 And Chamilia's State Unfair Competition Claim**

Pandora's challenge to Chamilia's claims under both the Lanham Act and 35 U.S.C. § 292 (false patent marking), as well as to Chamilia's common law unfair competition claim, are largely identical.[2]  Each of Pandora's arguments—(i) that Pandora did not mislead, (ii) that it did not engage in advertising or promotion, and (iii) that it caused Chamilia no damages—rests on a willful blindness to the evidence adduced in discovery.

*First*, as set forth above, there is ample evidence that Pandora has engaged in a pattern of deception intended to mislead retailers into believing that it possessed currently enforceable patent rights.  Pandora representatives made these false statements directly to Chamilia representatives on several occasions, accompanied by the threat to "shut down" Chamilia.  They repeated them to retailers both at trade shows and in telephone calls to store owners suspected of selling both Pandora and Chamilia products.  Indeed, Pandora's president, Michael Lund Peterson, left a tape-recorded answering machine message in which he claimed that "now our patent application that has been publicized and you are selling something *that violates my patent and therefore I can sue you for your profits and legal expenses*."  Chamilia Stmt. ¶ 112 (citing Carlos Decl. ¶¶ 7-8).

These false and misleading claims concerning patent rights were coupled with disparaging statements comparing Chamilia unfavorably to Pandora—the very kind of damaging statements the Lanham Act was intended to address.  *See Gordon & Breach Sci. Publrs. S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1531 (S.D.N.Y. 1994) ("This case [involves]…comparative advertising, in which defendants allegedly made misrepresentations

---

[2] Pandora argues that the Lanham Act and state unfair competition claims are indistinguishable and so must rise or fall together.  Pandora Mem. at 9-10.

about both their own goods and those of competitors, asserting the comparative superiority of their own products over their competitors' products. Such cases have always been actionable under Section 43(a)."). Indeed, there is no dispute that Pandora representatives described Chamilia as a "knockoff" company. Since Chamilia's jewelry line consists of original and unique designs, *see* Chamilia Stmt. ¶ 107, this characterization was false.

As to the deliberate nature of Pandora's misleading statements, there is no question Pandora knew it did not (and knows it does not) possess a patent. (Pandora itself does not claim to have been confused about the nature of its "patent rights"; it merely denies making the false statements.) The obvious falsity of Pandora's patent claims is enough to support a reasonable inference that it acted with intent to deceive. *See Sadler-Cisar, Inc. v. Commercial Sales Network, Inc.*, 786 F. Supp. 1287, 1296 (N.D. Ohio 1991) (finding intent to deceive could be reasonably inferred where defendant marked product "patent pending" and no patent application had been filed). Also supporting an inference of bad faith is the fact that Pandora's misleading claims were repeated so often, with its president the most persistent purveyor. But there is more: there is strong evidence that Pandora knew from the outset that its patent *application* was improper, having been filed more than a year after the company's entry into the United States market. If that is the case (and, for purposes of summary judgment, it is the case), then Pandora acted in bad faith even assuming it did nothing more than provide notice of its "patent pending" and warn retailers that it would enforce its patent "if and when" it issued.

*Second*, Pandora's claim to have enforceable patent rights was widely disseminated to retailers, and thus used in "advertising or promotion" within the meaning of the Lanham Act and section 292. Pandora's narrow reading of the phrase is at odds with the Lanham Act's broad remedial purpose. *See Gordon & Breach Sci. Publrs.*, 859 F. Supp. at 1532 (noting that section

8

43(a) of Lanham Act "has been characterized as a remedial statute that should be broadly construed").

Further, Pandora's claim not to have engaged in advertising or promotion completely ignores context. Pandora repeated its misleading statements both to retailers and to its own sales representatives—not individual consumers—and it made those statements at trade shows where retailers gathered to inform themselves about the marketplace. *See Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1385 (5th Cir. 1996) (noting that "advertising or promotion" depends on "the required level of circulation and the relevant 'consuming' or 'purchasing' public addressed by the dissemination of false information," which "will vary according to the specifics of the industry," and that **"public dissemination of false information to retailers at a trade show would most likely constitute 'commercial advertising and promotion,'"** even though retailers are not ultimate consumers of the product) (quotation omitted) (emphasis added).[3]

Moreover, Pandora sent its Terms and Conditions letter—asking retailers to agree to carry Pandora exclusively—to *hundreds* of retailers. It disseminated this letter to retailers after having led them to believe that Pandora possessed patent rights, that it would use those rights to shut own Chamilia, and that retailers who stocked Chamilia would themselves face legal repercussions. The letter states that Pandora is "aggressively pursuing those who infringe our intellectual property rights." Carlos Decl., Ex. C. There is thus nothing "conjectural" or "fanciful" about the role the letter played in Pandora's larger scheme to squeeze Chamilia's customer base. *See* Pandora Mem. at 9. Put in its proper context, the Terms and Conditions letter is evidence both of Pandora's malicious intent and the widespread nature of its scheme to mislead retailers—a scheme that involved advertising and promotion. *See Accent Designs v. Jan*

---

[3] The court in *Seven-Up* found that a sales presentation made to eleven out of seventy-four retailers constituted commercial advertising and promotion for purposes of the Lanham Act. *Id.* at 1386.

*Jewelry Designs*, 827 F. Supp. 957, 969 (S.D.N.Y. 1993) ("The act of advertising informs or gives notice to the public. In this case, the public was a specifically targeted class, to wit, the Defendants' customers who were also the Plaintiffs' potential or actual customers."); *Lase Co. v. Wein Prods., Inc.*, 357 F. Supp. 210, 213 (N.D. Ill. 1973) ("It is clear that the circulation by the defendants of their 'Directive to Distributors' was a type of advertisement within the purpose and intent of section 292.").

In light of these circumstances, the cases cited by Pandora are inapposite. In *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 56-58 (2d Cir. 2002) ("*Fashion Boutique II*"), for example, the statements at issue were made to a handful of individual consumers or undercover investigators rather than retailers, in some cases at the instigation of the consumers or investigators themselves. *Fashion Boutique II*, 314 F.3d at 54-55; *see also Prof'l Sound Servs., Inc. v. Guzzi*, 349 F. Supp. 2d 722, 729 (S.D.N.Y. 2004) (noting that "[e]vidence of one customer having heard the disparaging statement certainly does not suggest 'an organized campaign to penetrate the relevant market'") (quoting *Fashion Boutique II*). These facts are a far cry from the evidence here of Pandora's widespread and coordinated campaign to deceive retailers.

*Finally*, there is also ample evidence that Pandora's campaign damaged Chamilia. Given the nature of Pandora's tactics, it is difficult, of course, to identify or quantify prospective sales lost from retailers who were scared away from ever becoming Chamilia customers. As set forth above, however, Chamilia has specifically identified multiple former customers who abruptly ceased purchasing from Chamilia as a result of Pandora's misleading and threatening statements. Many of these customers returned Chamilia merchandise right around the time Pandora was making misstatements to retailers, distributing notice of the publication of its patent application,

and requiring customers to sign its Terms and Conditions letter. Some of these customers are known to have signed the Terms and Conditions letter. Particularly given this timing, the conclusion is inescapable that these former customers, representing thousands of dollars in lost sales, were casualties of Pandora's misinformation campaign.[4]

## II.     Chamilia's Other State Law Claims Raise Genuine Issues For Trial

Pandora glosses over the distinctions among the state law torts of slander of title, defamation, and product disparagement. In short, slander of title addresses slanderous statements about a party's ownership to property; defamation in the commercial context addresses slanderous statements impugning a business's reputation; and product disparagement addresses slanderous statements about the quality or nature of particular goods. Though there is some overlap, these causes of action are not duplicative each of other and involve different elements. When the elements are properly understood, and the facts fairly presented, it is apparent that Chamilia is entitled to a trial on these claims. Further, given the evidence of Chamilia's campaign of disparagement and the injury it caused, there is clearly a genuine issue for trial on Chamilia's tortious interference claim.

### A.     *Chamilia's Claim for Slander of Title Raises Genuine Issues for Trial*

Other than the untenable suggestion that there is no evidence it engaged in intentional misrepresentation, Pandora's argument for judgment on Chamilia's slander of title claim boils down to the proposition that the cause of action simply does not fit here. This argument rests on an unduly restrictive view of the tort, which has been extended over the years to apply to property other than land. *See Ruder & Finn, Inc. v. Seaboard Sur. Co.*, 52 N.Y.2d 663, 670, 422

---

[4] In any event, even had Chamilia presented no such evidence of damages, its claim for declaratory and injunctive relief under section 292 would still survive summary judgment. *See Blank v. Pollack*, 916 F. Supp. 165, 173 (N.D.N.Y. 1996) ("There is no requirement that the complainer hold a competing patent or even be engaged in the same industry.").

N.E.2d 518 (1981).  Indeed, it has been held to encompass intangible intellectual property.  *Tuff-N-Rumble Mgmt., Inc. v. Sugarhill Music Publ'g Inc.*, 8 F. Supp. 2d 357, 361 (S.D.N.Y. 1998) (denying motion to dismiss slander of title, tortious interference, and defamation claims under New Jersey law based on allegedly false statements about copyright ownership of song). Accordingly, Pandora's false statements, to the effect that Chamilia did not have the right to sell its jewelry products, give rise to a claim for slander of title.

> B.     *Chamilia's Defamation Claim Raises Genuine Issues for Trial*

Pandora raises two principal arguments unique to Chamilia's defamation claim:  first, that Pandora's false and disparaging statements were somehow privileged; and, second, that Chamilia cannot show "special damages."  (Here again, Pandora also argues that there is no evidence of false statements or fault on Pandora's part.  As has already been described in detail above, there is abundant evidence on both these points.)  The privilege argument and the "special damages" argument each rely on a misreading of the applicable law and the relevant facts.

> 1.     *Pandora's false and disparaging statements are not privileged.*

Pandora relies on privileges that simply do not apply to the facts presented here.

First, Pandora's claim that it enjoys a statutory privilege to report the outcome of a past judicial proceeding is irrelevant, since none of Chamilia's claims asserts liability for merely reporting the outcome of past litigation.  Instead, Chamilia takes issue with Pandora's insistence that Chamilia is currently infringing a patent that does not exist and is currently producing "knockoff" duplications of Pandora's "original" products.  Pandora cannot hide behind a former judicial proceeding, which involved different jewelry than Chamilia is now manufacturing and selling and did nothing to adjudicate Pandora's alleged patent rights, to make such statements about Chamilia's current product line.

Second, Pandora's reliance on a "common interest" privilege is entirely misplaced: no such privilege applies to Pandora's statements to Chamilia's customers. The "common interest" privilege has been held to exist between co-employees, members of a faculty tenure committee, constituent physicians of a health insurance plan, tenants in common, partners or corporate officers, and people associated in professional or other organizations. *See Liberman v. Gelstein*, 80 N.Y.2d 429, 437-38, 605 N.E.2d 344 (1992); RESTATEMENT (SECOND) OF TORTS § 596, cmt. c-e (2d ed. 1977). In a case closely resembling this one, where a corporation made disparaging remarks about a competitor to the competitor's customers, the California Court of Appeal noted the absurdity of applying the "common interest" notion to a corporation and its competitor's customers:

> Defendants presented no evidence showing they had any type of relationship with [plaintiff's] customers or that [plaintiff's] customers requested the information. Because defendants and [plaintiff] are business competitors, it is not reasonable to assume that the motive of the communication was innocent; rather, it appears defendants' only interest was to gain [plaintiff's] customers as their own. If we were to accept defendants' unsupported argument, business competitors would be free to publish defamatory statements about the business practices of a rival to its rival's customers by merely contending the customers were "interested" in the subject matter of the communication.

*Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90, 109 (Cal. App. 4th Dist. 2004) (holding statements not privileged). This logic applies with equal force here, and it makes no difference that some of the retailers with whom it communicated were customers of both Chamilia and Pandora. If Pandora were permitted to claim a privilege based on a "common interest" with retailers who had elected to carry jewelry of both manufacturers, it would be free to say anything to these customers absent actual malice.[5]

---

[5] Even if Pandora could claim some sort of common interest privilege, that privilege is not absolute. The record evidence raises at the very least a triable issue of fact as to whether Pandora acted with actual malice, which defeats the conditional privilege. *See Liberman v. Gelstein*, 80 N.Y.2d 429, 437-38, 605 N.E.2d 344 (1992) (actual malice may exist under common law standard of ill will or constitutional standard of high awareness of probable falsity).

> 2.   *Chamilia need not prove special damages resulting from Pandora's*
> *statements which impugned the basic integrity of Chamilia's business;*
> *and, in any event, Chamilia has provided evidence of special damages.*

In the commercial context, "[w]here a statement impugns the basic integrity or

creditworthiness of a business, an action for defamation lies and injury is conclusively

presumed"—in other words, special damages need not be pleaded or proven. *Ruder & Finn*, 52

N.Y.2d at 670, 422 N.E.2d 518; *see also Fashion Boutique II*, 314 F.3d at 59. The case of *Boulé*

*v. Hutton*, 320 F. Supp. 2d 132 (S.D.N.Y. 2004), is instructive. It demonstrates that Pandora's

false and disparaging statements are precisely the kind of statements that constitute business

defamation and, accordingly, do not require proof of special damages.

In *Boulé*, the plaintiff art collectors owned a number of works attributed to a particular

artist. *Boulé*, 320 F. Supp. 2d at 134. The plaintiffs obtained signed certificates of authenticity

of their artworks from the artist's son. *Id.* at 135. Subsequently, the artist's son and daughter-in-

law, as well as a gallery owner who exhibited works of the artist that were owned by the son and

daughter-in-law, disseminated statements questioning the authenticity of the plaintiffs' artworks,

denying the substance of conversations they had with the plaintiffs, and claiming that the

certificates of authenticity were forged. *Id.* at 135-36. Although at trial the plaintiffs could not

prove the authenticity of their artworks, they did prove the falsity of the defendants' statements

about conversations they had with the plaintiffs and about the certificates of authenticity. *Id.* at

139. The court stated:

> It is clear that these statements impugned the integrity of the Boulés' art
> collection and the reputation of the Boulés as sellers of art. Indeed, these
> statements can be seen as more harmful to the Boulés in the business context than
> the statements averring that the [artworks] in their collection were fake. The latter
> claim suggests only that the Boulés may have erroneously purchased works of art
> which they believed were by [the artist]. But defendants' false statements to the
> effect that the Boulés possessed and relied upon forged certificates of authenticity,
> and that they persisted in displaying and seeking to sell artworks which they had
> been informed were fakes by the individual who had signed those certificates,

> impute far more sinister motives to the Boulés.  They suggest that the Boulés
> sought to deliberately deceive prospective purchasers of their collection by
> supporting the uncertain provenance of the works with certificates of authenticity
> they knew to be forgeries.  In the business disparagement context, an insinuation
> of conscious or willful wrongdoing would be far more damaging to the reputation
> or integrity of the Boulé collection than a suggestion that the Boulés may simply
> have been mistaken about the provenance of some of their pieces.

*Id.*

Similarly here, it is evident that many of the statements made by Pandora impugn both

the basic integrity and the creditworthiness of Chamilia.  As set forth in detail above, Pandora

repeatedly labeled Chamilia a patent infringer; called its management "counterfeiters" who had

stolen Pandora's "patent"; and described Chamilia as a "knockoff" company.  It would be

difficult to conceive of statements that more directly impugn the basic integrity of a company.

Further, Pandora's statements to the effect that it would "shut down" Chamilia, with the direct

implication that Chamilia would not continue as a going concern, had the effect of impugning

Chamilia's creditworthiness.  So too did the statements to retailers suggesting that by carrying

Chamilia's products they were exposing themselves to legal liability.

Further, Chamilia has set out sufficient proof to satisfy the summary judgment standard

on damages to Chamilia's business reputation.  In *Boulé*, even though the plaintiffs could not

precisely quantify the damage to their reputation, the court accepted the amount they had paid for

their artwork as a "reasonable assessment" of such damages.  *Boulé*, 320 F. Supp. 2d at 139-40.

Notably, the court did not require the plaintiffs to prove with specificity the damages caused by

statements disparaging of their business (as opposed to statements disparaging the artworks

themselves).  Here, for purposes of opposing summary judgment, Chamilia has presented

evidence of damages far more specific than that accepted by the *Boulé* court as a reasonable

assessment.  Chamilia has identified specific customers who stopped doing business with it

because of Pandora's comments and identified the precise amount of sales those customers

represented.  It has also quantified the value of returns made by such customers precisely during the period when Pandora's coordinated campaign reached its peak.  Accordingly, Chamilia has more than satisfied any requirement that it prove general damages resulting from Pandora's defamation of Chamilia's business.  Indeed, while Chamilia is not required to prove special damages, it has provided sufficient evidence to satisfy this standard as well.  And, in any event, "[e]ven where the plaintiff can show no actual damages at all, a plaintiff who has otherwise shown defamation may recover at least nominal damages."  *Van-Go Transp. Co., Inc. v. New York City Bd. of Educ.*, 971 F. Supp. 90, 100 (E.D.N.Y. 1997) (denying summary judgment on business defamation claim).  Therefore, Pandora is not entitled to summary judgment on Chamilia's defamation claim.

     C.     *Chamilia's Product Disparagement Claim Raises Genuine Issues for Trial*

Pandora's motion with respect to Chamilia's product disparagement claim fails for reasons similar to those already discussed in relation to Chamilia's other claims.

As an initial matter, for the same reasons discussed above, Pandora's claim of privilege to disparage Chamilia's products fares no better than its claim of privilege to defame Chamilia's business.

Pandora's principal argument on the disparagement claim—that Chamilia cannot show malice—is wrong as a matter of fact and as a matter of law.

Pandora's subjective intent is a factual question that is particularly unsuitable for determination on a motion for summary judgment.  *See Grant Airmass Corp. v. Gaymar Indus., Inc.*, 645 F. Supp. 1507, 1512 (S.D.N.Y. 1986) (denying summary judgment on Lanham Act claim).  Not only is there evidence that Pandora had no basis for its claims that Chamilia had infringed Pandora's patent, but there is also evidence that Pandora's president was particularly

16

aggressive and persistent about spreading this false statement—harassing retailers with repeated telephone calls and at one point literally yelling at a customer about Chamilia.  *See* Chamilia Stmt. ¶¶ 109, 125.  Given these facts, a jury could readily conclude that Pandora acted with malice.

In any event, Pandora applies an unduly narrow definition of malice, for which there are actually two standards under the law.  "Actual malice is knowledge that the statement at issue is false or reckless disregard of whether it is false.  Statements are made with actual malice if they are made with at least a high degree of awareness of their probable falsity, meaning that the speaker entertained serious doubts as to the truth of the publication."  *Fashion Boutique of Short Hills, Inc. v. Fendi, USA, Inc.*, No. 91 Civ. 4544, 1998 WL 259942, *2 (S.D.N.Y. May 21, 1998) (Cedarbaum, J.); *see also Liberman v. Gelstein*, 80 N.Y.2d 429, 438, 605 N.E.2d 344 (1992) (discussing "serious doubts as to the truth" standard).  The common law standard of malice, on the other hand, examines whether the speaker of a false statement was motivated by "spite or ill will."  *Id.* at 437.  Only the common law standard requires that malice be the "one and only cause for the publication."  *Id.* at 439 (quoting *Stukuls v. State*, 42 N.Y.2d 272, 282 (1977)).

Here, there is unquestionably evidence that Pandora made statements "with at least a high degree of awareness of their probable falsity"—*i.e.*, with actual malice.  *See supra*, section I. This is enough to support a claim for product disparagement.  *See Verizon Directories Corp. v. Yellow Book USA, Inc.*, 309 F. Supp. 2d 401, 406 (E.D.N.Y. 2004) ("To state a claim of product disparagement under New York law, a plaintiff must allege (1) the falsity of the statement; (2) publication to a third person; (3) malice *or* actual malice; and (4) special damages.") (emphasis added).[6]

---

[6] Pandora also argues with respect to the product disparagement claim that Chamilia cannot show special damages. For the reasons set forth in relation to the claim for defamation, this argument has no merit.

D.    *Chamilia's Tortious Interference Claim Raises Genuine Issues for Trial*

Pandora's arguments for judgment on Chamilia's tortious interference claim, though tied to the specific elements of that claim, essentially mirror the arguments made in response to Chamilia's other claims and thus fail for reasons already discussed. First, Chamilia has offered ample evidence that Pandora intended to interfere with the business relationship between Chamilia and specific customers. Indeed, it is difficult to consider any other reason Pandora sought out customers to tell them that it possessed a patent and would shut Chamilia down. Second, Chamilia *has* identified specific loss—particular customers who used to do business with Chamilia but no longer do, in many cases having returned thousands of dollars of merchandise, as described and quantified above.[7] And, third, Pandora's repeated and knowing falsehoods—in particular, that it possessed an enforceable patent—was nothing if not a "dishonest, unfair or improper means" of doing business. In these circumstances, the record presents a paradigmatic case of tortious interference.

## III.    Chamilia Is Entitled To Declaratory Relief

Pandora's attack on Chamilia's claim for declaratory judgment misapprehends the nature of that claim. Chamilia does not ask this court to adjudicate a hypothetical dispute over potential patent rights. Rather, it is Pandora who has claimed to possess a "patent" that gives it the right to shut Chamilia down. Accordingly, there is a live controversy, and Chamilia is entitled to declaratory relief.

In any event, Pandora completely ignores the fact that Chamilia seeks injunctive relief in this case. Accordingly, even if Chamilia had not presented sufficient evidence of damages to

---

[7] Chamilia claims that Pandora has interfered with relationships between Chamilia and its actual customers as well as with prospective customers. Tortious interference with prospective business relations can involve interference with specific contracts, but "the tort usually involves interference with a business relationship not amounting to a contract." *Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council*, 857 F.2d 55, 74 (2d Cir. 1988) (rejecting requirement for plaintiff to identify particular contracts or contractual negotiations).

survive summary judgment, Chamilia's claims for injunctive relief would still be viable and would preclude summary judgment.  *See supra,* Section I, n.4.

## CONCLUSION

For the foregoing reasons, Chamilia respectfully requests that the Court deny the Pandora's motion for summary judgment in its entirety.

Dated:  August 15, 2005

Respectfully submitted,

/s/ James G. Goggin
James G. Goggin (*pro hac vice*)
Dylan Smith (DS 6740)

VERRILL DANA, LLP
One Portland Square
P.O. Box 586
Portland, ME  04112
(207) 774-4000
(207) 774-7499 (fax)

Attorneys for Plaintiff Chamilia, LLC

<u>CERTIFICATE OF SERVICE</u>

I, James G. Goggin, hereby certify that I have this day caused a copy of the foregoing Plaintiff's Memorandum of Law In Opposition to Defendant's Motion for Summary Judgment to be sent by first class mail to counsel of record as follows:

> William R. Hansen, Esq.
> Lathrop & Gage
> 230 Park Avenue, Suite 1847
> New York, NY  10169

Dated: August 15, 2005

> /s/ James G. Goggin
> James G. Goggin

P:\dsmith\Chamilia\Draft Pleadings\Opp MSJ filing ready.doc