**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

CHAMILIA, LLC,                    )
                                  )        Civil No.:  04-CV-06017 (KMK)
              Plaintiff,          )
                                  )
v.                                )
                                  )
PANDORA JEWELRY, LLC,             )
                                  )
              Defendant.          )

**PLAINTIFF'S OPPOSING STATEMENT OF MATERIAL FACTS**
**AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the

Southern District of New York, plaintiff Chamilia, LLC submits the following opposing statement

of material facts as well as its statement of additional material facts.

**RESPONSE TO DEFENDANT'S STATEMENT OF FACTS**

In accordance with Local Civil Rule 56.1, the following paragraphs correspond to each

numbered paragraph in the Statement of Undisputed Material Facts submitted by defendant

Pandora Jewelry, LLC ("Pandora") in support of its Motion for Summary Judgment.

1.      Admitted.

2.      Chamilia denies paragraph 2 and moves to strike it on the ground that the cited

paragraph of the Petersen Declaration does not support the assertion that Pandora is a

"recognized leader in the jewelry industry" and on the ground that, even if the paragraph in

question did make this assertion, there would be no foundation for it.

3.      Chamilia moves to strike this paragraph on the ground that it is irrelevant to the

subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

4.    Denied.  It appears Pandora entered the United States market and started selling its jewelry no later than June 2002.  Goggin Decl. ¶ 3, Ex. B.

5.    Denied.  It appears Pandora entered the United States market and started selling its jewelry no later than June 2002.  Goggin Decl. ¶ 3, Ex. B.

6.    Denied.  There is nothing particularly "unique" about Pandora's method of stringing jewelry beads, as a number of other brands of charm bracelets work interchangeably with Pandora.  Vogel Decl. ¶ 4.

7.    Admitted.

8.    Admitted.

9.    Admitted.

10.    Admitted.

11.    Admitted.

12.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Qualified.  Although Dov Schwartz previously managed the operations of Chamilia, he did not invest any money in the company and thus was not a "principal."  Julkowski Tr. at 116:18-116:20.[1]

13.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Chamilia moves to strike paragraph 13 on the ground that the portion of the Petersen Declaration cited for this assertion is not based on personal knowledge, as requierd by Federal Rule of Evidence 602.

14.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

---

[1] Excerpts from the transcripts of the depositions of Knud Hostrup, Jeffrey Julkowski, Kathy Shaw-Riley, Lisa Whirlow and Michael Lund Petersen are attached to the accompanying Declaration of James G. Goggin as Exhibits

15.     Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

16.     Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

17.     Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Qualified. Chamilia denies paragraph 18 to the extent its discussion of Chamilia's jewelry could be read to refer to the company's current line of jewelry, as opposed to the line of jewelry in existence prior to the previous lawsuit between Pandora and Chamilia, which settled in the Fall of 2003.  That prior line of jewelry was removed from distribution, destroyed pursuant to the parties' settlement, and replaced by a different line consisting of unique and original designs.  Julkowski Tr. at 103:5-103:17, 116:15-124:22, 131:4-146:15, 158:3-158:24.

18.     Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Qualified. Chamilia denies paragraph 18 to the extent its discussion of Chamilia's jewelry could be read to refer to the company's current line of jewelry, as opposed to the line of jewelry in existence prior to the previous lawsuit between Chamilia and Pandora, which settled in the fall of 2003.  That prior line of jewelry was removed from distribution, destroyed pursuant to the parties' settlement, and replaced by a different line consisting of unique and original designs.  Julkowski Tr. at 103:5-103:17, 116:15-124:22, 131:4-146:15, 158:3-158:24.

19.     Admitted.

20.     Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Qualified.

---

C, D, E, F and I, respectively, and shall be cited herein as "[name] Tr. at [page:line]."

In addition to pointing out that the then-existing Chamilia beads and the Pandora beads were identical, Mr. Petersen stated to Ms. Whirlow that Pandora had a "worldwide patent" and advised her that Pandora intended to use its patent to shut down Chamilia and any other future competitor.  Whirlow Tr. at 57:6-60:19, 183:24-185:10, 256:3-257:22; Goggin Decl., Ex. F (Pandora Dep. Ex. 14) ¶ 6.

21.    Denied.  Mr. Petersen stated that Pandora had a "worldwide patent."  Whirlow Tr. at 57:6-60:19, 183:24-185:10, 256:3-257:22; Goggin Decl., Ex. F (Pandora Ex. 14) ¶ 6.

22.    Denied.  Mr. Petersen stated that Pandora had a "worldwide patent."  Whirlow Tr. at 57:6-60:19, 183:24-185:10, 256:3-257:22; Goggin Decl., Ex. F (Pandora Ex. 14) ¶ 6.

23.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Qualified. Chamilia admits paragraph 23 to the extent it refers to the Chamilia line as it existed in August 2003.  Chamilia notes that the line in existence as of August 2003 was destroyed in accordance with the previous litigation between Chamilia and Pandora and has since been replaced by a different line consisting of unique and original designs.  Julkowski Tr. at 103:5-103:17, 116:15-124:22, 131:4-146:15, 158:3-158:24.

24.    Admitted.

25.    Denied.  Mr. Petersen stated that Pandora had a "worldwide patent."  Whirlow Tr. at 57:6-60:19, 183:24-185:10, 256:3-257:22; Goggin Decl., Ex. F (Pandora Ex. 14) ¶ 6.

26.    Denied.  Ms. Whirlow asked Mr. Petersen for information concerning Pandora's claimed "worldwide patent," which he declined to provide.  Whirlow Tr. at 57:6-59:24; 256:3-257:3.

27.    Denied.  Mr. Petersen told Ms. Whirlow that Pandora intended to use its "worldwide patent" to shut down Chamilia and any future competitor.  Whirlow Tr. at 57:6-60:19, 183:24-185:10, 256:3-257:22; Goggin Decl., Ex. F (Pandora Ex. 14) ¶ 6.

28.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

29.    Admitted.

30.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Qualified. The creation and marketing of the line of Chamilia jewelry in existence prior to the fall of 2003 was undertaken by Dov Schwartz without the involvement of Chamilia's owner, who at that point was largely a passive investor.  Once Chamilia's owner learned of Mr. Schwartz's conduct, investigated the underlying circumstances and obtained legal counsel, he agreed to remove the then-existing line of Chamilia jewelry from the market and destroy it.  Julkowski Tr. 21:4-24:25; 103:18-104:16; 105:8-107:7; 111:8-114:25, 116:15-124:22, 131:4 -146:15.

31.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

32.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

33.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

34.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

35.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

36.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

37.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

38.    Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

39.    Qualified.  Ms. Henderson visited the LAD Group Display booth on March 14, 2004—not 2003.  Henderson Decl. ¶ 4.

40.    Qualified.  Ms. Shaw-Riley, a sales representative for various manufacturers, testified that she calls on approximately 200 customers to sell jewelry products; she did not testify that she called on all 200 customers on behalf of Chamilia (although she did acknowledge that "most of all of my customers are potential customers to all the manufacturers I represent").  Shaw-Riley Tr. 26:5-26:7, 142:8-142:9.  Further, Ms. Shaw-Riley testified that she could not recall whether she or Ms. Henderson was the first to approach the other.  Shaw-Riley Tr. at 110:21-111:14.  Subject to these qualifications, paragraph 40 is admitted.

41.    Denied.  Ms. Shaw-Riley testified that Ms. Henderson initiated discussion of a lawsuit involving Pandora and Chamilia.  Shaw-Riley Tr. at 110:21-111:14.

42.    Qualified.  Ms. Shaw Riley testified that the owner of the Message Connection (*i.e.*, the Ladd Group), a Message Connection representative, Ms. Shaw-Riley, and Ms. Henderson and her daughter were in the booth, and, further, that there was a customer and

potential customers coming in and out of the booth.  Shaw-Riley Tr. at 109:11-111:14, 113:2-133:9, 141:4-143:3.

43.    Denied.  Ms. Henderson stated to Ms. Shaw-Riley that "there is a lawsuit against Chamilia for a patent infringement and we're going to put you out of business."  Shaw-Riley Tr. at 109:11-111:14.

44.    Denied.  Ms. Henderson stated to Ms. Shaw-Riley that "there is a lawsuit against Chamilia for a patent infringement and we're going to put you out of business."  Shaw-Riley Tr. at 109:11-111:14.

45.    Qualified.  The testimony paraphrased in the first sentence of paragraph 47 was in reference to Pandora Deposition Exhibit 3, a letter from Pandora's counsel to Chamilia's counsel.  Having just been shown that letter, Ms. Shaw-Riley was asked to explain how she knew that Pandora did not have a patent.  She testified as follows:  "Well I believe that I was told, but I'm sure if they were, they would--it [*i.e.*, Pandora Exhibit 3] says patent pending, I haven't seen a document that says it's gotten the patent."  Shaw-Riley Tr. at 130:6-131:10.  In the testimony purportedly paraphrased in the second sentence of paragraph 45, Ms. Shaw-Riley testified, "I haven't really had any wish to discontinue selling [Chamilia]."

46.    Denied.  Ms. Henderson stated to Ms. Shaw-Riley that "there is a lawsuit against Chamilia for a patent infringement and we're going to put you out of business."  Shaw-Riley Tr. at 109:11-111:14.

47.    Denied.  Shaw-Riley Tr. at 109:11-113:9, 141:4-143:3; Julkowski Tr. at 254:7-254:15.

48.    Admitted.

49.     Denied.  Shaw-Riley Tr. at 109:11-113:9, 141:4-143:3; Julkowski Tr. at 254:7-254:15.

50.     Denied.  Paragraph 50 misstates the testimony it purports to cite.  Ms. Shaw-Riley testified that, because the economy has taken a nose dive, *her* income is down.  Shaw-Riley Tr. at 32:2-34:3.  Further, Ms. Shaw-Riley did *not* testify that "Chamilia's sales have slowed because consumers are 'fickle' . . ."  Rather, she testified that sales of "the add-a-link charms are slowing down and the bulk of the business is starting to come from Chamilia," and that she "attribute[d] the slowing down of the sale of add-a-link jewelry" to the fact that the "consumer is [fickle]."  Shaw-Riley Tr. at 31:16-32:4.

51.     Admitted.

52.     Qualified as to the first sentence of paragraph 52.  Mr. Glueck's affidavit does not go so far as to say that he "did not purposefully visit" Chamilia's booth.  Ms. Whirlow testified that Mr. Glueck "kept walking by our booth."  Whirlow Tr. at 87:21-88:4.  The second sentence of paragraph 52 is denied.  Goggin Decl., Ex. F (Pandora Deposition Exhibit 14 (Whirlow Declaration)) ¶ 9.

53.     Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

54.     Chamilia moves to strike this paragraph on the ground that it is irrelevant to the subject matter of this action.  Subject to the foregoing, Chamilia responds as follows:  Admitted.

55.     Denied.  Mr. Glueck stated that Pandora had patent rights violated by Chamilia.  Goggin Decl., Ex. F (Pandora Dep. Ex. 14 (Whirlow Declaration)) ¶ 9.

56.     Denied.  Mr. Glueck stated that Pandora had patent rights violated by Chamilia.  Goggin Decl., Ex. F (Pandora Dep. Ex. 14 (Whirlow Declaration)) ¶ 9.

57.     Qualified.  Plaintiff admits that Mr. Glueck denied making the statements attributed him.  Plaintiff denies paragraph 57 to the extent it could be read to suggest that Mr. Glueck's denial was truthful.

58.     Denied.  Goggin Decl., Ex. F (Pandora Dep. Ex. 14 (Whirlow Declaration)) ¶¶ 9-10; Whirlow Tr. at 272:23-274:23.

59.     Denied.  Goggin Decl., Ex. F (Pandora Dep. Ex. 14 (Whirlow Declaration)) ¶¶ 9-10; Whirlow Tr. at 272:23-274:23..

60.     Admitted.

61.     Qualified.  Although Mr. Hostrup's Declaration states that he does not "recall" using the term "knockoff" on that particular occasion, he admitted in his deposition that he likely has used the term knockoff to describe Chamilia at trade shows  Hostrup Tr. 103:5-104:13.

62.     Admitted.

63.     Denied.  Mr. Hostrup has told customers that it had a "patent lawsuit" against Chamilia.  Vogel Decl. ¶ 2.

64.     Qualified.  Although Mr. Hostrup claims not to have made this statement, he told one retailer on another occasion that she could have her store shut down as a result of Pandora's "patent lawsuit."  Vogel Decl. ¶ 2.

65.     Denied.  Vogel Decl. ¶ 2.

66.     Denied.  Mr. Hostrup has told customers that Pandora had a "patent lawsuit" against Chamilia, thereby implying that Chamilia was in violation of existing patent laws.  Vogel Decl. ¶ 2.

67.     Qualified.  Although Mr. Hostrup denies making this particular statement, he told at least one retailer that her store could be shut down as a result of Pandora's "patent lawsuit" against Chamilia.  Vogel Decl. ¶ 2.

68.     Denied.  Mr. Hostrup has claimed that Pandora has a "patent lawsuit" against Chamilia, and has expressly threatened to shut Chamilia down once—not "if"— Pandora receives its patent.  Vogel Decl. ¶ 2.

69.     Qualified.  Chamilia admits that Mr. Hostrup made the statements attributed to him, but by so doing does not admit the truth of those statements.

70.     Qualified as to the first sentence of paragraph 70.  Ms. Whirlow was asked about "any situation where a customer returned a Chamilia jewelry product because a bead was unable to be removed from the bracelet," rather than (as paragraph 70 implies), multiple "customers" complaining of this situation.  Further, Ms. Whirlow made clear that she believed this situation resulted from damage done by the customer.  Whirlow Tr. at 156:24-157:11.  Chamilia denies the second sentence and moves to strike it on the ground that it is wholly speculative and lacking in foundation.  Whirlow Tr. at 154:14-155:24 (testifying that she had not examined any returned merchandise and did not handle returns).

71.     Denied.  Chamilia's necklaces and bracelets do not utilize substantially the same construction and perform the same function as Pandora's patent pending for its necklaces and bracelets.  Unlike the Pandora bracelet, there is no twisting to affix beads onto the middle pieces, or humps, affixed onto the chains dividing the chains into three pieces, and the Chamilia lock, or clasp, is different from the lock or clasp on the Pandora bracelet.  Whirlow Tr. at 129:11-131:4.

72.     Admitted

73.     Admitted

74.    Denied.  The evidence set forth below in the Additional Facts section make clear that Pandora adopted its Terms and Conditions letter, and sent it to customers, as part of its scheme to use its alleged "patent rights" to intimidate customers and potential customers of Chamilia from purchasing its products.  *See* paragraphs 108-116, 128 and 131-151 below and materials cited therein.

75.    Denied.  The evidence set forth below in the Additional Facts section make clear that Pandora adopted its Terms and Conditions letter, and sent it to customers, as part of its scheme to use its alleged "patent rights" to intimidate customers and potential customers of Chamilia from purchasing its products.  *See* paragraphs 108-116, 128 and 131-151 below and materials cited therein.

76.    Denied.  The evidence set forth below in the Additional Facts section make clear that Pandora adopted its Terms and Conditions letter, and sent it to customers, as part of its scheme to use its alleged "patent rights" to intimidate customers and potential customers of Chamilia from purchasing its products.  *See* paragraphs 108-116, 128 and 131-151 below and materials cited therein.

77.    Denied.  The evidence set forth below in the Additional Facts section make clear that Pandora adopted its Terms and Conditions letter, and sent it to customers, as part of its scheme to use its alleged "patent rights" to intimidate customers and potential customers of Chamilia from purchasing its products.  *See* paragraphs 108-116, 128 and 131-151 below and materials cited therein.

78.    Denied.  Chamilia admits that Mr. Lund Petersen authorized Mr. Glueck to send the April 12, 2005 letter.  Chamilia denies that the letter, which suggests that Chamilia is one of the "knock-off companies," was sent  "in an effort to address Pandora's retail customers'

concerns," as opposed to an effort to intimidate retailers from carrying Chamilia.  *See* paragraphs

108-116, 128 and 131-151 below and materials cited therein..

79.    Denied.  Mr. Lund Petersen's message stated in part as follows:  "Cause now our

patent application that has been publicized and *you are selling something that violates my patent*

and therefore I can sue you for your profits and legal expenses."  Carlos Decl. ¶ 7 (emphasis

added); Lund Petersen Tr. at 58:5-59:13; Goggin Decl., Ex. J.

80.    Admitted.

81.    Admitted.

82.    Admitted.

83.    Admitted.

84.    Admitted.

85.    Admitted.

86.    Admitted.

87.    Admitted.

88.    Qualified.  In the testimony cited, Ms. Whirlow testified that she had not received

any such emails.

89.    Qualified.  In the testimony cited, Ms. Whirlow testified that she had not received

any such emails.

90.    Qualified.  In the testimony cited, Ms. Whirlow was providing her general

impression of customers' communication practices.

91.    Qualified.  In the testimony cited, Ms. Whirlow stated that she had not received

any such written communications from any sales representative of Chamilia.

92.     Qualified.  Mr. Julkowski testified that, while Chamilia does not have a business plan *per se*, it does have "sales objectives."  Julkowski Tr. at 299:13-300:5.

93.     Admitted.

94.     Admitted.

95.     Admitted.

96.     Denied.  Mr. Julkowski testified that, at the January 2005 Atlanta gift show, he personally heard Michael Lund Petersen tell a retailer "that he was going to close down Chamilia with his patent and sue customers for all sales."  Julkowski Tr. at 209:13-213:14.

97.     Qualified.  Mr. Julkowski testified that, at the January 2005 Atlanta gift show, he personally heard Michael Lund Petersen tell a retailer "that he was going to close down Chamilia with his patent and sue customers for all sales."  Julkowski Tr. at 209:13-213:14.

98.     Admitted.

99.     Admitted.

100.     Qualified.  Although Chamilia has not had an "inability" to sell its product, it has lost business due to Pandora's campaign of disparagement.  Shaw-Riley Tr. at 89:4-90:2; 128:7-129:16; 145:22-146:15, 147:10-148:1; 150:11-151:7, 157:8-158:8; Julkowski Tr. at 173:23-179:25, 181:2-181:13, 183:9-184:24, 262:24-264:23, 265:13-266:12, 304:24-309:6; Whirlow Tr. at 93:19-94:22, 105:13-106:12, 113:11-113:21; Julkowski Decl. ¶ 4, Ex. A; *see also* paragraphs 131-151 below.

101.     Admitted.

102.     Admitted.

103.     Admitted.

## ADDITIONAL FACTS

In accordance with Local Civil Rule 56.1, following are additional material facts as to which there exists a genuine issue to be tried.

104.    Subject to Chamilia's objection as to the relevancy of the prior lawsuit between Pandora and Chamilia, Chamilia states as follows:  The creation and marketing the line of Chamilia jewelry in existence prior to the fall of 2003 was undertaken by Dov Schwartz without the involvement of Chamilia's owner, who at that point was largely a passive investor. Julkowski Tr. 21:4-24:25; 103:18-104:16; 105:8-107:7, 111:8-114:25.

105.    Subject to Chamilia's objection as to the relevancy of the prior lawsuit between Pandora and Chamilia, Chamilia states as follows:  Once Chamilia's owner learned of Mr. Schwartz's conduct, investigated the underlying circumstances and obtained legal counsel, he agreed to remove the then-existing line of Chamilia jewelry from the market and destroy it. Julkowski Tr. at 116:15-124:22, 131:4 -146:15.

106.    Subject to Chamilia's objection as to the relevancy of the prior lawsuit between Pandora and Chamilia, Chamilia states as follows:  In the fall of 2003, Chamilia stopped producing the jewelry designs that were the subject of the prior lawsuit between the Pandora and Chamilia; at that time, Chamilia developed new designs for its jewelry.  Julkowski Tr. at 118:23-119:14.

107.    The current line of Chamilia jewelry products is designed by Killian Reider and freelance designers under her supervision.  Ms. Reider became responsible for the design of Chamilia's line in the fall of 2003.  Julkowski Tr. at 103:5-103:17, 158:3-158:24; 293:16-294:8.

108.    Between March and May 2004, Pandora's Michael Lund Petersen placed several calls to Carlos Italian Charm Shop of Rancho Cordova, California.  Declaration of Donna-Renee

Carlos ("Carlos Decl.") ¶¶ 1, 4.  The owner of Carlos Italian Charm Shop, Donna-Renee Carlos spoke to Mr. Lund Petersen approximately five times during this period.  *Id.* ¶ 4.

109.    During these calls, Mr. Lund Petersen expressed anger that Carlos Italian Charm Shop was selling both Chamilia and Pandora jewelry.  Mr. Lund was so aggressive and persistent in calling Carlos Italian Charm Shop that Ms. Carlos told him she would no longer accept telephone calls from Pandora.  Carlos Decl. ¶ 4.

110.    Mr. Lund Petersen told Ms. Carlos that Pandora had a patent, and that the Chamilia people were "counterfeiters" who had stolen his patent.  Carlos Decl. ¶ 5.

111.    Mr. Lund Petersen also told Ms. Carlos during their telephone calls that she could not continue to sell Pandora if she also sold Chamilia.  Carlos Decl. ¶ 5.

112.    On August 16, 2004, Mr. Lund Petersen left the following message on Ms. Carlos's answering machine:

> Hi Donna.  This is Michael Lund with Pandora Jewelry.  I am the President.  I need to talk to you about something.  Could you please give me a call before my lawyer sends you a letter?  I just want to talk to you myself in regards to the Chamilia you're selling.  Cause now our patent application that has been publicized and you are selling something that violates my patent and therefore I can sue you for your profits and legal expenses.  So please give me a call so maybe we can clear this up in a good fashion.  I hope I can talk to you today.  My number is 4103090213.  Thank you very much.  Bye bye.

Carlos Decl. ¶¶ 7-8; Lund Petersen Tr. at 58:5-59:13; Goggin Decl., Ex. J.

113.    On August 19, 2004, Ms. Carlos received the letter attached as Exhibit B to her declaration from Pandora's attorney advising her that Pandora's patent application had been published and stating as follows:  "Pandora is now aware that Carlos Italian Charm Shop is offering to sell or selling necklaces and bracelets in the United States which appear to utilize substantially the same construction and perform the same function as Pandora's patent pending for its necklaces and bracelets."

114.    Given her contacts with Michael Lund Petersen, Ms. Carlos understood the above-quoted statement to refer to Chamilia Jewelry.  Carlos Decl. ¶ 9.

115.    On or about September 16, 2004, Pandora sent Carlos Italian Charm Shop a copy of its "Terms and Condition[s]."  Carlos Decl. ¶ 10, Ex. C.  Among other things, the Terms and Condition letter includes the following provision:  "As a customer of the Pandora Brand of jewelry products, you agree not to sell any other brand of modifiable jewelry which may appear to utilize substantially the same construction and perform the same function as described in Pandora's patent application."  *Id.*

116.    Pandora sent the Terms and Conditions letter to Ms. Carlos even though they had not requested exclusivity when they agreed to sell Pandora merchandise Carlos Italian Charm Shop.  Carlos Decl. ¶ 11.

117.    In January 2005, while attending the America's Mart trade show in Atlanta, Georgia, Michael Lund Petersen spoke to Dawn Moore of the Highlands West Gift Company. Declaration of Dawn Moore ("Moore Decl.") ¶ 2.

118.    Mr. Lund Petersen told Ms. Moore that Chamilia's jewelry was a "cheap imitation" of Pandora's jewelry; that Chamilia's jewelry did not work properly; that Chamilia had stolen the design of Pandora's charm bracelets; that Pandora was the original; and that Pandora had a patent pending.  Moore Decl. ¶ 3.

119.    In January 2005 at the Atlanta gift fair, four or five customers came into the Chamilia showroom and advised Chamilia representatives, including Mr. Julkowski, that Michael Lund Petersen had told them that Pandora was going to close Chamilia down with a patent and sue customers for all their sales.  Julkowski Tr. at 209:15-210:12.

120.    Upon hearing these reports, Mr. Julkowski went to investigate.  As a result, he personally heard Mr. Lund Petersen telling retail store owners from North Carolina that Pandora was shutting down Chamilia with a patent; that any customer Chamilia would be sued; and that the customers would be required to pay back profits and would have their Chamilia inventory confiscated.  Julkowski Tr. at 210:13-214:16; 223:6-224:6.

121.    On April 15, 2005, Knud Hostrup telephoned Michele Vogel, the owner of the West End Gallery in East Aurora, New York.  Vogel Decl. ¶¶ 1-2.

122.    West End Gallery carries both Chamilia and Pandora jewelry.  Vogel Decl. ¶ 1.

123.    During this April 15 telephone call, Mr. Hostrup stated that Pandora had a "patent lawsuit" against Chamilia, and that Pandora would shut Chamilia down once Pandora received the patent.'  Vogel Decl. ¶ 2.

124.    Mr. Hostrup also told Ms. Vogel that, as a seller of Chamilia jewelry, she could become involved in the "patent lawsuit" and potentially have her store shut down.  Vogel Decl. ¶ 3.

125.    Approximately two weeks after the telephone conversation between Mr. Hostrup and Ms. Vogel, Michael Lund Petersen placed a number of phone calls to Ms. Vogel over a two day period.  During these calls, Mr. Lund Petersen told Ms. Vogel that West End Gallery would not be able to carry Pandora if it continued carrying Chamilia.  Mr. Lund Petersen, who was very heated and aggressive on these calls, yelled when he spoke about Chamilia.  Vogel Decl. ¶ 3.

126.    Michael Lund Petersen has told Pandora's sales representatives that Pandora has a patent, and that the patent number is available "on line."  Vogel Decl. ¶ 5.

127.    On or about April 12, 2005, Steve Glueck, a Pandora sales representative, distributed to Pandora retailers the letter attached as Exhibit G to the accompanying Declaration of James Goggin.

128.    Mr. Glueck's April 12 letter stated in part as follows:

> It has been brought to my attention that the Chamilia sales force has been trying to strong-arm some of our customers into buying their product.  It seems to me that this is a last desperate approach in trying to gain some market share.  My stores felt bullied a bit when the representative informed them that "all the Pandora accounts" were carrying Chamilia along side Pandora.  I would like to assure you that this could not be further from the truth.  As you all know, we have an agreement with you to not carry the knock-off companies, as we have outlined in our terms and conditions policy.

Goggin Decl., Ex. G.

129.    Pandora representatives have told numerous retailers that it has a patent and that it is going to use its patent to put Chamilia out of business.  These retailers include the following: Blackberry Creek, Rustic Hutch, Charm Heaven, Merle Norman, Details, Wooden Key, the kiosk at Castleton Square Mall, The General Store of Minnesota, Seven Seas, Carin[a]'s, Italiancharms.com, Tina's Hallmark, Simply Charming, Interiors and More, Fine Things, A Thousand Charms, Dolls and Ducks, The Gift Gallery of Minnesota, Charms by the Bay, Burlingame Stationers, Country Charm, David M. Brian, Gingerbread Cottage, Interior Objects, Classic Duck, the Joy Club, Country Clutter, Hoppe Jewelers, Anne's Hallmark, Forever Charmed, Shad's, Bishop Hallmark, Pamela's, Identity Jewelers, Picket Fence and Richard's Gifts.  Shaw-Riley Tr. at 72:12-72:20, 73:8-74:25, 143:4-144:16; Julkowski Tr. at 173:23-179:25, 181:2-181:13, 183:9-184:24; Whirlow Tr. at 68:2-68:11; 85:22-86:13, 90:25-91:15, 93:19-94:22, 97:20-98:22, 105:13-106:12, 109:14-110:15, 113:11-113:21, 115:18-116:6; 118:9-119:6; 122:23-123:6, 125:7-125:19.

130.    Several retailers have indicated to Chamilia representatives that the retailers would not carry Chamilia products due to Pandora's allegations of patent infringement as well as Pandora's insistence that retailers not carry both lines.  Shaw-Riley Tr. at 89:4-90:2; 128:7-129:16; 145:22-146:15, 147:10-148:1; 150:11-151:7, 157:8-158:8; Julkowski Tr. at 173:23-179:25, 181:2-181:13, 183:9-184:24, 262:24-264:23, 265:13-266:12, 304:24-309:6; Whirlow Tr. at 68:2-68:11, 78:17-79:17; 93:19-94:22, 105:13-106:12, 113:11-113:21.

131.    Several former Chamilia customers have declined to continue carrying Chamilia products due to Pandora's statements concerning its alleged patent rights.  These retailers include the following:  A&A Beads & Things (with two retail locations), Added Touch, Best of Tymes, Comfort & Joy, Country Clutter of Hanover, Dream House Miniatures, the Joy Shop, Lasting Impressions, My Favorite Things, My Sister's Place, Seven Seas of Kansas, Washington Square, Fairwood Pharmacy, Silverland, The Silver Station, The Paper Store, Charming You, The General Store, The Barn Swallow, and Yesterday and Today.  Julkoski Decl. ¶ 4.

132.    In April 2004, A&A Beads and Things (including two retail store locations) purchased $5243 in merchandise from Chamilia.  It has not purchased anything from Chamilia since then.  Julkowski Decl., Ex. A.

133.    In June 2004, Added Touch purchased $1724 in Chamilia merchandise.  It returned all of this merchandise in August 2004.  Julkowski Decl., Ex. A.

134.    Between May 2004 and July 2004, Barn Swallow purchased $4104 of merchandise from Chamilia.  It has not since purchased anything from Chamilia.  Julkowski Decl., Ex. A.

135.    In January 2004, Best of Tymes purchased $2161 of Chamilia merchandise. It returned $49 of merchandise to Chamilia in April 2004 and $1886 of merchandise in September 2004. Julkowski Decl., Ex. A.

136.    Between January 2004 and June 2004, Charming You purchased $2235 of merchandise from Chamilia. Other than a recent (April 2005) purchase of $190, it has not purchased any Chamilia merchandise since June 2004. Julkowski Decl., Ex. A.

137.    In February 2004, Comfort & Joy purchased $1712 of Chamilia merchandise. It returned $1361 of this merchandise to Chamilia in September 2004. Julkowski Decl., Ex. A.

138.    In June 2004, Country Clutter of Hanover purchased $2079 in merchandise from Chamilia; it returned all this merchandise in July 2004. Julkowski Decl., Ex. A.

139.    Between April and July 2004, Dream House Miniatures purchased $3249 in merchandise from Chamilia. It returned $2059 of this merchandise in November 2004. Julkowski Decl., Ex. A.

140.    Between March 2004 and July 2004, the Joy Shop purchased $4573 in merchandise from Chamilia. It has not purchased anything from Chamilia since then. Julkowski Decl., Ex. A.

141.    Between March 2004 and July 2004, Lasting Impressions purchased $2608 in merchandise from Chamilia. It has not purchased any Chamilia merchandise since then. Julkowski Decl., Ex. A.

142.    Between June 2004 and July 2004, My Favorite Things purchased $2168 in merchandise from Chamilia. It has not purchased any Chamilia merchandise since then. Julkowski Decl., Ex. A.

143.    In March 2004, My Sister's Place purchased $2095 in merchandise from Chamilia.  In November 2004, it returned $1625 in merchandise to Chamilia.  Julkowski Decl., Ex. A.

144.    Between April 2004 and August 2004, the Paper Store purchased $2136 of Chamilia merchandise.  It returned $1826 of this merchandise in September 2004.  Julkowski Decl., Ex. A.

145.    Between July and October 2004, Seven Seas of Kansas purchased $3028 worth of merchandise from Chamilia.  It has not purchased any since.  Julkowski Decl., Ex. A.

146.    Between January 2004 and July 2004, Silverland purchased $5610 in merchandise from Chamilia.  It has not purchased anything from Chamilia since then.  Julkowski Decl., Ex. A.

147.    In March 2004, the Silver Station purchased $1752 in Chamilia merchandise.  It returned $105 of this merchandise in April 2004 and $1624 of the merchandise in July 2004.  Julkowski Decl., Ex. A.

148.    Between February and November 2004, Washington Square purchased $2809 of Chamilia merchandise.  It has not since purchased anything from Chamilia.  Julkowski Decl., Ex. A.

149.    Between April 2004 and August 204, Yesterday & Today purchased $2279 of Chamilia merchandise.  It returned $2002 of this merchandise in September 2004.  Julkowski Decl., Ex. A.

150.    Pandora received signed Terms and Condition letters from 449 retailers.  Goggin Decl. ¶ 2.

151.    **CONFIDENTIAL**:  [redacted].  Goggin Decl., Ex. A.

152.    Pandora has not been issued a patent covering its jewelry.  Pandora Answer ¶ 11.

Dated: August 15, 2005

                                        /s/
                                        _____
                                        James G. Goggin (*pro hac vice*)
                                        Dylan Smith (DS 6740)
                                        **Attorneys for Plaintiff Chamilia, LLC**

VERRILL DANA LLP
One Portland Square
P.O. Box 586
Portland, ME  04112-0586
(207) 774-4000

P:\vwright\Chamilia\Opposing.Stmt.Mat.Facts final redacted.doc