00021

1

2 products, does Chamilia offer any other services?

3    A.    As -- no.

4    Q.    Were you involved in the formation of

5 Chamilia?

6    A.    Not real -- yes.

7    Q.    And what involvement did you have?

8    A.    Investor.

9    Q.    By investor, what do you mean?

10    A.    I took some personal money, invested it

11 in somebody with a concept and was not involved

12 in the day-to-day operations or management of the

13 company.

14    Q.    And with whom did you invest your

15 money?

16    A.    There was another gentleman, Dove

17 Schwartz.

18    Q.    Could you spell that, please?

19    A.    D O F -- D O V E, S C H A R T Z.  I'm

20 not sure on the exact spelling of Schwartz.  I

21 believe it's the more standardized Schwartz.

22    Q.    And how do you know Dove Schwartz?

23    A.    Dove was -- I had another business, a

24 kiosk business in the mall that Dove was the

25 manager of.  Partner at that also.  He more or

00022

1

2  less ran this cart for Italian charms carts, and

3  that's how I met him.  Because he was the manager

4  operating the Italian charms cart.

5      I met him through somebody else in that

6  business.  A friend of a friend.  Another

7  gentleman Anthony introduced Dove to me.  Or sort

8  of pushed -- pushed Dove on to us to run the

9  cart.

10    Q.    When did you first meet Dove Schwartz?

11    A.    2001, 2002.  I never really met him.  I

12  was -- how I met Dove was through another

13  gentleman I was opening a business with, an

14  Italian charms cart.  His name was Anthony

15  Lemongello.  We were going into this business

16  50/50.

17      Anthony lived on the West Coast and

18  said I'm going to open this business with you.

19  Just take care of it.  I used to live in the

20  area.

21      Push came to shove and we signed the

22  lease for the business and we actually opened up

23  the Italian charms cart.  Anthony on the day of

24  opening said "I'm not going to be involved, I

25  want this guy I know, Dove Schwartz, to manage my

**Julkowski, Jeffrey (5/12/05)**                    **Page 22**

00023

1

2 position." So Anthony still owned the business

3 with me.

4         And what happened over time, I didn't

5 realize Anthony and Dove had an agreement where

6 Dove was going to just pay back Anthony over

7 time. And so Dove sort of became a partner by

8 default.

9         So at that point, I didn't know Dove.

10 I would have walked away from the business if

11 that ever happened, but we already paid for the

12 lease, paid for the inventory, and Anthony was

13 still backing him up as, you know, his sort of

14 manager of the business.

15     Q.    What business did you and Anthony

16 Lemongello enter into 50/50?

17     A.    Italian charms cart. It was called

18 Mazel Group.

19     Q.    What's an Italian charm?

20     A.    Italian charm is another jewelry

21 product in the market. It's a modular

22 interchangeable beauty product.

23     Q.    What do you mean by modular?

24     A.    Square in shape. It almost looks like

25 the old Seiko watch band where it stretches.

**Julkowski, Jeffrey (5/12/05)          Page 23**

00024

1

2     Q.   Do Italian charms also consist of

3 beads?

4     A.   No.

5     Q.   So in the summer of 2003, your only

6 involvement with the formation of Chamilia, LLC

7 was as an investor?

8     A.   Pretty much.

9     Q.   And when did you first become involved

10 with Chamilia?

11     A.   In the fall of 2003.

12     Q.   And how did you become involved?

13     A.   I had a decision to invest more money

14 into the company or walk away from the

15 investment.

16     Q.   Other than investing money in the fall

17 of 2003, did you perform any activities on behalf

18 of the company?

19     A.   Very little.  Little bit.  But I wasn't

20 there.  The offices -- I found out through Dove,

21 he was running the office out of his house.  That

22 was the Rego Park address.  He always said he was

23 going to open up an office and never did.  He

24 used to always tell me one thing and did

25 something else.

**Julkowski, Jeffrey (5/12/05)        Page 24**

00103

1

2    record at 11:22 a.m.  This begins tape 2 of

3    the deposition of Jeff Julkowski.

4  BY MS. SHORT:

5    Q.    Who is the designer of Chamilia jewelry

6  products?

7    A.    Killian Rieder.

8    Q.    How did she come to be the designer of

9  Chamilia jewelry products?

10    A.    We sought out somebody with design

11  experience.  She went to FIT and design school.

12    Q.    When you reference we, who do you refer

13  to?

14    A.    The investors, Troy and Mary.

15    Q.    When did you conduct this seeking?

16    A.    Killian became the designer in the fall

17  of 2003.

18    Q.    Who designed the beads that were first

19  manufactured in the summer of 2003?

20    A.    I wasn't involved with that.  That was

21  back when Dove was operating the company.

22    Q.    To your knowledge, who was the designer

23  of the Chamilia jewelry products in summer of

24  2003?

25    A.    Dove Schwartz.

**Julkowski, Jeffrey (5/12/05)**            **Page 103**

00104

1

2    Q.    Dove Schwartz designed the chains used

3    in connection with the sale of jewelry products

4    in summer of 2003?

5    A.    He was involved with all the product at

6    that point.

7    Q.    Was is the designer of the product at

8    that time?

9    A.    Yes.  I don't know.  I wasn't part of

10   it -- he was the designer or not.  He was

11   responsible for it.  So designer is a loose term

12   at that point.

13   Q.    Who was the designer of the beads in

14   the summer of 2003?

15   A.    I wasn't involved.  I wasn't part of

16   actually making the beads at that point.

17   Q.    Who was the designer of the beads in

18   summer of 2003?

19   A.    I don't recall.

20   Q.    Did you ever recall?  Did you ever

21   know?

22   A.    No.

23   Q.    Did you ever ask Dove Schwartz who was

24   the designer of the beads that were manufactured

25   in the summer of 2003?

**Julkowski, Jeffrey (5/12/05)**               **Page 104**

00105

1

2    A.    Anything Dove said at that point I

3  didn't trust him for anything.  I wasn't involved

4  with what was going on.

5    Q.    Did you ask Dove Schwartz who the

6  designer of the beads were in summer of 2003?

7    A.    No.

8    Q.    Did Dove Schwartz ever tell you who the

9  designer of the beads was in summer 2003?

10    A.    No.

11    Q.    Prior to investing in the company in

12  the summer of 2003, what involvement did you have

13  in the design of the Chamilia jewelry products,

14  if any?

15    A.    None.

16    Q.    Prior to investing in Chamilia in the

17  summer of 2003, did you have any input in what

18  product was sold?

19    A.    Not really, no.

20    Q.    Prior to the manufacture of the beads

21  in summer of 2003, did you see the beads before

22  they were manufactured?

23    A.    Right at the time they were starting to

24  sell them, I saw physical product, yes.

25    Q.    When was that?

**Julkowski, Jeffrey (5/12/05)**          **Page 105**

00106

1

2    A.    Fall of 2003.

3    Q.    Do you know what month?

4    A.    No.

5    Q.    Prior to the beads manufactured, did

6 you see the design concept for the beads?

7    A.    I was told -- we were selling Italian

8 charms at the cart -- Dove's talk was he was

9 coming out with a new charm, new charm product.

10    Q.    Okay.  Keep going.  So did you see the

11 concepts?

12    A.    No.

13    Q.    Before they were manufactured?

14    A.    Right after the time we more or less

15 saw the physical product.  This is what I was

16 shown and this is what the product was.  He had

17 samples at that point.

18    Q.    Prior to investing in the company, did

19 you see the product?

20    A.    It was more after the investment.  He

21 did everything on his own up to needing money to

22 purchase inventory.

23    Q.    What did you understand the concept to

24 be before you invested in the summer of 2003?

25    A.    A new charm for the cart.

**Julkowski, Jeffrey (5/12/05)**          **Page 106**

00107

1

2    Q.    And what type of charm did you

3  understand that to be?

4    A.    A charm, round charm, a bead charm.

5    Q.    Was it described to you what type of

6  charms this would be?

7    A.    No.

8    Q.    And the beads would be entirely round?

9    A.    There were different ones.  We were

10  selling flat beads at that time.  Flat charms.

11  Some of those were, even though they were square,

12  some are round.  They came in different shapes.

13    Q.    What shapes did them come in?

14    A.    Stars, triangles, hearts, diamonds,

15  love bugs, Hershey Kisses.

16    Q.    Did they come in characters?

17    A.    Yes.

18    Q.    What type of characters?

19    A.    SpongeBob Squarepants, Pepsi Cola can,

20  cars, sports teams, footballs.

21    Q.    And these beads as you're describing

22  them are the beads --

23    A.    I was describing the charms.

24    Q.    Are they the Italian charms that you

25  were describing?

**Julkowski, Jeffrey (5/12/05)**                    **Page 107**

00111

1

2  actually purchase the beads from the

3  manufacturer.

4      The way manufacturing works, you

5  receive a sample.  They'll make pieces for you,

6  you receive a sample.  Then you can purchase it

7  or say no to it.

8    Q.    Prior to investing in the company, did

9  you see a sample of the beads to be sold by

10  Chamilia?

11    A.    No.

12    Q.    Did you see a sample of the product

13  line to be sold by Chamilia?

14    A.    No.

15    Q.    What information did you --

16    A.    I wasn't involved.

17    Q.    What information did you have about the

18  company prior to investing in it?

19    A.    There wasn't any real company at that

20  point.  It was just running it from a cart.  Dove

21  was going to make a new charm line.

22    Q.    Prior to investing in the new venture,

23  what information did you have?

24    A.    None.  It was product he was going to

25  sell on the cart.

**Julkowski, Jeffrey (5/12/05)**          **Page 111**

00112

1

2    Q.    Have you ever visited the manufacturing

3  plant?

4    A.    Yes.

5    Q.    How many times?

6    A.    Once, twice.  Twice.

7    Q.    When was the first time?

8    A.    Fall of 2004 -- I'm sorry, 2003.

9    Q.    Do you remember what month of 2003?

10    A.    No.

11    Q.    What was your reason for visiting the

12  manufacturing plant?

13    A.    To figure out what was going on.

14    Q.    What was going on with what?

15    A.    The -- there was a tragic thing that

16  happened between two companies.  It's an

17  unfortunate thing that happened.  I wasn't

18  involved with what was going on.  And I had to

19  learn very quickly.

20        Once it came to the point of deciding

21  if I needed to invest more money in this company

22  or to just wash the investment away.  I was

23  told -- I went to the factory to see what they

24  were told to figure out what was happening.  And

25  how they are making this product.

**Julkowski, Jeffrey (5/12/05)**          **Page 112**

00113
1

00114

1

2   two companies that has been settled and

3   judgment has been entered. The fact that

4   there was a lawsuit may be relevant to the

5   case, but this level of detail is not.

6      MS. SHORT: There's an open question I

7   believe to the witness. Can you read it,

8   please.

9      (Record read)

10   A.   That Peter, who's the broker, was the

11  one who contacted the manufacturer to get the

12  samples made.

13   Q.   The samples of what?

14   A.   The samples that I saw, and that's

15  where we purchased those samples.

16   Q.   Other than to view the samples being

17  manufactured at the plant, did you have any other

18  reason for visiting?

19   A.   Just to establish what was going on.

20  The relationships.

21   Q.   The relationships between?

22   A.   Dubbie, the broker --

23   Q.   Between, I'm sorry?

24   A.   Dove. Dove. He went by the nickname

25  Dubbie.

**Julkowski, Jeffrey (5/12/05)**      **Page 114**

00116

1

2    A.    Thread.

3    Q.    A thread?

4    A.    A thread.

5    Q.    When is the second time you visited the

6    manufacturing plant?

7    A.    I don't recall.  Probably the summer of

8    '04.

9    Q.    What was the reason for your visit?

10    A.    I was becoming more involved with the

11    business -- well, I was very involved in the

12    business at that time.  And just building a

13    relationship with people across the world that

14    are manufacturing product for us.

15    Q.    When Dove Schwartz left Chamilia, did

16    you pay him to leave?

17    A.    No.  He -- no.

18    Q.    Did you refund Dove Schwartz the

19    investment he made in Chamilia?

20    A.    He had no investment in the company.

21    Q.    At the company's inception in summer of

22    2003, who owned it?

23    A.    Primarily myself.

24    Q.    And who else?

25    A.    Mary Rieder -- no, she didn't have any

**Julkowski, Jeffrey (5/12/05)**          **Page 116**

00117

1

2  money in there.  No, it was just myself.

3      Q.    You were the sole owner of Chamilia,

4  LLC?

5      A.    Yes.

6      Q.    Anthony Lemongello didn't own any part

7  of the company?

8      A.    No.

9      Q.    Despite being your partner, as you've

10  described, he didn't own any part of the company?

11     A.    Of Chamilia?

12     Q.    Um-hum.

13     A.    No.

14     Q.    As owner of Chamilia in the summer of

15  2003, did anyone report to you?

16     A.    Dove.

17     Q.    When was the first sale of Chamilia

18  jewelry products?

19     A.    Had to be September '03.

20     Q.    To whom was the first product sold?

21     A.    I was not aware.  I -- whoever -- Dove

22  was running the operation out of his apartment in

23  Rego Park.  I wasn't even around at that time.

24     Q.    Where was the first product shipped?

25     A.    To Rego Park.

00118

1

2    Q.    What location was the retail customer

3  that received the first shipment of Chamilia

4  jewelry products?

5    A.    I do not know.

6    Q.    Since it's inception in summer of 2003,

7  has there been a break in the manufacture of

8  Chamilia jewelry products?

9    A.    Define break.

10    Q.    Have you ever stopped the manufacture

11  at any time?

12    A.    Yes.

13    Q.    When was that?

14    A.    I'm sorry, the manufacturing never

15  stopped.

16    Q.    Okay.  Then what did you mean in

17  response to my question?

18    A.    There was -- it stopped -- they stop

19  periodically for holidays.  Working with Thai

20  people they take off when they work when they

21  want to.  So there was those breaks that we

22  didn't plan for.

23    Q.    Has there ever been a break in the

24  distribution of Chamilia jewelry products?

25    A.    Yes.

**Julkowski, Jeffrey (5/12/05)          Page 118**

00119

1

2    Q.    When was that?

3    A.    Fall of 2003.

4    Q.    What was the reason?

5    A.    Changing over the line, changing

6  designs of the line.

7    Q.    You changed the designs of the line in

8  fall of '03?

9    A.    Correct.

10    Q.    What was the reason for that change?

11    A.    The -- at that point, again, we

12  received contact from Pandora and learned that

13  there were similarities in designs and we stopped

14  producing those products.

15    Q.    When were you contacted by Pandora?

16    A.    Somebody knocked on my door and handed

17  me a piece of paper one Friday afternoon.

18    Q.    And when was that?

19    A.    I have to go back and check.

20    Q.    Was it the fall of 2003?

21    A.    Yes, September, October.

22    Q.    Was it the summer of 2003?

23    A.    September, October.

24    Q.    Who knocked on your door?

25    A.    Some gentleman who brought me a paper

**Julkowski, Jeffrey (5/12/05)**          **Page 119**

00120

1

2  that looks similar to the one in front of me, a

3  legal paper.

4      Q.    What was that paper?

5      A.    United States -- it was a lawsuit.

6      Q.    You were served with a lawsuit?

7      A.    Yes.

8          MS. SHORT:  I'd like the court reporter

9      to mark as Pandora Exhibit 7.

10         (Cease and desist demand marked Pandora

11     Exhibit 7 for identification)

12     Q.    Mr. Julkowski, will you please review

13  what's been marked as Pandora Exhibit 7.

14     A.    Yes.

15     Q.    Let me know when you finished reviewing

16  it.

17     A.    Okay.

18     Q.    Yes?

19     A.    Yes.

20     Q.    Do you recognize this document?

21     A.    Yes.

22     Q.    What do you recognize it to be?

23     A.    A letter that Dove showed me.

24     Q.    When did you first see this letter?

25     A.    I don't recall.

**Julkowski, Jeffrey (5/12/05)**          **Page 120**

00121

1

2   Q.   When did Dove show you the letter?

3   A.   I don't recall.  Probably pretty close

4 to the date it was written.

5   Q.   And where were you when he showed it to

6 you?

7   A.   At home.

8   Q.   In New York?

9   A.   Yes.

10   Q.   What do you understand this document to

11 be?

12   A.   A -- it says, reading the title, Cease

13 and Desist Demand.  Our client's Pandora -- just

14 reading the title, our client's property, Pandora

15 necklaces and bracelets.

16   Q.   What do you understand this document to

17 be?

18   A.   That's the time that we started hiring

19 an attorney to find out.

20   Q.   What is your understanding?

21   A.   It's a legal document.  I read it over.

22 I don't understand it fully.  But, you know,

23 cease and desist selling the product.

24   Q.   And what product is that?

25   A.   The ones that Chamilia at that time --

**Julkowski, Jeffrey (5/12/05)**               **Page 121**

00122

1

2   Q.   What product was Chamilia selling at

3 that time?

4   A.   The beads that Dove made.

5   Q.   And what beads were those?

6   A.   The beads that he made.

7   Q.   The beads that Chamilia made, isn't

8 that right?

9   A.   Correct.

10   Q.   What beads were those?

11   A.   Round beads.

12   Q.   Can you describe the beads, other than

13 being round?

14   A.   Round, some were square, some were

15 triangles, some were -- charms, charm beads.

16   Q.   What other shapes did those beads take?

17   A.   The shapes -- there was many shapes.

18 You know, like at Nominations they had beads out,

19 square beads, round beads, that would work on

20 leather straps.  So it was more or less beads

21 that were in different shapes, to go onto some

22 sort of bracelet, necklace, anklet, or anything

23 that would hold -- you know, that would slip

24 through a hole.

25   Q.   Other than the beads as you've just

**Julkowski, Jeffrey (5/12/05)**        **Page 122**

00123

1

2  described, by this letter, is Pandora referring

3  to any other component of the Chamilia jewelry

4  products as sold at that time?

5      A.    I'm sorry.

6      Q.    Other than the beads as you described

7  as Pandora by this letter requesting any other --

8          (Discussion off the record)

9          MR. GOGGIN:  Objection.  Foundation.

10         You haven't established that this witness

11         knows what Pandora's intentions were.

12     Q.    Okay.  You can answer the question.

13     A.    What's the question?

14         MS. SHORT:  Court reporter, do you want

15         to read the question back again.  The

16         witness still doesn't know what the question

17         is.

18     A.    We didn't have -- there was the

19  product.  There was nothing -- it's the beads.

20  And that's what I believe this letter was

21  referring to.  That's all the product that

22  Chamilia had.  Beads, bracelets, necklaces,

23  alphabet series, and different --

24     Q.    So in addition to the beads, Chamilia

25  sold chains and bracelets and necklaces at that

**Julkowski, Jeffrey (5/12/05)**          **Page 123**

00124

1

2  time?

3     A.    Yes.

4     Q.    And was Pandora objecting to Chamilia's

5  sale of necklaces and bracelets being sold at

6  that time?

7     A.    I'm not sure what Pandora was referring

8  to.  I took the letter, sent it to -- hired --

9  sent it to our attorney, and he checked and

10  that's when we hired an attorney to get involved.

11  Because it is -- it says they have a patent in

12  here.  So we were checking for the patent.

13     Q.    Did you respond to this letter?

14     A.    I'd have to ask our legal counsel at

15  that time.

16     Q.    Did you personally respond to this

17  letter?

18     A.    I responded to our counsel.

19     Q.    Did you personally respond to this

20  letter?

21     A.    I personally responded to the counsel

22  to take care of what needed to happen.

23     Q.    Did you write a written response to

24  this letter?

25     A.    I don't recall.  I mean, I may have

**Julkowski, Jeffrey (5/12/05)**          **Page 124**

00131

1

2          (Final Judgment on Consent marked

3      Pandora Exhibit 8 for identification)

4      Q.    Did there come a time when Pandora

5  filed a complaint against Chamilia?

6      A.    Yes.

7      Q.    And when was that?

8      A.    Fall of 2003.

9      Q.    Was it September 25, 2003, do you know?

10     A.    I do not recall.  It's in that area,

11  yes.

12     Q.    What was the subject of the complaint

13  filed by Pandora?

14     A.    That we violated trade laws or

15  copyrights, patents and trademarks.

16          MR. GOGGIN:  I'm going to object to the

17      question to the extent it calls for a legal

18      conclusion.  I also object to the question.

19      You haven't shown him the complaint.  And

20      the complaint speaks for itself.

21     Q.    What is your understanding of the

22  purpose of filing a complaint in court?

23     A.    Two companies have a disagreement.

24     Q.    About anything?

25     A.    Anything.

**Julkowski, Jeffrey (5/12/05)**          **Page 131**

00132

1

2     Q.   And what did Pandora have a

3   disagreement about with Chamilia in September of

4   2003?

5     A.   The complaint was they believed that

6   Chamilia violated -- Pandora believed that

7   Chamilia violated their patent and trademark

8   rights.

9     Q.   Anything else?

10    A.   Intellectual property patent, trademark

11  and copyrights.

12    Q.   What else do you know about Pandora's

13  claims against Chamilia in that complaint?

14    A.   I didn't review the whole claim.  It's

15  not in front of me.  I remember the companies had

16  disagreements.  And they were settled relatively

17  quickly.  What you put in front of me is the

18  final judgment and agreement that both companies

19  settled and moved on.

20    Q.   At the time the complaint was filed,

21  what did you understand Pandora's claims to be?

22    A.   Pandora's claims were they had a patent

23  and Chamilia was violating their patent and --

24  violating their patent.

25    Q.   And that's it?

**Julkowski, Jeffrey (5/12/05)**          **Page 132**

00133

1

2    A.   That's what patents, copyrights and

3  trademarks.

4    Q.   Did you understand that Pandora was

5  claiming that Chamilia was violating their

6  copyrights in their jewelry designs?

7    A.   It was part of the complaint, correct.

8  They said that we were violating their patents,

9  trademarks and copyrights, correct.

10    Q.   And what copyrights was Pandora

11  claiming that Chamilia copied?

12    A.   What copyrights Pandora had.

13    Q.   Which were those?

14    A.   I don't know.  I know what ours are.

15  I'm not sure what Pandora's copyrights are.

16    Q.   What copyrights were the subject of the

17  lawsuit brought by Pandora against Chamilia?

18    A.   I would assume that it would be

19  Pandora's copyrights of what they had copyrights

20  on.

21    Q.   Do you know?

22    A.   I don't know what Pandora's copyrights

23  are.

24    Q.   You didn't know at the time of the

25  complaint what the copyrights were that were the

**Julkowski, Jeffrey (5/12/05)**                **Page 133**

00134

1

2 subject of the action?

3    A.   From this it was --

4    Q.   From your memory.

5    A.   From my memory it was a claim that we

6 violated their trademarks, copyrights and

7 patents.  To do this settlement was all part of

8 what we -- the company came to an agreement on.

9 I'm not exactly sure what everything happened,

10 but we just came to an agreement on that

11 disagreement.

12    Q.   What do you understand Pandora's

13 copyrights to be at the time they filed the

14 complaint?

15       MR. GOGGIN:  He said he didn't know.

16    Asked and answered.

17    A.   I don't know.  I wasn't aware to who

18 Pandora was until I received the lawsuits.

19    Q.   What beads were Chamilia selling at the

20 time Pandora brought the lawsuit in September

21 2003?

22    A.   Different beads.  The collection is

23 always growing and changing.  I'm not sure what

24 was in the collection at that time.

25    Q.   What system was Chamilia using to

**Julkowski, Jeffrey (5/12/05)**          **Page 134**

00135

1

2 fasten beads onto their chains at that time?

3    A.    System was a thread.

4    Q.    Is that the same system they use today?

5    A.    No.

6    Q.    As a result of the lawsuit, was

7 Chamilia required to change that system attaching

8 beads?

9        MR. GOGGIN:  Objection to the extent

10      the witness can answer this question.  This

11      question calls -- the settlement was

12      negotiated by counsel.

13    Q.    You can answer the question.

14    A.    I don't think Pandora made us do

15 anything.  We agreed to stop producing beads.

16    Q.    As a result of the lawsuit, did

17 Chamilia change the system by which they fastened

18 beads onto their bracelet?

19    A.    Around that time the system was

20 different.

21    Q.    Was that as a result of the lawsuit?

22    A.    No, design considerations and customer

23 input.

24    Q.    Did a court order you to change the

25 system of attaching beads onto your chains?

**Julkowski, Jeffrey (5/12/05)**            **Page 135**

00136

1

2    A.    I don't recall the court saying -- I

3  never went to the court.  So I don't know.

4    Q.    But you don't recall that?

5    A.    I don't recall.

6    Q.    The Chamilia chains still utilize a

7  thread mechanism on their chains, right?

8    A.    I'm sorry.

9    Q.    They still utilize a thread mechanism?

10    A.    There's a thread at the front of it.

11    Q.    At any time was Chamilia ordered to

12  restrain from selling it's jewelry products?

13    A.    Yes.

14    Q.    And when was that?

15    A.    Right around this exact same time that

16  the lawsuit came.

17    Q.    Why were they required to do that?

18    A.    Our attorney said stop selling it.  I'm

19  not exactly sure what got us to that point.  He

20  said stop selling it.  He said take my word on

21  this, don't do it.

22    Q.    Was a court order issued requiring

23  Chamilia to cease the sale of its jewelry

24  products?

25    A.    Yes.

00137

1

2    Q.    And which jewelry products was Chamilia

3  required to cease the sale of?

4    A.    It was, I believe looking back from

5  that, I was given a list that was included in the

6  lawsuit.  There's a list of item numbers.

7    Q.    Was that the entire line of jewelry

8  products?

9    A.    No.

10    Q.    What was excluded?

11    A.    Some different pieces.  I'm not exactly

12  sure what was or wasn't included.  I remember

13  just mathematically counting one time.  It was

14  not 100 percent.

15    Q.    Was it 95 percent?

16    A.    I have no idea.

17    Q.    Was it 90 percent?

18    A.    I have no idea.

19    Q.    Was it over half?

20       MR. GOGGIN:  He says he has no idea.

21    Q.    Was it over half?

22    A.    I have no idea.  It was a portion.  I

23  don't know what the percentage was.

24    Q.    You remember physically counting the

25  beads?

**Julkowski, Jeffrey (5/12/05)          Page 137**

00138

1

2    A.    I didn't count the beads physically.  I

3  saw -- I counted on a piece of paper that how

4  many pieces are in a collection, how many pieces

5  we were told to stop selling.  But not the same

6  number.

7    Q.    Did you communicate with your customers

8  at any time that you were required to cease the

9  sale of your jewelry products?

10    A.    We did and Pandora did, yes.

11    Q.    Who did you communicate that to?

12    A.    Customers.

13    Q.    Yes, which ones?

14    A.    Customers, whoever probably at that

15  time -- I don't know the customers.  Looking back

16  what we would have to probably -- obviously do is

17  contact the customers about the product.

18    Q.    How many customers was that?

19    A.    I don't recall.  60, 70, 50.  You know,

20  it could have been a hundred.  I wasn't involved

21  with the shipping packages.

22    Q.    Were you involved in maintaining the

23  customer list?

24    A.    It was -- not maintaining it, no.  I

25  had access to it in the system, in the

00139

1

2  QuickBooks.

3      Q.   So in the fall of 2003, how many

4  customers did Chamilia have?

5      A.   Fall of -- what month?  I have no idea.

6      Q.   September.

7      A.   I'm not exactly sure.  I know at that

8  time part of this document was providing all that

9  information to Pandora.  So they had 100 percent

10  of the customer list at that time.

11     Q.   So approximately how many customers did

12  Chamilia have in September of 2003?

13     A.   40 to 100.  No idea.  It's just a

14  guess.  It's a hundred percent guess.

15     Q.   How many customers did Chamilia have in

16  August of 2003?

17     A.   Fractions of that, probably ten, 15

18  customers.

19     Q.   How many customers did Chamilia have in

20  July of 2003?

21     A.   I'm sorry.

22     Q.   How many customers?

23     A.   In July of 2003?

24     Q.   Um-hum.

25     A.   July of 2003, zero probably.

**Julkowski, Jeffrey (5/12/05)                    Page 139**

00140

1

2    Q.   Did you personally communicate with

3  customers that you were ordered -- Chamilia was

4  ordered to cease the sale of its jewelry

5  products?

6    A.   Yes.

7    Q.   And who did you communicate to?

8    A.   Customers.

9    Q.   Do you have any specific names?

10    A.   No.  I mean, whoever the customers were

11  at that time.

12    Q.   What exactly was Chamilia restrained

13  from doing as a result of the restraining order?

14    A.   Selling the product.

15    Q.   Which product was that?

16    A.   The product that had we had at the

17  time, beads, bracelets, necklaces.

18    Q.   Can you describe the necklaces?

19       MR. GOGGIN:  Objection.  Asked and

20    answered.

21    A.   Silver necklace.

22    Q.   Who designed the jewelry beads sold by

23  Chamilia at that time the restraining order was

24  issued?

25       MR. GOGGIN:  Objection.  Asked and

**Julkowski, Jeffrey (5/12/05)**            **Page 140**

00141

1

2    answered.  You went through this with Dove

3    earlier on the record.

4        MS. SHORT:  We've never even touched on

5    that question before.

6        MR. GOGGIN:  Yes, you have.

7    Definitely.

8    A.    You asked --

9    Q.    Who designed the jewelry beads sold by

10   Chamilia at the time the temporary order was

11   issued?

12   A.    Dove --

13   Q.    Temporary restraining order?

14   A.    Dove was.

15   Q.    Did you contact your sales

16   representatives to inform them that you were

17   ordered to cease the sale of your jewelry

18   products?

19   A.    Yes.

20   Q.    And who were your sales reps at the

21   time?

22   A.    I'd have to go back and recall -- I

23   don't recall at that time who were sales reps.

24   At that time it was very limited of the number of

25   sales reps we had.  And after that time, I don't

**Julkowski, Jeffrey (5/12/05)**          **Page 141**

00142

1

2  recall who they exactly were.

3    Q.    How many did you have?

4    A.    I believe -- I don't know how many

5  sales reps we had.  I believe there's one sales

6  rep company at that time.

7    Q.    And who was that?

8    A.    Whirlow & Associates.

9    Q.    What did you communicate to them about

10  the order restraining you from the sale of your

11  jewelry products?

12    A.    They received the same document too,

13  so...

14    Q.    Go ahead.  I'm sorry.

15    A.    Pandora sent I believe Whirlow &

16  Associates the same document.  And it is to stop

17  selling product also.

18    Q.    What did you tell Whirlow & Associates

19  about the order requiring you to cease the sale

20  of your jewelry products?

21    A.    I didn't know exactly what it meant.

22  As we were speaking with our counsel, the

23  recommendation was to stop selling it.  We just

24  took our counsel's advice and told or asked

25  everyone to stop selling it.

**Julkowski, Jeffrey (5/12/05)**          **Page 142**

00143

1

2    Q.   What did you understand the reason for

3  your requirement, your order to stop selling the

4  product?

5    A.   Because the document -- the attorneys

6  told us to stop selling the product.

7    Q.   But did you have an understanding as to

8  why?

9        MR. GOGGIN:  Any understanding he had

10       would come from his counsel.  And I'm going

11       to object to this question and tell him not

12       to answer it.

13    Q.   Did your sales reps, which was Whirlow

14  & Associates at the time, ask you why you were

15  required to cease the sale of your products?

16    A.   They had the same documents as us,

17  correct.

18    Q.   Right.  So did they ask you?

19    A.   We recommended not -- that they didn't

20  sell it.

21    Q.   Did you order them not to sell it?

22    A.   We told them not to sell it.

23    Q.   You told them?

24    A.   Yes.

25    Q.   What did you communicate to them about

**Julkowski, Jeffrey (5/12/05)**          **Page 143**

00144

1

2  the lawsuit?

3      A.    What it said and what the attorneys

4  told us to say.

5      Q.    What did you understand the lawsuit to

6  be about that you communicated to the sales

7  associates?

8      A.    That we were told not to sell our

9  products, to stop selling the product.  People

10  started shipping product back to us.

11     Q.    Who started shipping product back to

12  you?

13     A.    Customers.

14     Q.    Which customers were those?

15     A.    Whoever the customers were at that

16  time.

17     Q.    How did customers know to ship the

18  product back to you?

19     A.    They would stop selling it.  If they

20  can't use product, they sent it back to us

21  automatically.

22     Q.    How did they know that they were not

23  allowed to sell the product anymore?

24     A.    Because we asked them not to or told

25  them not to sell it.  And Pandora sent them

**Julkowski, Jeffrey (5/12/05)**          **Page 144**

00145

1

2 letters.

3    Q.    Have you seen copies of letters that

4 Pandora sent your customers in fall of 2003?

5    A.    Yes, customers faxed them to us all the

6 time.

7    Q.    Do you still maintain those?

8    A.    I don't have -- I don't know where they

9 are personally.  They are in the file I would

10 think.

11    Q.    In your office?

12    A.    I don't know where they are now.  We

13 moved offices.

14    Q.    But they're in a file somewhere?

15    A.    Yes.  I mean, all the documents were

16 part of the lawsuit.

17    Q.    That's maintained by Chamilia, those

18 files?

19        MR. GOGGIN:  Or its counsel.

20    A.    Counsel.  We moved firms, so they had a

21 lot of the documents.

22    Q.    Did you take any steps to ensure that

23 the jewelry beads and jewelry products being sold

24 by Chamilia that were the subject of the

25 restraining order were not sold by retailers?

**Julkowski, Jeffrey (5/12/05)**          **Page 145**

00146

1

2    A.    I'm sorry.

3    Q.    Did you take any steps --

4    A.    Called customers and told them not to

5 sell it, or told the sales reps not to sell it.

6    Q.    Other than that?

7    A.    Letters maybe.  I don't recall exact

8 steps.

9    Q.    What did you do with the returned

10 merchandise?

11    A.    When merchandise came back, it was part

12 of the settlement, we sent it all back to the

13 factory and melted it.

14    Q.    Who is we?

15    A.    Well, the company I mean.

16    Q.    I ask you to review Pandora Exhibit 8.

17 Have you had a chance to review that?

18    MR. GOGGIN:  No, he hasn't read it.

19    Q.    Can you review it now, please.

20    MR. GOGGIN:  You want him to read the

21 whole thing?

22    MS. SHORT:  Just so he has an

23 understand so I can question him about it,

24 sure.

25    MR. GOGGIN:  Read it.

**Julkowski, Jeffrey (5/12/05)**          **Page 146**

00158

1

2    A.    No.

3    Q.    Other than Killian Rieder, who designs

4  Chamilia jewelry products?

5    A.    I'm not exactly sure.

6    Q.    Are there other designers?

7    A.    Yes.

8    Q.    Who would have that information?

9    A.    It's just free-lancers.  Killian's the

10  designer.  Somebody draws a sketch, it's just

11  more or less an artist.

12    Q.    So who would have the information as to

13  who those free-lancers are?

14    A.    Well -- I don't have the information.

15  I don't know.

16    Q.    So you don't know who would have that

17  information?

18    A.    Killian.  She's the designer.

19    Q.    Who approves the designs of the jewelry

20  beads?

21    A.    Killian.

22    Q.    Who approves the designs of the jewelry

23  bracelets?

24    A.    Killian.

25    Q.    Who approves the designs of the jewelry

**Julkowski, Jeffrey (5/12/05)**          **Page 158**

00173

1

2    A.    It would say on the order form new

3  customer.  Or if there was a mistake, there would

4  be no customer on the list.

5    Q.    How do you receive invoices or customer

6  orders?

7    A.    Phone, fax, e-mail.

8    Q.    And from whom do you receive them?

9    A.    Customers, sales reps.

10    Q.    So you receive order forms from both

11  sales reps and customers directly?

12    A.    Yes.

13    Q.    A customer doesn't need to go through

14  his other her sales rep in order to place an

15  order with Chamilia?

16    A.    If they're have an established

17  customer.

18    Q.    And who are your established customers?

19    A.    If they have ordered from us prior.

20    Q.    And what are their names?

21    A.    I have no idea.

22    Q.    To your knowledge, since Chamilia's

23  inception, how many sales reps have been fired?

24    A.    I'd have to go back and look.  Sales

25  reps -- the company doesn't fire any sales reps.

**Julkowski, Jeffrey (5/12/05)**            **Page 173**

00174

1

2 There's been two sales groups that maybe are no

3 longer with us.

4    Q.    And when was that?

5    A.    I don't recall.

6    Q.    What was their reason for being fired?

7    A.    They -- one quit because of constant

8 harassment from customers from Pandora reps

9 saying that we're going out of business.  So they

10 got tired of fighting the fight of -- we're

11 working with customers, explaining to customers

12 that we wouldn't be going out of the business.

13    Q.    And who was that?

14    A.    That was in Minnesota was the

15 territory.  I don't even remember the name.  It

16 was an old rep.  I believe her first name is

17 Janet.  I don't know what her company was, Janet

18 Associates or something like that.

19    Q.    Jen Associates?

20    A.    Janet.

21    Q.    Is there a document in your possession

22 that would refresh your recollection as to who

23 this individual was?

24    A.    Janet is her name.  I'd have to go back

25 and look -- somewhere.  She received -- yes.

**Julkowski, Jeffrey (5/12/05)**                    **Page 174**