EXHIBIT

E

00026

1  A.  Jewelry customers or --

2  Q.  Jewelry customers.

3  A.  Approximately -- I need to clarify that.  Jewelry

4  stores or jewelry -- just anybody who buys jewelry?

5  Q.  How many customers do you call on to sell the jewelry

6  products, the customers whether they be retailers or --

7  A.  Approximately 200.

8  Q.  And do you maintain a list of those customers?

9  A.  Yes, I do.

10  Q.  How is that list maintained?

11  A.  How do you mean how is it maintained?

12  Q.  Do you have a hard copy that you --

13  A.  I keep hard copies.

14  Q.  Do you have a list on your computer?

15  A.  I wish I did, no.

16  Q.  How often do you call on individual retail customers?

17  A.  It all depends if you class a retail customer -- we

18  class them as A, B and C customers.  I could call on an A

19  customer probably every two weeks, a B customer once a

20  month and a C customer 6 to 12 weeks.

21  Q.  What do you consider an A customer?

22  A.  An A customer is a finer boutique or jewelry store,

23  more high end or one that does the most volume.  I have

24  some A customers that could be a grocery store, so I wanted

25  to clarify that.

**Shaw-Riley, Kathy 5-6-05**                    **Page 26**

00031

1 Italian charms in the last two years.

2 Q.  Italian charms?

3 A.  The Italian charms.

4 Q.  Which ones are those?

5 A.  The add-a-link.

6 Q.  And what are the brand names of add-a-link charms?

7 A.  C.G. Creations and Lavello.

8 Q.  Could you spell that?

9 A.  L-A-V-E-L-L-O.  And Sunrise and that's not a name I

10 gave you before.

11 Q.  So the bulk of your business has been selling Italian

12 charms?

13 A.  Yes.

14 Q.  And what --

15 A.  In the last two years only.

16 Q.  And has there been a change in that business?

17 A.  Yes, there has.

18 Q.  And what has been the change?

19 A.  The change is the add-a-link charms are slowing down

20 and the bulk of the business is starting to come from

21 Chamilia and a card company I represent, that's my

22 business.

23 Q.  What do you attribute the slowing down of the sale of

24 add-a-link jewelry to be?

25 A.  It's the nature of the business.  The consumer is

**Shaw-Riley, Kathy 5-6-05**                    **Page 31**

00032

1 spiffle, they move from one product to the next.

2 Q.  So approximately when did the customer start moving

3 away from the add-a-link charms to the Chamilia product?

4 A.  Approximately in the last six to nine months.

5 Q.  So back in late 2003 when you say you began selling

6 the Chamilia jewelry products, was your sale less than the

7 Italian charms, add-a-link bracelets?

8 A.  Repeat the time frame, please.

9 Q.  You began selling Chamilia jewelry products in late

10 2003; isn't that what you said?

11 A.  Correct.

12 Q.  Back in late 2003 you also were selling Italian

13 charms, add-a-link bracelets?

14 A.  Yes.

15 Q.  At that time were you selling more Italian add-a-link

16 bracelets than Chamilia jewelry products?

17 A.  Well, probably I need to clarify it for you.

18 Q.  Okay.

19 A.  We're talking two different entities.  The Italian

20 charms are $1.25.

21 Q.  1.25?

22 A.  Wholesale, I'm speaking wholesale.

23 Q.  Each piece?

24 A.  Each piece.  Chamilia at that time was $5.50 starting

25 prices.  So at that point in time the bulk of my business

**Shaw-Riley, Kathy 5-6-05**                    **Page 32**

00033

1 still was coming from the Italian charms just because of

2 sheer volume, but as far as wholesale price, the bulk was

3 coming from Chamilia.

4 Q.  So you were selling more of the add-a-link charm

5 bracelets than Chamilia products; however, your income

6 received from the Chamilia products was greater than the

7 income you received from the add-a-link charms?

8 A.  It was probably at that point in time that you're

9 speaking about even.

10 Q.  In the industry the Italian add-a-link bracelets were

11 more popular with consumers than the Chamilia jewelry

12 products?

13 A.  It depends on what portion of the U.S. you're speaking

14 about.  In Indiana, yes.

15 Q.  And that was back in late 2003?

16 A.  Correct.

17 Q.  When did you notice a change in the trend in the

18 purchasing decisions of consumers in your territory?

19 A.  Purchasing trends?  Everything got a lot different

20 last year probably, I would say spring and summer of 2004.

21 Q.  What do you mean when you say everything got a lot

22 different?

23 A.  Well, the economy has taken a nose dive so anything in

24 this industry has changed and people are being very

25 particular about how they spend their money and what they

**Shaw-Riley, Kathy 5-6-05**                          **Page 33**

00034

1 spend it on.

2 Q.  And how has that affected your business?

3 A.  Well, my income is down.

4 Q.  And --

5 A.  It's a very tough industry out there, very

6 competitive.

7 Q.  In spring and summer of 2004, were you selling the

8 Chamilia jewelry products exclusive in your territory?

9 A.  Yes, I was.

10 Q.  And who do you consider competitors of Chamilia

11 jewelry products?

12 A.  Pandora, Unodomani, Pasha, Zo beads.

13 Q.  Any others?

14 A.  There are some others, but I don't really -- Biagi.

15 Q.  Why do you characterize those five brands, Pandora,

16 Unodomani, Pasha, Zo beads and Biagi to be competitors?

17 A.  Those are all sterling silver and gold beads.

18 Q.  Is there any similarities in how the beads are

19 attached to the chain?

20 A.  Excuse me, Troll is another one.

21 Q.  Okay.

22 A.  They're all made the very same way.

23 Q.  Which is how are they made?

24 A.  You screw the beads on to or slide -- you screw the

25 beads on to the cylinder or tubular bracelet and you slide

**Shaw-Riley, Kathy 5-6-05**              **Page 34**

00072

1  agreement?

2  A.  I don't recall the time, probably January, February of

3  '04 maybe -- now I'm getting my years confused.

4  Q.  Do you still have the settlement agreement?

5  A.  No, I don't think so.

6  Q.  Did you read the settlement agreement?

7  A.  No, I read the agreement had been settled and put it

8  in my briefcase to have in case questions came up when

9  everybody kept telling me there was a lawsuit going on

10  between Chamilia and Pandora and I had the document to show

11  there was no longer a lawsuit.

12  Q.  What was the reason that Chamilia sent this settlement

13  agreement to you?

14  A.  Well, a lot of my retailers had been saying that they

15  should not buy Chamilia because the Pandora reps and

16  Pandora was telling them that they had a patent and that

17  Chamilia was going against their patent and that their

18  goods would be confiscated if they bought it and they

19  should not buy Chamilia because we would be out of business

20  in a short amount of time.

21  Q.  So did you request a copy of the settlement agreement

22  from Chamilia?

23  A.  Yes, I did.

24  Q.  And how do you know that -- to request the settlement

25  agreement?

**Shaw-Riley, Kathy 5-6-05**                    **Page 72**

00073

1  A.  Because I had been told the lawsuit had been settled.

2  When I had retailers keep asking me about it, I finally

3  asked about this lawsuit, what was going on and was told it

4  was settled.

5  Q.  And who sent the settlement agreement to you?

6  A.  I believe it was Jeff that faxed it, but I don't know

7  exactly who faxed it.  It just came across as a fax.

8  Q.  And when did you first learn that there was a lawsuit

9  between Chamilia and Pandora?

10  A.  When I first started selling the line in January is

11  when many retailers said oh, yeah, Pandora is suing

12  Chamilia for patent infringement.

13  Q.  Who said that to you?

14  A.  Retailers.

15  Q.  Do you remember which ones?

16  A.  Oh, gosh, there were -- Gingerbread Cottage once told

17  me there was, The Village Shop said they knew of a lawsuit,

18  there wasn't -- the Merle Norman account, I'm not saying

19  these were all at the same time in January, I'm just

20  stating accounts that have said that there was a lawsuit,

21  the Charm Heaven in the Castleton Square Mall, he had

22  locations at Castleton and Greenwood at that time, there

23  was a jewelry kiosk in the Castleton Square Mall, there

24  was --

25  Q.  All of these entities communicated to you that Pandora

**Shaw-Riley, Kathy 5-6-05**                     **Page 73**

00074

1  was involved in a lawsuit with Chamilia prior to January of

2  2004?

3  A.  They don't -- they didn't give me a time.  They said

4  there was a lawsuit going on.

5  Q.  When did they communicate this to you, over what

6  period of time?

7  A.  From January on and it's still going on.

8  Q.  And when was the first time someone approached you

9  discussing the Pandora and Chamilia lawsuit?

10  A.  Probably January, that same January.

11  Q.  And do you recall what was discussed?

12  A.  Well, like I said they all said to me that Pandora had

13  a patent on the beads, they were suing Chamilia, they were

14  going to win, that Chamilia was infringing on their patent

15  and that they would be putting us out of business and if

16  they had the product, that they stood the chance of having

17  the product confiscated because of a patent infringement

18  and losing their merchandise that they would have in the

19  store; so that they should not buy Chamilia because we

20  would not be in business.

21  Q.  And did retailers indicate to you from whom they

22  received this information?

23  A.  Most of them indicated they received it from the

24  Pandora reps or either at the Pandora booth at one of the

25  trade shows.

**Shaw-Riley, Kathy 5-6-05**                    **Page 74**

00089

1 jewelry products as a result of the lawsuit between

2 Chamilia and Pandora?

3 A. No.

4 Q. Did customers -- any of your customers communicate to

5 you that they would not sell Chamilia jewelry products as a

6 result of the first lawsuit between Chamilia and Pandora

7 Jewelry products?

8 A. Yes.

9 Q. Who were those?

10 A. Well, I have listed to you several of them, Rustic

11 Hutch, Charm Heaven, Merle Norman.

12 Q. These are retailers that have indicated that they will

13 not carry Chamilia jewelry products because of the first

14 lawsuit?

15 A. They have told me -- their words as I have stated

16 before, that they knew that Pandora was suing Chamilia and

17 that their goods would be confiscated if they carried them

18 and we would be out of business and they couldn't risk the

19 financial loss of carrying Chamilia if indeed that

20 happened.

21 Q. Did any customers communicate to you that they would

22 not carry Chamilia jewelry products because Chamilia had

23 been found to infringe Pandora copyrights?

24 A. I had never heard the word copyright. I have always

25 only heard that there was a patent infringement from my

**Shaw-Riley, Kathy 5-6-05**          **Page 89**

00090

1 retailers. Another one of the stores I tried to sell to

2 was Details.

3 Q. In any of Chamilia's marketing materials that you have

4 seen, does Chamilia indicate when they first started

5 selling their jewelry line?

6 A. No, not to my knowledge.

7 Q. Do customers ever ask you when they first started

8 selling their jewelry line?

9 A. No.

10 Q. What type of advertising do you do on behalf of

11 Chamilia?

12 A. I don't do any.

13 Q. Where does Chamilia advertise its products, if you

14 know?

15 A. They advertise in brochures, trade publications and

16 some consumer publications.

17 Q. Fashion magazines?

18 A. Yes.

19 Q. Do you know the names of those magazines?

20 A. One is Elle.

21 Q. Does Chamilia advertise on the Internet?

22 A. Not to my knowledge.

23 Q. Does Chamilia maintain a website?

24 A. Yes.

25 Q. And at what web address?

**Shaw-Riley, Kathy 5-6-05**                    **Page 90**

00109

1  A.  Are we talking March or July?

2  Q.  Sorry, March 2004, I apologize.

3  A.  How many were with me, Pat Mullens was in attendance

4  and there were several of my manufacturers there and

5  customers.  I don't have an exact number.

6  Q.  Does it cost anything to attend a gift show?

7  A.  No.

8  Q.  How do you gain access to the Chicago Gift Show?

9  A.  You have to be a manufacturer or manufacturer's rep or

10  a retail store.

11  Q.  Do you recall having a conversation with anyone about

12  Pandora at the Chicago Gift Show in March of 2004?

13  A.  Yes, Jody Henderson.

14  Q.  And who is Jody Henderson to your knowledge?

15  A.  To my knowledge she is the Pandora rep in Downstate

16  Illinois.

17  Q.  And how do you know that?

18  A.  Because she told me she was.

19  Q.  And when did she tell you that?

20  A.  At that gift show.

21  Q.  Did you exchange business cards?

22  A.  I believe -- I don't recall.

23  Q.  Did you exchange contact information?

24  A.  No.

25  Q.  Can you please describe how the conversation with Jody

00110

1 Henderson was initiated?

2 A.   We both represent the Message Connection line and we

3 were in their booth.

4 Q.   And what does Message Connection sell?

5 A.   It is a bracelet.

6 Q.   And what type of bracelet is it?

7 A.   A locket-type bracelet.

8 Q.   Is that a competitor of Chamilia jewelry products?

9 A.   No.

10 Q.   And how do you know that Jody Henderson reps for

11 Message Connection?

12 A.   Because she came into the booth as their

13 representative for Downstate Illinois.  We were both there

14 as representatives of Message Connection.

15 Q.   So you were both working the booth at Message

16 Connection?

17 A.   We were both visiting the booth.  I was working the

18 booth and I don't know if she was working it or just came

19 to visit.  She was in blue jeans and had her little girl

20 with her, so I don't know what she was doing.

21 Q.   And how was the conversation between you and Jody

22 initiated?

23 A.   I don't know which one of us started it, but she had

24 on Pandora bracelets and I said oh, you represent Pandora,

25 she said yes and I said I represent Chamilia and she said

**Shaw-Riley, Kathy 5-6-05**                    **Page 110**

00111

1  you know there is a lawsuit and we're going to put you out

2  of business and I said if you're referring to the

3  lawsuit -- and she said there is a lawsuit against Chamilia

4  for a patent infringement and we're going to put you out of

5  business and I said well, I beg to differ but to my

6  knowledge there was a settlement of that lawsuit.  She said

7  we have another one against you, you're infringing on all

8  of our patents and you will not be able to sell that line

9  and I just -- at that point in time she was getting

10  confrontational and we were in a -- we were in another

11  manufacturer's booth at the time, they were there, there

12  were customers walking up and down the aisle and I just

13  said Pandora has a lovely product and we have a lovely

14  product and I wish both companies the best and I left.

15  Q.   At that time you were working the booth, yet you left

16  at that time?

17  A.   We are free to go.  We're not actually -- and I told

18  the manufacturer that I was leaving.

19  Q.   There is not a scheduled set of time where you man a

20  booth on behalf of one of your companies you rep for?

21  A.   No, I would not just irresponsibly leave a booth

22  unmanned.

23  Q.   How long was your conversation with Jody Henderson?

24  A.   Not long, maybe 5 to 10 minutes.

25  Q.   And how long of that 5 to 10-minute conversation did

**Shaw-Riley, Kathy 5-6-05**          **Page 111**

00112

1  you discuss a conflict between Chamilia --

2  A.  Almost all of it.

3  Q.  And how large is the Message Connection booth at the

4  trade show?

5  A.  10 by 10 or 10 by 8.

6  Q.  Is that pretty standard for most trade shows?

7  A.  Yes.

8  Q.  Where were you standing in the booth when you had the

9  conversation; were you in the booth?

10  A.  I was in the booth.

11  Q.  Where were you standing?

12  A.  If you're looking at the booth, I was on the

13  right-hand side, she was in the center of the booth and the

14  owner of Message Connection was at an angle and behind her

15  and the rep for Message Connection out of Illinois was also

16  in the booth.

17  Q.  What is the Ladd Group?

18  A.  The Ladd Group is an umbrella of the Message

19  Connection.

20  Q.  It is an umbrella to what, I'm sorry?

21  A.  Message Connection.

22  Q.  What do you mean by umbrella?

23  A.  They go by the Ladd Group and they go by the Message

24  Connection.

25  Q.  They are the same entity?

**Shaw-Riley, Kathy 5-6-05**                **Page 112**

00113

1  A.  I believe they are the same entity.

2  Q.  Was anyone else present during your conversation with

3  Jody Henderson?

4  A.  I had a customer come by.  I do not know if she heard

5  the conversation or not, but there were other manufacturers

6  to our right and to our left and the owner was there and

7  like I said another Illinois rep group and there were

8  booths right across from us or people in booths right

9  across the aisle from us.

10  Q.  And how many people were in the booth, if you recall,

11  at the time having a conversation?

12  A.  Four of us and Jody's little girl.

13  Q.  So there were five total, including you and Jody

14  Henderson?

15  A.  Correct -- no -- yes, correct.

16  Q.  Is Chamilia jewelry products displayed in the Message

17  Connection booth?

18  A.  No, it's not.

19  Q.  What is the layout of the booth?

20  A.  It had a table along the back and I believe two tables

21  on each side.

22  Q.  And where were the other people that you referred to

23  standing in relation to where you and Jody were having your

24  conversation?

25  A.  I was standing to the right, Jody was standing mostly

00114

1  in the middle of the booth, her little girl was beside her,

2  the Illinois rep and the owner of Message Connection were

3  standing back by the back table.  It is a very small booth

4  and very cramped, so there were just inches between all of

5  us.

6  Q.  Did you speak with anyone from Message Connection

7  about your conversation with Jody Henderson?

8  A.  I think that -- to my recollection I apologized that

9  there was any kind of confrontation in her booth.

10  Q.  And how did she respond?

11  A.  She said it's okay.

12  Q.  Did she indicate that she heard the conversation?

13  A.  No, we were --

14  Q.  Did you discuss your conversation you had with Jody

15  Henderson with anyone else?

16  A.  Yes, I did.

17  Q.  And who did you discuss it with?

18  A.  Reggie and Lisa and Pat Mullens and either Killian or

19  Jeff.

20  Q.  When did you tell Reggie about your conversation with

21  Jody Henderson?

22  A.  Probably after I got home from the show.

23  Q.  And what did you tell Reggie?

24  A.  I just said I can't believe this happened and it was

25  confrontational and it was very uncomfortable being in

**Shaw-Riley, Kathy 5-6-05**                    **Page 114**

00115

1  another manufacturer's booth having her go on and on about

2  how Pandora is suing us and putting us out of business.

3  Q.  And how did Reggie respond?

4  A.  He just said that's pretty unprofessional.

5  Q.  And you called to relay this conversation to him?

6  A.  Yes, I did.

7  Q.  Did you have any subsequent discussions with Reggie

8  regarding your conversation with Jody Henderson?

9  A.  Not that I recall.

10  Q.  And when did you speak with Pat Mullens about your

11  conversation with Jody Henderson?

12  A.  At that show.

13  Q.  How soon after your conversation with Jody Henderson

14  did you speak with Pat Mullens?

15  A.  Probably within hours.

16  Q.  And how did the conversation come up?

17  A.  I told Pat you're not going to believe what just

18  happened.

19  Q.  And what did you say?

20  A.  I just said -- and I didn't know Jody's last name at

21  the time, I just said -- I used the term the Downstate

22  Illinois rep just verbally let me have it saying that

23  Pandora was suing Chamilia and putting us out of business

24  and how we had infringed on a patent.

25  Q.  How do you know that Jody Henderson was the Downstate

**Shaw-Riley, Kathy 5-6-05**          **Page 115**

00116

1  rep for Pandora?

2  A.  Because she told me she was the Illinois rep and Pat

3  Mullens is the Downstate rep for Reggie for Chamilia and

4  Jody and Pat are in the same territory.

5  Q.  When did you speak with Lisa about your conversation

6  with Jody Henderson?

7  A.  I don't know, sometime that week or after I got home.

8  Q.  Was that the sole purpose of contacting Lisa?

9  A.  Probably not.

10  Q.  What was Lisa's reaction to your contact with Jody?

11  A.  She said another Pandora incident and I said yes, they

12  just won't leave us alone.

13  Q.  What did you mean by yes, they just won't leave us

14  alone?

15  A.  Well, Pandora just won't quit badmouthing us in the

16  marketplace and saying that they have a patent, that

17  they're suing us, that we're going to be out of business.

18  Q.  So prior to March of 2004, what had you heard that

19  Pandora was saying about Chamilia prior to March 2004?

20  A.  I told you in January when I started trying to sell

21  Chamilia, a lot of my retailers had said but there is a

22  lawsuit and Pandora says you're going to be out of business

23  and you're no longer going to be able to do it.

24  Q.  Is it possible that they were referring to the

25  copyright infringement lawsuit?

**Shaw-Riley, Kathy 5-6-05**                    **Page 116**

00117

1   A.   They always said patent to me.

2   Q.   They never spoke generally about a lawsuit between

3   Chamilia and Pandora?

4   A.   I suppose but mostly it was they said that they had

5   been told by their Pandora reps that there was a lawsuit

6   about the patent.

7   Q.   Did Lisa ask you to take any action with respect to

8   your conversation with Jody?

9   A.   No.

10   Q.   How did she, if at all, advise you to respond to

11   similar conversations should they occur?

12   A.   I don't think she necessarily advised me to respond to

13   the conversations.  I just --

14   Q.   Have you received any instructions from Reggie as to

15   how to respond to retailers discussing Pandora products

16   with you?

17   A.   No, I know how to respond.

18   Q.   And how is that?

19   A.   I always respond in a positive way, that there is room

20   for everybody in this industry, there is no lawsuit, if

21   they have the patent, then why aren't they suing Zo, Pasha

22   and everybody else out there that has the very same product

23   and I have said are they going to sue everybody and put

24   everybody out of business and have just said there is room

25   for all of us in the industry and to my knowledge they must

**Shaw-Riley, Kathy 5-6-05**                    **Page 117**

00118

1  be more afraid of our competition than anybody else's or

2  they would be trying to go after them, too.

3  Q.  What is your basis for saying that Pandora is not

4  going after anyone else?

5  A.  Well, I have not heard one other lawsuit that Pandora

6  is trying to put anybody else out of business and not one

7  of my retailers has mentioned any other company that

8  Pandora has said that they were going to sue.

9  Q.  Do you know whether Pandora has taken any action

10  against other manufacturers to stop the selling of their

11  jewelry designs?

12  A.  Not to my knowledge.

13  Q.  Do you know whether Pandora has written any letters to

14  retailers other than Chamilia?

15  A.  They have written letters to retailers, yes, saying

16  that they would only be allowed to carry the Pandora line

17  and that if they put in any other line but Pandora, Pandora

18  would take back their goods and no longer allow them to

19  sell Pandora.

20  Q.  Have you seen these letters?

21  A.  I did see one.  I did not read it in its entirety.

22  Q.  Where did you see that letter?

23  A.  I saw it at the Wooden Key in Carbon, Indiana.

24  Q.  And how did you come to see it?

25  A.  The store manager gave it to me.

**Shaw-Riley, Kathy 5-6-05**                    **Page 118**

00119

1 Q. And who is that?

2 A. I don't remember. I've got her name at home. I don't

3 recall it.

4 Q. What did you two discuss?

5 A. We had discussed that her boss -- I was showing him

6 the Disney line and the Murano line and hoping to get him

7 to buy Chamilia and she said well, I'm not sure Jim will do

8 that because we have Pandora and we've gotten a letter that

9 we have to sign now an agreement saying we won't carry any

10 other lines other than Pandora or they will take back their

11 goods.

12 Q. And when did you have this conversation?

13 A. I believe that was probably in November or December of

14 2004.

15 Q. Have you had any similar conversations with other

16 customers?

17 A. Yes.

18 Q. And how many others?

19 A. Well, I know that the Rustic Hutch told me that they

20 had got a letter saying that they could only sell Pandora

21 and no other lines or Pandora would take back their

22 merchandise and not allow them to continue. I had a

23 conversation just in it was either February or early March

24 with the Details store in Indianapolis saying -- she saw me

25 and I said -- I said I see you carry Pandora, it is a very

**Shaw-Riley, Kathy 5-6-05**                    **Page 119**

00120

1  pretty line and she said yes and I said I sell Chamilia,

2  have you seen our line and she said yes, I have seen it,

3  but I can only sell Pandora, we signed an agreement and we

4  play by the rules and you guys don't play by the rules and

5  I said how do you mean, she said Pandora is suing you for a

6  patent infringement and are going to put you out of

7  business and I said, you know, we were just given the

8  Disney license and I can't imagine Disney would give a

9  license to somebody that wasn't going to be in business

10  soon.

11  Q.  Was this -- this was the Rustic --

12  A.  No, this was Details.

13  Q.  Was Details ever a customer of Chamilia?

14  A.  No.

15  Q.  Do you know when Details received this letter from

16  Pandora?

17  A.  No, I do not.  They all had received it though, I do

18  know, after the fact of carrying the line.  It was not

19  prior to opening up with Pandora.

20  Q.  What do you mean by that?

21  A.  I mean they had already been carrying Pandora and did

22  not have to sign an agreement for opening up with Pandora;

23  they received the letter after the fact.

24  Q.  And do any of those retailers that you know to have

25  received letters from Pandora also carry Chamilia jewelry

**Shaw-Riley, Kathy 5-6-05**              **Page 120**

00121

1 products?

2 A.  From responses I have heard on the Gift Beat website,

3 yes, there are other retailers.

4 Q.  Any of your retailers?

5 A.  Other than Gingerbread Cottage, no.

6 Q.  Have you spoken with other sales representatives about

7 your conversation with Jody Henderson?

8 A.  No.

9 Q.  When you spoke to Jeff Julkowski about Jody Henderson

10 and your conversation, what was the content?

11 A.  Mostly the content again was I just said I can't

12 believe she did this in a manufacturer's booth.  I don't

13 understand why they can't just be happy and let everybody

14 sell their product and my feeling is it would be like you

15 buying another red blouse, we're all out there just to make

16 an honest living and money and that they're both very nice

17 lines, why is there all this confrontation.

18 Q.   And how did Jeff respond when you told him about your

19 conversation with Jody Henderson?

20 A.  He said I don't know and I said Jeff, I'm going to

21 take the high road, they're both nice lines; he said you're

22 doing exactly what you should do.

23 Q.  Did Jeff ask you to take any action with respect to

24 your conversation with Jody Henderson?

25 A.  He asked me at some point in time if I would write an

**Shaw-Riley, Kathy 5-6-05**           **Page 121**

00122

1  affidavit.  I don't even believe it was an affidavit at the

2  time.  He just --

3  Q.  And did you write an affidavit?

4  A.  I wrote a letter just stating the conversation and a

5  couple of other instances.

6  Q.  Do you still have that letter?

7  A.  No, we don't.  I believe it's sitting right here, but

8  I haven't had it.

9  Q.  To your knowledge has Chamilia ever issued a statement

10  or a communication to its sales representatives that --

11       MS. SHORT:  I ask that she not read her

12  declaration.

13  A.  Sorry.

14  Q.  It's okay.  Has Chamilia issued a statement or

15  communication to its sales representatives as to how to

16  respond to inquiries concerning Chamilia jewelry products?

17  A.  No, but I --

18  Q.  You don't receive e-mails from anyone at Chamilia

19  discussing how you should approach Pandora Jewelry products

20  or comments made about Pandora Jewelry products?

21  A.  No, but I don't have to be told what to say.  I have

22  been in the industry long enough like I've said I always

23  say Pandora is a nice product, we're a nice product, there

24  is room for everybody in the marketplace.  I'm not here to

25  badmouth Pandora or put them down; I am just here to sell

**Shaw-Riley, Kathy 5-6-05**                    **Page 122**

00123

1  Chamilia and in this industry if you were selling Italian

2  charms, you had -- a retailer would have five or six

3  different lines of the same product and I don't want to

4  inhibit any of my retailers from making more money or

5  making a good living and if they can carry all the

6  different lines and have a good job and a good

7  presentation, that's what I feel they should do.  I am not

8  afraid of any competition, I guess.

9  Q.  Has Chamilia issued any statements regarding the

10 pending lawsuit to its sales representatives?

11 A.  No, not to my knowledge.

12 Q.  You haven't received any?

13 A.  No.

14 Q.  When did you first learn about the lawsuit that you're

15 now being deposed about?

16 A.  When they told me I was going to be deposed.

17 Q.  And when was that?

18 A.  Probably in the last week and a half.

19 Q.  And who contacted you telling you that you were going

20 to be deposed?

21 A.  I believe it was Troy.

22 Q.  Have you spoken to Jeff about your deposition?

23 A.  He knows I'm going to be deposed.

24 Q.  Have you ever attended the San Francisco International

25 Gift Fair?

**Shaw-Riley, Kathy 5-6-05**                    **Page 123**

00124

1 A.  Years ago.

2 Q.  With respect to Chamilia jewelry products?

3 A.  No.

4 Q.  Have you attended the Winter International Gift Show

5 in California?

6 A.  I have attended almost every gift show in the United

7 States throughout my career but none representing Chamilia

8 other than the ones I have told you about.

9 Q.  Do you recognize the name Steve Glueck?

10 A.  No.

11 Q.  Do you recognize the name Kanood Hopstrop?

12 A.  No.  Steve Glueck sounds familiar, but I don't have

13 any idea from where or how.

14 Q.  Do you know what rights a patent affords its owners?

15 A.  Yes, I do.

16 Q.  And what is that?

17 A.  If you once get a patent, nobody else can make that

18 exact product.

19 Q.  And do you know what the phrase patent pending means?

20 A.  Patent pending means you have a patent in place, but

21 you've not been awarded those rights yet.

22 Q.  A patent in place meaning what?

23 A.  Patent pending, you want it to be patented, but it has

24 not been patented yet.

25 Q.  Have you seen the language patent pending with respect

**Shaw-Riley, Kathy 5-6-05**                    **Page 124**

00125

1  to Pandora Jewelry products?

2  A.  No, I have not.

3  Q.  Can you refer to Pandora Exhibit 2, I'll refer your

4  attention to the left-hand column.

5      MR. GOGGIN:  For the record, the witness

6  testified she has never seen this before today.

7  A.  And it says copyright infringement, it doesn't say

8  patent, does it?

9  Q.  On the top left portion of the left column, the fifth

10  line, what does it indicate patent pending on jewelry has?

11  A.  I'm having a hard time reading it.  Patent pending on

12  its bracelet design.

13  Q.  So what does that phrase patent pending mean to you in

14  relation to Pandora Jewelry products?

15  A.  Patent pending means to me that they probably applied

16  with the patent office to have their product patented, but

17  it's not patented as of yet.

18  Q.  Do you know what the subject of their patent is?

19  A.  No, I do not, but I have never seen this before.

20  Q.  I understand.  Have you ever seen Pandora advertising

21  materials?

22  A.  I have seen a couple of their brochures, I believe.

23  Q.  Have you ever seen the phrase patent pending in any of

24  their advertising literature?

25  A.  I don't recall, no.

**Shaw-Riley, Kathy 5-6-05**              **Page 125**

00126

1  Q.  Do you know whether Pandora operates a website?

2  A.  I'm sure they do.

3  Q.  Have you ever seen it?

4  A.  No.

5  Q.  Does Chamilia have a patent pending for any of their

6  jewelry designs?

7  A.  Not to my knowledge.

8  Q.  Do they indicate that they have a patent pending in

9  any of their advertising literature for their jewelry?

10  A.  Not to my knowledge I have never seen it.

11  Q.  Does Chamilia hold any patents for their designs?

12  A.  I believe they do.

13  Q.  Which ones are those?

14  A.  I don't know.

15  Q.  How do you believe that they have copyrights for their

16  jewelry designs?

17  A.  Well, in this industry if you're intelligent, I'm sure

18  they are intelligent, that they would copyright some of

19  their designs so that people can't knock you off directly.

20  Q.  What does the term knock off mean to you?

21  A.  A knock off is if a company comes and copies you

22  exactly the same and puts it out there to sell, but it only

23  has to have a 20 percent difference to my knowledge to not

24  be the same and not protected under copyright law, but I'm

25  not an attorney.

**Shaw-Riley, Kathy 5-6-05**                    **Page 126**

00127

1  Q.  Do you know whether Pandora Jewelry products predated

2  the sale of Chamilia jewelry products?

3  A.  I believe possibly they did.

4  Q.  And why do you believe that?

5  A.  Because I believe I have been told that at some point

6  in time.

7  Q.  Do you know by whom?

8  A.  Probably my retailers.  Can I add something here?

9     MR. GOGGIN:  Wait until she asks a question.

10  Q.  Have you read the complaint in this action?

11  A.  No.

12  Q.  Do you know whether your name is referred to in the

13  complaint?

14  A.  I know it's referred to in the deposition.  I don't

15  know if it's referred to in the complaint.  I haven't seen

16  it.

17  Q.  Has anyone told you that your name is mentioned in the

18  complaint in this action?

19  A.  No.

20  Q.  And what is your understanding of the nature of this

21  action?

22  A.  My understanding is that we have -- Chamilia has lost

23  so much business by all the innuendoes and saying that

24  retailers -- to retailers that their goods would be

25  confiscated, that they're going to be out of business,

**Shaw-Riley, Kathy 5-6-05**                    **Page 127**

00128

1 there had to be a stop to it. I know the reps that

2 represent them -- I have personally lost a lot of business

3 because of this, so I am assuming that the nature of the

4 complaint is to just stop the confrontational comments

5 about how we're going to be out of business and how we have

6 infringed on their patent.

7 Q. You say you have personally lost business; what

8 business is that?

9 A. Well, all of the retailers that would not buy from me

10 because they made the comment we can't afford to risk

11 buying Chamilia when Pandora is telling us our goods are

12 going to be confiscated and that you guys are going to be

13 out of business.

14 Q. And which retailers are those?

15 A. The Wooden -- well, the Rustic Hutch has told me that,

16 Details has told me that, Merle Norman has told me that, I

17 believe I've listed all of them. I have lost business by

18 Pandora sending out a letter after they've already shipped

19 these manufacturers saying you can't sell anybody but us

20 when normally they would sell many of the same like

21 companies.

22 Q. So Rustic Hutch refused to purchase Chamilia jewelry

23 products from you as a result of statements made by

24 Pandora?

25 A. And signing a letter that they could carry nobody but

**Shaw-Riley, Kathy 5-6-05**                    **Page 128**

00129

1 Pandora, yes.

2 Q.  Both of those reasons?

3 A.  Yes.

4 Q.  And the statements Rustic Hutch has communicated to

5 you that Pandora has made are that there is a patent

6 pending?

7 A.  Yes, every retailer has told me patent pending -- no,

8 everybody has said patent, not patent pending, everybody

9 has stated to me that there was a patent and we infringed

10 on their patent, not pending but a patent.

11 Q.  Which retailers have communicated to you that they

12 will not carry Chamilia jewelry products based on the

13 letter agreement they signed with Pandora jewelry products?

14 A.  The Wooden Key, the Rustic Hutch, Details, I'm trying

15 to think, Merle Norman, Charm Heaven, the kiosk in the

16 Castleton Square Mall.

17 Q.  How was this communicated to you?

18 A.  Either at an appointment or over the phone.

19 Q.  Is there any written communications that customers

20 have made?

21 A.  No.

22 Q.  Other than Jody Henderson, have you spoken with any

23 other representative of Pandora Jewelry products about the

24 pending -- about a patent issue?

25 A.  No.

**Shaw-Riley, Kathy 5-6-05**          **Page 129**

00130

1 Q.  Are you aware that Pandora -- are you aware whether

2 Pandora has sent a letter to Chamilia advertising Chamilia

3 that it has a patent which has been published with the

4 Patents and Trademark Office?

5 A.  No, I'm not.

6       MS. SHORT:  I ask that the court reporter mark as

7 Pandora Exhibit 3, Bates No. PAN 00030 through PAN 00042.

8     (Exhibit No. 3, Letter, marked for identification.)

9 Q.  Please take a moment to review that document and let

10 me know when you've finished reviewing it.

11       Are you finished?

12 A.  Uh-huh.

13 Q.  Have you ever seen this document before?

14 A.  No.

15 Q.  What is your understanding of what this document is?

16       MR. GOGGIN:  I'll object to the relevance.  This

17 document, she has never seen this.  It's a letter from a

18 lawyer to a lawyer.  I don't see how it's relevant,

19 questions on this document is relevant.

20 Q.  You can answer the question.

21 A.  I have never seen the letter before.

22 Q.  What do you understand it to say?

23 A.  I understand it to be a letter written to the

24 attorneys at Chamilia to try to get them to stop selling

25 the product, but it's dated August 14, 2004 where the

**Shaw-Riley, Kathy 5-6-05**                    **Page 130**

00131

1  application is made and that is much after the fact then

2  when several companies were out there with the same

3  product.

4  Q.  Do you know whether Pandora holds a patent for its

5  Jewelry designs?

6  A.  It does not to my knowledge.

7  Q.  How do you know it doesn't?

8  A.  Well, I believe that I was told, but I'm sure if they

9  were, they would -- it says patent pending, I haven't seen

10  a document that says it's gotten the patent.

11  Q.  Has anyone communicated to you otherwise?

12  A.  Yes, I have been told that through Chamilia that there

13  is no patent on it.

14  Q.  And do you remember who communicated that to you?

15  A.  No, I do not.

16  Q.  Do you know when that was communicated to you?

17  A.  It's been recently, also, probably within the last

18  month.

19  Q.  And what would be the reason for this person to tell

20  you that there hasn't been a patent issued for Pandora

21  jewelry designs?

22  A.  I'm sure to insure their rights to still sell the

23  product.

24  Q.  Through you?

25  A.  Through everyone.

**Shaw-Riley, Kathy 5-6-05**                    **Page 131**

00132

1 Q.  Has Chamilia ever shared with you a business plan of

2 projected sales?

3 A.  No, they would not do that.

4 Q.  Have they ever indicated to you that they would expect

5 a certain amount of sales of Chamilia jewelry products to

6 retailers?

7 A.  In my territory or in the U.S.?

8 Q.  In your territory.

9 A.  They don't have to, but I'm one of the best reps in

10 the U.S.

11 Q.  How do you know that?

12 A.  I open more accounts and do more business; I'm always

13 in the top three or four.

14 Q.  You're always in the top three or four of what?

15 A.  The salespeople.

16 Q.  How do you know that?

17 A.  Lisa Whirlow and Jeff and Killian have told me.

18 Q.  Verbally?

19 A.  Yes.

20 Q.  Is there a document which reflects that you're one of

21 the top four salespeople for Chamilia?

22 A.  No.

23 Q.  Are their sales reports provided by Chamilia of sales

24 generated by individual sales reps?

25 A.  No, because we're independent reps, we would not be

**Shaw-Riley, Kathy 5-6-05**                    **Page 132**

00133

1  provided with that information.

2  Q.  Would Reggie Bowles have that information?

3  A.  I would not believe so, but I do not know that

4  information.

5  Q.  Does Chamilia generate reports of the sales made in

6  your territory by you?

7  A.  Yes, I get a sales report.

8  Q.  Who is that from?

9  A.  It's not actually -- I should correct that, I get

10  knowledge of how much has been shipped into my territory in

11  a month's time and I am aware of what I have sold for the

12  month, so I know how much business I write.

13  Q.  And how are you aware of how much business you sold?

14  A.  Because I write the orders.

15  Q.  Has Chamilia ever shared with you a prospective

16  business opportunity list of customers they'd like you to

17  target?

18  A.  No.

19  Q.  Does Chamilia ever provide you with information on new

20  products they intend to launch?

21  A.  As in new beads, yes.

22  Q.  And how often does that happen?

23  A.  Probably once every couple of months.

24  Q.  When you first started working for Pandora --

25  A.  Let me correct that.  We know that every month there

**Shaw-Riley, Kathy 5-6-05**                **Page 133**

00141

1  Square, Castleton Square, Merle Norman in Washington Square

2  and Castleton Square, Lafayette, Indiana, a jewelry store

3  in Lafayette, Indiana.

4  Q.   In paragraph five of your declaration you indicate

5  that your conversation with Jody Henderson occurred in

6  front of customers of Chamilia; is that true?

7  A.   I said customers and potential customers.  They didn't

8  necessarily have to be Chamilia customers.

9  Q.   It says here in front of other jewelry distributors,

10  customers and potential customers; so you made a

11  distinction between customers and potential customers;

12  isn't that right?

13  A.   Yes.

14  Q.   So which customers were present during your

15  conversation?

16  A.   I believe there were all kinds of customers walking up

17  and down the aisles and when you're at the Chicago shows

18  like this, anybody could be a potential customer.  I don't

19  believe I stated specifically Chamilia customers, but there

20  were customers coming in and out of the Ladd Group that

21  were their potential customers and it's not good to see

22  customers, have them coming in when there is a

23  confrontation about another manufacturer's product.

24  Q.   What is the distinction you're making between

25  customers and potential customers?

**Shaw-Riley, Kathy 5-6-05**                    **Page 141**

00142

1 A.  A customer would have been a customer that already was

2 buying Message Connection bracelets and/or other jewelry

3 product and/or potential customers who have not placed the

4 line, but you're hoping to be able to sell that line.

5 Q.  So they weren't Message Connection customers or

6 potential customers of Chamilia?

7 A.  All -- most all of my customers are potential

8 customers to all the manufacturers I represent.

9 Q.  But these specific customers that you're referencing

10 that were in and out of the booth when you were having the

11 conversation with Jody Henderson were they customers?

12 A.  Yes, one of them was a customer.

13 Q.  Who was that?

14 A.  That was the Gingerbread Cottage.

15 Q.  Who from Gingerbread Cottage was present?

16 A.  Pam Mitchell.

17 Q.  Pam Mitchell?

18 A.  Yes.  And a potential customer was a customer that was

19 with her from Elkhart, Indiana and boy, I don't recall her

20 name or the store's name, but I can get that for you.

21 Q.  And how do you know they heard the conversation

22 between you and Jody Henderson?

23 A.  I believe I stated they were standing there, I'm not

24 sure that they heard the exact conversation, but they were

25 present and around the booth at the time.

**Shaw-Riley, Kathy 5-6-05**          **Page 142**

00143

1  Q.  Did you later discuss with Pam Mitchell the

2  conversation you had with Jody Henderson?

3  A.  No, I did not.

4  Q.  I refer your attention to paragraph six of your

5  declaration.  You indicate that you have had to address the

6  same Pandora patent lawsuit with eight customers or

7  potential customers.  Who are the eight customers or

8  potential customers to which you refer?

9  A.  Okay.  Three Merle Normans, she owns three stores --

10  Q.  Three Merle Normans, so one entity owns three retail

11  locations?

12  A.  Yes.

13  Q.  So it is one customer with three exact stores?

14  A.  Correct, Charm Heaven --

15  Q.  Okay.

16  A.  -- Rustic Hutch, Interior Objects I discussed it with,

17  Wooden Keys, a kiosk in the Castleton Square Mall, I met

18  with her two times and didn't sell her, Hoppe Jewelers.

19       MR. GOGGIN:  Happy or Hoppy?

20  A.  Hoppe, H-O-P-P-E.  How many is that?  I could go on.

21  Q.  One more according to my count.

22  A.  I discussed it with Pearson's Hallmark, I discussed it

23  with Ann's Hallmark.

24  Q.  What is the date of your declaration, turn your

25  attention to the second page?

**Shaw-Riley, Kathy 5-6-05**          **Page 143**

00144

1 A.  4/13/04.

2 Q.  And the eight customers to which you refer in

3 paragraph six of the declaration were all communicated to

4 you prior to April 14 -- April 13, '04 that Pandora

5 communicated or Pandora's representative communicated to

6 you that there is a patent lawsuit?

7 A.  Yes.

8 Q.  So from starting to sell the Chamilia jewelry products

9 in January 2004 to the signing of your declaration of

10 April 13, 2004, all of these entities have discussed a

11 Pandora patent issue with you?

12 A.  Yes, and I can list more.

13 Q.  All between January '04 and April '04?

14 A.  Yes.

15 Q.  Have there been any since April '04?

16 A.  Yes.

17 Q.  And how many have there been?

18 A.  I'm not sure the exact number.

19 Q.  Do the three Merle Norman stores carry Chamilia

20 products?

21 A.  No, they carry Pandora now.

22 Q.  When you say now, did they ever carry Chamilia

23 products?

24 A.  No, but they weren't carrying Pandora either when I

25 was trying to sell them Chamilia.

**Shaw-Riley, Kathy 5-6-05**                    **Page 144**

00145

1  Q.  And when was that?

2  A.  Probably March of '04.

3  Q.  And to your knowledge do the three Merle Norman stores

4  still carry Pandora Jewelry products?

5  A.  Yes, they do.

6  Q.  Have you tried to sell Chamilia jewelry products to

7  them since they initially rejected to accept your offer of

8  Chamilia jewelry products in '04?

9  A.  No, they said they signed an agreement with Pandora.

10  Q.  When did they say that?

11  A.  Sometime that March.

12  Q.  Charm Heaven, to your knowledge do they carry Pandora

13  Jewelry products?

14  A.  They are out of business now.

15  Q.  When did they go out of business?

16  A.  I don't know.

17  Q.  How do you know they are out of business?

18  A.  Because their stores are not there anymore.

19  Q.  And when did you realize that their stores were not

20  there anymore?

21  A.  Probably January of this year.

22  Q.  What did Charm Heaven communicate to you as a reason

23  for not carrying Chamilia jewelry products?

24  A.  I walked up to their booth at the Castleton Square

25  Mall and said you carry the Pandora product and asked the

**Shaw-Riley, Kathy 5-6-05**                    **Page 145**

00146

1  clerk who was on duty, I said can I have your owner's

2  business card and she said yes, can I ask you why you want

3  it and I said I'm the Chamilia rep and I would like to show

4  him the Chamilia beads and she said well, he won't be

5  interested because we have Pandora and I said well, perhaps

6  you would like to carry both.  No, you guys have a

7  patent -- Pandora is suing you for a patent infringement

8  and that you're not going to be in business after this

9  summer anyway because they're going to be able to

10  confiscate all of your goods and we're not going to do

11  business with somebody that is not going to be in business,

12  we can't take -- he won't be able to take the risk.

13  Q.  Did this person indicate to you who communicated that

14  information to them?

15  A.  The Pandora rep.

16  Q.  And who was that?

17  A.  I don't -- I don't know for sure.

18  Q.  Who is the --

19  A.  Mary Ellen, I believe.

20  Q.  And Rustic Hutch, do they carry the Pandora line?

21  A.  Yes, they do.

22  Q.  Have they ever carried the Chamilia line?

23  A.  No, they have not.

24  Q.  Has Charm Heaven ever carried the Chamilia line?

25  A.  No.

**Shaw-Riley, Kathy 5-6-05**        **Page 146**

00147

1  Q.  When did you approach Rustic Hutch to start carrying

2  the Chamilia line?

3  A.  Just this year.

4  Q.  And when was that?

5  A.  Probably in January.

6  Q.  And why did you wait a full year after trying to

7  promote Chamilia jewelry products to approach Rustic Hutch?

8  A.  Because I have the whole state of Indiana and I can't

9  get to everybody at one time.

10  Q.  And when you approached Rustic Hutch, what was their

11  response?

12  A.  Their response was no, we carry Pandora and she said

13  we've signed an agreement with Pandora not to carry anybody

14  else and I said well, we have the Disney license and Murano

15  beads and she said we still can't carry anybody else.  I

16  said but you're also carrying Troll beads and she said that

17  is different and I said aren't they the same as Pandora,

18  she said well, it's just different.  I said okay, I was not

19  going to get into an argument with a customer.

20  Q.  Did she say anything else?

21  A.  No.

22  Q.  And --

23  A.  She said -- I believe she said there was a lawsuit or

24  a patent lawsuit that Pandora had against Chamilia.

25  Q.  But you're not sure?

**Shaw-Riley, Kathy 5-6-05**                    **Page 147**

00148

1  A.  Yes, she did say it.

2  Q.  She did.  How are Troll beads fastened to the jewelry

3  bracelets?

4  A.  They screw on, I believe.

5  Q.  Could you describe how they screw on?

6  A.  You just grab them and screw them on to the tubular

7  bracelet.  I have not had a bracelet -- a Troll bracelet.

8  I have seen one, but I have not worked with one.

9  Q.  How would you describe the tubular bracelet of

10  Chamilia's?

11  A.  Sterling silver, round bracelet with a screw-type

12  device on the end and a snap on the other end.

13  Q.  Is there any separation in the bracelet?

14  A.  How do you mean separation?

15  Q.  Is there any spacers or clips which divide or

16  segregate certain parts of the bracelet from others?

17  A.  There is a certain little round device on two places

18  on the bracelet.

19  Q.  That is separating the bracelet into three segments,

20  if there is two?

21  A.  Basically.

22  Q.  Are they evenly spaced on the bracelet?

23  A.  Yes, I believe so.

24  Q.  And what does the Troll beads bracelet look like?

25  A.  It is a silver, circular bracelet that looks just like

**Shaw-Riley, Kathy 5-6-05**                    **Page 148**

00150

1 eight customers that communicated to you that there was a

2 patent lawsuit with Pandora and Chamilia?

3 A.  Yes.

4 Q.  And what did they communicate to you?

5 A.  Just that there was a lawsuit and he was carrying

6 Pandora, but he started carrying us, too.

7 Q.  So you didn't lose Interior Objects as a customer as a

8 result to these alleged statements about a patent lawsuit

9 between Chamilia and Pandora?

10 A.  No, that's one of the very few that I didn't lose.

11 Q.  Was Wooden Keys a customer of Chamilia products ever?

12 A.  I had a purchase order for $10,000 from Wooden Keys in

13 December of '03 for a Chamilia product, but he did not

14 follow through with the purchase order.

15 Q.  How did you have a purchase order for a product in

16 December of '03 if you didn't start work for Chamilia until

17 January of '04?

18 A.  I said I was approached in October of '03, agreed to

19 sell it, could still sell but I didn't have any information

20 on it; I verbally talked to him on the phone, told him

21 about the product, the opening and he gave me a purchase

22 order for the opening amount and I believe it was for three

23 or four of his stores.

24 Q.  So from October '03 to January '04, you were promoting

25 Chamilia products?

**Shaw-Riley, Kathy 5-6-05**                    **Page 150**

00151

1 A.  Just to him.

2 Q.  He was the only customer?

3 A.  It was Christmastime, he is my major account.

4 Q.  Is he still your major account?

5 A.  He does not carry Chamilia; he is carrying Pandora, I

6 lost him to Pandora, but he is one of my -- he's still the

7 most major account in my territory.

8 Q.  Do you have a copy of the purchase order from --

9 A.  No, I threw it away after he canceled it.

10 Q.  -- from Wooden Keys?  How did you receive the purchase

11 order in December '03?

12 A.  He faxed it to me.

13 Q.  When in December '03 did he place the order; do you

14 recall?

15 A.  Probably the week before Christmas, but I don't recall

16 the exact time.

17 Q.  And how long after he placed the order did he cancel

18 it?

19 A.  Right after the January show in Atlanta.

20 Q.  And how did he communicate that he wanted to cancel

21 his order?

22 A.  I had called him to see when he wanted shipment, he

23 said -- at that point in time he said he had also heard

24 about Pandora, he was going to look at Pandora in Atlanta,

25 this was right before the Atlanta show.  When I got back, I

**Shaw-Riley, Kathy 5-6-05**                    **Page 151**

00157

1 products?

2 A.  What type of delay do you mean?

3 Q.  You indicated that customers could place an order

4 within two or three days --

5 A.  No, there may be a day late in certain products if

6 we're out of stock but never in a delay of them getting

7 product.

8 Q.  Kiosk at the Square Mall?

9 A.  Castleton Square Mall.

10 Q.  Have they ever carried Chamilia jewelry products?

11 A.  No.

12 Q.  Do they carry Pandora Jewelry products?

13 A.  No.

14 Q.  Have they ever carried Pandora Jewelry products?

15 A.  No, she did not carry Pandora because the Charm Heaven

16 was in the Castleton Square Mall, they were carrying

17 Pandora.  After the person at the kiosk told me that no,

18 she wasn't going to carry us because I went to this other

19 kiosk and met with her on two occasions, she also said you

20 know that there is a lawsuit, Pandora has a lawsuit against

21 Chamilia for the patent and everything and I said it's been

22 settled and everything.  She ended up though finally on our

23 second appointment saying I'm opting to go with Unodomani

24 because there is no lawsuit against them and I can't afford

25 to get tangled up in any legal items.

**Shaw-Riley, Kathy 5-6-05                    Page 157**

00158

1 Q.  The kiosk at Castleton Square is -- does not carry

2 Pandora?

3 A.  No, they carry now the Biagi, Unodomani.

4 Q.  So Chamilia didn't lose the business of the kiosk at

5 the Castleton Square Mall to Pandora?

6 A.  I lost the business because of Pandora.

7 Q.  But Castleton Square Mall does not carry Pandora?

8 A.  No.

9 Q.  Hoppe Jewelry --

10 A.  Yes.

11 Q.  -- have they ever carried Chamilia jewelry products?

12 A.  No.

13 Q.  Do they carry jewelry products?

14 A.  I don't know what they're doing.  I haven't been back.

15 Q.  Have they ever carried Pandora?

16 A.  I don't know.

17 Q.  Have you ever spoken to a representative of Hoppe

18 Jewelry regarding Pandora?

19 A.  Other than our meeting and she had told me she knew

20 there was a lawsuit when I was trying to sell her Chamilia,

21 that there was a lawsuit between Pandora and about how we

22 were infringing on their patent and asked me about it.

23 Q.  Did she indicate to you a reluctance to carry the

24 Chamilia jewelry line because of any statements made by

25 Pandora or its representatives?

**Shaw-Riley, Kathy 5-6-05**            **Page 158**