EXHIBIT

F

00057

1          Whirlow - Confidential

2     Q.   To your knowledge, was Chamilia

3   required to change it's round clasp?

4     A.   Yes.

5     Q.   Who required that?

6     A.   Well, I don't -- actually, when Michael

7   Lund showed up in San Francisco, I had not seen

8   the product of Pandora or Chamilia before the

9   August show.  And when Michael Lund showed up and

10  showed me that the products were alike, I made a

11  phone call and said, you know, this is

12  unacceptable.  We need to change this line so

13  that it has its own identity.

14    Q.   So it was your decision to change the

15  clasp of the Chamilia chain?

16    A.   I mean, we had discussed changing the

17  line, and then there was the legal action.

18    Q.   So was it your decision to change the

19  lock on the Chamilia chain?

20    A.   I wouldn't say it was my decision.

21    Q.   Whose decision was it?

22    A.   I would say that that was Jeff's

23  decision.

24    Q.   And when was that decision made?

25    A.   Well, I think the decision to change

**Whirlow, Lisa (5/13/05)**                    **Page 57**

00058
1          Whirlow - Confidential

2  the line was made as soon as we found out it was

3  just like Pandora's.

4     Q.    When you say the line was just like

5  Pandora's, what line are you referring to?

6     A.    The Chamilia.

7     Q.    What about the lines were similar or

8  just like Pandora?

9     A.    The beads were the same.

10    Q.    Identical?

11    A.    Pretty much.

12    Q.    The entire line?

13    A.    Pretty much.

14    Q.    When you say pretty much, can you think

15 of any beads --

16    A.    There were a few beads that they had,

17 that Chamilia had that Pandora didn't have.

18    Q.    And which ones were those?

19    A.    I don't really remember.

20    Q.    When you said you placed a call from

21 the San Francisco gift show, who did you call?

22    A.    I called Jeff.  Well, I had not -- I

23 got the product I think on Friday.  And I'd never

24 seen it.  And just had phone conversations.

25 Showed up at the San Francisco gift show, opened

**Whirlow, Lisa (5/13/05)**          **Page 58**

00059

1        Whirlow - Confidential

2  the box that Saturday morning, and was there

3  maybe an hour and a half.  And everyone had, you

4  know, seen the product.

5       And then I received -- Michael Lund

6  called my office, Whirlow & Associates, and said

7  I needed to immediately call him.  That he had a

8  worldwide patent.  And I needed to stop selling

9  the beads immediately.

10      And I did not call him back.  And he

11  called and said he was flying out to San

12  Francisco to come see me and to close me down at

13  the show because he had a worldwide patent.  And

14  I had already called Jeff and I talked to Troy.

15  And they had asked what the worldwide patent, you

16  know, the number.

17      And then when Michael Lund showed up at

18  the booth, he proceeded -- he was very pleasant,

19  proceeded to -- he was flashing a paper.  I asked

20  him for a copy saying that this was -- saying he

21  had a worldwide patent.  I asked him where he got

22  the worldwide patent, you know, what city, what

23  country, and could I have a copy.  And he said

24  no, I would be receiving it in the mail.

25      And he showed me that the beads -- you

**Whirlow, Lisa (5/13/05)**                  **Page 59**

00060

1        Whirlow - Confidential

2 know, he had his beads and showed me that they

3 were identical.

4    Q.   And when you said you called Jeff, what

5 did you discuss with him?

6    A.   Well, I had called him to tell him that

7 this phone call had occurred.

8    Q.   And what was his response?

9    A.   I think shock.

10    Q.   And what did he say?

11    A.   Well, he called Troy, who's a lawyer,

12 and had Troy call me.

13    Q.   And what did you speak with Troy about?

14    A.   About this patent, the worldwide

15 patent, you know.  And he asked me, well, you

16 know, if Michael Lund shows up, ask him, you

17 know, where the patent was.

18        And so when Michael Lund did show up, I

19 asked him.

20    Q.   What else did Troy say?

21        MR. GOGGIN:  I will instruct the

22       witness not to answer any more questions

23       about what Troy said.

24        MS. SHORT:  Based on what grounds?

25        MR. GOGGIN:  Attorney-client privilege.

**Whirlow, Lisa (5/13/05)**        **Page 60**

00068

1       Whirlow - Confidential

2   A.  I've had asked Troy to call other

3 customers.

4   Q.  And who are they?

5   A.  Carrots, Carina -- and I know he talked

6 to them.  Carina also -- they carry Pandora and

7 supposedly are Pandora's biggest customers.  And

8 they returned their product to Chamilia because

9 of the lawsuit.  And because Michael Lund told

10 them he is closing us down.  And they really

11 didn't want any part of this.

12   Q.  Where's Words Lovely Words located?

13   A.  In Oregon.

14   Q.  And Carlos Italian Charm Shop?

15   A.  Sacramento.

16   Q.  California?

17   A.  Um-hum.

18   Q.  And Petals --

19   A.  Territory.

20   Q.  Petals & Stems?  Without referring to a

21 document that's not been provided.

22   A.  I think Idaho.

23   Q.  Carrots?

24   A.  California.

25   Q.  Carina?

**Whirlow, Lisa (5/13/05)**       **Page 68**

00078

1          Whirlow - Confidential

2     Q.    And how many customers were selling

3 Chamilia jewelry products at that time?

4     A.    I don't know.

5     Q.    Was it less than ten?

6     A.    I think it was more.

7     Q.    Was it more than 50?

8     A.    I don't know that.

9     Q.    So it was somewhere between ten and 50?

10     A.    Probably.

11     Q.    And did that ten to 50 number that you

12 just gave me include the entire United States?

13     A.    Yes.

14     Q.    Does Carrots currently sell Chamilia?

15     A.    No, they sell Pandora.  And they sell

16 other lines.

17     Q.    Does Carina currently carry Chamilia

18 jewelry products?

19     A.    No.

20     Q.    Do they currently carry Pandora jewelry

21 products?

22     A.    Yes.

23     Q.    And when did they start carrying

24 Chamilia jewelry products?

25     A.    Well, they both started in I think

**Whirlow, Lisa (5/13/05)**                    **Page 78**

00079

1        Whirlow - Confidential

2 August, September.

3     Q.    When did Carina start carrying Chamilia

4 jewelry products?

5     A.    I think August.

6     Q.    Of which year?

7     A.    '03.

8     Q.    Was that one of the customers that

9 returned --

10     A.    They returned the first product and

11 then bought the new product.

12     Q.    And when was the new product purchased?

13     A.    I don't remember.

14     Q.    Was it in January of 2004?

15     A.    Probably.

16     Q.    Who designed the jewelry that was

17 offered for sale in August and September of 2003?

18     A.    I think Dove.

19     Q.    Who's Dove?

20     A.    He used to be involved with Chamilia.

21     Q.    And what was his involvement with

22 Chamilia?

23     A.    I think he did that part of it.  He's

24 no longer involved.

25     Q.    And when did he cease being involved

**Whirlow, Lisa (5/13/05)**                    **Page 79**

00085

1          Whirlow - Confidential

2   customer, a retail location ever carried their

3   product?

4      A.   Well, I'm sure they have a list.

5      Q.   So they keep a list of all prior

6   customers of their jewelry products?

7      A.   I'm sure it's in the computer.

8      Q.   Does Chamilia also keep a list of those

9   customers that carry Pandora jewelry products?

10     A.   No.

11     Q.   Do you have a list of retail locations

12  which carry Pandora jewelry products?

13     A.   No.  You, know, I mean, other than I

14  have people that carry both.  You know, some of

15  our customers carry Pandora and have mentioned

16  it.

17          There's several more people that, you

18  know, they have harassed.  I mean, going back to

19  that list, I didn't even get started on the

20  people that had been harassed.  And there's more

21  people I've had, you know, Troy Sergent call.

22     Q.   And who are the other customers that

23  you are aware of that have received communication

24  from a Pandora representative about Chamilia?

25     A.   Tina's Hallmark.

**Whirlow, Lisa (5/13/05)**              **Page 85**

00086

1          Whirlow - Confidential

2     Q.    And where are they located?

3     A.    California.

4     Q.    And what do they claim were the

5  statements made by Pandora representatives about

6  Chamilia?

7     A.    That they were closing us down.

8     Q.    Anything else?

9     A.    That they had a patent.

10    Q.    Anything else?

11    A.    I think that's enough.  I mean, you

12  know, that in itself is pretty damaging when

13  people go around saying stuff like that.

14    Q.    When did Tina's Hallmark communicate

15  this to you?

16    A.    In the beginning of 2004.

17    Q.    By what method of communication?

18    A.    Her rep Norm.

19    Q.    So you didn't personally speak with

20  Tina's Hallmark?

21    A.    I have talked to her, and that would

22  probably be in -- I even talked to her at the

23  last January show.

24    Q.    So the first time you heard that

25  statements were allegedly made by Pandora

**Whirlow, Lisa (5/13/05)**          **Page 86**

00087

1           Whirlow - Confidential

2 representatives as you've just described was in

3 early 2004?

4     A.    From her.

5     Q.    You spoke directly with Tina's Hallmark

6 and received that information?

7     A.    Um-hum.

8     Q.    Did you personally hear the statements

9 made by a Pandora representative to Tina's

10 Hallmark about Chamilia?

11     A.    No.

12     Q.    Have you personally heard any

13 statements made by Pandora representatives to

14 Tina's Hallmark that they have a patent?

15     A.    No.

16     Q.    Have you seen any written statements

17 made by Pandora representatives to Tina's

18 Hallmark that they have a patent?

19     A.    No.  I --

20     Q.    Have you -- I'm sorry.  Go ahead.

21     A.    I have not heard anyone at Pandora say

22 anything to any of these customers.  I have not

23 overheard it.  I personally heard it from Michael

24 Lund, he told me.  And Steve Glueck in the

25 following show in January, Steve Glueck

**Whirlow, Lisa (5/13/05)**                    **Page 87**

00088

1          Whirlow - Confidential

2  personally, he kept walking by our booth.  And

3  finally I stopped him and said hi, you know, are

4  you the Pandora rep and he said yes.

5     Q.   Did you personally see any written

6  communications by Pandora representatives to

7  Tina's Hallmark that they were going to shut

8  Chamilia down?

9     A.   No.

10    Q.   In addition to Tina's Hallmark, what

11  other retailers have communicated to you that

12  they have heard statements made by Pandora

13  representatives about Chamilia?

14    A.   So every person I name off you're going

15  to ask me, even though I've told you that they

16  haven't -- I didn't witness it, so we're going to

17  go through the ten questions with each customer?

18    Q.   I'm sorry.  I understand you're asking

19  me a question, but you're not really in the

20  position to ask any questions.  I'm the one

21  asking questions.

22         If you could answer the question, I

23  would appreciate it.  If you don't understand a

24  question I'm asking you --

25    A.   Well, I mean -- I thought it was just

**Whirlow, Lisa (5/13/05)**                    **Page 88**

00090

1          Whirlow - Confidential

2   and they had Pandora bracelets on and they said

3   they worked for Pandora.

4      Q.   They communicated to you that they

5   worked for Pandora?

6      A.   Uh-huh.

7      Q.   Not through their T-shirt, but they

8   verbally communicated to you?

9      A.   Yes, I talked to them.

10     Q.   What territory did they have?

11     A.   I don't know.

12     Q.   And how old were they?

13     A.   Probably in their 40s.

14     Q.   How many of them were there?

15     A.   Two.

16     Q.   And what did they say to you about

17  Pandora?

18     A.   We just talked about, you know, the

19  lines, that they were very good -- you know, they

20  were both pretty lines.  And I told them to tell

21  Michael Lund hi for me.

22     Q.   Did they discuss Chamilia with you?

23     A.   They looked at the bracelets that we

24  had on our hands, hand.

25     Q.   Other than Tina's Hallmark in

00091

1          Whirlow - Confidential

2  California, what other retail locations have

3  communicated to you that they have heard

4  statements made by Pandora representatives about

5  Chamilia?

6      A.    Charms by the Bay.

7      Q.    And where are they located?

8      A.    California.

9      Q.    And what do they claim they heard

10  Pandora representatives say about Chamilia?

11      A.    That they're closing us down.

12      Q.    Anything else?

13      A.    They had a patent.

14      Q.    Anything else?

15      A.    No.

16      Q.    Did they explain to you the reason the

17  Pandora rep gave for them being able to shut

18  Chamilia down?

19      A.    Oh, I'm sorry, they did get a letter

20  from Pandora at the very beginning.  They had --

21  and that was that they were shutting us down.

22  And they did fax me -- they faxed the letter to

23  their rep.  And their rep faxed the letter to me.

24      Q.    And where's that letter today?

25      A.    That letter?  I faxed a copy to Jeff

**Whirlow, Lisa (5/13/05)**                    **Page 91**

00093

1          Whirlow - Confidential

2     Q.   Who had communicated that he received

3 it?

4     A.   Me and Jeff.

5     Q.   And when did you have that

6 communication?

7     A.   When I faxed it to him.

8     Q.   And that was beginning of 2004?

9     A.   Yes.  And he was going to fax it to the

10 lawyers.

11    Q.   Do you know if he ever did that?

12    A.   Well, I'm sure he did.

13    Q.   Do you know if he ever did that?

14    A.   No.

15    Q.   Did you ever hear the statements made

16 by Pandora representatives to Charms by the Bay

17 about Chamilia?

18    A.   No.

19    Q.   Other than Charms by the Bay, what

20 other retail locations have communicated to you

21 that Pandora representatives have made statements

22 to them about Chamilia?

23    A.   No -- I'm sorry.  I zoned out.  You

24 keep asking the same thing.  What was your

25 question?

**Whirlow, Lisa (5/13/05)**          **Page 93**

00094

1           Whirlow - Confidential

2           MS. SHORT:  Could you repeat the

3      question, Ms. Court reporter.

4           (Record read)

5      A.   Okay.  I'm sorry.  Burlingame

6  Stationeries.

7      Q.   Burlingame?

8      A.   Burlingame.

9      Q.   Could you spell that?

10     A.   No.  Burlingame.

11          MR. GOGGIN:  B U R -- California?

12          THE WITNESS:  Yes, I think so.

13          MR. GOGGIN:  I think it's probably.

14          B U R L I N G A M E.

15     Q.   Burlingame is the name of the store?

16     A.   Stationeries.

17     Q.   And what did they communicate to you

18  were the statements made by Pandora

19  representatives about Chamilia?

20     A.   That they were shutting us down and

21  they returned their product because they didn't

22  want to be involved.

23     Q.   And when did they return their product?

24     A.   First part of '04.

25     Q.   And to whom did they return it?

**Whirlow, Lisa (5/13/05)**          **Page 94**

00097

1          Whirlow - Confidential

2    Q.    I asked Chamilia.

3    A.    Yes, they carry Chamilia.

4    Q.    And when did they start carrying

5  Chamilia?

6    A.    Beginning of 2004.

7    Q.    Do they carry Pandora?

8    A.    No.

9          MS. SHORT:  We're just going to take a

10    quick break so the gentleman can change the

11    videotape.

12          THE VIDEOGRAPHER:  We're going off the

13    record at 11:01 a.m.  This completes tape 1

14    of the deposition of Lisa Whirlow.

15          (Recess)

16          THE VIDEOGRAPHER:  We're back on the

17    record at 11:13 a.m.  This begins tape 2 of

18    the deposition of Lisa Whirlow.

19  BY MS. SHORT:

20    Q.    Ms. Whirlow, other than Burlingame

21  Stationery, what other retailers have

22  communicated to you that Pandora has made

23  statements about Chamilia?

24    A.    Blackberry Creek.

25    Q.    And what did they communicate to you

**Whirlow, Lisa (5/13/05)**               **Page 97**

00098

1          Whirlow - Confidential

2   were the statements made by Pandora

3   representatives?

4      A.   Well they had, Blackberry Creek, they

5   had said that they were closing us down.  They

6   also sold us and Pandora and they were scared and

7   they returned their Pandora --

8      Q.   Returned Pandora?

9      A.   I mean, I'm sorry, Chamilia.  And then

10   they -- that was the first of '04.  Then they

11   continued selling Pandora and then they started

12   buying Chamilia again.  And then Michael Lund

13   gave them a letter saying that they could -- that

14   they had to sign that they could only sell

15   Pandora.

16          And they -- so they sent their -- then

17   they decided to send their product back to

18   Pandora because of the harassment.  They said

19   they really didn't want to deal with Pandora

20   anymore.  And this was a big ruckus.  It was on

21   Gift Beat, which is a website that retailers go

22   on and talk on.

23          And Michael Lund -- and this is a very,

24   very nice woman with six kids, and he was very

25   rude and mean and nasty to her.  And she wrote a

**Whirlow, Lisa (5/13/05)**                    **Page 98**

00105

1          Whirlow - Confidential

2     Q.   And how did you deal with it?

3     A.   No, I told him to deal with it.

4     Q.   You told --

5     A.   Jeff.

6     Q.   You told Jeff --

7     A.   He said he's dealing with it.  Great,

8 you know, you've got a copy of it.  Do we need

9 our lawyer to call this customer, and we didn't.

10    Q.   But you don't know who that customer

11 was?

12    A.   No.

13    Q.   Other than Blackberry Creek, what other

14 customer has communicated to you that Pandora

15 representatives have made statements to them

16 about Chamilia?

17    A.    God, I wish I did have my customer list

18 here.

19         There's stores that -- Ann's Hallmark,

20 he had a chain of several stores.  And he was at

21 the San Francisco gift show and had gone to their

22 booth and was told they were shutting us down and

23 he never opened.  I don't think he opened with

24 Pandora either.  But he was going to open.  And

25 over this -- so he didn't.  And he has several

**Whirlow, Lisa (5/13/05)**                    **Page 105**

00106

1          Whirlow - Confidential

2  stores.  Country Charm is another store.

3     Q.    And who is the owner of Ann's Hallmark?

4     A.    John something.

5     Q.    When you say he, do you refer to John?

6     A.    Um-hum.

7     Q.    And what has John communicated to about

8  the statements made by Pandora representatives

9  about Chamilia?

10    A.    "You know they're saying they're going

11  to close you down, that they have a patent?"  And

12  I said yes, I know that, and it's not true.

13    Q.    And when did he make these statements

14  to you?

15    A.    In January.

16    Q.    Of this year?

17    A.    No, '04.  I'm sorry, maybe -- yes,

18  January '04.

19    Q.    And how did you know in January of '04

20  that Pandora did not have a patent?

21    A.    Well, we had tried to find -- done

22  patent searches.  Or I was told we had done

23  patent searches.  I had personally asked Michael

24  Lund and I had asked Steve Glueck what was the

25  patent number, where was it filed.

**Whirlow, Lisa (5/13/05)**          **Page 106**

00109

1           Whirlow - Confidential

2 Pandora?

3     A.    Where was John?

4     Q.    Where did the conversation occur?

5     A.    At their booth.

6     Q.    Whose booth?

7     A.    Pandora's.  At trade shows you have --

8 you rent space.  And so everybody has a booth.

9     Q.    Did you visit the Pandora booth at that

10 San Francisco January '04 trade show?

11     A.    No.  It's pretty unethical to walk into

12 someone else's booth if you're, you know, not

13 friends.

14     Q.    In addition to Ann's Hallmark, what

15 other retail locations have communicated to you

16 that they've received statements from Pandora

17 representatives about Chamilia?

18     A.    Simply Charming.

19     Q.    And what do they claim the statements

20 were that were made?

21     A.    That they were closing us down, that

22 they had a patent.

23     Q.    And who are they?

24     A.    Pandora.

25     Q.    And when did you have this conversation

**Whirlow, Lisa (5/13/05)**                    **Page 109**

00110

1  Q.  By what means of communication did you

2  have that conversation?

3  A.  They had gone to the, you know, shows

4  and -- we were like two aisles away from Pandora.

5  And you walk the aisles.  And so if people would

6  go -- you know, people who were maybe interested

7  in our product, then they, you know -- when

8  you're a buyer, you walk the whole show.  And you

9  also, if you're interested in certain items, you

10 look at all.  You know, you compare the different

11 items.

12 Q.  So your discussions with Simply

13 Charming about statements made by Pandora

14 representatives about Chamilia occurred during

15 that January '04 San Francisco trade show?

16 A.  Um-hum.

17 Q.  Did you have any other conversations

18 with Simply Charming regarding Pandora?

19 A.  She thought they were assholes.

20 Q.  Other than that?

21 A.  No.

22 Q.  Does Simply Charming carry Chamilia

23

24

25

**Whirlow, Lisa (5/13/05)**　　　　　　　**Page 110**

00113

1          Whirlow - Confidential

2     Q.    Do you live in New York?

3     A.    No.

4     Q.    Where were --

5     A.    I was in my hotel room.

6     Q.    Were you looking at any document while

7 you wrote down those names?

8     A.    No, just trying to go through my, you

9 know, my mind.

10    Q.    Okay.

11    A.    David M. Brian, he's in California.

12    Q.    And what statements do David M. Brian

13 claim were made by Pandora representatives about

14 Chamilia?

15    A.    He carries Pandora.  He was going to

16 carry Chamilia.  And due to the statements that

17 they're closing us down in the lawsuit he didn't

18 bring us in.

19    Q.    Has David M. Brian ever carried

20 Chamilia?

21    A.    No.

22    Q.    And when did you learn that David M.

23 Brian received statements from Pandora

24 representatives about Chamilia?

25    A.    I don't remember.

**Whirlow, Lisa (5/13/05)**                    **Page 113**

00115

1        Whirlow - Confidential

2    Q.    Just so the record's clear, my

3  understanding is Pandora representatives made

4  statements to David M. Brian who communicated

5  those statements to Tony Brading, and then Tony

6  Brading communicated those statements to you?

7    A.    Right.

8    Q.    At any time did you communicate those

9  statements to Jeff Julkowski?

10    A.    Probably.

11    Q.    And when was that?

12    A.    Probably when it happened.

13    Q.    Did you communicate to anyone else

14  about these statements?

15    A.    I don't think so.

16    Q.    Other than David M. Brian --

17    A.    I didn't talk to David M. Brian.

18    Q.    Other than David M. Brian, what other

19  retailers?

20    A.    Oh, okay.  Linda's Gifts.

21    Q.    And where are they located?

22    A.    California.

23    Q.    And what statements did they claim were

24  made by Pandora representatives about Chamilia?

25    A.    All these people I'm going to give you

**Whirlow, Lisa (5/13/05)**                    **Page 115**

00116

1          Whirlow - Confidential

2  the name, they all had the same statement.  You

3  know, they had a patent, they were closing us

4  down.  So if that helps any.

5          And all these people, you know, I did

6  not oversee or hear Pandora.

7      Q.    So the list you have in front of you,

8  is that an all-inclusive list of all the

9  retailers who have made communications to you

10  that Pandora representatives have made statements

11  to them about Chamilia?

12      A.    No.  Not even close.  No.  There's so

13  many more.

14      Q.    And what document would indicate who

15  those customers are?

16      A.    I would have to go through the customer

17  list.  I mean -- I wasn't about -- I didn't

18  really want to take the time to do all that.  Go

19  through the customer list and, you know, talk --

20  because it's different areas and different reps

21  and stuff.

22          To me this is all so negative and

23  upsetting.  I really -- I like to be more

24  positive and have fun and do good things and not

25  deal with negative stuff.  So I really try not to

**Whirlow, Lisa (5/13/05)**                    **Page 116**

00118

1           Whirlow - Confidential

2 representatives --

3    A.   I could determine --

4    Q.   -- about Chamilia?

5    A.   Yes, I could determine some of them.

6 This is a daily thing.  I mean -- usually some

7 things die down.  This just doesn't seem to be

8 dying down and going away.

9    Q.   What other retailers have communicated

10 to you that they received statements made by

11 Pandora representatives about Chamilia?

12   A.   Dolls & Ducks.  And he actually had

13 conversations with Michael Lund and he talked to

14 Michael Lund's attorneys.  Chuck is his name.

15   Q.   Chuck at Dolls & Ducks?

16   A.   Um-hum.  And I don't know what division

17 of the attorneys, because he had -- he had it up

18 on his website.  And had had personal

19 conversations with also Pandora's attorneys.  I

20 don't know if that's you guys or someone before.

21   Q.   And when you refer to it, what was it

22 that was on his website?

23   A.   The Pandora -- the Chamilia product.

24   Q.   And it's no longer offered for sale on

25 Dolls & Ducks?

**Whirlow, Lisa (5/13/05)**               **Page 118**

00119

1          Whirlow - Confidential

2    A.    Yes, it is.

3    Q.    So --

4    A.    But he was harassed.  I'm sorry.  He

5 was one that was harassed.  He still sells

6 Chamilia.

7    Q.    Did Dolls & Ducks ever sell Pandora?

8    A.    No.

9    Q.    They've never sold Pandora?

10    A.    No.  After dealing with them they said

11 there was no way they would sell the product.

12    Q.    Was Dolls & Ducks one of the retailers

13 that was selling Chamilia jewelry products in the

14 fall of 2003?

15    A.    Yes.

16    Q.    And what did they do with their

17 merchandise that they were selling?

18    A.    They returned it.

19    Q.    And who did they return it to?

20    A.    The Chamilia office.

21    Q.    And what was the reason for their

22 return?

23    A.    Because we called it back.

24    Q.    And why did you call back the

25 merchandise being sold at Dolls & Ducks?

**Whirlow, Lisa (5/13/05)**          **Page 119**

00122

1          Whirlow - Confidential

2     Q.    And when did he tell you that?

3     A.    When it happened, and I don't remember

4  when it happened.

5     Q.    What else did he tell you about the

6  lawsuit?

7     A.    That it was over.  I mean, we really --

8  I really don't try to talk about those things.  I

9  mean, I do so many other things.  So I really try

10  to, you know, stay off the things that I don't

11  have to waste the brain energy on.

12    Q.    In your years of experience working in

13  the jewelry industry, what other manufacturers

14  that you've represented have recalled their

15  product as a result of a lawsuit?

16    A.    I've never experienced any of this

17  before.

18    Q.    So prior to working for Chamilia,

19  you've never repped for any other jewelry company

20  that was ordered to recall their merchandise that

21  was offered for sale as a result of a lawsuit?

22    A.    No.

23    Q.    Other than Dolls & Ducks, what other

24  retailers have communicated to you that they

25  received statements made by Pandora

**Whirlow, Lisa (5/13/05)**                    **Page 122**

00123

1          Whirlow - Confidential

2    representatives about Chamilia?

3    A.    Country Clutter.  It's a chain of

4    stores individually owned.  Pandora had contacted

5    their main office and several stores involved in

6    their chain and, you know, told them.

7    Q.    Who at Pandora communicated with

8    Country Clutter?

9    A.    You know, I don't know.  Because

10   there's so many different owners and different,

11   you know -- they're in different states and

12   everything.  Their corporate office is out of

13   California.

14   Q.    Did you ever hear statements made by

15   Pandora representatives about Chamilia to Country

16   Clutter?

17   A.    No.

18   Q.    Do you know whether or not Country

19   Clutter received written statements made by

20   Pandora representatives about Chamilia?

21   A.    I don't know.  But I assume they did.

22   Q.    Other than names that you're going to

23   read from that piece of paper, are there any

24   other --

25          THE WITNESS:  You're covering your mic.

**Whirlow, Lisa (5/13/05)**          **Page 123**

00125

1        Whirlow - Confidential

2  conversations.

3     Q.   Why don't you, if you could, read the

4  names into the record.

5     A.   Well, I mean --

6        MR. GOGGIN:  Just read them in.

7     Q.   I think you left off at Country

8  Clutter.

9     A.   Yes, I know where I left off.

10        Classic Duck.

11     Q.   Okay.  You can continue.

12     A.   Oh, I can?

13     Q.   Just give the list.

14     A.   Oh, great.  Okay.  Perfect.

15        Interiors & More, Fine Things, A

16  Thousand Charms, Forever Charmed, Shad's, Bishop

17  Hallmark, Pamela's, Identity Jewelers, Picket

18  Fence.  And I just thought of another one,

19  Richard's Gifts.  And --

20        MR. GOGGIN:  Are you still reading from

21     the list.

22        THE WITNESS:  No, I'm not.  I've read

23     all the list that I wrote down this morning.

24     Q.   Okay.  Before you leave I'd like a copy

25  of the list.

**Whirlow, Lisa (5/13/05)**          **Page 125**

Q.   Have you ever described those grooves
11  or the twisting motion as threading?
12     A.   No, I haven't.
13     Q.   Other than the portion that the bead is
14  twisting over on the end of the chain, is there
15  any other twisting that is required in order to
16  attach the beads onto the chain?
17     A.   No, no.  We changed this part, the lock
18  part.
19     Q.   I'm asking, is it today?
20     A.   No.
21     Q.   What do you mean you changed the lock
22  part?
23     A.   There's no twisting on the middle
24  pieces.
25     Q.   By the middle pieces, what do you mean?

00130
1          Whirlow - Confidential
2     A.   The humps in the middle is what I call
3  them.  I'm sure you call them something else.
4  But these pieces.
5     Q.   And where are those pieces affixed onto
6  the chain?
7     A.   In the middle I guess.
8     Q.   Exactly in the middle?
9     A.   Like balancing the bracelet out.
10     Q.   Balancing the bracelet out into three
11  equally divided segments?
12     A.   Um-hum.
13     Q.   Can I see your bracelet, please.  Is
14  this the lock that you previously described in
15  the record as an octagonal shape?
16     A.   Um-hum.
17     Q.   Is that the lock that was previously
18  used to close, fasten Chamilia bracelets?
19     A.   No.
20     Q.   And how is it different, since we have
21  it now?  If you can describe --
22     A.   I don't really know.  I mean, it's
23  different on the outside look.  On the inside
24  it's different, but I don't know how.  I know
25  this is different where it's not screwed from

00131
1          Whirlow - Confidential

2  before.

3      Q.   And when was that changed?

4      A.   After the first lawsuit.

00154

1          Whirlow - Confidential

2          MR. GOGGIN:  She just said she --

3     A.    I gave you a couple.  I mean, I gave

4  you, you know, a couple of them.  A stone falls

5  out.

6     Q.    No, that's when you explained that a

7  product was damaged.  I'm asking what your

8  experience is with a defective jewelry product.

9     A.    I mean, it's just the buzz word.  You

10  write damaged and defective merchandise.  Love

11  Letters, Jewelry John, all the companies, you

12  know, guarantee -- it's just the way you write

13  it.

14     Q.    But then there's nothing defective that

15  you've received as a return from customers?

16     A.    I'm sure there is.

17     Q.    Then what are those situations?

18     A.    You know, it's maybe something's not

19  right with it.  I don't -- you know.

20     Q.    And what about it wouldn't be right

21  that would make it defective?

22     A.    That it might not go on the bracelet.

23     Q.    Why wouldn't it go on the bracelet?

24     A.    Because it would be defective.

25     Q.    What about the bead would be defective

**Whirlow, Lisa (5/13/05)**                    **Page 154**

00155

1          Whirlow - Confidential

2   that wouldn't allow it to attach to the bracelet?

3          MR. GOGGIN:  This is all speculation.

4   I object to this questioning.

5          MS. SHORT:  I asked for examples and

6   she's providing me examples of situations --

7          MR. GOGGIN:  Of what might be?

8          MS. SHORT:  Court reporter, could you

9   read back the entire exchange, please.

10        (Record read)

11    A.   I mean, the hole could be too small.

12    Q.   Have you seen that with Chamilia beads?

13    A.   That the hole's too small?

14    Q.   Um-hum.

15    A.   I don't really -- I mean, I've seen a

16   pile of stuff that came back.  I don't go look at

17   it.  I don't care.

18    Q.   But have you?

19    A.   No.

20    Q.   So what product have you received as a

21   return from a customer that has been defective?

22    A.   I personally don't do returns.  I'm not

23   involved in that.  So I don't think I personally

24   have taken anything back.

25    Q.   What have your sales reps communicated

**Whirlow, Lisa (5/13/05)**                    **Page 155**

00156

1        Whirlow - Confidential

2  to you that customers have returned based on a

3  product sold by Chamilia being defective?

4        A.   Well, if it's defective, I tell them,

5  you know, to take care of it.

6        Q.   And what about the jewelry product was

7  defective?

8        MR. GOGGIN:  Asked and answered.

9        A.   I mean, it's like I don't get involved

10  in that.  I mean, it's like I do other things.  I

11  mean, it's like -- I want them to take care of

12  the customers and make the customer happy.

13        Q.   Have you ever had situations where a

14  customer returned a bead because it was unable to

15  thread onto the bracelet?

16        A.   To me, no.  I --

17        MR. GOGGIN:  If you don't know, say you

18        don't know.

19        Q.   Do you have knowledge of a situation

20  where a customer returned a bead and it was --

21        A.   I'm sure these things have happened.

22  But do I have exact knowledge of these certain

23  situations, no.

24        Q.   Are you aware of any situation where a

25  customer returned a Chamilia jewelry product

**Whirlow, Lisa (5/13/05)**                **Page 156**

00157

1         Whirlow - Confidential

2   because a bead was unable to be removed from the

3   bracelet because it was stuck?

4     A.    Yes, I do know that.

5     Q.    Would you call it a defect?

6     A.    I mean, we would characterize it as a

7   defect.  But whether or not the customer hit the

8   bead and damaged it, we cover it.  But how it

9   actually happened -- it went on there at one

10  point and it was fine.  So I think that there was

11  some damage done to it, but we still cover it.

12    Q.    But that would be a defect if a bead

13  was stuck on --

14    A.    That would come under damage and

15  defect.  So, I mean, your interpretation of

16  damage and defect, I don't analyze it all that

17  much.

18    Q.    I'm just asking for your understanding.

19    A.    I know.

20    Q.    Who do you consider to be competitors

21  of Chamilia?

22    A.    Pandora.

23    Q.    What makes Pandora a competitor of

24  Chamilia?

25    A.    Well, what I say to people is, at a

**Whirlow, Lisa (5/13/05)**                    **Page 157**

00183

1          Whirlow - Confidential

2  representing Chamilia jewelry products?

3      A.    You know, Joyce Townsend, Ryan Whirlow,

4  Chris Whirlow.  Ivy was there.  Norm was there.

5      Q.    Norm who?

6      A.    Lewis.

7      Q.    Was Dove Schwartz there?

8      A.    Who?

9      Q.    Dove Schwartz?

10     A.    Yes, he showed up.   But to bring

11  stuff.

12     Q.    At the San Francisco August 2003 show

13  did you take out a booth of Chamilia products?

14     A.    I had a booth already.

15     Q.    At which you displayed Chamilia

16  products?

17     A.    Um-hum.

18     Q.    Was that the first trade show at which

19  Chamilia jewelry products were displayed?

20     A.    Yes.

21     Q.    Did Pandora also have a booth at the

22  San Francisco trade show?

23     A.    No.

24     Q.    You indicated that you had a discussion

25  with Michael Lund at the San Francisco trade

**Whirlow, Lisa (5/13/05)**                    **Page 183**

00184

1          Whirlow - Confidential

2   show.  Can you discuss that with me.

3       A.   He only got on the plane and came to

4   see me.  He didn't come to the gift show.  He

5   wasn't going to be there.  It was a last-minute

6   thing.

7       Q.   Did any representative of Pandora visit

8   the booth that you operated and displayed

9   Chamilia jewelry products?

10      A.   I think Jim was a represent -- rep for

11  him, but he kept it very secret.  And I think,

12  but I don't know, but I think Jim, I can't

13  remember his name, was also a customer of ours.

14  Owns another Italian charm line.  But I think he

15  also worked for Pandora at the time.  But he

16  didn't identify himself as a Pandora rep.

17      Q.   So the gentleman you spoke with named

18  Jim, what did you discuss?

19      A.   I don't think he talked to me.  I think

20  he talked with his rep which was Tony.

21      Q.   So to your understanding what made

22  Michael Lund approach you at the San Francisco

23  gift show?

24      A.   He called and said he was shutting us

25  down.  I told you that earlier, remember?

**Whirlow, Lisa (5/13/05)**          **Page 184**

00185

1          Whirlow - Confidential

2     Q.    Did you discuss a copyright issue at

3   that time with Michael --

4     A.    No, worldwide patent.

5     Q.    Was the word copyright mentioned at

6   that time?

7     A.    No, worldwide patent.  Which I've never

8   heard of a worldwide patent until -- and that's

9   why I was so adamant what country did he get it

10  in, where do you get one.

11    Q.    At that time had you had any other

12  communications with Michael Lund?

13    A.    No.

14    Q.    Did you know who Michael Lund was prior

15  to that communication?

16    A.    Um-hum.

17    Q.    And how did you know who he was?

18    A.    Because he -- another person I worked

19  with in the other industry had given Michael Lund

20  my name and told him that he should contact me

21  and hire me.  And he did not.  And then he showed

22  up in the booth.

23    Q.    Did you ever contact him to attempt to

24  carry Pandora jewelry?

25    A.    My stores, yes.

**Whirlow, Lisa (5/13/05)**          **Page 185**

00256

1          Whirlow - Confidential

2   someone's booth like that, so I wouldn't do that.

3      Q.   In paragraph 7 of your declaration, you

4   indicate that you immediately after hearing Mr.

5   Lund's patent assertions, as described in

6   paragraph 6, that you contacted Jeff Julkowski.

7          When you say immediately, how long

8   after you had the conversation with Mr. Lund did

9   you contact Mr. Julkowski?

10     A.   I called him right after he walked out

11  of the booth.  As a matter of fact, Michael Lund

12  came back and I was on the phone with Jeff.

13     Q.   And how long was your conversation with

14  Michael Lund?

15     A.   I would say at least 15 minutes, maybe

16  30.

17     Q.   15 to 30 minutes you spoke with Michael

18  Lund?

19     A.   Um-hum.

20     Q.   And of the 15 to 30 minutes, how much

21  of that time was designated to discussing

22  patents, or any patent rights Pandora may have?

23     A.   Well, I mean, he said it, you know,

24  numerous times.  And I asked him, you know, for a

25  patent number, the patent city, state, where he

**Whirlow, Lisa (5/13/05)**                **Page 256**

00257

1          Whirlow - Confidential

2 started, you know.  Nothing was said about a

3 trademark at that point.

4          I explained to him about the Italian

5 charm business.  He explained to me what he

6 wanted to do, where he wanted to take his

7 company, his vision.

8    Q.    Do you remember which day -- well, it

9 says August 27, 2004.  Do you know what day of

10 the week that was, do you recall?

11     A.    No.  I think it was like the last day

12 of the show, you know.

13     Q.    And how long --

14     A.    Or day before.

15     Q.    -- does the San Francisco international

16 gift show usually last?

17     A.    Five days.

18     Q.    And when does it usually begin, what

19 day of the week?

20     A.    Saturday and ends on a Wednesday.  It

21 actually -- I think it was Tuesday.  He maybe

22 didn't come -- it wasn't the very last day maybe.

23     Q.    And did you contact Mr. Julkowski at

24 the Chamilia offices?

25     A.    I think I called his cell phone.

**Whirlow, Lisa (5/13/05)**          **Page 257**

00272

1          Whirlow - Confidential

2  the caption as it appears today, was that on the

3  document when you signed it, the Declaration of

4  Lisa Whirlow in Support of a Petition to Access a

5  Pending Patent Application?

6     A.   I would assume.

7     Q.   Did you read the entire document before

8  you signed it?

9     A.   I'm sure.

10    Q.   And what did you understand that

11  caption to be in reference to?

12    A.   I don't think I really cared.

13    Q.   You didn't ask?

14    A.   I'm sure we talked about it, you know.

15  I just basically wanted, you know, this to go

16  away and get on with life.  I mean, you know, I'm

17  in sales and I, you know, am trying to work.  I

18  don't like having this aggravation all the time.

19         So I don't really remember what we

20  talked about.  I mean, I know they made me aware

21  of why I was doing this.  I mean, but right now I

22  don't know.

23    Q.   I refer your attention to paragraph 10.

24    A.   That's the winter gift show.

25    Q.   The sentence that begins "Those

**Whirlow, Lisa (5/13/05)**                    **Page 272**

00273

1           Whirlow - Confidential

2  representatives," the second line down, do you

3  see that?

4   A.   Um-hum.

5   Q.   To whom do you refer when you say those

6  representatives?

7           THE VIDEOGRAPHER:  We have to go off

8       the record for a second.  For some reason

9       this just stopped.

10      (Recess)

11          THE VIDEOGRAPHER:  We're back on the

12      record at 3:43 p.m.  This begins tape 4 of

13      the deposition of Lisa Whirlow.

14          MS. SHORT:  Ms. Court reporter, can you

15      please read back the last question.

16      (Record read)

17   A.   The representatives in our booth would

18  talk to people about buying Chamilia, and then

19  they would walk a couple of booths, you know,

20  over.  And then when they would go to Pandora, a

21  lot of them wouldn't return to buy the product

22  after, you know, they said they wanted to.

23   Q.   Those representatives referred to --

24   A.   I'm talking about my sales, the sales

25  staff that were in the booth for Whirlow &

**Whirlow, Lisa (5/13/05)**                    **Page 273**

00274

1          Whirlow - Confidential

2 Associates.

3     Q.    Those representatives further informed

4 you that they would not order product from

5 Chamilia based on an assertion made by Mr.

6 Glueck?

7     A.    Right.

8     Q.    So you're referring to Chamilia

9 representatives or Chamilia's customers?

10    A.    I didn't catch that before.  Basically

11 what it is is the customers -- the reps, the reps

12 in our booth and the customers, you know, they

13 would have a conversation and they were going to

14 buy the product.  And then after the customers

15 would talk to Steve, you know, or go to the

16 Pandora booth, then they didn't want to buy

17 Chamilia anymore, is what that means.

18    Q.    So the representatives refers to the

19 they and the they is the Chamilia customers?

20    A.    It's -- there's really a couple words

21 missing out of there.  It should be the

22 representatives and after they and the customers.

23 So there's a little bit of --

24    Q.    To your knowledge, do you know whether

25 any Chamilia sales representatives have been

**Whirlow, Lisa (5/13/05)**                    **Page 274**