UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHAMILIA, LLC,

                              Plaintiff,

            -v-                                           Case No. 04-CV-6017 (KMK)

PANDORA JEWELRY, LLC,                                     OPINION AND ORDER

                              Defendant.

Appearances:

Dylan David Smith, Esq.
James George Goggin, Esq.
Verrill & Dana, LLP
Portland, ME
*Counsel for Plaintiff*

William Robert Hansen, Esq.
Gianfranco Gustavo Mitrione, Esq.
Lathrop & Gage, LC
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, District Judge:

        Plaintiff Chamilia, LLC ("Chamilia" or "Plaintiff"), and Defendant Pandora Jewelry,

LLC ("Pandora" or "Defendant"), are competing jewelry designers in the cutthroat world of

charm bracelet design and manufacture.  In a prior action, final judgment on consent was entered

for Pandora against Chamilia on a claim for copyright infringement.  *See Pandora Jewelry, LLC

v. Chamilla LLC*, No. 03-07587 (S.D.N.Y. Nov. 26, 2003) [hereinafter *Pandora I*].

Nevertheless, Chamilia, the conceding party in the prior action, bravely brings this suit accusing

Pandora of being "maliciously engaged . . . in a smear campaign to destroy" Plaintiff's business

by having "publicly accused [Chamilia's] products of infringing [Pandora's] patent rights.

The Complaint enumerates seven substantive counts of the action. The first two are claims under federal statutory law: (1) the making of misleading commercial advertising or promotion statements about Plaintiff's products in violation of Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B); and (2) false patent marking in violation of 35 U.S.C. § 292. In addition, plaintiff states five New York common law claims: (3) slander of title; (4) defamation; (5) business and product disparagement; (6) "tortious interference with advantageous relationships;" and (7) unfair competition. Plaintiff also seeks a declaratory judgment finding that Plaintiff is not in violation of Defendant's patent and enjoining Defendant from initiating or threatening patent litigation against Plaintiff.

Defendant moves for summary judgment on all claims, and also moves to strike as inadmissible certain evidence submitted in support of Defendant's motion.

For the reasons stated herein, Defendant's motion for summary judgment is GRANTED IN ITS ENTIRETY, and its motion to strike inadmissible evidence is DENIED as moot.

## I.  Background

### A.  Defendant's Entry into the United States Market

Defendant is a jewelry company in the business of creating and selling bracelets featuring silver and gold beads. (Def.'s Rule 56.1 Statement of Undisputed Material Facts ¶ 1 ("Def.'s 56.1").) Defendant created the jewelry designs at issue in 2000, and the designs are protected by Danish copyright law. (*Id.* ¶ 3.) In 2002, Defendant began offering its jewelry for sale in the United States by distributing its copyrighted catalogs and sales information.[1] (*Id.* ¶ 4; Pl.'s

---

[1] The Parties disagree about the month of 2002 in which Defendant began selling in the U.S. market. (Pl.'s 56.1 ¶¶ 4-5; Def.'s 56.1 ¶ 4-5.) The dispute is immaterial.

Opposing Statement of Material Facts and Statement of Additional Material Facts 56.1 ¶¶ 4-5 ("Pl.'s 56.1").)  Defendant obtained certificate registrations from the U.S. Copyright Office that were effective September 4, 2003.  (Def.'s 56.1 ¶ 3.)

Claiming that its principal had invented a unique method of constructing its jewelry, Defendant filed a U.S. patent application on July 21, 2003, which was assigned Application No. 10/623,641.  (*Id.* ¶ 6-7.)  After this filing, Defendant began to state "patent pending" on its Pandora jewelry promotional and advertising material.  (*Id.* ¶ 8.)  When the U.S. Patent and Trademark Office (PTO) published the application on July 29, 2004, defendant also provided notice of the application to various other industry members, including Plaintiff.  (*Id.* ¶ 11.)

B.  Prior Related Litigation

At the San Francisco International Gift Fair on August 26 and 27, 2003 ("2003 SF Show"), Defendant's president, Michael Lund Petersen ("Petersen"), visited Plaintiff's booth and spoke with Plaintiff's sales representative, Lisa Whirlow ("Whirlow").  (Def.'s 56.1 ¶¶ 14-16.) Petersen believed that the jewelry Plaintiff was offering for sale was copied from Defendant's copyrighted products.  (*Id.* ¶¶ 14-15.)  According to Defendant, Petersen told Whirlow that Defendant owned a "worldwide copyright" for its designs, that Plaintiff's jewelry was an illegal copy of Defendant's designs, and that Defendant had a patent application pending for the method of constructing the bracelets.  (*Id.* ¶¶ 20-27.)  According to Plaintiff, Petersen told Whirlow that Defendant had a "worldwide patent" and intended to use the patent to "shut [her] down."  (Pl.'s 56.1 ¶¶ 20-23, 25-27.)  Defendant denies Petersen stated that anyone would be "shut down." (Def.'s 56.1 ¶ 27.)

Also, on August 26, 2003, Petersen instructed Pandora's counsel to send Chamilia a cease and desist letter on the basis of Plaintiff selling items that potentially infringed Pandora's

3

intellectual property rights. (Def.'s 56.1 ¶¶ 28-29.) Pandora then filed suit against Chamilia on copyright infringement and other grounds in the Southern District of New York on September 25, 2003. *Pandora I.* Judge Sprizzo issued a temporary restraining order on October 2, 2003, and final judgment on consent of the parties was entered on November 25, 2003, in favor of Pandora, with Chamilia ordered to destroy its inventory of infringing goods and to cease manufacture, promotion, and sale of the infringing jewelry. *Id.*

Pandora filed a second action premised on the sale of Chamilia jewelry infringing its copyright, this one in November 2003 against Chamilia retailer Jason Adams ("Adams") in the District of New Jersey. *Pandora Jewelry LLC v. Adams*, No. 03-5220 (D.N.J. Jan. 26, 2004). That court approved a settlement on January 26, 2004, by which on consent of the parties it permanently enjoined Adams from selling infringing jewelry. (Def.'s 56.1 ¶¶ 37-38 & Ex. J.) Plaintiff claims that it stopped producing the infringing jewelry designs and developed new designs for its jewelry after these judgments were entered. (Pl.'s 56.1 ¶¶ 23, 30, 104-07.)

C. Defendant's Alleged Trade Show Statements

In February 2004, Defendant was an exhibitor at the Winter International Gift Show in San Francisco ("2004 SF Show"), represented by employee Steve Glueck ("Glueck"). (Def.'s 56.1 ¶ 51.) While at the show, Glueck discussed litigation between the parties with Whirlow, who was there representing Plaintiff. (*Id.* ¶ 52; Pl.'s 56.1 ¶ 52.) Whirlow expressed regret that Plaintiff had engaged in copying Defendant's designs. (Def.'s 56.1 ¶ 53; Pl.'s 56.1 ¶ 53.) Whirlow has stated her recollection to be that Glueck told her "Pandora had patent rights violated by Chamilia." (Pl.'s 56.1 ¶ 55; Decl. of James G. Goggin in Supp. of Chamilia, LLC's Mem. in Opp'n to Def.'s Mot. for Summ. J. ("Goggin Decl.") Ex. H ("Whirlow Decl.") (stating same in declaration filed with PTO).) Glueck remembers differently, and has stated that he told

4

Whirlow that Pandora had filed a patent, that the patent application was pending, and that, if

issued, Pandora would seek to protect its rights.  (Def.'s 56.1 ¶ 55.)   After the 2004 SF Show,

Glueck received a call from an individual identifying himself as the vice president of Chamilia,

who accused Glueck of telling a customer that Defendant would "close down" Plaintiff based on

patent rights.  (*Id.* ¶ 57.)  Glueck told the Chamilia caller that the customer must have

"misunderstood" him and he now denies having said that Pandora would "close down Chamilia

with the Pandora patent."  (*Id.* ¶¶ 57, 59; Pl.'s 56.1 ¶ 57.)

Agents of the parties met again on March 14, 2004, at the Chicago Gift Show ("2004

Chicago Show"), another large trade show.  (Pl.'s 56.1 ¶ 39.)  At a display booth there for

jewelry manufacturer LAD Group, Jody Henderson ("Henderson"), then a sales representative

for Defendant and other vendors, and Kathy Shaw-Riley ("Shaw-Riley"), a sales representative

for Plaintiff and other vendors, engaged in a conversation, in which they discussed litigation

between Pandora and Chamilia.  (Def.'s 56.1 ¶¶ 39-48; Pl.'s 56.1 ¶¶ 40-48.)  The Parties contest

the contents of the conservation, as do the individuals party to it.  (Def.'s 56.1 ¶ 42; Pl.'s 56.1 ¶

42.) According to Shaw-Riley, Henderson told her that "there is a lawsuit against Chamilia for a

patent infringement and we're going to put you out of business."  (Pl.'s 56.1 ¶ 43.)  According to

Henderson, the two discussed only Pandora's November 2003 copyright lawsuit against

Chamilia (*Pandora I*), and she never mentioned patents or the status of Pandora's patent

application for its jewelry designs.  (Def.'s 56.1 ¶ 46.)  According to Defendant, Henderson had

developed a practice of responding to customer inquiries about lawsuits between Pandora and

Chamilia by providing a copy of an item that had run in *Gift Beat* magazine indicating that

Pandora had a "patent-pending on its bracelet design."  (*Id.* ¶¶ 10, 47-48.)

At a trade show in Atlanta from July 9 to 13, 2004 ("2004 Atlanta Show"), Defendant

5

had a booth managed by Knud Hostrup ("Hostrup"), its sales manager.  (*Id.* ¶ 60.)  The parties

agree that, at the show, Hostrup encountered a representative for Plaintiff, whom he told that

Plaintiff's products were inferior to Defendant's and that Plaintiff's products were not

compatible with Defendant's.  (*Id.* ¶ 69.)

At yet another trade show, America's Mart, in January 2005 in Atlanta ("2005 Atlanta

Show"), Petersen spoke with the owner of the Highlands West Gift Company, Dawn Moore

("Moore").  (Pl.'s 56.1 ¶ 117.)  As described by Moore, Petersen told her that Plaintiff's jewelry

was a "cheap imitation" of Defendant's, that it did not work properly, that the design was stolen,

and that Defendant had a patent pending.  (*Id.* ¶ 118.)  Jeffrey Julkowski ("Julkowski"),

Plaintiff's president, alleges that also at this show he personally heard Petersen telling retail store

owners that Defendant was shutting down Plaintiff with a patent and that it would sue Plaintiff's

customers for their sales.[2]  (*Id.* ¶ 119.)

D.  Defendant's Alleged Phone Calls to Chamilia Customers

Plaintiff alleges that Petersen repeatedly telephoned Carlos Italian Charm Shop in

Rancho Cordova, California, between March and May 2004, and that he spoke approximately

five times during this period with its owner, Donna-Renee Carlos ("Carlos").  (Pl.'s 56.1 ¶ 108.)

During these calls, Petersen told Carlos that Chamilia was counterfeiting Pandora's jewelry and

had "stolen his patent."  (*Id.* ¶ 110.)  Carlos told Petersen to stop calling in May 2004, and she

---

[2] On motion for summary judgment, the Court may consider only admissible evidence.
*See* Fed. R. Civ. P. 56(e).  Julkowski cannot give evidence regarding the truth of statements
made to him.  *See* Fed. R. Evid. 801(c).  Julkowski's claim to have heard Petersen tell customers
that Pandora was shutting down Chamilia would be admissible, however, because Julkowski has
personal knowledge of the statements and Plaintiff is not offering them for the truth of the matter
asserted.  *See* 5 Weinstein's Federal Evidence § 801.11 (2000) ("If the significance of an offered
statement lies solely in the fact that it was made, no issue is raised as to the truth of anything
asserted.").

next

heard from him by way of an answering machine message on August 16, 2004, stating in part:

> Hi Donna.  This is Michael Lund [Petersen] with Pandora Jewelry.
> I am the President.  I need to talk to you about something.  Could
> you please give me a call before my lawyer sends you a letter?  I
> just want to talk to you myself in regards to the Chamilia you're
> selling.  Cause now our patent application that has been publicized
> and you are selling something that violates my patent and therefore
> I can sue you for your profits and legal expenses.  So please give
> me a call so maybe we can clear this up in a good fashion.

(*Id.* ¶ 109-12.)  Carlos received a letter from Defendant's attorney on August 19, 2004, stating

"Pandora is now aware that Carlos Italian Charm Shop is offering to sell or selling necklaces and

bracelets . . . which appear to utilize substantially the same construction and perform the same

function as Pandora's patent pending for its necklaces and bracelets."  (Pl.'s 56.1 ¶ 113.)

In a second set of alleged telephone incidents beginning on April 15, 2005, Hostrup

allegedly telephoned Michele Vogel ("Vogel"), owner of the West End Gallery in East Aurora,

New York, a store that sells both Plaintiff's and Defendant's products.  (*Id.* ¶¶ 121-22.)  Hostrup

told Vogel that Defendant had a "patent lawsuit" against Plaintiff and that "Pandora was waiting

for its patent and would shut Chamilia down once it received the patent."  (*Id.* ¶¶ 12; Decl. of

Michele C. Vogel ("Vogel Decl.") ¶ 2.)  Hostrup also allegedly told Vogel that, as a seller of

Chamilia jewelry, she could potentially have her store "shut down."  (*Id.*)  Two weeks later,

Petersen allegedly called Vogel a number of times over two days and told her that she would not

be able to carry both Chamilia and Pandora products.  (Pl.'s 56.1 ¶ 125.)

E.  Defendant's Terms and Conditions and April 2005 Letters

On or about September 16, 2004, Defendant sent letters to its reseller customers revising

the terms and conditions of their relationship ("T&C letters") and requiring each reseller to sign

a pledge "agree[ing] not to sell any other brand of modifiable jewelry which may appear to

utilize substantially the same construction and perform the same function as described in

Pandora's patent application."  (Pl.'s 56.1 ¶ 115.)  Approximately 449 of these letters were

signed.  (*Id.* ¶ 150.)  Subsequently, on April 12, 2005, Glueck sent another letter to Defendant's

vendors ("April 2005 letters"), stating that "the Chamilia sales force has been trying to strong-

arm some of our customers into buying their product" and reminding vendors of their obligation

"to not carry the knock-off companies."  (*Id.* ¶¶ 127-28.)

### F.  Alleged Effects on Plaintiff's Business

Plaintiff identifies a total of thirty-six different reseller customers who it alleges

Defendant told it owned a patent with which it would put Plaintiff out of business.  (*Id.* ¶ 129.)

Plaintiff alleges that some of these reseller customers told Plaintiff's representatives that they

chose not to carry Chamilia products based on Pandora's "patent infringement" allegations.  (*Id.*

¶ 130.)  Additionally, Plaintiff represents that numerous Chamilia reseller customers ceased to

purchase Chamilia product between February and July 2004, which Plaintiff asserts is proof that

Pandora's statements during that time period were affecting its customers.  (*Id.* ¶¶ 132-49.)

### G.  Procedural History

Plaintiff filed the Complaint on August 3, 2004.  On September 3, 2004, this case was

reassigned to the undersigned.  Defendant filed the Answer on September 22, 2004.  Defendant

moved for summary judgment on all counts and Plaintiff timely responded.

## II.  Discussion

### A.  Standard of Review

Summary judgment may be granted where it is shown that there is "no genuine issue as

to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed.

R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view all evidence in the light most favorable to the non-moving party and must draw all reasonable inferences in the non-movant's favor. *See Tufariello v. Long Island R.R. Co.*, 458 F.3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Segal v. City of New York*, 459 F.3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the nonmoving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). "The motion 'will not be defeated merely . . . on the basis of conjecture or surmise.'" *Id.* (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991)); *see also McPherson v. N.Y. City Dep't of Educ.*, 457 F.3d 211, 215 n.4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). The materiality of the facts considered by the court will be governed by substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue for trial. *See Castro v. Met. Transp. Auth.*, No. 04-CV-1445, 2006 WL 1418585, at *2 (S.D.N.Y. May 23, 2006); *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990). A court's goal should be to "isolate and dispose of factually insupportable claims." *Celotex*, 477 U.S. at 323-24.

B. Lanham Act Claim

Section 43(a) of the Lanham Act, codified in Title 15, Chapter 22, of the United States Code, makes those who use false or misleading representations of fact that "in commercial

advertising or promotion, misrepresent[] the nature, characteristics, qualities, or geographic origin of his or her or another person's goods" liable for civil damages to "any person who believes that he or she is or is likely to be damaged by such act."  15 U.S.C. § 1125(a)(1)(B).  The Lanham Act is a remedial statute and therefore is to be "broadly construed."  *See Gordon & Breach Sci. Publishers, S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1532 (S.D.N.Y. 1994) (citing *PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 125 (2d Cir. 1984)).  Not every false representation is actionable, however; to violate the Lanham Act, the alleged false representation must "misrepresent[] an inherent quality or characteristic of the product."  *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 238 (2d Cir. 2001) (internal quotation omitted).

Plaintiff alleges that Defendant falsely claimed it had a patent on its jewelry designs when it did not, and falsely claimed that Chamilia jewelry was both a "knock-off" and a "cheap imitation" that infringed its purported patent.  Plaintiff alleges that these statements were made at trade shows, in phone calls to Plaintiff's customers, and in a letter that Defendant sent to its own customers.  To prevail on this cause of action, Plaintiff must show:  (1) that these statements were false; (2) that they were used in commercial advertising or promotion; and (3) that this advertising or promotion misrepresents the nature, characteristics, qualities, or geographic origin of an inherent quality or characteristic of Plaintiff or Defendant's products.  *See* 15 U.S.C. § 1125(a)(1)(B).  Defendant contends that Plaintiff has failed to show Defendant's statements were false, or that those statements constituted "commercial advertising or promotion" within the meaning of the Lanham Act.

### 1.  Falsity

To prove falsity for the purposes of a false advertising claim, "a plaintiff must show that

either: 1) the challenged advertisement is literally false, or 2) while the advertisement is literally

true it is nevertheless likely to mislead or confuse consumers." *Johnson & Johnson Merck*

*Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992); *see also*

*McNeil-PPC, Inc. v. Pfizer, Inc.*, 351 F. Supp. 2d 226, 248 (S.D.N.Y. 2005). "The falsity of

advertising is an issue of fact." *Gordon & Breach Sci. Publishers*, 859 F. Supp. at 1532; *see also*

*Mylan Pharms., Inc. v. Proctor & Gamble Co.*, 443 F. Supp. 2d 453, 459 (S.D.N.Y. 2006) ("The

meaning of an advertisement may present an issue of fact."). Here, Plaintiff alleges that all of

Defendant's statements were literally false.[3]

    As to Defendant's statements regarding its alleged patent, it is clear that there is a dispute

over a material fact, namely, whether Defendant's representatives said that Pandora had a

"patent" or whether they said that Pandora had a "patent pending." Specifically, as outlined

above, there is considerable disagreement on this issue, with Defendant's representatives stating

that they assiduously used the phrase "patent pending," while Plaintiff's representatives insist

that they remember talk of a "worldwide patent." If Defendant's representatives stated they had

a patent on technology that Chamilia was using, this statement would be false because Pandora

did not receive its patent until March 7, 2006. (Transcript of Oral Argument at 3:9, July 20,

2006.) If Defendant's representatives stated that Pandora had a "patent pending," that statement

---

[3] Plaintiff also argued in its brief that Defendant had an intent to deceive consumers. Intent to deceive is not an element of a Lanham Act claim. *See Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir. 1997) ("[A] plaintiff may recover for unfair competition in violation of *federal law* without a showing of bad faith."); *Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 189 (2d Cir. 1980) ("[Section 43(a)] differs from the common law action for trade disparagement in two important respects: (1) it does not require proof of intent to deceive . . . .").

would be true, as Pandora had filed its patent application on July 21, 2003.[4]  "Generally, before a court can determine the truth or falsity of an advertisement's message, it must first determine what message was actually conveyed to the viewing audience." *Johnson & Johnson*, 960 F.2d at 298.  Thus, as what was said is clearly material to the issue of falsity, it is an issue of fact that must be resolved by the jury.

Plaintiff also alleges that Glueck's statement in the April 2005 letters that Chamilia was a "knock-off company," as well as Petersen's statements at trade shows that Chamilia products were a "cheap imitation" of Pandora products, were literally false.  Defendant argues that: (1) the favorable judgment it received in *Pandora I* is proof that its statements are true; and (2) the industry understanding of "knock-off," a product copied from a different product, accurately describes Chamilia's product's relationship with Pandora's.  No reasonable juror could find for Plaintiff that the statements made in these letters were false.

The April 2005 letters do not describe Chamilia's current product line as a "knock-off." Rather, they warn retailers that each has agreed not to carry any products similar to Pandora's

---

[4] Plaintiff, in its reply brief, wildly speculates that even if Defendant did use the words "patent pending," those statements were intentionally false because Defendant "knew from the outset that its patent *application* was improper."  Pandora submitted its patent application to the PTO on July 21, 2003.  According to Plaintiff, Defendant would be ineligible for its patent if it marketed its product more than one year prior to the filing of its patent application.

In support of its claim, Plaintiff has submitted a series of archived web pages from an Internet service called the "Wayback Machine," which Defendant moves to strike.  This putative evidence suffers from fatal problems of authentication under Fed. R. Evid. 901.  *See Novak v. Tucows, Inc.*, No. 06-CV-1909, 2007 WL 922306, at *5 (E.D.N.Y. March 26, 2007) (striking Wayback Machine evidence "in the absence of any authentication of plaintiff's internet printouts, combined with the lack of any assertion that such printouts fall under a viable exception to the hearsay rule").  Even if such evidence were admissible, the pages preceding the one-year period (that is, the two pages dated June 1, 2002) do not contain Defendant's products, but only a link that Plaintiff contends might have lead to a page with Defendant's products.  In short, they would not prove anything.  Thus, Defendant's motion to strike this evidence is denied as moot.

products.  Though the letters use disparaging terminology, describing Chamilia as a "knock-off

compan[y]," Chamilia in fact signed a consent decree in prior litigation where it admitted to

creating goods that infringed on Defendant's designs.  *See Pandora I.*  Thus, no reasonable juror

could find that the description of Plaintiff as a "knock-off company" is false.  In addition, the

thrust of the April 2005 letters was merely to remind vendors of the exclusivity of their sales

obligations to Defendant.  This does not speak to the quality of Chamilia's products or any other

issue contemplated by the Lanham Act.  Therefore, although Plaintiff has raised a material issue

of fact regarding the falsity of Defendant's representatives' alleged statements regarding

Defendant's patent, it has failed to carry this burden with regard to the statements made in the

April 2005 letters.

### 2.  Use in Commercial Advertising or Promotion

"In this circuit, to constitute 'commercial advertising or promotion' under the Lanham

Act, a statement must be: (1) 'commercial speech,' (2) made 'for the purpose of influencing

consumers to buy defendant's goods or services,' and (3) 'although representations less formal

than those made as part of a classic advertising campaign may suffice, they must be disseminated

sufficiently to the relevant purchasing public.'"  *See Gmurzynska v. Hutton*, 355 F.3d 206, 210

(2d Cir. 2004) (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48,

56-58 (2d Cir. 2002).  Promotion, however, is distinct from advertising.  "Although advertising

is generally understood to consist of widespread communication through print or broadcast

media, 'promotion' may take other forms of publicity used in the relevant industry, such as

displays at trade shows and sales presentations to buyers."  *Fashion Boutique*, 314 F.3d at 57.

Here, Defendant does not challenge that the alleged statements were commercial speech and that

they were made for the purpose of influencing consumers of its goods and services.  Rather,

Defendant argues that its statements were not sufficiently disseminated to constitute "advertising or promotion" under the Lanham Act. (Mem. of Law in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem.") 6-8.)

In general, proof of isolated disparaging statements is insufficient to state a Lanham Act claim. *See Fashion Boutique*, 314 F.3d at 57 ("Proof of widespread dissemination within the relevant industry is a normal concomitant of meeting [the commercial advertising and promotion] requirement. Thus, businesses harmed by isolated disparaging statements do not have redress under the Lanham Act; they must seek redress under state-law causes of action."); *see also Prof'l Sound Servs. v. Guzzi*, 349 F. Supp. 2d 722, 729 (S.D.N.Y. 2004) (holding isolated statement to a single customer insufficient to state Lanham Act claim); *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 250 (S.D.N.Y. 2004) (holding posting of plaintiff's advertisements on Defendant's walls insufficient dissemination to state Lanham Act claim). However, no minimum number of statements is required. Rather, the "touchstone of whether a defendant's actions may be considered 'commercial advertising or promotion' under the Lanham Act is that the contested representations are part of an organized campaign to penetrate the relevant market." *Fashion Boutique*, 314 F.3d at 57.

Defendant argues that Plaintiff has not provided sufficient proof of dissemination to survive summary judgment. Plaintiff responds that: (1) statements made at trade shows constitute commercial promotion per se, and (2) it is undisputed that the April 2005 letters sent by Defendant reached more than 400 Pandora jewelry retailers, some of whom were also Chamilia retailers, and that this is sufficient evidence for a rational jury to find that Defendant engaged in "commercial advertising or promotion" under the Lanham Act.

Plaintiff's first argument is unavailing. Plaintiff cites dicta from the Court of Appeals for

14

the Fifth Circuit (itself quoting dicta from a district court in yet another circuit) that states: "'public dissemination of false information to retailers at a trade show would most likely constitute "commercial advertising and promotion."'" *Seven-Up Co. v. Coca-Cola Co.*, 86 F.3d 1379, 1385 (5th Cir. 1996) (quoting *American Needle & Novelty, Inc. v. Drew Pearson Mktg., Inc.*, 820 F. Supp. 1072, 1078 (N.D. Ill. 1993)).  While displays at a trade show certainly *could* constitute commercial advertising or promotion, the law of this Circuit requires an inquiry into whether "the contested representations [were] part of an organized campaign to penetrate the relevant market." *See Fashion Boutique*, 314 F.3d at 57.  Thus, Plaintiff's Lanham Act claim will survive if it has raised a material question of fact as to whether Defendant's statements, including the trade show statements and the April 2005 letters, were part of an organized campaign to penetrate the market for charm bracelets.

When evaluating whether a party's statements were "part of an organized campaign to penetrate the relevant market," a number of factors merit consideration.  In *Fashion Boutique*, the Second Circuit considered:  (1) the number of alleged statements; (2) to whom the statements were made; (3) where the statements were made; and (4) the size of the relevant market.  314 F.3d at 58.  Applying these factors here, Plaintiff has not produced sufficient evidence for a reasonable jury to conclude that Defendant's statements were part of an organized campaign to penetrate the market.

Initially, the T&C letters and the April 2005 letters sent by Pandora to its retailers do not constitute advertising or promotion.  The statements therein were made to existing Pandora retailers, who were under contract not to sell products that would compete with Pandora products.  (Supplemental Declaration of Steve Glueck Ex. N.)  The agreement between Pandora and its retailers was not limited to competing products that infringed Pandora's designs; rather it

15

prohibited Pandora retailers who signed the agreement from selling jewelry that utilized substantially the same construction and performed the same function as Pandora's products. (*Id.*)  Because the T&C letters are designed to structure nascent or existing business relationships, but are in any case not a solicitation of new business, they do not meet the prong of the *Fashion Boutique* test requiring "commercial advertising or promotion" to be made "for the purpose of influencing consumers to buy defendant's goods or services."  314 F.3d at 56-58. Similarly, the April 2005 letters were sent in response to queries from existing retailers about Chamilia sales tactics.  (*Id.*)  The statements were not public and were sent directly to retailers who had signed agreements with Pandora.  Although Pandora sent them to a large number or retailers, more than 400, it sent them only to the portion of the relevant market with which it already had exclusive sales agreements.  If communications between two parties with an exclusive sales agreement inherently constituted commercial advertising and promotion under the Lanham Act, the parties to the agreement could never communicate to each other their opinions on when a breach had occurred without fearing liability under the Act.  There is no authority that supports such a conclusion.  Moreover, as noted, there was nothing in these letters that was actionable under the Lanham Act.

Plaintiff has offered admissible evidence of only four allegedly disparaging statements made by Defendant's representatives at trade shows:  (1) Glueck's statement to Whirlow at the 2004 SF Show; (2) Henderson's statement to Shaw-Riley at the 2004 Chicago Show; (3) Hostrup's statement to a Chamilia Representative at the 2004 Atlanta Show; and (4) Petersen's comments to Moore at the 2005 Atlanta Show.  In addition to the statements made at trade shows, Plaintiff offered evidence of two phone calls made by Defendant's representative to Plaintiff's customers.  Because the Court finds that the T&C letters and the April 2005 letters

to retailers did not contain any actionable statements, Plaintiff can at most claim only this handful of, that is six, disparaging comments.  While neither party has produced evidence of the precise size of the jewelry market or the number of potential jewelry retailers, it is clear that the market involves hundreds, if not thousands, of customers.

In *Fashion Boutique*, the Second Circuit held that "twenty-seven oral statements regarding plaintiff's products in a marketplace of thousands of customers" were insufficient "to satisfy the requirement that representations be disseminated widely."  314 F.3d at 58.  The parties in *Fashion Boutique* were rival retailers of luxury handbags and plaintiff there alleged that defendant's retail sales personnel had made disparaging remarks to customers about the products sold by plaintiff.  In this case, there are fewer statements at issue than in *Fashion Boutique*.  Plaintiff has alleged only six statements, most directed at a single individual, and the impact of the statements is presumptively de minimis.  Even if the relevant market, jewelry retailers, is in fact be smaller than that for the handbags in *Fashion Boutique*, taken as a whole, a rational jury could not find that Defendant's "representations [were] part of an organized campaign to penetrate the relevant market."  *Fashion Boutique*, 314 F.3d at 57.  Therefore, summary judgment for Defendant on Plaintiff's Lanham Act claim is granted.

C.  False Patent Marking

Plaintiff also alleges that Defendant violated 35 U.S.C. § 292 by falsely advertising that it had a patent on its designs, when in fact it merely had a patent pending.  Section 292 mandates a fine against "[w]hoever marks upon, or affixes to, or uses in advertising in connection with any unpatented article, the word 'patent' or any word or number importing that the same is patented, for the purpose of deceiving the public . . . ."  To state a cause of action for false patent marking, a plaintiff must show both:  (1) advertising or use of the word "patented" in connection with a

device that is not patented; and (2) intent to deceive.  *See Accent Designs, Inc. v. Jan Jewelry Designs, Inc.*, 827 F. Supp. 957, 968 (S.D.N.Y. 1993); *see also Sadler-Cissar, Inc. v. Commercial Sales Network, Inc.*, 786 F. Supp. 1287, 1296 (N.D. Ohio 1991) ("Requisites for liability under § 292 include that the advertising or use of the word 'patented' be made in conjunction with a device which is not patented and an intent to deceive.").  Because Section 292 is, unlike the Lanham Act, a penal statute, it must be strictly construed, and, as such, an intent to deceive will not be inferred from statements that may have been the result of inadvertence or mistake.  *See Blank v. Pollack*, 916 F. Supp. 165, 173 (N.D.N.Y. 1996).

Also unlike the Lanham Act, Section 292 applies only to "advertising;" it does not encompass "promotion."  Thus, "the expression 'uses in advertising' cannot refer to any and all documents by which the word 'patent' is brought to the attention of the public; it can only refer to use of the word 'patent' in publications which are designed to promote the allegedly unpatented product, namely, advertisements."  *Accent Designs*, 827 F. Supp at 968-69. "Advertising" is defined as "the action of calling something . . . to the attention of the public esp[ecially] by means of printed or broadcast paid announcements."  *Webster's Third New International Dictionary* (1993).  Here, the only alleged statements that include the allegedly false mark, "patent," are two remarks of Defendant's representatives at trade shows,[5] and one phone call from Defendant's representatives to retailers.  These statements were all one-on-one conversations, and there is no evidence that they were designed to promote Defendant's product

---

[5] These are the remarks at the 2004 SF Show and the 2005 Atlanta Show.  As to the 2004 Chicago Show, the evidence is only that a representative of Defendant told a representative of Plaintiff that Defendant had filed a lawsuit for patent infringement.  Although this statement clearly implies that Defendant had a patent, it does not identify any specific product.  As to the 2004 Atlanta Show, there is no evidence that Defendant's representative there told anyone that Defendant had a patent.

to the public – certainly not by "paid announcements."  Though courts interpreting Section 292 have sometimes construed the word "advertising" broadly, *see Accent Designs*, 827 F. Supp at 969 (finding legend on defendant's invoices to be "use in advertising" because they "serve the function of advertising by targeting a specific market, trade, or class of customers"), there is no case law suggesting that the three statements at issue would meet any definition of advertising. Defendant's alleged statements that it had a "patent" were made primarily to representatives of the Plaintiff, not to consumers or purchasers of Plaintiff's or Defendant's products.  Because no rational jury could find that these three isolated statements constitute "advertising" under Section 292, summary judgment in favor of Defendant on Plaintiff's false patent marking claim is granted.  *See Gleason Works v. Oerlikon Geartec, A.G.*, 141 F. Supp. 2d 334, 341 (W.D.N.Y. 2001) (granting summary judgment where no material issue of fact was raised as to whether defendant's statements were commercial advertising).

### D.  Slander of Title

To establish slander of title under New York law, a plaintiff must demonstrate: "(1) a communication falsely casting doubt on the validity of [the] complainant's title, (2) reasonably calculated to cause harm, and (3) resulting in special damages."  *39 Coll. Point Corp. v. Transpac Capital Corp.*, 810 N.Y.S.2d 520, 521 (App. Div. 2006) (internal quotation omitted). As to the first element, both the Second Circuit and New York state courts have considered allegations of patent infringement actionable as slander of title since the turn of the last century. *See W. Elec. Co. v. Pacent Reprod. Corp.*, 42 F.2d 116, 119-20 (2d Cir. 1930); *Palmer v. Travers*, 20 F. 501, 501 (C.C.S.D.N.Y. 1884) (applying New York law); *Wittemann Bros. v. Wittemann Co.*, 151 N.Y.S. 813, 816-17 (Sup. Ct. 1914) (discussing allegation of patent infringement as basis for slander of title claim).  As Defendant's alleged statements that it

19

possessed a patent and that Plaintiff's goods infringed on that patent are nearly identical to those in *Wittemann Brothers*, Plaintiff has raised a material issue of fact as to the first element.[6]

The second element of slander of title is that the statements must have been reasonably calculated to cause harm.  In other words, Plaintiff must demonstrate that Defendant acted with malice.  *See Modulars by Design, Inc. v. DBJ Devel. Corp.*, 571 N.Y.S.2d 168, 170 (App. Div. 1991) ("We also agree that the cause[] of action alleging slander of title . . . [is] facially defective, as [it] fails to allege malice . . . .") (citing 5 Warren's Weed, New York Real Property, Slander of Title, §§ 3.01, 3.04 [4th ed]); *see also Fink v. Shawangunk Conservancy Inc.*, 790 N.Y.S.2d 249, 251 (App. Div. 2005) (upholding summary judgment in favor of defendant on slander of title claim for failure to produce evidence of "malicious intent"); *Regan v. Lanze*, 346 N.Y.S.2d 113, 114 (App. Div. 1973) ("An action for slander of title is maintainable only on a showing of malice."); Robert D. Sack, 13 Sack on Defamation §§ 13.1.4.1, 13.1.4.5 (2006) (describing common law malice requirement of slander of title actions).  Where malice is an element of a claim "[s]ome facts must be asserted to support the claim that the state of mind existed" in order to survive summary judgment.  *Markowitz v. Republic Nat'l Bank*, 651 F.2d 825, 828 (2d Cir. 1981).  "A plaintiff does not become entitled to a jury trial simply by asserting

---

[6] The material issues of fact in dispute encompass only those alleged statements that Plaintiff's product violates Defendant's "patent."  They do not include the statements that Plaintiff's company was a "knock-off company" or that its product was a "knock-off," as such statements do not impugn Plaintiff's title or ownership of its product.  These statements relate only to the quality of Plaintiff's products and though such a statement is potentially actionable as product disparagement, discussed *infra*, it is not slander of title.  *See Ruder & Finn Inc. v. Seaboard Sur. Co.*, 422 N.E.2d 518, 521-22 (N.Y. 1981) (discussing evolution of product disparagement from slander of title under New York law).  Thus, Plaintiff has raised issues of material fact by its evidence of the three trade show statements where a patent was discussed and of the phone calls from Petersen to Carlos and Vogel; there is no material issue, however, with regard to Hostrup's statement at the 2004 Atlanta Show or the T&C letters and the April 2005 letters.

a cause of action in which the defendant's state of mind is a material element." *Id.* (*quoted in*

*Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 222 (2d Cir. 2006)). Defendant

argues that Plaintiff has failed to show the requisite level of malice and that Defendant's

representatives were acting on a good faith belief that Plaintiff's jewelry was copied from

Defendant's.

There is some doctrinal dispute as to the level of malice required for a slander of title

claim. *See* 13 Sack on Defamation § 13.1.4.5 (describing dispute over whether "common law

malice," i.e., ill will, or "actual malice," i.e., "a reckless disregard for the truth or falsity of the

statement" is required to state a claim for slander of title). In New York, courts have applied the

"actual malice" standard, and have regularly dismissed claims where the plaintiff has failed to

show that the defendant acted with knowledge that the statements were false or with a "reckless

disregard" for the truth or falsity of the statements. *See, e.g., Fink*, 790 N.Y.S.2d at 251 ("We

find no evidence of the malicious intent necessary to support a cause of action for slander of title

and, given our conclusion that defendant had probable cause to claim title to the disputed

property, these public assertions cannot be said to have been made 'with a reckless disregard for

their truth or falsity.'"); *see also Terrace Hotel Co. v. State*, 227 N.E.2d 846, 849-50 (N.Y. 1967)

(holding slander of title to require proof of "malice or spite" and dismissing claim where

defendant had good faith belief that statements were true); *John W. Lovell Co. v. Houghton*, 22

N.E. 1066, 1067 (N.Y. 1889) (stating that slander of title action will fail unless defendant has

"knowledge" that statements were false). Malice under this standard is not a measure of whether

the speaker harbored ill will or spite; rather, actual malice exists when a speaker makes a

statement knowing it is false or while personally harboring serious doubts about its veracity. *See*

*Karedes v. Ackerley Group, Inc.*, 423 F.3d 107, 114 (2d Cir. 2005) (quoting *Church of*

*Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001)).

Here, there is little evidence of malice. Mere falsity, prior disputes between the parties, and "[s]uspicion, surmise and accusation" are insufficient to raise an inference of malice. *Donofrio-Ferrezza v. Nier*, No. 04-CV-1162, 2005 WL 2312477, at *7 (S.D.N.Y. Sept. 21, 2005) (quoting *Shapiro v. Health Ins. Plan of Greater N.Y.*, 163 N.E.2d 333, 338 (N.Y. 1959)). In this case, there is no evidence that any of Defendant's representatives' statements were knowingly false. Putting aside the question of actual falsity, Plaintiff has failed to raise a material issue of fact that Defendant's representatives knew their statements were false or harbored any doubts about their falsity. Although there are disputes over what was said, none of the depositions even suggest that Defendant's representatives knew that Plaintiff's products did not infringe on Defendant's rights. Nor is there evidence that the employees making the relevant statements, mostly salespersons, harbored any personal doubts about the veracity of their statements. The conversations at issue were primarily among sales representatives of companies that had been and were presently engaged in litigation. None of the speakers was an expert or an attorney, and, even accepting the truth of Plaintiff's allegations of what was said, there is no evidence that Defendant's representatives had doubts regarding the status of Defendant's pending patent or its patent litigation. The same is true for the phone messages left by Petersen on the answering machine of Carlos. Petersen stated that "now our patent application that has been publicized and you are selling something that violates my patent and therefore I can sue you for your profits." Though this may be a poor statement of the law, and it does make a legal conclusion, there is no evidence in the record that Petersen knew it was false or held any doubts about its truth. Although the statement recognizes that Defendant had only applied for a patent, given the previous litigation history between the Parties and Petersen's status as a non-lawyer, there is no

22

evidence to support the conclusion that this statement was knowingly false.[7]  Thus, Plaintiff has

failed to raise a material issue of fact as to whether Defendant acted with actual malice.[8]

### E.  Defamation

"Under New York law, the elements of a defamation cause of action are: (i) a defamatory

statement of fact concerning the plaintiff, (ii) publication to a third party by the defendant,

(iii) falsity of the defamatory statement, (iv) some degree of fault, and (v) special damages or per

se actionability (defamatory on its face)."  *Kasada, Inc. v. Access Capital, Inc.*, No. 01-CV-8893,

2004 WL 2903776, at *17 (S.D.N.Y. Dec. 14, 2004).  Defendant argues that regardless of

whether Plaintiff has substantiated its defamation claim, Defendant's representatives' statements

were privileged and therefore not actionable under New York defamation law.  In addition,

Defendant argues that Plaintiff has failed to raise a material question of fact regarding fault or

the existence of special damages.

Defendant first argues that it is shielded from Plaintiff's defamation claims as its agents'

statements merely regarded the outcome of *Pandora I*, the copyright-grounded prior lawsuit

between the Parties, and were therefore privileged under New York Law.  *See* N.Y. Civ. Rights

---

[7] There is no evidence that Defendant's representatives made their statements with a reckless disregard for the truth or falsity of the statements in that they had reason to believe their statements were false.  *See Karedes*, 423 F.3d at 114 ("If it cannot be shown that the defendant knew that the statements were false, a plaintiff must demonstrate that the defendant made the statements with reckless disregard of whether they were true or false.").  To the contrary, all evidence suggests the speakers believed, even if incorrectly (given that what was actually said is disputed), that their statements were true.

[8] Defendant did not raise the issue of special damages in its motion for summary judgment, but special damages are a necessary element of a slander of title claim.  *See 39 Coll. Point Corp.*, 810 N.Y.S.2d at 521.  As discussed, *infra*, Plaintiff has failed to demonstrate special damages.  Thus, although not raised by Defendant, Plaintiff's slander of title claim fails also because Plaintiff did not raise a material fact on the issue of special damages.  *See Iuliano v. Romano*, 640 N.Y.S.2d 43, 44 (App. Div. 1996) (affirming post-trial dismissal in slander of title action because of failure to prove special damages).

L. § 74 ("A civil action cannot be maintained against any person, firm or corporation for the publication of a fair and true report of any judicial proceeding . . . ."). Plaintiff argues, however, as discussed *supra*, that its current line of products is wholly different from that at issue in *Pandora I*, and, thus, the privilege for discussing the outcome of litigation does not apply. This dispute turns on two contested facts, namely, what was said and whether Defendant's representatives were referring to a Chamilia product that was involved in the prior lawsuit. As a result, Defendant's assertion of privilege New York Civil Rights Law is insufficient to support summary judgment for Defendant.

Defendant, however, also argues that the common law "common interests" privilege protects some of its representatives' alleged statements. The "common interests" privilege is a qualified privilege, and it generally protects statements that are "communication[s] made by one person to another upon a subject in which both have an interest." *Liberman v. Gelstein*, 605 N.E.2d 344, 349 (N.Y. 1992) (quoting *Stillman v. Ford*, 238 N.E.2d 304, 306 (N.Y. 1968). "Under New York law, the decision as to whether, under the circumstances, a privilege exists is for the court and not the jury." *Konikoff v. Prudential Ins. Co.*, No. 94-CV-6863, 1999 WL 688460, at *13 (S.D.N.Y. Sept. 1, 1999) (internal quotations omitted), *aff'd* 234 F.3d 92 (2d Cir. 2000). New York courts have extended the common interest privilege to otherwise-defamatory communications between partners, officers of a corporation, and employers and their employees. *See id.*; *see also Liberman*, 605 N.E.2d at 349 ("This 'common interest' privilege has been applied, for example, to employees of an organization, members of a faculty tenure committee and constituent physicians of a health insurance plan." (internal citations omitted)). It has also been held to encompass a conversation between two businesspersons, meeting to discuss the relationship between their two companies, when the statements were intended to protect one

businessperson's business from unethical competition. *See McSherry v. Nat'l Blue Print Div. of Nat'l Reprograhics, Inc.*, No. 81-CV-5182, 1982 U.S. Dist. LEXIS 17044, at *1-2 (S.D.N.Y. Dec. 27, 1982).

The common interests privilege does not extend to Defendant's representatives' statements at trade shows or its telephone calls to Chamilia retailers. Defendant relies on *McSherry* to claim that the privilege applies to any statements made by businesspersons for the purpose of protecting their businesses against unfair competition. That stretches *McSherry* too far. *McSherry* stands for the proposition that protecting a longstanding business relationship from unethical competition is a legitimate interest that may be covered by the common interests privilege, so long as the statements are made defensively, rather than offensively. *Id.* at *1. The *McSherry* court relied on numerous cases emphasizing both that the defendant and the publishee must have an existing business relationship, and that the statements at issue must be "defensive, " i.e., must be in response to some type of conduct with potential to undermine the existing relationship between the defendant and the publishee. *Id.* at *2-4. Neither of these situational elements is present in the trade show statements or phone calls in this case. The statements and calls were made to persons with whom the Defendant had no collaborative business relationship or only a limited relationship, and they discussed only the outcome of potential future litigation. Although, as considered, *supra*, these statements were not made with "actual malice," they do not qualify for the privilege as they did not further an existing business interest of Defendant other than dissuading potential customers from dealing with a rival. If such an interest was sufficient to defeat a defamation claim, businesses would be free to defame their competitors without consequence. *See Mann v. Quality Old Time Serv., Inc.*, 120 Cal. App. 4th 90, 109 (Ct. App. 2004) (noting risk of expanding California statutory "common interests" privilege to

unsolicited statements by a business to customers of its rival).

The privilege does apply, however, to the April 2005 letters sent by Defendant. These letters were sent to Defendant's existing customers who previously had agreed not to sell jewelry similar to Defendant's. Both Defendant and its customers had a legitimate interest in knowing that Defendant believed that selling Plaintiff's jewelry constituted a violation of that agreement. The letters were not unsolicited, as Defendant had preexisting business relationships with the recipients. This type of common interest is precisely the kind contemplated by the privilege. Thus, Defendant's statements in the April 2005 letters are conditionally privileged. *See McSherry*, 1982 U.S. Dist. LEXIS 17044, at *2-4.

The common interests privilege can be defeated, however, if the privileged statements were made with malice. *See Liberman*, 605 N.E.2d at 349-50. Both common law malice, known as "ill will," and "actual malice" are sufficient to defeat a conditional privilege. *Id.* at 350. As discussed, *supra*, Plaintiff has not produced sufficient evidence for a rational jury to find that any of the alleged statements in this case, least of all the April 2005 letters, were made with "actual malice." Thus, it remains to determine only whether Plaintiff has produced sufficient evidence for a rational jury to find that the April 2005 letters were sent with "ill will" toward the Plaintiff. In this context, "ill will" refers to the speaker's motivation for making the statements, not any generalized feelings between the speaker and the Plaintiff. *See id.* at 350. A triable issue of fact regarding malice is raised "only if a jury could reasonably conclude that 'malice was the one and only cause for the publication'" of the disputed statements. *Id.* (quoting *Stukuls v. State of New York*, 366 N.E.2d 829, 835 (N.Y. 1977)). "If the defendant's statements were made to further the interest protected by the privilege, it matters not that the defendant *also* despised plaintiff." *Liberman*, 605 N.E.2d at 350.

26

Here, there is no evidence that the April 2005 letters were the product of ill will.  Glueck made his statements in these letters only to existing Pandora retailer customers, and, regardless of whether he harbored any additional "ill will" towards Plaintiff, it is clear from the face of the letters that his primary interest was in notifying his customers that Defendant considered sale of Plaintiff's products to violate the agreement signed by Defendant's retailers.  Because this is a legitimate interest protected by the privilege, a reasonable jury could not find that Glueck's statements were made with "ill will" toward the Plaintiff.

Defendant next asserts that Plaintiff has produced insufficient evidence of fault.  The level of fault required in a defamation action varies depending upon the person who is defamed and the context of the alleged defamation.  *See Chalpin v. Amordian Press, Inc.*, 515 N.Y.S.2d 434, 438 (App. Div. 1987).  Depending on the circumstances, either common law malice or "actual malice" is required to establish a claim.  *Id.*  These standards are identical to those of Plaintiff's slander of title claim.  As discussed, *supra*, Plaintiff has not produced sufficient evidence that the statements made in the April 2005 letters were made with either level of malice.  Summary judgment in favor of Defendant on Plaintiff's claim for defamation based on those statements is therefore granted.[9]

Plaintiff has raised a material question of fact that the remaining statements were made solely on the basis of ill will.  To prove this element under the common law standard of malice, however, a plaintiff must show that malice was the *only* motivation for the publication of the

---

[9] Defendant argued in briefing, without authority, that the alleged defamatory statements were not published because they were made to agents of Plaintiff.  This argument fails because, under New York law, transmission of a defamatory statement to an agent of the defamed satisfies the publication requirement for defamation.  *See Solas v. Jones*, No. 04-CV-2980, 2005 WL 525444, at *3 (S.D.N.Y. Mar. 7, 2005); *Teichner v. Bellan*, 181 N.Y.S.2d 842, 845 (App. Div. 1959); *Penn Warranty Corp. v. DiGiovanni*, 810 N.Y.S.2d 807, 814 (Sup. Ct. 2005).

statement.  *See Stukuls*, 366 N.E.2d at 835 (noting that on remand plaintiff would have to "successfully carry the burden of proving that malice was the one and only cause for the publication"); *Hoesten v. Best*, 821 N.Y.S.2d 40, 51 (App. Div. 2006) ("In order to establish a triable issue regarding common-law malice, a defamed plaintiff must show that a jury could reasonably conclude that the speaker spoke out of spite or ill will, and that such malicious motivation was the one and only cause for the publication." (internal quotation omitted)).  Here, there is evidence to support a conclusion that Defendant's agents were motivated by ill will, particularly with respect to the phone calls from Hofstrup to Chamilia retailers.  Plaintiff produced evidence that Defendant's agents made frequent angry phone calls to and often left agitated voicemail messages with Plaintiff's retailers.  These messages were made with sufficient hostility to support a finding that Defendant's agents acted with ill will when they made these statements.  *See Devoy v. Irish World & Am. Indus. Liberator Co.*, 203 N.Y.S. 369, 369 (App. Div. 1924) ("The plaintiff may prove malice in fact by showing actual hostility or ill will . . . .").

Plaintiff's defamation cause of action still fails, however, because Plaintiff has not produced sufficient evidence of "special damages" resulting from the trade show statements and the telephone calls.  Under New York law, "special damages" are defined "as the loss of something having economic or pecuniary value such as loss of profits," as opposed to other types of harm to reputation or community standing.  *See Wolf Street Supermarkets, Inc. v. McPartland*, 487 N.Y.S.2d 442, 448 (App. Div. 1985).  When a defamatory statement concerns the nature of a person's business, that statement is defamatory per se, and, at the pleading stage, special damages are presumed.  Under New York law, however, "all [damage] awards must be supported by competent evidence concerning the injury, although there need be no evidence

which assigns an actual dollar value to the injury." *Id. (*internal quotation omitted); *see also Fashion Boutique*, 314 F.3d at 59. Though Plaintiff argues it need not produce evidence of special damages, the authority it cites supports the opposite conclusion. *See Boule v. Hutton*, 320 F. Supp. 2d 132, 138 (S.D.N.Y. 2004) ("[T]he Second Circuit noted that '[w]here a statement impugns the basic integrity of a business, an action for defamation per se lies, and general damages are presumed. Nonetheless, actual damages must be proved with competent evidence of injury.'" (quoting *Boule v. Hutton*, 328 F.3d 84, 94 (2d Cir. 2003))).

Plaintiff alleges that it lost roughly thirty-two accounts due to Defendant's statements. Its evidence of these losses comes from two primary sources: (1) deposition statements from Julkowski, Shaw-Riley, and Whirlow regarding fifteen allegedly canceled accounts;[10] and (2) a signed declaration by Julkowski listing twenty allegedly canceled accounts, which Julkowski recalled based on his review of a Chamilia sales report.[11] To be considered on summary judgment, however, the statements in this deposition testimony and declaration must be admissible. "Supporting and opposing affidavits" filed in support of a summary judgment motion "shall be made on personal knowledge, shall set forth facts as would be admissible in

---

[10] Julkowski testified at his deposition that he knew of at least six of Plaintiff's customers that allegedly canceled their accounts because of Defendant's alleged statements: The General Store (Goggin Decl. Ex. D. ("Julkowski Dep.") 177-79); italiancharms.com (*id.* 184); Pat's / Carinie's (*id.*); Joy Store (*id.* 264); Seven Seas (*id.*); and Gift Gallery (*id.* 307). Shaw-Riley testified the same regarding five customers: Rustic Hutch (Goggin Decl. Ex. E. ("Shaw-Riley Dep.") 89, 128, 147); Charm Heaven (*id.* 89, 128, 145-46); Merle Norman (*id.* 89, 128); Details (*id.* 128); and the Kiosk at the Castleton Square Mall (*id.* 157-58). Whirlow testified the same regarding four customers: Carrots (Goggin Decl. Ex. F. ("Whirlow Dep.") 68, 78-79); Carina (*id.* 68, 78-79); Burlingame Stationaries (*id.* 94); and Ann's Hallmark (*id.* 105-06).

[11] Seventeen of the customers on Julkowski's list are additional names beyond those identified in the depositions; three are duplicative (the Joy Shop (called "Joy Store" in testimony); Seven Seas; and The General Store). (Decl. of Jeffrey Julkowski ("Julkowski Decl.") ¶ 4.)

evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated

therein." Fed. R. Civ. P. 56(e). "A court may therefore strike portions of an affidavit [in support

of summary judgment] that are not based upon the affiant's personal knowledge, contain

inadmissible hearsay or make generalized and conclusory statements." *Hollander v. Am.*

*Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999); *see also Patterson v. County of Oneida*, 375

F.3d 206, 219 (2d Cir. 2004) ("affidavit's [inadmissible] hearsay assertion is insufficient to

create a genuine issue for trial"); *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001)

("Affidavits submitted to defeat summary judgment must be admissible themselves or must

contain evidence that will be presented in an admissible form at trial."). At the summary

judgment stage, however, inadmissible affidavits may in practice guide the court to documentary

evidence in the record supporting their conclusions. *See, e.g., Societe Generale Energie Corp. v.*

*N. Y. Marine & Gen. Ins. Co.*, 368 F. Supp. 2d 296, 299 n.3 (S.D.N.Y. 2005); *Golden Pac.*

*Bancorp v. FDIC*, No. 95-CV-9281, 2002 WL 31875395, at *10 (S.D.N.Y. Dec. 26, 2002).

As an initial matter, almost all of the evidence that customers ceased purchasing

Plaintiff's products as a result of Defendant's statements is hearsay. For example, when asked

during his deposition how he knew that the owner of The General Store had canceled an order

because of Defendant's actions, Julkowski stated: "[The owner] told me personally she's

canceling her order because she just received a call from [Petersen]." (Julkowski Dep. 178:16-

18.) In purporting to explain why another customer, The Gift Gallery, canceled its Chamilia

order, Julkowski said: "[the customer] was told Pandora had a patent." (*Id.* at 308:1-3.) Asked

if he personally heard these statements, Julkowski replied: "no." (*Id.* at 307:17-19.)[12]

---

[12] In discussing other customers, Julkowski either offered similar testimony or provided
no basis to support his knowledge of the customers' motives in canceling their orders.

Explaining how she knew that Rustic Hutch, Charm Heaven, and Merle Norman had refused to buy Plaintiff's products as a result of Defendant's statements, Shaw-Riley said "they have told me."[13] (Shaw-Riley Dep. 89:15-20.) Whirlow gave similar testimony. (Whirlow Dep. 87.)

As hearsay, the evidence regarding Plaintiff's lost customers' motives for ceasing to buy their products is inadmissible unless it is supported by documentary evidence or other evidence that would be admissible at trial.[14] *See Santos*, 243 F.3d at 683. The only documentary evidence

---

[13] Shaw-Riley later testified that the reason Charm Heaven ceased carrying Plaintiff's products was Defendant's non-competition agreement with its vendors, which barred them from selling products similar to Defendant's. (Shaw-Riley Dep. 145-46.)

[14] Defendant has moved to strike paragraph four of the Julkowski Declaration on the grounds that it is based on inadmissible hearsay. (Def.'s Mem. of Law in Supp. of Def.'s Mot. to Strike Inadmissible Evid. 3-4.) Plaintiff argues that: (1) this statement was based on personal knowledge merely "informed" by the statements of others; and (2) the evidence is admissible as evidence of his "state of mind." As discussed, *supra*, Julkowski's testimony at his deposition, which the Court reads to avoid direct contradiction with his declaration, was that he knew these customers' motives for canceling their Chamilia orders based on their statements to him. Such hearsay-based personal knowledge is admissible only if supported by the documentary record. *See Santos*, 243 F.3d at 683. Plaintiff cites *Agfa-Gevaert, A.G. v. A.B. Dick Co.*, 879 F.2d 1518, 1523 (7th Cir. 1989), for the proposition that personal knowledge may be based on hearsay. That argument is not supported by the holding of *Agfa-Gevaert*. In that case, the issue was whether a business executive could testify to the quality of his own business' product when his opinion regarding that product was based on what the company's engineers had told him. The court held that he could, because the inference he would draw about the product's quality was the type of inference normally drawn by an executive in his position. Analogizing the situation to that of an expert witness, the *Agfa-Gevaert* court held that the business executive's inferences about his own product's quality were admissible. Here, the situation is entirely different. Julkowski is attempting to provide evidence about the *motive* of a customer for choosing not to purchase his product, and to introduce hearsay statements regarding those motives for their truth; he is attempting to testify that the motive of these customers was in fact what was said to him. Such evidence is hearsay and inadmissible.

The same analysis applies to Plaintiff's argument that these statements are admissible as related to Julkowski's state of mind. Although stating a valid exception to the hearsay rule, Julkowski's state of mind is here totally irrelevant. Plaintiff does not explain why it would be otherwise, although it is theoretically possible that Plaintiff would, at trial, offer such an argument. Therefore, while the Court does not consider paragraph four of the Julkowski Declaration sufficient to survive summary judgment, Defendant's motion to strike paragraph four of the Julkowski declaration is denied.

31

that has been offered in support of any of these claims is a report of Chamilia sales, listed by

customer, from January 1, 2004, through May 1, 2005. (Julkowski Decl. Ex. A.) Julkowski

stated in his declaration that this report refreshed his recollection as to which of Plaintiff's

customers canceled or refused to renew orders due to Defendant's alleged statements. (*Id.* ¶ 4.)

In that declaration, Julkowski listed twenty customers who allegedly canceled orders. This

evidence, however, is insufficient to justify Plaintiff's hearsay testimony. Plaintiff argues that

the sales report corroborates its agents' account that numerous customers began to cancel their

orders of Chamilia products at approximately the same time that Defendant was making its

statements. The report itself makes no mention of any customer's reasons for ending its

purchases. (*Id.* Ex. A.) Although the report lists numerous customers who ended their orders

between January 1, 2004, and May 1, 2005, it provides no support for the relevant material fact

that these terminations were a result of Defendant's statements. For instance, one of the

customers Julkowski identified as ending its purchases as a result of Defendant's statement,

Seven Seas, made numerous purchases from Chamilia up to October 2004, after which it

stopped. (*Id.* Ex. A at 13.) All the statements at issue in this case, however, were made either

prior to July 2004 or in 2005. Plaintiffs have not alleged that statements raising issues for this

case were made in October 2004. In addition, other customers identified by Julkowski had

vastly different purchasing behavior. For example, the General Store made a single purchase in

February 2005. (*Id.* Ex. A at 24.) Further, numerous customers not identified by Plaintiff as

ending their sales because of Defendant exhibited purchasing behavior similar to those

customers Plaintiff did identify. In short, this report does not support the inadmissible

statements made by Plaintiff's agents, nor does it by itself raise any inference that Plaintiff lost

sales because of Defendant's behavior. Even if it did raise such an inference, there is no

evidence linking that behavior *to the specific statements at issue in this case.* Plaintiff may not offer general proof of defamation and seek damages for those customers it speculates may have heard the defamatory statements. Plaintiff's burden is to offer proof of special damages running from the statements at issue in this case. *Cf. Fashion Boutique*, 314 F.3d at 61-62 (rejecting argument that jury could be allowed to infer other instances of slander based on those in evidence). Because Plaintiff has offered no admissible evidence of special damages, it has failed to raise a material issue of fact as to special damages. Thus, summary judgment in favor of Defendant on Plaintiff's defamation claim is granted.

F.  Product Disparagement

Under New York law, product disparagement consists of:  (1) a false statement; (2) published by Defendant to a third party; (3) with malice; and (4) with special damages. *See Gucci Am., Inc. v. Duty Free Apparel, Ltd.*, 277 F. Supp. 2d 269, 276 (S.D.N.Y. 2003); *Kirby v. Wildenstein*, 784 F. Supp. 1112, 1115 (S.D.N.Y. 1992).

As with the above causes of action, Plaintiff has failed to produce evidence of malice or special damages. There is an additional hurdle here, because, unlike Plaintiff's defamation claim, proof of *itemized* special damages is required. *See Fashion Boutique*, 314 F.3d at 60. Because Plaintiff has not produced sufficient evidence to raise a material question of fact as to malice, and has provided no admissible evidence on the issue of special damages, let alone any itemized damages, summary judgment in favor of Defendant on Plaintiff's product disparagement claim is granted.

G.  Tortious Interference with Prospective Business Relations

Plaintiff's next cause of action was pled as "tortious interference with advantageous relationships." No such tort exists under New York law. In its brief, however, Plaintiff

33

describes the claim as "tortious interference with prospective business relationships."[15]  A

tortious interference with prospective business relations claim requires that "plaintiff must

demonstrate that defendant 'interfered with the plaintiff's business relationships either with the

sole purpose of harming the plaintiff, or by means that were unlawful or improper.'"  *Redeye*

*Grill, L.P. v. Rest. Opportunities Ctr. of N.Y., Inc.*, 13 Misc. 3d 1212(A) (N.Y. Sup. Ct. 2006)

(quoting *71 Pierrepont Assocs. v. 71 Pierrepont Corp.*, 663 N.Y.S.2d 263, 263 (App. Div.

1997)).  To meet this requirement, "defendant's conduct [must be] motivated solely by malice or

to inflict injury by unlawful means, beyond mere self-interest or other economic considerations."

*Shared Commc'ns Servs. of ESR, Inc. v. Goldman Sachs & Co.*, 803 N.Y.S.2d 512, 513 (App.

Div. 2005).  Here, there is not even an allegation that non-economic considerations motivated

Defendant's statements, let alone that they were the sole type of motive.  Therefore, summary

judgment on Plaintiff's tortious interference claim is granted in favor of Defendant.  *See Newport*

*Serv. & Leasing, Inc. v. Meadowbrook Distrib. Corp.*, 794 N.Y.S.2d 426, 427-28 (App. Div.

2005) (affirming summary judgment in favor of defendant where defendant acted out of own

economic self-interest rather than solely out of desire to harm plaintiff).

---

[15] It appears that Plaintiff may have intended the more ambiguous wording to encompass both the tort of interference with prospective business relationships and the tort of interference with contract.  When Defendant responded to Plaintiff's claim as a tortious interference with contract claim, Plaintiff argued it as a tortious interference with prospective business relationships claim.  Setting aside the procedural propriety of this maneuver, Plaintiff's claim still fails if it is construed as for tortious interference with contract.  "'Tortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom.'"  *Fusco v. Fusco*, 829 N.Y.S.2d 138, 140 (App. Div. Jan. 9, 2007) (quoting *Lama Holding Co. v. Smith Barney*, 668 N.E.2d 1370, 1375 (N.Y. 1996)); *see also Accent Designs*, 827 F. Supp. at 965 (stating elements of tortious interference with contract under New York law).  Plaintiff has introduced no evidence of any existing contract that was breached as a result of Defendant's actions.  Therefore, such a claim fails as a matter of law.

H.  Unfair Competition

Both Plaintiff and Defendant treat Plaintiff's unfair competition cause of action as

identical to Plaintiff's Lanham Act claim.  Their authority for that position, *Lurzer GMBH v.*

*American Showcase, Inc.*, is a trademark infringement case.  73 F. Supp. 2d 327, 331 n.5

(S.D.N.Y. 1998) (quoting *Tri-Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 359 n.18

(S.D.N.Y. 1998)).  Traditionally, under New York law, an "unfair competition" claim referred to

various types of trademark infringement, such as "palming off" or creating confusion about a

person or corporation's trademark.  *See Ball v. United Artists Corp.*, 214 N.Y.S.2d 219, 226

(App. Div. 1961) (internal quotation omitted).  Although a common-law unfair competition

claim encompasses more than merely trademark actions,

> [t]he basis of the action at law is fraud, or deception or confusion
> of the public amounting to fraud, and resulting injury to plaintiffs.
> A right of recovery of damages in such an action exists only upon
> a showing that the defendants' acts were such as to amount to a
> fraud upon the plaintiffs or upon the public and that the plaintiffs
> have been injured thereby.

*Id.* (footnote omitted).  This standard is significantly different, and more stringent, than the

Lanham Act standards discussed *supra*.[16]  To demonstrate fraud under New York law, a plaintiff

must show that the defendant knowingly made a false statement.  *See Iannucci v. Viscardi*, 672

N.Y.S.2d 816, 816 (App. Div. 1998).  As discussed, *supra*, Plaintiff has produced insufficient

evidence that any of the statements made by Defendant's agents was knowingly false.

_____

[16] Some federal courts have recognized a New York tort of "unfair competition by
disparagement."  *See, e.g.*, *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 623 F. Supp. 1038,
1044 (E.D.N.Y. 1985).  This tort, however, is identical to "product disparagement."  *See id.* ("it
appears that this claim is redundant").  Thus, even if Plaintiff's claim could be differentiated
from the "unfair competition" claim described in this section, it would still be redundant with
Plaintiff's product disparagement claim, and summary judgment in favor of Defendants would
still be appropriate.

Therefore, summary judgment in favor of Defendant on Plaintiff's unfair competition claim is granted.

    I.  Declaratory Judgment

    Plaintiff seeks a declaratory judgment that Defendant lacks authority to threaten Plaintiff for patent infringement; that Plaintiff has not infringed Defendant's patents; and that Plaintiff is not liable for infringement.  Declaratory judgments are a discretionary remedy, and federal courts "'must be alert to avoid imposition upon their jurisdiction through obtaining futile or premature interventions, . . . [particularly] where a ruling is sought that would reach far beyond the particular case." *Jenkins v. United States*, 386 F.3d 415, 417 (2d Cir. 2004) (alteration in original) (quoting *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 243 (1952)).  Defendant argues that Plaintiff's request is premature, as Plaintiff's requested judgment concerns patent rights regarding a patent that, at the time the Complaint was filed and the time that the Parties briefed this motion, had not yet been issued.

    "The existence of an actual controversy is an absolute predicate for declaratory judgment jurisdiction." *GAF Bldg. Materials Corp. v. Elk Corp.*, 90 F.3d 479, 481 (Fed. Cir. 1996) (internal quotation omitted).  The standard inquiry for the existence of a controversy in a declaratory judgment regarding patent infringement looks to:  (1) whether the defendant in the action has engaged in conduct that created in the plaintiff a reasonable apprehension that it will face an infringement suit; and (2) that the plaintiff must have actually produced or prepared to produce the allegedly infringing device.  *Id.*  Where, as here, the Complaint alleges a dispute over the validity or infringement of "a possible *future* patent not then in existence," the district court cannot "know with certainty whether a patent would issue or, if so, what legal rights it would confer" and should therefore avoid issuing "an impermissible advisory opinion."  *Id.*

(emphasis added).  In such a case, the declaratory judgment action would not satisfy the actual

case or controversy requirement for federal jurisdiction at the time the complaint was filed.  *See*

*id.* at 484; *see also Dr. Reddy's Labs., Ltd. v. aaiPharama Inc.*, No. 01-CV-10102, 2002 WL

31059289, at *8 (S.D.N.Y. Sept. 13, 2002) ("It is axiomatic that [the plaintiff] cannot obtain a

declaratory judgment of invalidity and/or noninfringement on a patent that has not yet been

issued by the PTO at the time the complaint was filed.").

Therefore, summary judgment on Plaintiff's declaratory judgment requests must be

granted for Defendant.  Although Defendant has since been issued a patent on its products,

justiciability is evaluated at the time the complaint is filed, and "[t]he fact that the patent . . .

would have been granted before the court reached the merits of the case is of no moment."  *GAF*

*Building*, 90 F.3d at 482; *see also Eldridge v. Springs Indus.*, 882 F. Supp. 356, 357 (E.D.N.Y.

1995) ("It is well settled that a patent cannot be infringed until after that patent has been

issued.").  Plaintiff argues that, as it also seeks injunctive relief, there is no requirement that the

patent have issued.  It cites for authority one sentence of *Blank* stating that a Lanham Act

claimant need not "hold a competing patent or even be engaged in the same industry."  *Blank*,

916 F. Supp. at 173.  That case, however, states the law relating to the Lanham Act and is

irrelevant to Plaintiff's request for declaratory relief regarding *patent infringement from a patent*

*not yet in existence*.  Plaintiff has cited no authority for the proposition that this Court has, let

alone should exercise, the power to enjoin future patent infringement proceedings when no

patent had issued at the time the complaint was filed.  If such authority exists, it is discretionary,

and the Court declines to exercise it.  *See Jenkins*, 386 F.3d at 417.

### III.  Conclusion

Defendant's Motion for Summary Judgment is GRANTED in its entirety.  Defendant's Motion to Strike Evidence is DENIED as moot.  The Clerk of the Court is directed to terminate all pending motions on the docket (Docket Nos. 25, 66) and to close the case.

SO ORDERED.

Dated:       September 24, 2007
             New York, New York

                                        KENNETH M. KARAS
                                        UNITED STATES DISTRICT JUDGE